# MARKET VALUE APPRAISAL OF
# THREE 1.5-ACRE SUB-SITES OF THE
# 4.501-ACRES OF LAND
# ON THE WEST SIDE OF PARK PLACE BOULEVARD
# IMMEDIATELY SOUTH OF MADISON CENTRAL DRIVE
# MADISON, MADISON COUNTY, MISSISSIPPI



AS OF:

JULY 2, 2010

PREPARED FOR:

T.E. WALKER, CHAIRMAN AND CEO
BANK OF FOREST
POST OFFICE BOX 60
FOREST, MISSISSIPPI 39074

PREPARED BY:

F. BARR BIGGS, MAI
POST OFFICE BOX 12231
JACKSON, MISSISSIPPI 39236



EXHIBIT
B

# F. Barr Biggs, MAI



*Appraisals – Consulting*

P.O. BOX 12231 · JACKSON, MISSISSIPPI 39236-2231
PHONE (601) 853-0736 · FAX (601) 853-6955
barrmai@aol.com

July 13, 2010

T.E. Walker, Chairman and CEO
Bank of Forest
Post Office Box 60
Forest, Mississippi 39074

RE:    Appraisal of three 1.5-acre sub-sites of the 4.501-acres of land on the west side of Park
        Place Blvd. immediately south of Madison Central Drive in Madison, Madison County,
        Mississippi

Dear Mr. Walker:

At your request and authorization, I have completed a real estate appraisal of the above
referenced property.  I have made an inspection of the property, investigated the current real
estate market, and analyzed the resulting data in order to estimate its market value.

As a result of my investigation and analysis, it is my opinion that the subject property's fee
simple, market value as of July 2, 2010 is as follows:

|  |  |
|---|---|
| **NORTHERN SUB-SITE** | **$415,000** |
| **CENTRAL SUB-SITE** | **$395,000** |
| **SOUTHERN SUB-SITE** | **$395,000** |
|  |  |
| **TOTAL** | **$1,205,000** |

*This total above is simply the sum of the 3 sub-sites and does not reflect any discount for the time
it would take to sell all 3 sub-sites or any holding costs.*

*The values for the central and southern sub-sites are reflective of site work/fill costs associated
with each and assume a letter of map amendment (LOMA) waiving the requirement for flood
insurance.  The cost was estimated based on interviews with knowledgeable professionals
familiar with this type work in this market and believed relatively accurate.  However, should the
actual cost vary, the value would change accordingly.  While current flood maps show the
overall site to be within a flood hazard, the client was lead to believe that the site was not
impacted by such flood plain.  If this were to be the case, the value of each sub-site would be
$415,000, which would total $1,245,000.  This scenario would be a hypothetical condition based
on the appraiser's observations.*

*The value is reflective of a zoning change from R-2 to C-2 for a small portion of the site.  While the probability of accomplishing this is near 100%, the zoning situation is a hypothetical condition and if the zoning change were unsuccessful, the value conclusion would be inaccurate.*

The following report, including its Addendum, is a *Self Contained Appraisal Report*, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for a Self-Contained Appraisal.  As such, a comprehensive level of detail is used to describe the presentation of information.  The appraiser is not responsible for unauthorized use of this report.

Respectfully submitted,

F. Barr Biggs, MAI
State Cert. # GA-297

# TABLE OF CONTENTS

Title Page
Letter of Transmittal
Table of Contents

**Introduction**
Purpose of the Appraisal................................... 1
Property Rights Appraised................................. 1
Use of Appraisal.......................................... 1
Scope of Work............................................ 2

**Descriptive Section**
Location Description...................................... 3
Neighborhood Description................................. 3
Site Description.......................................... 5
Real Estate Taxes........................................ 6
Ownership and History.................................... 6
Highest and Best Use..................................... 7

Site Valuation........................................... 9

**Exposure Time**......................................... 19
**Environmental Statement**............................... 19
**Summary and Limiting Conditions**...................... 19
**Certification**......................................... 22

**Addendum**
Subject Photos
Legal Description
Survey
Flood Maps
Appraiser Qualifications

# SELF CONTAINED APPRAISAL REPORT

**PURPOSE OF THE APPRAISAL:**  The purpose of this appraisal is to provide the appraiser's best estimate of the market value of the subject real property as of the effective date.  For the purpose of this report, the term "market value" is defined as follows:

*The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*

1. *buyer and seller are typically motivated;*

2. *both parties are well informed or well advised, and acting in what they consider their best interests;*

3. *a reasonable time is allowed for exposure in the open market;*

4. *payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and*

5. *the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]*

**PROPERTY RIGHTS APPRAISED:**  The fee simple estate in the subject property is appraised.

**Definition of Fee Simple Estate**
*Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[2]*

**USE OF THE REPORT:**  This appraisal is intended to provide an estimate of the current market value of the subject property for the client's internal decision making.

---

[1] The Uniform Standards of Professional Appraisal Practice (USPAP), Copyright 2010 by the Appraisal Foundation, page A-105.

[2] Appraisal Institute, The Dictionary of Real Estate Appraisal, Fourth Ed., (Chicago: Appraisal Institute, 2002), page 113.

F. Barr Biggs, MAI

**SCOPE OF WORK:**  In preparing this appraisal, the appraiser

- inspected the subject site;

- gathered information on comparable land sales in the area by interviewing brokers, developers, and other appraisers with direct marketing knowledge;

- made adjustments to the sales for their differences relative to the subject;

- reconciled a reasonable value based on the adjusted land sales.

The type, extent and level of research and analysis completed is deemed appropriate as it best reflects the market and the most meaningful valuation methodology for this form of real estate.

## DESCRIPTION OF REAL ESTATE APPRAISED

**LOCATION DESCRIPTION:**  The subject is physically located in the southwest quadrant of Madison Central Drive and Park Place Boulevard in Madison, Madison County, Mississippi.

**NEIGHBORHOOD DESCRIPTION:**  The boundaries of the neighborhood include State Highway 463 to the north, Interstate 55 (I-55) to the east, Lake Castle Road to the south, and North Livingston Road to the west. This is essentially the southwestern sector of the City of Madison.  Highland Colony Parkway is the primary focus of this neighborhood with a variety of quality uses ranging from multiple church/school campuses to high intensity retail along with some single family residential and suburban office development.

Highland Colony Parkway (The Parkway), a nearly 8-mile-long, 4-lane, divided boulevard with attractive lighting and signage, was completed about 16 years ago.  It extends from Interstate 220 on its southern end to State Highway 463 (SH-463) on its northern end linking the western sectors of the cities of Madison and Ridgeland.  Property value and the intensity of development has blossomed in the later years.  In fact, in the last several years, a precedence has been set for high-profile, larger scale office and retail users choosing this neighborhood as their new location. In terms of a prestigious address, value enhancement, and investment risk, it is the appraiser's judgement that this neighborhood has an excellent outlook and promise especially when the economy and financial markets improve.

Factors that are fueling the growth include: good accessibility; investment opportunity (owning investment grade, growth oriented real estate versus renting); the very strong residential base of Madison County west of Interstate 55; and the synergy of retail property recently added.

At the northwest corner of The Parkway/Bozeman Road and SH-463 is the relatively new Colony Crossing, a 46-acre retail development.  Properties around the Kroger anchored, shopping center include:  BancorpSouth branch bank, CVS drugstore, Exxon gas/convenience store, Wendy's restaurant, a Home Depot (130,000 SF), a Hilton Garden Inn, Bone Fish Grill, and an upscale liquor store.  With the Kroger anchor store and in line retail space, the shopping center comprises over 150,000 square feet.

Key office park exists at the southwest corner of The Parkway and SH-463.  It is an established suburban office park with relatively small offices of brick and wood frame design.  Several branch banks oriented toward SH-463 are a part of this development cluster as well.

In this the northeastern sector of the neighborhood are several medically related developments. First, Baptist Health Services of Jackson, in the last several years has completed a $6.2 million, 15,000 square foot outpatient surgery and a $1.1 million, 5,000 square foot diagnostic imaging center on a 60-acre tract south of SH-463 and between I-55 and Highland Colony Parkway.

Second, is a $4.8 million office complex for the Mississippi Hospital Association along the north side of SH-463 between The Parkway and I-55.

Third, is a physician-owned, Highland Medical Arts Building.  This property is located on a 7-acre site south of the Baptist development.  The 81,000 square foot, 2-story, facility provides radiological and gastroenterological services, as well as other services.

Two new, high-end, relatively large bank buildings (Bank First and Merchants & Farmers) exist along the Parkway in this vicinity as well.  The Bank First property is located at the entrance to the Fountains of Madison, which is a development along a drive that loops behind Key Office Park to SH-463.

Broadmoor Baptist Church, Madison Central High School, and Cypress Lake residential subdivision comprise 3 large land uses along the west side of The Parkway in the northern section of the neighborhood.  This is the district in which the subject is located.  It is noted that Cypress Lake, a large-scale, good quality single family residential district includes a Courthouse fitness club.  The commercial subdivision known as One Madison Plaza, which is at the northeast corner of Lake Castle and Highland Colony Parkway includes a 35,000 square foot, relatively new, very good quality office condominium building.  Another office property (16,000 SF) of similar design was finished in 2008 in this office park.

Along Lake Castle Road, the southern border of the neighborhood, are a couple of single family residential developments.  The newest of these is Adderly Gardens, which was developed in the mid to late 90's.  This gated community contains upper scale homes.  Lake Castle is an older development that was first platted in 1973 and had later development in the 80's and mainly contains 1980's vintage style homes situated around Lake Castle.

Land use in the western portion of the neighborhood is more rural in nature and includes acreage tracts with estate-type homes and hobby farms.

Access for the neighborhood is very good.  A full modern interchange is available at the SH-463/I-55 intersection.  One-way frontage roads are planned to run parallel on each side of I-55 between SH-463 and Steed Road in Ridgeland with an additional interchange at Lake Castle Road.  This means that the I-55 frontage road will be accessible in the future via Lake Castle Road.  A segment of this frontage is now in place on the west side of I-55 between Steed and Old Agency Roads.

In summary, the neighborhood is highlighted by the Highland Colony Parkway corridor between SH-463 and Lake Castle Road.  As described, the uses along this Parkway are the area's highest quality and most well conceived of their particular varieties.  With the interchange at Madison not to mention the future interchange at Lake Castle Road and proposed frontage road system between Madison and Ridgeland together with the good quality retail along SH-463 at Bozeman/Highland Colony Parkway and the above standard residential uses west of Interstate 55, the outlook for the neighborhood is among the best in its region especially when the economy and financial markets improve.

**OVERALL SITE DESCRIPTION:**

**Size**

The site is comprised of three, 1.5-acre sub-sites of the total 4.501 acres.

**Shape**

Irregular - refer to the facing page for a visual account.

**Frontage**

The total frontage for the full 4.501-acres is approximately 687 feet on the west side of Park Place Blvd.  After dividing the total site into three equal sub-sites, each site would have adequate frontage along Park Place Blvd.

**Access**

Cecil Palmer with the City of Madison Planning and Zoning Department stated that access along the subject's Park Place Blvd. frontage could be granted at locations where there is a crossover in the median.  The overall subject site has three potential access points along the west side of Park Place Blvd.; one at its northeast corner, one just south of the ditch near the central portion of the property, and one at its southeast corner.  Therefore, each sub-site would have access from Park Place Blvd.

**Topography**

While it is below the grade of its frontage the total site is relatively level.  The central sub-site is level except near the ditch, while the northern site gradually slopes downward from north to south towards the ditch that traverses the central sector of the total site.  The southernmost sub-site has an opposite gradual downward slope from south to north towards the ditch.

**Flood Hazard**

According to Flood Insurance Rate Map Community Panel Number 28089C0557F, dated March 17, 2010, approximately 65% or 2.910-acres in the southern sector of the overall subject property is located in the 100-year flood zone, which leaves 35% of the site or 1.591-acres in the northern sector and also a portion of the southeast corner of the subject property outside of both the 100- and 500-year flood zones.  The area of the site located in the flood plain was scaled by the appraiser and while perceived relatively accurate, a more legally binding area would need to be provided by a certified, professional land surveyor.

The northernmost sub-site is located outside any flood zones while the remaining two sub-sites are essentially covered with the 100-year flood plain.

**F. Barr Biggs, MAI**

| | |
|---|---|
| **Zoning** | The subject zoning is both C-2, General Commercial and R-2 Single Family Residential by the City of Madison.  The R-2 portion is a relatively narrow strip oriented east/west across a portion of the southern sector of the site. |
| **Utilities** | All utilities are located south of the subject property at the Highland Colony Parkway with the exception of sanitary sewer, which is available to the subject site (gravity flow in ditch traversing site from east to west). |
| **Adjoining Uses** | North - Madison Central Drive; vacant, undeveloped land<br>East - Park Place Blvd.; vacant, undeveloped land<br>South - Vacant, wooded, undeveloped land fronting H.C. Pkwy<br>West - Madison Central High School campus (football field) |

**REAL ESTATE TAXES:**  For ad valorem tax purposes, the subject is under the jurisdiction of Madison County and Madison County Schools.  The current millage rate for the subject's taxing district is $115.18.  The subject property is three 1.5-acre sites (4.501-acres) of Parcel #: 071A-12B-9/13, which comprises 32.22 total acres.  The total true value (use value) for this parcel is $6,830 or $212 per acre.  Therefore, the allocated use value for each individual subject sub-site is only approximately $318 (1.5-acres x $212).

Using the current millage rate, the annual tax expense for each of the subject sub-sites is calculated as shown below.

$$\$318 \times 15\% = (\$47.70 \ x \ 0.11518) = \$5$$

Obviously, once developed the true value will increase dramatically and be based on a more market reflective figure.

**OWNERSHIP AND HISTORY:**  The subject site is currently in the name of Hanover Investments, LLC.  It is a 4.501-acre portion of the 100.762-acre tract that was purchased from G & B Investments Inc. in July 2008 according to the Warranty Deed recorded in Deed Book 2338, Page 304 in the Office of the Chancery Clerk of Madison County.  At closing Hanover Investments, LLC paid 5 million dollars cash as a down payment for the subject property's parent tract, which was later found to be 95.70-acres, and executed a Promissory Note with G&B Investments Inc. for the balance due under the contract in the amount of 11 million dollars.  Hanover Investments misrepresented their intentions and financial wherewithal and fraudulently induced G&B to enter into and close this transaction.  Therefore, the purchase price of $16,000,000 is not reflective of an armslength transaction.  It is noted that this is the only transfer of title within the appraiser's required three year title history.

Subsequently, Deeds of Trust were entered into between the owner and Bank of Forest involving

the subject property.  Misrepresentation regarding ownership was also involved with these Deeds of Trust concerning the subject property.

Most recently in May 2010, with respect to the 95.70-acre parent tract, a "Complaint to Determine Validity, Priority, and Extent of Liens" was filed in the United States Bankruptcy Court for the Southern District of Mississippi by G & B Investments Inc. against Hanover Investments, LLC (and other entities).

## HIGHEST AND BEST USE:

**Highest and best use as if vacant:** Based on the legally permissible, physically possible, and financially feasible uses, it appears that the maximally productive use for the subject site is for some type of limited commercial use most likely office development.  This conclusion is influenced by the zoning and the trend for such in the immediate vicinity.  With regard to zoning, Cecil Palmer, with the City of Madison, reported that changing the R-2 to C-2 should be easy to accomplish.  Nevertheless, the zoning situation is a hypothetical condition.

Also, as mentioned previously in the Site Description, 65% (approximately 2.910-acres) of the subject property's southern sector is located in the 100-year flood plain, while the northern sector and a portion of the southeast corner are located outside both the 100- and 500-year flood zones. With regard to the subject's 3 sub-sites, the northern site would be located outside of any flood zones, while the central and southern sub-sites would be essentially covered with the 100-year flood plain.  The central and southern sub-sites are generally similar; therefore, they will be discounted the same.  Based on data provided by Tom McDonald (registered land surveyor), the elevation of the flood plain is actually at or slightly above the 352 base flood elevation.  The building pad for both sub-sites impacted by flood hazard would need to be graded to remove the existing substandard soils involved therein.  According to *Marshall and Swift Cost Manual*, this grading/surplus removal cost is $0.25 per square foot.  In accordance with typical ground floor area ratios of about 17.5% in this market area, the appraiser estimates the ground floor building area at about 11,435 square feet (1.5-acres x 43,560 SF x 17.5%) for each of the hypothetical building pads within the flood plain.  Using this information, the grading/substandard soil removal cost is estimated at $2,859 (11,435 SF x $0.25/SF).

After the grading/substandard soil removal, the appraiser estimates about 3 feet of fill would be needed for each hypothetical building pad in the southern two sub-sites so that the building pad elevation would be at the required 2-feet above flood plain level.  After consulting with Bob Barnes, Land Surveyor and Dwayne Ballard, with DBB construction, a price for 1 foot of fill for 1 acre of building area costs $20,000 or $0.46/SF.  This includes the cost for the fill dirt, hauling, grading, and proper compacting.  After applying this cost to the 11,435 square feet of ground floor area, the total cost for the dirt work would be approximately $15,780 (11,435 SF x $0.46/SF x 3 feet).

The total dirt work cost for each of the 2 sub-sites impacted by the flood plain equates to $18,639 ($2,859 + $15,780) and will be applied respectively for the central and southern sub-sites.

With the fill work properly completed and documented, a letter of map amendment (LOMA)

could be obtained from FEMA, which would waive the requirement for flood insurance.

The subject property would also require utilities to be available to the site.  According to the Public Works Director for the City of Madison, Denson Robinson, the closest location to tap into water, gas, electricity and telephone is at Highland Colony Parkway, which is approximately 425 feet south from the southeastern corner of the southernmost sub-site along Park Place Blvd. However, to provide utilities to all three sub-sites the utilities would have to be extended an extra 495 feet north to the southeast corner of the northernmost sub-site.  Therefore, the total length the utilities would have to travel is 920 feet.  In an attempt to estimate the cost to bring these utilities to the subject sub-sites the appraiser used *Marshall & Swift Cost Manual* and the total estimated cost would be approximately $78,798 or $26,266 per each individual sub-site.

**F. Barr Biggs, MAI**

# SITE VALUATION

**Introduction**
In this section of the report a valuation of the site will be completed.  This site value is based on the potential highest and best use, as vacant.

**Site Valuation Techniques**
The 4 procedures used to value land are:

1. Sales comparison
2. Allocation
3. Extraction
4. Income Capitalization
   a. Direct Capitalization techniques
      1. Land residual
      2. Ground rent capitalization

   b. Yield capitalization techniques
      (a)   Discounted cash flow (subdivision development analysis)

The Sales Comparison Approach, which is the most common and preferred method when land sales are available, has been employed in estimating the value of the sites as vacant.  It involves gathering data on actual sales, listings, offers, and options of similar parcels of land.  These similar sales are analyzed, compared, and adjusted for a value indication appropriate for the subject.

The greatest weight is placed on the most similar actual land that occurred at times relatively concurrent with the date of the appraisal and subject to similar conditions.  Comparable sales are analyzed in terms of similarity to, and differences from, the subject property.  The sales, in order

to be considered comparable, must be voluntary, bona fide, recent and similar to the subject in regard to physical and locational characteristics.  Elements of comparison include:

- property rights
- financing terms
- conditions of sale (motivation)
- market conditions (sale date)
- location
- physical characteristics (size, shape, frontage, topography, location, and view)
- available utilities
- zoning

Adjustments to the sales for variances in their elements of comparison are applied using matched pairs, if possible.  Final adjusted prices are then analyzed to derive a unit value applicable to the subject site.  When applied to the appropriate unit measure, a value estimate for the site is obtained.  Examples of unit prices include the following:

- Price per Square Foot
- Price per Acre
- Price per Front Foot
- Price per dwelling unit

The following pages contain the market information used to estimate the value of the subject site.

**F. Barr Biggs, MAI**

### LAND SALE NO. 1

| | |
|---|---|
| **LOCATION:** | W/S Park Place Boulevard 1 block south of SH-463<br>Madison County, Mississippi |
| **SECTIONAL REFERENCE:** | Section 12, Township 7 North, Range 1 East |
| **GRANTOR:**<br>**GRANTEE:** | G & B Investments, Inc.<br>Elizabeth N. Craft |
| **DATE:**<br>**RECORDING DATA:** | November 19, 2007<br>Book 2259, Page 865 |
| **SALES PRICE:**<br>**UNIT PRICE:** | $696,960<br>$8.00 per square foot |
| **SIZE:**<br>**ZONING:**<br>**UTILITIES:**<br>**FLOOD HAZARD:** | 2.00 acres (87,120 SF)<br>C-2, Restricted Commercial<br>See comments<br>None |
| **COMMENTS:** | The intended use for this property is professional office.  At the time of sale the site was to be incorporated by the City of Madison and the zoning would be C-2 Commercial.  The buyer mistakenly assumed that full utilities would be provided in the immediate future. |

**F. Barr Biggs, MAI**

## LAND SALE NO. 2

| | |
|---|---|
| **LOCATION:** | NWS of Highland Colony Parkway between Key Office Park and Fountains of Madison |
| | Madison, Madison County, Mississippi |
| | |
| **SECTIONAL REFERENCE:** | Sections 12, Township 7 North, Range 1 East |
| | |
| **GRANTOR:** | Wilson Real Estate, LLC |
| **GRANTEE:** | JB Investments, LLC |
| | |
| **DATE:** | June 25, 2009 |
| **RECORDING DATA:** | Book 2442, Page 222 |
| | |
| **SALES PRICE:** | $625,000 |
| **UNIT PRICE:** | $7.80 per square foot |
| | |
| **SIZE:** | 1.84 acres (80,150 SF) |
| **ZONING:** | C-1, Restricted Commercial |
| **UTILITIES:** | All available |
| **FLOOD HAZARD:** | None |
| | |
| **COMMENTS:** | The buyer plans to develop a medical office on this site. |

## LAND SALE NO. 3

| | |
|---|---|
| **LOCATION:** | NEC of Bozeman Road & Highway 463<br>Madison, Madison County, Mississippi |
| **SECTIONAL REFERENCE:** | Section 7, Township 7 North, Range 2 East |
| **GRANTOR:** | Bank of Yazoo City |
| **GRANTEE:** | Community Bank of Mississippi |
| **DATE:** | December 27, 2007 |
| **RECORDING DATA:** | Book 2271, Page 398 |
| **SALES PRICE:** | $1,650,000 |
| **UNIT PRICE:** | $8.79 per square foot |
| **SIZE:** | 4.31 acres (187,744 SF) |
| **ZONING:** | C-2 (see comments) |
| **UTILITIES:** | All available |
| **FLOOD HAZARD:** | None |
| **COMMENTS:** | The original price was negotiated at $12/SF when it was zoned C-3; however, the city wanted limited commercial in this area and the site was down-zoned to C-2. |

**F. Barr Biggs, MAI**

## LAND SALE NO. 4

| | |
|---|---|
| **LOCATION:** | N/S Trace Colony Park Drive |
| | 4 parcels west of Highland Colony Parkway |
| | Ridgeland, Madison County, Mississippi |
| **SECTIONAL REFERENCE:** | Section 25, Township 7 North, Range 1 East |
| **GRANTOR:** | Calvert Properties Inc. |
| **GRANTEE:** | First South Farm Credit |
| **DATE:** | August 29, 2007 |
| **RECORDING DATA:** | Book 2232, Page 390 |
| **SALES PRICE:** | $315,810 |
| **UNIT PRICE:** | $7.25 per square foot |
| **SIZE:** | 1.00 acres (43,560 SF) |
| **ZONING:** | C-1, Restricted Commercial District |
| **UTILITIES:** | All available |
| **FLOOD HAZARD:** | None |
| **COMMENTS:** | A 7,300 SF professional office building for the buyer's company was completed on this site in 2008. |

**F. Barr Biggs, MAI**

## LAND SALE NO. 5

**LOCATION:**  N/S Trace Colony Park Drive
1 parcel west of Highland Colony Parkway
Ridgeland, Madison County, Mississippi

**SECTIONAL REFERENCE:**  Section 25, Township 7 North, Range 1 East

**GRANTOR:**  Simoda Properties, LLC
**GRANTEE:**  Roundtree Energy, LLC

**DATE:**  April 24, 2007
**RECORDING DATA:**  Book 2181, Page 985

**SALES PRICE:**  $311,454
**UNIT PRICE:**  $7.15 per square foot

**SIZE:**  1.00 acres (43,560 SF)
**ZONING:**  C-1, Restricted Commercial District
**UTILITIES:**  All available
**FLOOD HAZARD:**  None

**COMMENTS:**  A low density, professional office building for the buyer's
oil company has been completed on this site.

## LAND SALE NO. 6

**LOCATION:** The Commons Office Park NWC Highland Colony Parkway and Hanover Circle
Ridgeland, Madison County, Mississippi

**SECTIONAL REFERENCE:** Section 25, Township 7 North, Range 1 East

**GRANTOR:** Highland Colony L.P.
**GRANTEE:** Telephone Electronics Corporation

**DATE:** December 28, 2006
**RECORDING DATA:** Book 2138, Page 222

**SALES PRICE:** $731,332
**UNIT PRICE:** $5.57 per square foot

**SIZE:** 3.14 acre (136,778 SF)
**ZONING:** C-1, Restricted Commercial District
**UTILITIES:** All available
**FLOOD HAZARD:** None

**COMMENTS:** Upon acquisition the buyer intended to build a 20,000 SF building that they would occupy.

**F. Barr Biggs, MAI**

The value of the subject's raw land is estimated using the Sales Comparison Approach. A summary of the land sales analyzed is illustrated below.

| SUMMARY OF COMPARABLE LAND SALES | | | | | |
|---|---|---|---|---|---|
| Sale No. | Location/ Description | Date of Sale | Zoning | Size Acres | Price/ SF |
| 1 | W/S Park Place Blvd. south of SH-463 | 11-07 | C-2 | 2.00 | $8.00 |
| 2 | NWS H.C. Parkway between Key Office Park and Fountains of Madison | 06-09 | C-1 | 1.84 | $7.80 |
| 3 | NEC Bozeman Rd. & SH-463 | 12-07 | C-2 | 4.31 | $8.79 |
| 4 | N/S Trace Colony Park Drive 4 parcels west of H.C. Pkwy | 08-07 | C-1 | 1.00 | $7.25 |
| 5 | N/S Trace Colony Park Drive 1 parcel west of H.C. Pkwy | 04-07 | C-1 | 1.00 | $7.15 |
| 6 | NWC H.C. Parkway and Hanover Circle | 12-06 | C-1 | 3.14 | $5.57 |
| Subj. | W/S of Park Place Blvd. just south of Madison Central Drive | 07-09 | C-2 | 1.50 | -------- |

The appraiser was able to uncover 6 land sales with similar highest and best uses located on or near Highland Colony Parkway. The sales ranged in value from $5.57 to $8.79 per square foot with a mean of $7.43 per square foot. Sale 3 sets the upper limit in this range due to its superior location at the intersection of Bozeman Road and SH-463 and its superior market conditions element of comparison. The lower end of this range is represented by Sale 6 at $5.57 per square foot. Since the sale is larger than the subject sub-sites and almost 4 years old, it is regarded as less meaningful. Sales 4 and 5 are also less meaningful due to their location south of the Natchez Trace along the southern segment of the Parkway.

Sales 1 and 2 are the most meaningful relative to the subject property. Sale 1 is located just north of the subject property at the northwest corner of Park Place Boulevard and Madison Central Drive. It is generally similar in size and zoning; however, it is superior in terms of market conditions. Over the past 2 to 3 years, market conditions have declined between 10% and 15% based on paired sales from office park land sales along Highland Colony Parkway. For example, an early 2007 office lot sale with Highland Colony Parkway frontage in The Commons office park sold at $6.00 per square foot and a late 2008 lot sale of similar size, but at an interior

location sold for $4.36 per square foot showing an approximate 27% downward adjustment. After considering a reasonable premium for the Parkway frontage, the effective market condition adjustment for the last 2 to 3 years is estimated at between 10% and 15%.  This indication is supported by a comparison of market rent and capitalization rates for office property from a few years ago to those of today.  After adjusting Sale 1 downward 12.5% for market conditions, its price per square foot is approximately $7.00.  Sale 2 sold with similar market conditions and is also similar in size, relative to the subject.  However, its superior location along the Parkway nearer its intersection with SH-463 requires a downward adjustment for location.  The appraiser estimates a 15% downward adjustment for location, which would bring Sale 2's price per square foot to approximately $6.63.  In light of the available data provided by the two adjusted sales the appraiser concludes the subject's market value at **$6.75** per square foot assuming the subject has full utilities and no flood plain.  However, as analyzed in the Highest and Best Use the cost for utilities and flood hazard related costs must be reflected.

The following calculation shows the value indication of the Site Valuation.

| | |
|---|---:|
| Northern sub-site (1.5-acres x 43,560 SF x $6.75) | $441,045 |
| Utility related costs | - $26,266 |
| | |
| Value Indication | $414,779 |
| Rounded to, | **$415,000** |
| | |
| | |
| Central sub-site (1.5-acres x 43,560 SF x $6.75) | $441,045 |
| Utility related costs | -   $26,266 |
| Flood Hazard related costs | - $18,639 |
| | |
| Value Indication | $396,140 |
| Rounded to, | **$395,000** |
| | |
| | |
| Southern sub-site (1.5-acres x 43,560 SF x $6.75) | $441,045 |
| Utility related costs | -   $26,266 |
| Flood Hazard related costs | - $18,639 |
| | |
| Value Indication | $396,140 |
| Rounded to, | **$395,000** |

## EXPOSURE/MARKETING TIME

Exposure time is the time period assumed to have occurred prior to the date of the appraisal as required in the definition of market value.  The subject property is assumed to be exposed on the market for a reasonable period of time, then the sale takes place as of the appraisal date.  Marketing time is essentially the same except it follows the date of the appraisal.  Properties of the subject's size and type, typically, require exposure on the open market for six months to one year for a sale to occur.

This does not assure a six to twelve month exposure time for the subject at the appraised value.  An appraisal generally derives a market value estimate, which is based on properties that have been exposed to the market, prior to the date of appraisal, under market conditions which may have differed from market conditions in the future.  Adverse or favorable market conditions arising subsequent to the date of appraisal may extend or shorten the required exposure time at any given price.

## ENVIRONMENTAL STATEMENT

No environmental hazards were noted, nor were there signs (i.e. dead vegetation, chemical spills, unusual odors) which indicated that an environmental hazard exists.  The appraisers, however, are not experts at detecting environmental hazardous conditions and has based the final value estimate in this appraisal on the assumption that no such condition exists on or near the subject property.

## SUMMARY AND LIMITING CONDITIONS:

1.    This is a Summary Appraisal Report which is intended to comply with the reporting requirements set forth under Standard Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report.  As such, it might not include full discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraisers' opinion of value.  Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file.  The information contained in this report is specific to the needs of the client and for the intended use stated in this report.  The appraiser is not responsible for unauthorized use of this report.

2.    No responsibility is assumed for legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated in this report.

3.    The property is appraised free and clear of any or all liens and encumbrances unless otherwise stated in this report.

4.    Responsible ownership and competent property management are assumed unless otherwise stated in this report.

5.  The information furnished by others is believed to be reliable.  However, no warranty is given for its accuracy.

6.  All engineering is assumed to be correct.  Any plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

7.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

8.  It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in this report.

9.  It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in this appraisal report.

10.  It is assumed that all required licenses, certificates of occupancy or other legislative or administrative authority from any local, state, or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report are based.

11.  Any sketch in this report may show approximate dimensions and is included to assist the reader in visualizing the property.  Maps and exhibits found in this report are provided for reader reference purposes only.  No guarantee as to accuracy is expressed or implied unless otherwise stated in this report.  No survey has been made for the purpose of this report.

12.  It is assumed that the utilization of the land improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless otherwise stated in this report.

13.  The appraiser is not qualified to detect hazardous waste and/or toxic materials.  Any comment by the appraisers that might suggest the possibility of the presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials.  Such determination would require investigation by a qualified expert in the field of environmental assessment.  The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property.  The appraiser's value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value unless otherwise stated in this report.  No responsibility is assumed for any environmental conditions, or for any expertise or engineering knowledge required to discover them.  The appraisers' descriptions and resulting comments are the result of the routine observations made during the appraisal process.

14.     Unless otherwise stated in this report, the subject property is appraised without a specific
        compliance survey having been conducted to determine if the property is or is not in
        conformance with the requirements of the American with Disabilities Act.  The presence
        of architectural and communications barriers that are structural in nature that would
        restrict access by disabled individuals may adversely affect the property's value,
        marketability, or utility.

15.     Any proposed improvements are assumed to completed in a good workmanlike manner in
        accordance with the submitted plans and specifications.

16.     The distribution, is any, of the total valuation in this report between land and
        improvements applies only under the stated program of utilization.  The separate
        allocations for land and buildings must not be used in conjunction with any other appraisal
        and are invalid if so used.

17.     Possession of this report, or a copy thereof, does not carry with it the right of publication.
        It may not be used for any purpose by any person other than the party to whom it is
        addressed without the written consent of the appraisers, and in any event, only with proper
        written qualification and only in its entirety.

18.     Neither all nor any part of the contents of this report (especially any conclusions as to
        value, the identity of the appraisers, or the firm with which the appraisers are connected)
        shall be disseminated to the public through advertising, public relations, news sales, or
        other media without prior written consent and approval of the appraiser.

**F. Barr Biggs, MAI**

# CERTIFICATION

The appraiser certifies that, to the best of his knowledge and belief:

1.      The statements of fact contained in this report are true and correct.

2.      The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.      The appraiser has no present or prospective interest in the property that is the subject of this report, and has no personal interest with respect to the parties involved.

4.      The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.      His engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.      His compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.      The reported analyses, opinions and conclusion were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice.*

8.      The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

9.      The appraiser has made a personal inspection of the property that is the subject of this report.

10.     No one provided significant real property appraisal assistance to the person signing this certification.

14.     As of the date of this report, the appraiser has completed the continuing education program of the Appraisal Institute.

F. Barr Biggs, MAI
State Certification #GA-297

_____7-13-2010_____
Date

**ADDENDUM**

## SUBJECT PHOTOS



**North-northwest view along Park Place Blvd. with the subject to the left**



**South-southeast view along Park Place Blvd. with the subject to the right**



**Western view of the ditch that traverses the southern sector of the subject. Taken from near the subject's eastern border.**



**View of the subject's northern sector from near its northeastern corner**



**Southwest view of the subject property from near its northeast corner**

## QUALIFICATIONS OF
## F. BARR BIGGS

Barr Biggs has been actively engaged in the appraisal profession since graduation from The University of Mississippi in May, 1987.  Majoring in Real Estate, he graduated with a Bachelor's degree in Business Administration.  From June 1987 until February 1988 he worked in Nashville, Tennessee for Michael P. Ishie and Associates gaining valuable experience in fundamental techniques and assisting in various commercial appraisals.  In February 1988, he began work as a staff appraiser with McRoberts and Company in Dallas, Texas.  There he completed about seventy-five, full narrative appraisals and attained the position of Vice President before moving back home to Mississippi in 1992.  He has been an independent commercial real estate appraiser in the Jackson area since 1992 and has been MAI designated since 2000.

**PROFESSIONAL DESIGNATION AND LICENSE**
MAI - Member of the Appraisal Institute (Certification No. 11607)
   *Vice President for Mississippi Chapter of the Appraisal Institute*

MS State Certified General Real Estate Appraiser (# GA-297)

**COLLEGE EDUCATION**
Bachelor's Degree in Business Administration, major real estate, The University of Mississippi, 1987.

**TECHNICAL EDUCATION**

| | |
|---|---|
| AIREA Course 1A-1: | Real Estate Appraisal Principles<br>University of Colorado, 1986 |
| AIREA Course 1A-2: | Basic Valuation Procedures<br>University of Colorado, 1986 |
| AIREA Course 1B-1: | Capitalization Theory and Techniques, A<br>University of Colorado, 1986 |
| AIREA Course SPP: | Standards of Professional Practice<br>University of Texas, Austin, 1988 |
| Urban Land Institute: | Improving Shopping Center Design and Operation (#632)<br>San Francisco, California, 1990 |
| AIREA Seminar: | Feasibility Analysis and Highest and Best Use<br>Dallas, Texas, 1990 |
| AIREA Seminar: | Hotel/Motel Valuation (Steve Rushmore)<br>Dallas, Texas, 1991 |
| Maxim Engineers, Inc.<br>Professional<br>Development Seminar | Environmental Issues in Real Estate<br>Dallas, Texas |
| North Texas Chapter<br>of Appraisal Institute Seminar | Rates, Ratios, and Reasonableness<br>Dallas, Texas |

**F. Barr Biggs, MAI**

| | |
|---|---|
| Appraisal Institute<br>Course 2-1 | Case Studies in Real Estate Valuation<br>Addison, Texas, 1992 |
| Appraisal Institute<br>Course 1B-2 | Capitalization Theory, B<br>Addison, Texas, 1992 |
| Appraisal Institute<br>Seminar | Limited Scope Appraisals (Evaluations)<br>Biloxi, Mississippi, 1994 |
| Mississippi R.E.<br>Appraiser Licensing<br>and Certification Board<br>Seminar | Performing Real Estate Evaluations<br>Jackson, Mississippi, 1994 |
| Mississippi R.E.<br>Appraiser Licensing<br>and Certification Board<br>Seminar | Environmental Issues for<br>Real Estate Professionals<br>Jackson, Mississippi, 1996 |
| Appraisal Institute<br>Course II540 | Report Writing and Valuation Analysis<br>Memphis, Tennessee 1997 |

Latest Appraisal Institute Seminars

- Env. Assessment & Mold (Flowood, MS - 2004)
- Valuation for Financial Reporting (Flowood, MS - 2004)
- Evaluating Residential Construction (Pearl, MS - 2005)
- Appraisal Review (Gulfport, MS - 2005)
- Appraising MS Forest Land (Starkville/MSU -2006)
- What Clients Would Like Their Appraiser to Know (Biloxi, MS - 2007)
- Forecasting Revenue (Pearl, MS 2007)
- National USPAP Update Course (Pearl, MS - 2008)
- Appraising Convenience Stores (Biloxi, MS - 2008)
- Appraising Distressed Commercial Real Estate (Biloxi - 2009)

## Appraisal Experience

| | |
|---|---|
| Apartment Communities | Vacant Industrial Land |
| Condominiums | Vacant Retail Land |
| Apartment Buildings | Vacant Multi-Family Land |
| Single-Tenant Office Buildings | Vacant Single-Family Land |
| Multi-Tenant Office Buildings | Neighborhood Shopping Centers |
| Multi-Story Office Buildings | GSA/Government Leased Properties |
| Mini-Storage Facilities | Office/Showroom Buildings |
| Community Shopping Centers | Motel Property |
| Gas/Convenience Stores | Mixed-Use Development |
| Nursing Homes | Medical Office Buildings |
| Hospital | Recreation Land |
| LIHTC Apartments | Golf Courses |
| Cemetery | Funeral Home |
| National Chain Drugstores | HUD M.A.P. apartments |

## TECHNICAL SKILLS

WordPerfect, Quattro Pro, Excel, Project, and Argus

**F. Barr Biggs, MAI**



