## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

|  |  |
|---|---|
| **JON CHRISTOPHER EVANS**<br>**AND JOINTLY ADMINISTERED**<br>**RELATED CASES** | **Case No. 09-03763-NPO** |
| **DEBTORS.** | **Chapter 7** |

|  |  |
|---|---|
| **G&B INVESTMENTS, INC.** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 10-00040-NPO** |
| **DEREK A. HENDERSON, TRUSTEE**<br>**FOR THE BANKRUPTCY ESTATE OF**<br>**JOHN CHRISTOPHER EVANS, ET AL** | **DEFENDANTS** |

## TITLE COMPANIES' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT AS TO
## HERITAGE BANKING GROUP'S CROSS-CLAIM

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") file this Memorandum in Support of Motion for Summary Judgment as to Heritage Banking Group's ("Heritage Bank") Cross-Claim [Dkt. No. 195] (the "Cross-Claim").

### I.       INTRODUCTION

The Title Companies issued a lender's title insurance policy to Heritage Bank.  After receiving a claim from Heritage Bank, the Title Companies determined that the title as insured under the lender's title insurance policy to Heritage Bank was defective.  Therefore, the Title Companies paid Heritage Bank $430,000.00—the appraised value of the property insured. Despite this fact, Heritage Bank filed a Cross-Claim against the Title Companies asserting

various breach of contract claims, vicarious liability for the acts of Charles Evans, and a tort-liability theory not recognized in Mississippi.

Simply put, Heritage Bank seeks to expand the terms of the insurance contract in an effort to get more money. Such a result would effectively re-write the clear and unambiguous terms of the title insurance policy and create a loan insurance policy. The Title Companies did not insure any bank loans; rather, the Title Companies simply agreed to indemnify Heritage Bank for loss arising from a defect in title under the terms, conditions, exceptions, exclusions and limitations of the title insurance policy. This Court should enter judgment as a matter of law on all claims and/or issues related to Heritage Bank's Cross-Claim for the following reasons:

1)  Heritage Bank's breach of contract claim under a title insurance commitment fails as a matter of law because it is undisputed no title insurance commitment was issued to Heritage Bank by the Title Companies. Heritage Bank admits that it mistakenly believed a certificate of title provided by Charles Evans to Heritage Bank was a title commitment. The undisputed facts establish that it was not.

2)  Heritage Bank's breach of contract claim under the Lender's Policy fails as a matter of law because the undisputed facts confirm that Title Companies have fully complied with the terms of the insurance contract by paying Heritage Bank's claim under the policy. The sole issue in dispute was whether the $430,000.00 paid by the Title Companies to Heritage Bank was the proper value of Tract T-6 (also known as 4D). Because Heritage Bank failed to designate an expert on the issue of valuation, there are no remaining genuine issues of material fact. The only relevant and admissible evidence before the Court on the issue of valuation for Tract T-6 is the expert opinion of Van Duncan, designated by the Title Companies. Mr. Duncan valued Tract T-6 at $430,000.00, which is the exact amount the Title Companies paid Heritage Bank.

3)  Heritage Bank's claims under vicarious liability fail as a matter of law because the undisputed facts establish that Charles Evans was neither an employee nor an agent for the Title Companies with regard to any transaction involving Heritage Bank.

4)  The issue of whether a title insurance company may be liable in tort to its insured is an issue of first impression in Mississippi. The overwhelming majority of jurisdictions hold that a title insurance company cannot be liable in tort (absent other evidence of bad faith) to its insureds because their relationship is purely contractual. Under the twin-aims of *Erie*, this Court should adopt the majority

2

rule and enter judgment as a matter of law in favor of the Title Companies on all negligence claims asserted by Heritage Bank.

5)       Because the Title Companies did not, as a matter of law, breach the Lender's Policy, Heritage Bank's claims for bad faith and breach of the covenant of good faith and fair dealing necessarily fail.

Because there are no remaining genuine issues of material fact, judgment as a matter of law in favor of the Title Companies on all claims asserted by Heritage Bank is proper.

## II.       STATEMENT OF FACTS

On July 18, 2008, Heritage Bank made a loan in the amount of $781,980.00 to Twinbrook Run Development Company, LLC ("Twinbrook Run").  (Exhibit "A", Promissory Note); (Cross-cl., ¶ 6); (Exhibit "B", Heritage Depo., p. 19).  (Exhibit "B", Heritage Depo., p. 86-87).[1]  Heritage Bank disbursed loan proceeds to Twinbrook Run and Charles Evans on the same day.  Heritage Bank permitted Charles Evans to close the loan.  (Exhibit "B", Heritage Depo., p. 66).

The Title Companies did not issue a title commitment to Heritage Bank.  Despite asserting otherwise in its Cross-Claim, Heritage Bank admitted in its deposition that the Title Companies did not issue a title commitment to Heritage Bank.  (Exhibit "B", Heritage Depo., p. 48, 50-51, 55-56, 62-63, 107-109).  The document referenced in the Cross-Claim at paragraph 8 is clearly a certificate of title provided by Charles Evans to Heritage Bank and does not identify or refer to the Title Companies.  (Exhibit "C", Certificate of Title).

Over three months after Heritage Bank closed the loan with Twinbrook Run and disbursed loan proceeds, the Title Companies received an application and attorney's final certificate from Charles Evans seeking a lender's title insurance policy on or about October 28, 2008.  (Exhibit "D", Application and Attorney's Certificate).  The Title Companies issued a

---

[1] All Exhibits cited herein are attached to the Title Companies' Motion for Summary Judgment as to Heritage Banking Group's Cross-Claim.

lender's title insurance policy to Heritage Bank, policy number LP-107059 (the "Lender's

Policy"), on October 28, 2010.  (Exhibit "E", Lender's Policy).

By letter dated November 4, 2008, Charles Evans provided the following to Heritage

Bank: (1) a certificate of title from Charles Evans to Heritage Bank; (2) the Lender's Policy; and

(3) the deed of trust purportedly securing Heritage Bank's first priority security lien on the

subject property.  (Exhibit "F", Ltr. to Heritage).  Heritage Bank admits that it did not and could

not have relied on any representations or documents from the Title Companies for purposes of

making the loan on July 18, 2008 because it did not seek or obtain a title insurance policy until

October 28, 2008.  (Exhibit "B", Heritage Depo., p. 88-89).

After learning of a potential title defect on title insured in the Lender's Policy, the Title

Companies investigated and concluded that Heritage Bank was not in a first priority secured lien

position with respect to Tract T-6 (also known as 4D).  The Title Companies obtained an

appraisal on the property from Duncan & Associates and Mr. Duncan, an MAI appraiser,, who

appraised the property at $430,000.00.  (Exhibit "G", Appraisal).  Based on this appraisal, the

Title Companies tendered payment to Heritage Bank in the amount of $430,000.00.  (Exhibit

"B", Heritage Depo., p. 21, 55, 73-74).  Mr. Van Duncan was designated as an expert in this

matter and has offered an opinion that the value of Tract T-6 is $430,000.00.  This is the only

expert opinion before the Court for Tract T-6.  Heritage Bank did not designate any experts.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if "no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law."  *Wright v. Ford Motor Co.*, 508 F.3d

263, 274 (5th Cir. 2007) (citing Fed. R. Civ. P. 56(c)).  The court should review all pleadings,

depositions, admissions, and other evidence to determine if a genuine issue of material fact

exists. *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995). The moving party

satisfies its burden by showing an absence of "genuinely" disputed material facts, and pointing to

evidence that it is entitled to a judgment. *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir.

1989). The moving party need only point out the absence of genuinely disputed material facts

and "need not negate the elements of the non-movant's case." *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994).

To avoid summary judgment, "the non-movant must go beyond the pleadings and come

forward with specific facts indicating a genuine issue for trial." *EMCASCO Ins. Co. v. American

Intern. Specifalty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006) (citing *Celotex Corp. v.

Catrett*, 477 U.S. 317, 324 (1986)). This requires "significant probative evidence" that would

allow a reasonable jury to rule in favor of the non-movant on all essential claim elements.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 322-23. The

non-movant cannot meet this burden simply by relying on unsubstantiated assertions, improbable

inferences, or unsupported speculation because these are not competent summary judgment

evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

## IV.   ARGUMENT

### A.   Heritage Bank's Claims as to Vicarious Liability Fail as a Matter of Law.

In its Cross-Claim, Heritage Bank alleges that the Title Companies are liable for the acts

of Charles Evans "under the doctrine of vicarious liability or the doctrine of respondeat

superior." (Cross-cl., ¶ 19). The undisputable facts confirm, however, that Heritage Bank has no

evidence suggesting that the Title Companies are vicariously liable for Charles Evans actions.

### 1.   The Title Companies cannot be liable under a theory of respondeat superior because Charles Evans was not their employee.

Heritage Bank's respondeat superior claim must fail because it is undisputed that Charles

Evans was not an employee of the Title Companies.  (Exhibit "B", Heritage Depo., p. 56).

"Generally, an employer is liable for the negligent acts of its employee done in the course and

scope of his employment under the doctrine of respondeat superior, but an employer is not liable

for the negligence of an independent contractor." *McKee v. Brimmer*, 39 F.3d 94, 96 (5th Cir.

Miss. 1994) (citing *W.J. Runyon & Son, Inc. v. Davis*, 605 So. 2d 38, 45 (Miss.1992).   The

doctrine of respondeat superior is "a derivative claim [against an employer] arising solely out of

the negligent conduct of its employee within the scope of his or her employment." *Crawford*

*Logging, Inc. v. Estate of Irving*, 41 So. 3d 687, 690 (Miss. 2010).  Thus, a threshold requirement

of respondeat superior is the existence of an employee/employer relationship.  For this reason

alone, Heritage Bank's claims under respondeat superior fail.

Heritage Bank admits that Charles Evans was not an employee for the Title Companies.

(Exhibit "B", Heritage Depo., p. 56).  During its deposition, Heritage Bank was asked whether it

had any belief or knowledge that Charles Evans was an employee of the Title Companies.  *Id*.

Heritage Bank admitted that it had no such knowledge or belief.  *Id*.  Heritage Bank's testimony

is consistent with the indisputable fact that Charles Evans was never employed or paid by the

Title Companies.  (Exhibit "H", Affidavit of Parrish Fortenberry).  Because Heritage cannot

produce any evidence of Charles Evans' employment with the Title Companies, its respondeat

superior claim must fail as a matter of law.

> **2.      The Title Companies are not liable under general agency principles because Charles Evans possessed neither apparent nor actual authority.**

Heritage Bank's remaining vicarious liability claims are grounded in agency.

Specifically, Heritage Bank asserts that Charles Evans possessed either express or apparent

authority to bind the Title Companies.  (Cross-cl., ¶ 19).  The undisputed facts confirm, however,

that no such authority exists.

In Mississippi, "the general law of agency applies to insurers' relationships with their

agents." *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss. 1990).  An

agent's authority may be based on actual authority or apparent authority.  *Id*.  "If an agent had

apparent authority to bind his or her principal, then the issue of actual authority need not be

reached."  *Id*.  (citing *Baxter Porter & Sons Well Servicing Co., Inc v. Venture Oil Corp.*, 488 So.

2d 793, 796 (Miss. 1986)).

> a.   **The Undisputed Facts Establish that Charles Evans did not have
> Apparent Authority to Act on Behalf of the Title Companies.**

"Apparent authority exists when a reasonably prudent person, having knowledge of the

nature and usages of the business involved, would be justified in supposing, based on the

character of the duties entrusted to the agent, that the agent has the power he is assumed to

have."  *Andrew Jackson*, 566 So. 2d at 1180 (citing *Ford v. Lamar Life Ins. Co.*, 513 So. 2d 880,

888 (Miss. 1987)).  Mississippi employs a three-prong test to determine the existence of apparent

authority.  This test requires Heritage Bank to establish:

> (1) acts or conduct on the part of the principal indicating the agent's authority,

> (2) reasonable reliance on those acts, *and*

> (3) a detrimental change in position as a result of such reliance.

*Id*. at 1181 (citing *Lamar Life Ins. Co.*, 513 So. 2d at 888) (emphasis added).  Heritage Bank's

claims under agency fail under all three prongs.

Regarding the first prong, the undisputed facts establish that Heritage Bank has no

knowledge of any acts or conduct by the Title Companies indicating that Charles Evans

possessed authority to act on behalf of the Title Companies.  Heritage Bank asserts that it only

relies on two documents to assert that Charles Evans possessed the authority to bind the Title

Companies – (1) Charles Evans' letter to Heritage Bank dated November 4, 2008, and (2) the

Lender's Policy issued by the Title Companies to Heritage Bank. (Exhibit "B", Heritage Depo., p. 58-61). A review of each document reveals, however, that neither document contains any act or conduct by the Title Companies indicating that Charles Evans had authority to act on behalf of the Title Companies.

First, Heritage Bank points to a November 4, 2008 letter from Charles Evans and asserts that this letter allegedly gave Charles Evans the authority to bind the Title Companies. The specific portion of the letter relied upon by Heritage Banks states:

> Enclosed herewith are the following documents:
>
> 1.    An original commitment for title insurance procured through Mississippi Valley Title Insurance Company insuring the first priority security lien of the Heritage Banking Group upon the subject property.

(Exhibit "B", Heritage Depo., p. 59); (Exhibit "F", Ltr. to Heritage Bank). Nothing in the above quoted language indicates explicitly or implicitly any act or conduct of the Title Companies suggesting that Charles Evans had authority to act on behalf of the Title Companies. Additionally, this letter was written by Charles Evans on his own letterhead and addressed only to Heritage Bank. These facts are undisputed:

Q.    And that's -- well, let's talk about that. Is that a letter from Mississippi Valley Title to Heritage Bank?

A.    This letter here? This Exhibit 1?

Q.    Yes.

A.    It is not.

Q.    Who is that letter from?

A.    It appears to be from Charles Evans.

Q.    And whose letterhead is it on?

A.    Charles Evans'.

Q.      And who is it directed to?

A.      Directed to Heritage Banking Group, Highway 25, Suite Q, Flowood, Mississippi,
which would be our Flowood branch.

Q.      Are there any carbon copies to that letter?

A.      Not that I'm aware of.

(Exhibit "B", Heritage Depo., p. 48).  As a result, no reasonable interpretation of this letter can

be construed as conduct by the Title Companies.

Further, the letter incorrectly states that a title commitment is enclosed.  The Title

Companies did not issue a commitment to Heritage Bank.  The document upon which Heritage

Bank mistakenly relies, is a certificate of title provided by Charles Evans to the bank.  A simple

review of the document clearly establishes that it is not issued, provided, or endorsed by the Title

Companies.  (Exhibit "C", Certificate of Title).  As discussed in greater detail below, it is

indisputable that the Title Companies did not issue or provide a title commitment to Heritage

Bank.  At the very least, the mistaken statement by Charles Evans in the November 4, 2008 letter

should have prompted Heritage Bank to inquire further.  Heritage Bank did not make any further

inquiries.  (Exhibit "B", Heritage Depo., p. 45-46, 53-54).

Secondly, Heritage Bank points to the Lender's Policy as a representation that Charles

Evans possessed authority to bind the Title Companies.  Specifically, Heritage Bank points to the

top of Schedule A of the Lender's Policy which states "Prepared for Charles Evans."  (Exhibit

"B", Heritage Depo., p. 65); (Exhibit "E", Lender's Policy, Schedule A).  To this effect, Heritage

Bank testified as follows:

Q.      And that -- you're looking at the top of Schedule A, where it says -- it says
"Prepared for Charles Evans"; is that correct?

A.      Yes, sir.

9

Q.    It doesn't say prepared by Charles Evans, does it?

A.    It does not.

Q.    If you'll look at the first page of the title insurance policy, which is back a couple of pages there from where you're looking, right underneath the policy number, would you read that sentence?

A.    "Issued by Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company."

Q.    Okay.  So you agree with me that that language says it's issued by Mississippi Valley Title and Old Republic National Title, and Schedule A to the policy says issued for Charles Evans?

A.    That's correct.

(Exhibit "B", Heritage Depo., p. 65).  The Lender's Policy is clear and unambiguous.  The Title Companies issued the Lender's Policy, and it was issued for Charles Evans at the request of Heritage Bank.  Charles Evans did not have authority to issue policies or commitments.  Heritage Bank's apparent authority claim fails under the first prong alone.

Similarly, Heritage Bank's apparent authority fails under the second prong because it cannot establish reasonable reliance on the November 4, 2008 letter or the Lender's Policy when the bank made the loan to Twinbrook Run.  Heritage Bank made the loan to Twinbrook Run on July 18, 2008 and disbursed loan proceeds on that day.  (Exhibit "A", Promissory Note); (Exhibit "B", Heritage Depo., p. 86-87).  Charles Evans sent the letter to Heritage Bank on November 4, 2008.  (Exhibit "F", Ltr. to Heritage).  The Title Companies issued the Lender's Policy on October 28, 2008.  (Exhibit "E", Lender's Policy).  Common sense dictates that July 18, 2008 comes months before October 28, 2008 and November 4, 2008.  Thus, it was impossible for Heritage to rely on the letter and the Lender's Policy when it made the loan to Twinbrook Run.  Indeed, Heritage Bank acknowledged its inability to rely on the letter and/or the Lender's Policy

when it testified as follows:

> Q.  But as we sit here today, and testifying on behalf of Heritage Bank, you can't identify any document or communication between Mississippi Valley Title or Charles Evans and Heritage Bank upon which Heritage Bank could rely prior to the promissory note executed on July 21st, 200- -- I'm sorry, July 18th, 2008. Do you agree with that?
>
> A.  That's correct.

(Exhibit "B", Heritage Depo., p. 89). Simply put, Heritage Bank could not have relied (reasonably or unreasonably) on the Title Companies' alleged acts or conduct to close the loan with Twinbrook Run because all alleged conduct occurred after the date the loan between Twinbrook Run and Heritage Bank closed.

Because Heritage Bank cannot prove that it relied on any acts or conduct by the Title Companies, it cannot prove the third prong of detrimental reliance.

**b.  No Facts Exist Suggesting that Charles Evans had Actual Authority to Act on Behalf of the Title Companies.**

Because Heritage Bank cannot show apparent authority, it must establish that Charles Evans had actual authority on behalf of the Title Companies to succeed on its agency claim. *See Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss. 1990). However, Heritage Bank's claim fails.

Actual authority is "the power of the agent to effect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him," and it may be either express or implied. *Butler v. Bunge Corp.*, 329 F. Supp. 47, 55 (N.D. Miss. 1971) (quoting RESTATEMENT, AGENCY (2d ed.) § 7). "An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties."

*Id.* (quoting 3 Am. Jur. 2d *Agency* § 18, at 429).

It is indisputable that the Title Companies did not have any oral or written agreements giving Charles Evans the authority to act on behalf of the Title Companies. (Exhibit "H", Affidavit of Parrish Fortenberry). No such agreement existed and Heritage Bank has not identified any such agreement. Heritage cannot identify such an agreement because such an agreement never existed. Heritage Bank admits that it had no knowledge of any relationship between Charles Evans and the Title Companies at the time the loan with Twinbrook Run was closed. (Exhibit "B", Heritage Depo., p. 47-55). Because no evidence of actual authority exists, Heritage Bank's actual authority claim should be dismissed as a matter of law.

**3.    As a matter of law and based on the undisputed facts, Charles Evans' status as "approved attorney" does not create an agency relationship with the Title Companies.**

Charles Evans was an approved attorney for the Title Companies. This means that the title insurance company will accept the approved attorney's opinion on land titles. *Southwest Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Lawyer Title Ins. Corp. v. Edmar Constr. Co.*, 294 A.2d 865, 866 (D.C. 1972). An approved attorney does not have the authority to bind a title insurance company. By contrast, a title agent may "issue binders, commitments, or policies on behalf of the title insurance company." James Bruce Davis, *The Law of Closing Protection Letters*, 36 Tort & Ins. L. J. 845, 846 (2001). An approved attorney is paid by the buyer or lender because the buyer or lender actually hires the attorney for representation throughout the real estate transaction.[2] *Ticor Title Ins. Co. v. FTC,*

---

[2] The Third Circuit has explained:

> An attorney may act as an attorney-agent for hypothetical insurance company A and at the same time act as an approved attorney for insurance company B. If company A hires the attorney to perform a search and examination as an attorney-agent, he will receive as compensation from the insurance company the price fixed by the insurance companies through the rating bureau in the state in which the property is located. In

998 F.2d 1129, 1132 (3d Cir. 1993).

Unlike an approved attorney, a title agent is paid for his services rendered by the title

insurance company and not the buyer or the lender.  *Id.*  Here, Heritage Bank admits that

Twinbrook Run selected Charles Evans as the attorney to close the loan and that Heritage Bank

agreed to allow Charles Evans to close the loan.  This is consistent with Heritage Bank's

testimony that it permitted Charles Evans to close the loan with Twinbrook Run.  (Exhibit "B",

Heritage Depo., p. 63-66).

It is undisputed that Charles Evans was an approved attorney for the Title Companies.

Because Charles Evans was an approved attorney, he had no authority to issue commitments or

policies.  Charles Evans could not bind the Title Companies in any way regarding title insurance.

As an approved attorney, Charles Evans could only send the Title Companies applications for

title insurance and his opinion on the title of the land stated on the application.  The Title

Companies made the ultimate decision whether or not to issue a commitment or policy.  Heritage

Bank admits that the Lender's Policy was issued by the Title Companies and not by Charles

Evans.  In fact, the language of the Lender's Policy itself expressly states that it is "issued by"

the Title Companies and "prepared for" Charles Evans.  (Exhibit "E", Lender's Policy).

Additionally, Charles Evans did not, at any time, receive compensation from the Title

Companies.  This fact is indisputable.  As an approved attorney, Charles Evans was to receive

compensation from the lender (Heritage Bank) or the borrower (Twinbrook Run).  Whether

Charles Evans actually received such compensation is immaterial to the discussion of his

relationship with the Title Companies.  The important point is that the Title Companies did not

---

contrast, if a buyer or lender hires the attorney either directly or by reference to company B's list of
approved attorneys, the attorney bills the buyer or lender at whatever rate they negotiate.

*Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1132 (3d Cir. 1993).

pay Charles Evans any money.  (Exhibit "H", Affidavit of Parrish Fortenberry).  Again, Heritage

Bank cannot point to evidence of payment made to Charles Evans by the Title Companies.

It is indisputable that Charles Evans was not a title agent for the Title Companies.  He did

not issue or purport to issue any title insurance policies or commitments.  Rather, Charles Evans

was merely an approved attorney.  Heritage Bank admits that it had no knowledge of any

relationship between Charles Evans and the Title Companies.  In this regard, Heritage Bank

testified as follows:

> Q.    So to -- and you're certainly welcome to look through that entire file.  But
>       other than any written documentation that's contained in Heritage Bank's
>       file, that we have a copy of right here, is the bank aware of any other
>       communication with Charles Evans regarding Mississippi Valley Title or
>       Old Republic National Title?
>
> A.    It is not.  Not to my knowledge.
>
> Q.    And the date of the letter that we were talking about from Charles Evans
>       to Heritage Bank is November 4th, 2008; is that correct?
>
> A.    That's correct.
>
> ***
>
> Q.    Did Heritage Bank ever ask Charles Evans whether he was an approved
>       attorney or a title agent?
>
> A.    Not to my knowledge.
>
> ***
>
> Q.    All right, Mr. Courtney.  We went through and we talked about the
>       November 4th letter and the certificate of title.  And what led me to that
>       series of questions was my original question, saying:  Are you aware of
>       any communications between Heritage Bank and the title companies?
>       And you identified this letter.  But we've now -- you've told me all the --
>       you've talked about that communication.  But you agree with me, that that
>       is not a direct communication from the title companies to Heritage Bank?
>
> A.    I agree.

> Q. Okay. Now, are you aware of any communications between Heritage Bank and the title companies regarding Chris Evans, Charles Evans, or the Twinbrook Run loan?
>
> A. Other than through our attorney when the proceeds were paid on that loan, we received a check that we negotiated.

(Exhibit "B", Heritage Depo., p. 45-47, 53-54).

Heritage Bank's testimony and the undisputed facts establish that there is no genuine issue of material fact on the issue of whether Charles Evans was an agent for the Title Companies. These facts make clear that Charles Evans was not an agent for the Title Companies.

This Court should enter judgment as a matter of law in favor of the Title Companies on all issues pertaining to vicarious liability, including respondeat superior and agency.

**B.** **Heritage Bank's Contract-Based Claims Fail as a Matter of Law.**

Heritage Bank also has asserted four contract related claims – (1) breach of title commitment (Count Two); (2) breach of title policy (Count Three); (3) breach of good faith and fair dealing (Count Four); and (4) bad faith (Count Eight). Because it is indisputable that the Title Companies did not issue a title commitment to Heritage Bank (Exhibit "B", Heritage Depo., p. 48, 50-52; Exhibit "H", Affidavit of Parrish Fortenberry), the bank cannot maintain a cause of action for breach of this alleged contract. With regard to the Lender's Policy, the Title Companies have fully performed under the terms of the insurance contract and there remains no genuine issue of material fact. Therefore, summary judgment in favor of the Title Companies is proper as to each contract-based cause of action asserted by Heritage Bank.

**1.** **The Title Companies did not issue a title commitment to Heritage Bank for the Twinbrook Run transaction; therefore, no breach occurred.**

In Count Two of its Cross-Claim, Heritage Bank asserts that the Title Companies

15

breached a title commitment that was allegedly issued to Heritage Bank. (Cross-cl., ¶21-24).

Heritage Bank must prove by a preponderance of the evidence: (1) the existence of a valid and

binding contract; (2) that the Title Companies breached the contract; and (3) that Heritage Bank

has been thereby damaged monetarily.  *See Warwick v. Matheney*, 603 So. 2d 330, 336 (Miss.

1992).

Heritage Bank cannot prove the existence of a valid binding contract because the Title

Companies did not issue a title commitment to Heritage Bank.  Heritage Bank has not and cannot

produce the title commitment because no such commitment exists.  Indeed, the Title Companies

have no record of issuing a title commitment to Heritage Bank for the Twinbrook Run

transaction.  (Exhibit "H", Affidavit of Parrish Fortenberry).

In its Cross-Claim, Heritage Bank mistakenly asserts that it received a title commitment

based on a the letter it received from Charles Evans on November 4, 2008, as evidence of the

title commitment.  (Exhibit "B", Heritage Depo., p.106-107).  The letter states in pertinent part::

Enclosed herewith are the following documents:

> 1.  An original commitment for title insurance procured through Mississippi Valley
>     Title Insurance Company insuring the first priority security lien of the Heritage
>     Banking Group upon the subject property.

(Exhibit "B", Heritage Depo., p. 107-109); (Exhibit "F", Ltr. to Heritage Bank).  Despite Charles

Evans' assertion that he enclosed a title commitment, the letter as produced by Heritage Bank

reveals that no commitment was attached or enclosed.  (Exhibit "F", Ltr. to Heritage Bank).

Heritage Bank admitted in its deposition that the only documents attached to the letter were a

certificate of title from Charles Evans to Heritage Bank, a survey, a legal description, and the

Lender's Policy.  (Exhibit "B", Heritage Depo., p. 52).  The certificate of title, like the letter, is

from Charles Evans on Charles Evans' own letterhead and sent directly to Heritage Bank.

(Exhibit "B", Heritage Depo., p. 48, 50-51).

In fact, Heritage Bank acknowledges that the Lender's Policy was the only document it

received directly from the Title Companies when it testified as follows:

> Q.      So again, just -- I just want to be clear on it.  The only document that Heritage
> Bank has received that it believes is from the title companies is the title insurance
> policy that's attached as Exhibit 2 to the complaint filed by Heritage Bank?
>
> A.      Yes, that's correct.

(Exhibit "B", Heritage Depo., p. 62-63).

The certificate of title from Charles Evans to Heritage Bank is clearly not a title

commitment from the Title Companies.  Because Heritage Bank cannot prove the existence of a

commitment issued by the Title Companies, its breach of contract claim regarding the

commitment should fail as a matter of law.

### 2.      The Title Companies did not breach the Lender's Policy.

In Count Three of its Cross-Claim, Heritage Bank alleges that the Title Companies

breached the Lender's Policy issued to Heritage Bank.  (Cross-cl., ¶ 25-27).  Again, Heritage

Bank must prove by a preponderance of the evidence:  (1) the existence of a valid and binding

contract; (2) that the Title Companies breached the contract; and (3) that Heritage Bank has been

thereby damaged monetarily.  *See Warwick v. Matheney*, 603 So. 2d 330, 336 (Miss. 1992).

There is no dispute that the Lender's Policy is valid and enforceable.  It is undisputed that

the Title Companies did not deny coverage under the Lender's Policy.  To the contrary, the Title

Companies paid Heritage Bank $430,000.00 under the terms of the Lender's Policy.  Heritage

Bank alleges breach of contract due to the Title Companies' "adjustment and payment of

Heritage Bank's claim and loss under the title policy…."  (Cross-cl., ¶ 26).  As discussed below,

there has never been a dispute as to the fact of loss under the Lender's Policy.  Heritage Bank's

lien was not perfected and was defective.  Thus, the Title Companies were obligated under the

Lender's Policy to resolve Heritage Bank's claim.

Under the Lender's Policy, the Title Companies could cure the title defect or pay the loss.

The Title Companies elected to pay the loss suffered by Heritage Bank.  Unless the Title

Companies cure the title defect, the Lender's Policy states that the Title Companies will pay "the

difference between the value of the Title as insured and the value of the Title subject to the risk

insured against by this policy."  (Exhibit "E", Lender's Policy, Condition 8(a)(iii)).  This simply

means the difference between the value of the property and the value of Heritage Bank's lien

position.  When Heritage Bank filed its claim, the Title Companies determined the value of the

property through an independent, third-party appraiser, which returned a value of $430,000.00.

(Exhibit "G". Appraisal).  Because Heritage Bank's lien was not valid, it was worth nothing.

Accordingly, on July 21, 2010,[3] the Title Companies paid Heritage Bank the difference

between the value of the property ($430,000.00) and the value of Heritage Bank's lien ($0).

(Exhibit "B", Heritage Depo., p. 21).  The value was based on an appraisal obtained shortly after

the claim was submitted by Heritage Bank to the Title Companies.  Heritage Bank did not

respond or dispute this payment until it filed its Cross-Claim in this matter.  The dispute is not

over the extent of loss; rather, the sole issue is the valuation of that loss.  Put simply, Heritage

Bank wants more money.  The issue as to the valuation of Tract T-6 is no longer in dispute,

however, because Heritage Bank failed to designate an expert as to the valuation of Tract T-6.

This Court set the deadline to designate experts for December 1, 2010.  The Title

Companies designated Van Duncan as an expert to appraise the value of Tract T-6 (also known

as 4D).  Heritage Bank did not designate any expert.  Heritage Bank's failure to designate an

---

[3] Payment was made to Heritage Bank after the Title Resolution Order [Dkt. No. 683, in cause no. 09-0373] was
entered by this Court and became final and non-appealable.

expert establishes that the only admissible evidence pertaining to the value of Tract T-6 is the expert opinion designated by the Title Companies.

Because Heritage Bank has no relevant evidence to rebut the expert opinion of Van Duncan, there is no genuine issue of material fact on the issue of valuation. The only relevant evidence before the Court as to the value of Tract T-6 is the expert opinion of the Title Companies. The Title Companies are entitled to summary judgment on the issue of valuation for Tract T-6 and the amount of payment made under the terms of the Lender's Policy.

**3.   The Title Companies did not breach the covenant of good faith and fair dealing because the Title Companies did not breach the insurance contract.**

Heritage Bank also alleges that the Title Companies breached "the covenant of good faith and fair dealing implied in every contract." (Cross-cl., ¶ 29). Heritage Bank does not provide any specific instances of this breach; rather, Heritage Bank simply relies on "the acts an omission complained of herein [the Cross-Claim]." (Cross-cl., ¶ 29).

Mississippi recognizes that "every contract contains an implied covenant of good faith and fair dealing in performance and enforcement." *Blue Diamond v. Liberty Mut. Ins. Co.*, 21 F. Supp. 2d 631, 633 (S.D. Miss. 1998) (citing *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992)). The Mississippi Supreme Court has described this duty as follows:

> In recent years, courts have often supplied a term requiring both parties to a contract to exercise what is called 'good faith' or sometimes 'good faith and fair dealing.' This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

*Cenac*, 609 So. 2d at 1272 (quoting Farnsworth, Contracts, § 7.17, 526-27 (1982)). Put

differently, "[g]ood faith is the faithfulness of an agreed purpose between two parties, a

purpose which is consistent with *justified expectations of the other party*." *Id.*, at 1272 (citing

RESTATEMENT (SECOND) OF CONTRACTS § 205, 100 (1979)) (emphasis added). "The breach of

good faith is bad faith characterized by some conduct which violates standards of decency,

fairness or reasonableness." *Id*.

It is undisputed that the Title Companies issued a Lender's Policy. (Exhibit "E",

Lender's Policy). Under the Lender's Policy, the Title Companies insured that Heritage Bank

had a first priority lien on Tract T-6. (Exhibit "E", Lender's Policy). Should a defect arise by

reason not excluded under the Lender's Policy, the Title Companies are obligated to either cure

the defect or pay the lender the amount of its loss due to the title defect. (Exhibit "E", Lender's

Policy). As discussed above, the Title Companies resolved Heritage Bank's title claim by paying

the value of the Tract T-6 ($430,000.00) as determined by an independent MAI appraiser. The

sole dispute under the Lender's Policy between Heritage Bank and the Title Companies was the

value of the subject property. This issue is no longer a genuine dispute because Heritage Bank

failed to designate an expert as to the value of the property. Thus, no breach of contract claim

remains.

Because there is no cause of action for breach of contract, there can be no breach of the

implied covenant of good faith and fair dealing. *Cothern v. Vickers, Inc.*, 759 So. 2d 1241, 1249

(Miss. 2000) (finding that defendant did not breach covenant of good faith and fair dealing

because no breach of contract occurred); *Johnston v. Palmer*, 963 So. 2d 586, 593-95 (Miss.

App. 2007) (finding no breach of the covenant of good faith and fair dealing when defendant

complied with contract terms.)); *West v. Nationwide Trustee Services, Inc.*, 2010 WL 3122801, *

2 (S.D. Miss. August 4, 2010) (the duty of good faith and fair dealing is not breached when the

contract underlying contract is not breached)(citing *Grand Hous., Inc. v. Bombardier Capital, Inc.*, 2005 WL 673267, at * 4 (5th Cir. Mar. 23, 2005) (finding no bad faith where defendant "at all times acted within its contractual authority")).  The Title Companies are entitled to judgment as a matter of law on Heritage Bank's claims for breach of the covenant of good faith and fair dealing.

4.     **The Title Companies did not act in bad faith because the Title Companies paid Heritage Bank's claims in a reasonable manner according to the terms of the contract.**

In Count Eight of its Cross-Claim, Heritage Bank alleges bad faith because the Title Companies "adjusted and paid Heritage Bank's loss and claim under the title policy in a manner that is advantageous to [the Title Companies] and to Heritage Bank's detriment."  (Cross-cl., ¶ 48).  Heritage Bank points to the Title Companies' payment of its claim as evidence of bad faith.  Specifically, Heritage Bank claims that the Title Companies had "no reasonable or arguable basis for the manner in which Heritage Bank's claim under title policy was adjusted and paid."  (Cross-cl., ¶ 48).  However, it is undisputed that the Title Companies' decision to pay $430,000.00 was based on an independent appraisal performed by a qualified third-party and was based on the terms of the Lender's Policy.

To show bad faith, Heritage Bank must first "demonstrate that the claim or obligation was in fact owed."  *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) (quoting JACKSON, MISS. INS. LAW, § 13:2).  This fact is not in dispute.  The Title Companies investigated Heritage Bank's claim, determined the scope and extent of loss, and paid the loss under the Lender's Policy.

Second, "the insured must demonstrate that the insurer has no arguable reason to refuse to pay the claim or to perform its contractual obligation."  *Id.*  Heritage Bank's claim fails on this

point alone.  The Title Companies did not refuse to perform under the Lender's Policy.  To the

contrary, the Title Companies paid the claim according to the Lender's Policy.

Third, "the insured must demonstrate that the insurer's breach of the insurance contract

'results from an intentional wrong, insult, or abuse as well as from such gross negligence as

constitutes an intentional tort.'"  *Id.*  (quoting *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095

(Miss. 1996)).  Again, Heritage Bank's claim for bad faith fails on this element.

As discussed above, the Lender's Policy allows the Title Companies to pay "the

difference between the value of the Title as insured and the value of the Title subject to the risk

insured against by this policy."  (Exhibit "E", Lender's Policy, Condition 8(a)(iii)).  Based on the

terms of the Lender's Policy and the appraised value of the property, the Title Companies paid

Heritage Bank$430,000.00.  (Exhibit "B", Heritage Depo., p. 21).  Heritage Bank accepted and

deposited the check into its accounts.  (Exhibit "B", Heritage Depo., p. 21).  The Title

Companies paid the claim according the terms of the policy and according to an appraisal that is

undisputed.  (Exhibit "B", Heritage Depo., p. 92-94).

As discussed above, Heritage Bank failed to designate an expert as to the valuation of

Tract T-6.  By failing to present any admissible evidence as to valuation of the subject property

to contradict the expert opinion of Van Duncan, Heritage Bank's claims as to valuation and on

bad faith fail as a matter of law.  Even if a dispute remained as to the valuation of Tract T-6,

Heritage Bank's testimony above establishes the reasonableness of the Title Companies payment

of the claim under the Lender's Policy.  Moreover, Mississippi recognizes that a "pocketbook

dispute exists when parties are in agreement as to the extent of damage but disagree on the value

to be assigned to the damage."  *Fonte v. Audubon Ins. Co.*, 8 So. 3d 161, 168 (Miss. 2009); *State

Farm Mut. Auto. Ins. Co. v. Roberts*, 379 So. 2d 321, 322 (Miss. 1980).  The Mississippi

Supreme Court has held that a pocketbook dispute does "not rise to the level of wanton, gross or

intentional conduct in the nature of an independent tort."  Thus, even if valuation were still a

disputed fact, Heritage Bank's claims of bad faith must be dismissed because the facts simply

present a pocketbook dispute.  For this reason alone, Heritage Bank's claims of bad faith must be

dismissed.

**C.    Heritage Bank's Tort-Based Claims Fail as a Matter of Law.**

Heritage Bank alleges tort-related claims in Counts Five, Six, and Seven of its Cross-

Claim.  Specifically, Heritage Bank asserts claims against the Title Companies for negligent

misrepresentation, intentional misrepresentation / fraud, and negligent hiring, training and

supervision.  The issue of a title insurer's tort liability is an issue of first impression in

Mississippi.  In the absence of a final decision by the Mississippi Supreme Court on the issue at

hand, it is the duty of this Court to determine, in its best judgment, how the Mississippi Supreme

Court would resolve the issue if presented with the same case.  *Am. Int'l Specialty Lines Ins. Co.*

*v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).  This process is typically referred to as

an "Erie guess," based on the U.S. Supreme Court's decision in *Erie R. Co. v. Tompkins*, 304

U.S. 64, 78-80 (1938).

The Court should follow the overwhelming majority and modern trend of jurisdictions

and hold that a title insurer may not be liable in tort because the relationship between a title

insurer and its insured is based on contract law.[4]  This rule is based on the fact that parties to a

contract elect to reduce their duties, rights, responsibilities, and obligations to writing for more

predictable results.  The majority rule finds significant support from basic Mississippi insurance

principles.  This Court should follow the majority rule and enter an order that, as a matter of law,

---

[4] This rule does not include the tort of bad faith refusal to pay a claim, which is discussed above.  However, this rule
includes all other torts.

the Title Companies cannot be liable to Heritage Bank under a tort theory.

1.    **Basic Mississippi insurance principles recognize that the relationship between insurer and insured is strictly one of contract and not tort.**

Mississippi has long held that "the relation between the policy holder and the [insurance] company [is] one of contract, measured by the terms of the policy." *Equitable Life Assurance Soc. of the U.S. v. Weil*, 60 So. 133, 134 (Miss. 1912) (citations omitted); *Szumigala v. Nationwide Mut. Ins. Co.*, 853 F.2d 274, 280, n.7 (5th Cir. 1988) (describing the insurance relationship as "one that is contractual in nature...."). Indeed, "[i]t is clear that the relationship between an insurance company and its insured is contractual in nature, with the rights and duties set out by the provisions of the insurance policy." *Sessoms v. Allstate Ins. Co.*, 634 So. 2d 516, 519 (Miss. 1993) (citing *Cauthen v. National Banks Life Ins. Co.*, 88 So. 2d 103 (Miss. 1956)).

Mississippi courts interpret insurance policies according to contract law. *Am. States Ins. Co. v. Nethery*, 79 F.3d 473, 475 (5th Cir. 1996) (citing *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1109 (5th Cir. 1983)). "Like all other contracts, insurance policies which are clear and unambiguous are to be enforced according to their terms as written." *Sessoms*, 634 So. 2d at 519 (citing *Davidson v. State Farm Fire & Cas. Co.*, 641 F. Supp. 503 (N.D. Miss. 1986) and *Aero International v. United States Fire Ins. Co.*, 713 F.2d 1106 (5th Cir. 1983)).

Tort law principles should not dictate judicial construction of insurance policies.... Insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties...." *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 70 (Miss. 1998).[5]

---

[5] The *Lewis* case involves the interpretation of a homeowners insurance policy. *Lewis v. Allstate Ins. Co.*, 730 So. 2d at 67. In *Lewis*, the Mississippi Supreme Court stated that insurance policies are contracts of adhesion and thus, ambiguities should be construed in favor of the insured. *Id*. at 70. Title insurance policies, however, have not been held out to be contracts of adhesion. In fact, the Fifth Circuit has suggested that title insurance policies are arms-length transactions because the policies are drafted and promulgated by the American Land and Title Association ("ALTA"). *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 496-97, FN5 (5th Cir. 2004)(citing Michael F. Jones & Rebecca R. Messall, *Mechanic's Lien Title Insurance Coverage for Construction Projects: Lenders and Insurers Beware*, 16 REAL EST. L.J. 291, 306-07 (1988)).

Stated simply, the Court may not construe "a contract differing from that made by the parties themselves, or [] enlarge an insurance company's obligations where the provisions of its policy are clear." *State Auto. Mut. Ins. Co. v. Glover*, 176 So. 2d 256, 258 (Miss. 1965).

Mississippi's basic contract and insurance principles are consistent with the majority rule described below and support a determination by this Court that title insurers may not be liable in tort.

### 2.     The Court should adopt the majority rule regarding tort liability of a title insurance company.

Whether a title insurance company may be found liable in tort to its insured is an issue of first impression in Mississippi.  The overwhelming majority and modern trend of states that have addressed this issue have either favorably discussed or expressly followed the rule that a title insurer is not liable in tort to the insured for duties performed under the contract unless the title insurer affirmatively assumes additional duties outside the contract.  The Court should adopt this rule for the following reasons.

### a.     The relationship between the title insurance company and its insured is based solely on the insurance policy.

The relationship between the title insurer and the insured is purely contractual.  "A title insurance policy is a contract of indemnity…. [T]he only duty imposed by a title insurance policy is the duty to indemnify the insured against losses caused by defects in title…. [Thus, the] issuance of a [title] policy did not constitute a representation regarding the status of the property's title; rather, it constituted an agreement to indemnify the [insured] against losses caused by any defects." *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310  (Tex. 1994); 1 AM JUR 2D *Abstracts of Title* § 16 (2010) (A title insurance policy is simply "a contract for indemnification under which the insurer is obligated to indemnify the insured against losses

sustained in the event that a lien or encumbrance affecting title to property is discovered.").

One leading explanation of this contractual relationship, which has been cited by numerous courts,[6] comes from the New Jersey Supreme Court:

> [T]he relationship between the company and the insured is essentially contractual. The end result of the relationship between the title company and the insured is the issuance of the policy.  To this extent, the relationship differs from other relationships conceivably sounding in both tort and contract, such as the relationship between physician and patient, to which plaintiff alludes.  Although the relationship between physician and patient is contractual in its origins, the purpose of the relationship is to obtain the services of the physician in treating the patient.  The patient reasonably expects the physician to follow the appropriate standard of care when providing those services.  By contrast, the title company is providing not services, but a policy of insurance.  That policy appropriately limits the rights and duties of the parties.
>
> From this perspective, the insured expects that in consideration for payment of the premium, it will receive a policy of insurance.  The insurer's expectation is that in exchange for that premium it will insure against certain risks subject to the terms of the policy.  If the title company fails to conduct a reasonable title examination or, having conducted such an examination, fails to disclose the results to the insured, then it runs the risk of liability under the policy.

*Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 220 (N.J. 1989) (citations omitted); *Greenberg v. Stewart Title Guar. Co.*, 171 Wis. 2d 485, 496 (Wis. 1992) ("There was no obligation under the [title insurance] contract to search the title, thus no duty could arise to search the title with due care and skill.").  Again, the title searcher provides services in the form of reviewing title and producing a comprehensive review of title called an abstract.  The title insurer simply contracts to indemnify the insured should any problems arise in the chain of title.  Consistent with the nature of insurance, the title insurer rather than the insured assumes any risk that the description of title in the subsequent policy is incorrect.

Put differently, the contract for title insurance and the contract for a title search are

---

[6] *See e.g., Ruger v. Funk*, 1996 Del. Super. LEXIS 34 (Del. Super. Ct. Jan. 22, 1996); *Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650 (Utah 1990); *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147 (Wis. 1992); *Hulse v. First Am. Title Co.*, 33 P.3d 122 (Wyo. 2001).

separate and distinct and the "doctrine of skill or negligence has no application to a contract of

title insurance." *Citibank v. Chicago Title Ins. Co.*, 632 N.Y.S. 2d 779, 781 (Sup. Ct. App. Div.

1995). This idea fits perfectly with the concept that a title insurer will not be liable in tort unless

it voluntarily assumes duties outside the contract because "title insurance only insures against

damage resulting from defects in the insured's title in the property, and does not represent that

the contingency insured against will not occur." *Brown's Tie & Lumber Co. v. Chicago Title Co.

of Idaho*, 764 P.2d 423, 426 (Id. 1988).

Adopting the majority rule also recognizes the clear distinction between the functions of

searching title and insuring title. For example, a title searcher, often called an abstractor, enters

into a services contract to conduct a comprehensive review of the chain of title for a particular

piece of property. *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 562 A.2d 208, 220 (N.J.

1989). By contrast, a title insurer enters into an insurance contract to indemnify the insured with

respect to its proper place in the chain of title should any problems arise. *Id*. The Utah Supreme

Court has described the difference as follows:

> The function, form, and character of a title insurer is different from that of an abstractor.
> One who hires a title insurance company does so for the purpose of obtaining the
> assurance or guarantee of obtaining a certain position in the chain of title rather than for
> the purpose of discovering the title status. A title company's function is generally
> confined to the practice of insurance, not the practice of abstracting.

*Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 654 (Utah 1990).

A title searcher or abstractor provides title abstract or certificate of title. A title insurance

company typically provides title insurance commitments and policies. The information

contained in a title commitment and a title policy is simply to identify the property and the

particular state of title to be insured. *First Midwest Bank v. Stewart Title Guar. Co.*, 843 N.E.2d

327, 335 (Ill. 2006); s*ee also Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147, 149 (Wis.

1992) ("A title commitment is a document which describes the property as the title insurer is

willing to insure it and contains the same exclusions and general and specific exceptions as later

appear in the title insurance policy.").  A "title insurer is not in the business of supplying

information when it issues a title commitment or a policy of title insurance." *First Midwest*

*Banks*, 843 N.E.2d at 336.

Discussing the relationship between a title insurance company and its insured, the Texas

Court of Appeals has properly explained that "[t]he title insurance company is not, as is an

abstract company, employed to examine title."  Rather, the title insurance company agrees to

indemnify the insured in the event a title defect is discovered.  Thus, the relationship between the

parties is limited to that of indemnitor and indemnitee." *Houston Title Co. v. Ojeda de Toca*, 733

S.W.2d 325, 327 (Tex. Ct. App. 1987).  The contractual relationship between Heritage Bank and

the Title Companies is one of indemnification.  This Court may not alter or amend the clear and

unambiguous terms of the Lender's Policy, which is the only evidence of any relationship

between Heritage Bank and the Title Companies.

> **b.** **Subjecting a title insurer to tort liability would render the actual
> terms of the insurance policy meaningless.**

Where Heritage Bank and the Title Companies had no communication other than the

Lender's Policy itself there can be no plausible argument that the Title Companies assumed any

additional duty.  Without the assumption of a legal duty, it is axiomatic that no breach may

occur.  Likewise, if this Court were to permit a cause of action in tort to proceed based on the

undisputed facts of this case, the terms and conditions of the Lender's Policy would be rendered

meaningless.  The sole relationship between Heritage Bank and the Title Companies is an

indemnity agreement for defects in title.  The Title Companies were not requested by Heritage

Bank to provide, and did not provide, an abstract or report on the status of title.

Describing current industry practices, the U.S. District Court for the Eastern District of

Michigan explained:

> As in other states, parties in Michigan generally purchase title insurance, rather
> than relying on an abstract, because they prefer the certainty of insurance.  In
> purchasing insurance, a buyer acquires a contractual right against the insurer for
> coverage of title defects.  In purchasing an abstract, a buyer merely obtains an
> examination of title.  With an abstract, a real estate buyer can obtain damages for
> title defects only through tort litigation.  To protect the rights and expectations of
> the parties, a title insurer should be liable in accordance with the terms of the title
> policy only and should not be liable in tort.  To hold otherwise does violence to
> the whole concept of insurance.

*Mickam v. Joseph Louis Palace Trust*, 849 F. Supp. 516, 521 (E.D. Mich. 1993).  Following this

line of thought, a Delaware Superior Court noted the following:

> If the insured could seek recovery in tort for the failure of an insurer to discover
> defects in title, the policy limits agreed to by the parties would become
> meaningless.  The insureds have paid for a policy providing for a certain level of
> indemnification.  They have paid for no more.  Therefore, recovery is limited to
> that provided for in the contract.  *In other words, no reasonable land purchaser
> [or lender] would consider a title insurance company as certifying that no title
> defect exists, when the whole purpose of the policy is to spell out the rights and
> responsibilities of parties if a defect does exist.*

*Ruger v. Funk*, 1996 Del. Super. LEXIS 34, *29 (Del. Super. 1996) (emphasis added).

This sound logic and reasoning applies equally in Mississippi.  This Court should adopt

the majority rule that, as a matter of law, the Title Companies owed no duties to G&B beyond

the terms, conditions, limitations, exceptions and exclusions of the Owner's Policy.  To do

otherwise would effectively alter, diminish, or negate the contract entered into by the parties.

Such a rule ignores the purpose of title insurance altogether, which is that specific risks of title

defects as outlined in the policy are shifted from the insured to the insurer.  Ignoring this premise

would detrimentally alter the insurance industry.  This Court should adopt the majority rule

which properly recognizes the purpose and intent of insurance and basic contract principles of

Mississippi.

3.        **Heritage Bank's Tort Claims fail under established Mississippi Law.**

By adopting the majority rule in this case, the Court need not reach an analysis of the

specific elements of Heritage Bank's tort claims.  Even if this Court's *Erie* guess recognizes tort

liability for a title insurance company, however, Mississippi law makes clear that Heritage

Bank's negligence claims fail.  To succeed on its negligent misrepresentation claim, Heritage

Bank must prove the following the elements:

> (1) a misrepresentation or omission of a fact;
>
> (2) that the representation or omission is material or significant;
>
> (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities;
>
> (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and
>
> (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

*Mladineo v. Schmidt*, 2010 Miss. LEXIS 569, at *25-26 (Miss. Oct. 28, 2010) (quoting

*Hazlehurst Lumber Co., Inc. v. Miss. Forestry Comm'n*, 983 So. 2d 309, 313 (Miss. 2008)).  The

standard required to establish a fraudulent or intentional misrepresentation in even more

stringent.  *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992).

Heritage Bank admits that the Lender's Policy is the only document that it received from

the Title Companies (Exhibit "B", Heritage Depo., p. 62-63), but Heritage Bank cannot point to

any provision in the Lender's Policy that explicitly or implicitly made such a promise.  It is

impossible for Heritage Bank to have relied on the Lender's Policy (Oct. 28, 2008) when it made

the loan to Twinbrook Run (July 18, 2008) over three months prior to the issuance of the

Lender's Policy.  Heritage Bank admits this fact.  (Exhibit "B", Heritage Depo., p. 89).

Heritage Bank's claims for negligent hiring should be dismissed because Charles Evans

was not an employee of the Title Companies.  Mississippi recognizes that "a master [or employer] cannot be liable for the negligence of a fellow employee who was hired with due care."  *Jones v. Toy*, 476 So. 2d 30, 31 (Miss. 1985).  In order to prove negligent hiring, the plaintiff must show "(1) that [the employer] knew or should have known of some incompetence on the part of [the employee] and (2) that [the employer] failed to do anything about it."  *Raiola v. Chevron U.S.A., Inc.*, 872 So. 2d 79, 86 (Miss. App. 2004) (citing *Jones*, 476 So. 2d at 31).  As explained above in the respondeat superior section, it is undisputed that Charles Evans was not an employee for the Title Companies.  (Exhibit "B", Heritage Depo., p. 61).  Moreover, there is a complete dearth of evidence that the Title Companies had any knowledge that Charles Evans was unworthy when he was put in the approved attorney list in 1982.

The Court should also dismiss Heritage Bank's negligent training and supervision claims.  The Mississippi Court of Appeals has stated "that specific evidence of an employer's actual or constructive knowledge of its employee's dangerous or violent tendencies is necessary in order to create a genuine issue of material fact on an improper training or supervision theory of liability."  *Holmes v. Campbell Props.*, 2010 Miss. App. LEXIS 243, at *18 (Miss. Ct. App. May 18, 2010).  Again, Charles Evans was not an employee of the Title Companies.  This is undisputed.  Likewise, they had no knowledge of any improper acts by Charles Evans until September 2009—long after the Lender's Policy was issued.

The Title Companies are also entitled to judgment as a matter of law on Heritage Bank's claim for failure to audit Charles Evans.  The Title Companies have diligently researched and found no reported cases where any court has imposed upon a title insurer a tort duty to audit its approved attorneys.  No such duty has even been imposed with regard to title agents.  The only reported cases found have held that a title insurance company owes no duty to its insured to

monitor and/or audit title agents.  In *Bluehaven Funding, LLC v. First American Title Ins. Co.*, the Eight Circuit held that a title insurer owes no common law tort duty to its insureds or other third parties to monitor or audit the title insurer's title agents.  *Bluehaven Funding, LLC v. First Am. Title Ins. Co.*, 594 F.3d 1055, 1161 (8th Cir. 2010) (applying Missouri law).

Additionally, when a title insurer audits its title agents, the right to audit is by either statute or contract and not based on the common law of tort.  *See, e.g.*, *Proctor v. Metropolitan Money Store Corp.*, 579 F. Supp. 2d 724, 726-27 (D. Md. 2008) (statutory duty); *Fidelity Nat'l Title Ins. Co. v. Mussman*, 930 N.E.2d 1160, 1166 (Ind. Ct. App. 2010) (contractual duty); *Bluehaven Funding, LLC v. First Am. Title Ins. Co.*, 594 F.3d 1055, 1159 (8th Cir. 2010) (contractual duty); *First Am. Title Ins. Co. v. First Alliance Title, Inc.*, 2010 U.S. LEXIS 58433, at *31-32 (E.D. Va. 2010) (contractual duty)*; See also Haley v. Corcoran*, 659 F. Supp. 2d 714, 725 n. 11 (D. Md. 2009) (no cause of action or other liability to third parties attaches simply because of statutory duty to review).

Audits are conducted for the sole benefit of the title insurer and not for the insured or some other third party.  As one court stated, "[a]n audit occurs after the fact to verify that the transaction occurred as contemplated and to verify the risk assumed under the policy issued."  *Fidelity*, 930 N.E.2d at 1168.  Additionally, the *Bluehaven Funding* court stated, "[the title insurer's contractual] right to review [the title agent's] escrow files and accounts was for [the title insurer's] own benefit and protection, and not for the benefit of any third party."  594 F.3d at 1161.  Clearly, if a title insurer is not under a duty to audit its title agents, then it follows that no such duty applies to approved attorneys.

This Court should adopt the overwhelming majority view that a title insurance company is not subject to tort liability absent some independent duty assumed outside of the insurance

contract. Even if this Court elects to rule otherwise, Heritage Bank's negligence claims against

the Title Companies fail as a matter of law.

V.     CONCLUSION

FOR THESE REASONS, the Title Companies respectfully request that this Court grant

their motion for summary judgment, award expenses and attorney fees to Title Companies, and

grant any additional relief deemed appropriate by this Court.

**RESPECTFULLY SUBMITTED,** this the 22nd day of December 2010.

MISSISSIPPI VALLEY TITLE INSURANCE
COMPANY and OLD REPUBLIC TITLE
INSURANCE COMPANY

BY:  /s/ *William C. Brabec*
      William C. Brabec (MSB No. 4240)
      M. Scott Jones (MSB No. 102239)
      Lindsey N. Oswalt (MSB No. 103329)
      Benjamin B. Morgan (MSB No. 103663)
      ADAMS AND REESE LLP
      111 E. Capitol Street, Suite 350 (39201)
      Post Office Box 24297
      Jackson, MS  39225-4297
      Telephone:      601-353-3234
      Facsimile:      601-355-9708

## CERTIFICATE OF SERVICE

I hereby certify that on this day, a copy of the foregoing has been served by electronic filing through the ECF System, which provides electronic notice to all parties of record, including the following:

William Liston                                          Terry Levy
wlist3@aol.com                                       tlevy@danielcoker.com

Lawrence Deas                                        Richard Bradley
ldeas@aol.com                                        rbradley@danielcoker.com

Kristina Johnson                                     Jeffrey Tyree
kjohnson@watkinsludlam.com             jktyree@harrisgeno.com

Dale Danks                                             Jeff Rawlings
ddanks@dmc-law.net                            rrm_h@bellsouth.net

Michael Cory                                          Mike MacInnis
mc@dmc-law.net                                  mikems@bellsouth.net

Michael Simmons                                   Derek Henderson
mike@cs-law.com                                  d_henderson@bellsouth.net


This the 22nd day of December, 2010.


/s/ *M. Scott Jones*
M. Scott Jones