Page 1

\*\*\*\*\*\*\*\*\*\*

EXAMINATION UNDER OATH OF DONALD JOSEPH BRATA

Taken at the offices of
Danks, Miller & Cory,
213 South Lamar Street,
Jackson, Mississippi,
on Friday, November 5, 2010,
beginning at approximately 9:40 a.m.

\*\*\*\*\*\*\*\*\*\*

APPEARANCES NOTED HEREIN

CHRISTY R. SIEVERT, CSR, RPR
PROFESSIONAL COURT REPORTING, LLC
Registered Professional Reporter
Certified Shorthand Reporter
Mississippi CSR No. 1421
Post Office Box 320928
Jackson, Mississippi 39232-0928
(601) 919-8662
www.procourtreporting.com



EXHIBIT H

Examination Under Oath of Donald Joseph Brata

Page 2

1                       APPEARANCES

2

3   MR. MICHAEL CORY
    MR. DALE DANKS, JR.
4   Danks, Miller & Cory
    213 South Lamar Street
5   Jackson, Mississippi  39201
          COUNSEL FOR G&B INVESTMENTS, INC.
6

7   MR. WILLIAM C. BRABEC
    Adams and Reese, LLP
8   111 East Capitol Street, Suite 350
    Jackson, Mississippi  39201
9         COUNSEL FOR MISSISSIPPI VALLEY TITLE
          INSURANCE and OLD REPUBLIC NATIONAL
10        TITLE INSURANCE COMPANY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 10-00040-NPO  Doc 275-8  Filed 12/22/10  Entered 12/22/10 15:42:13  Desc
Exhibit H - Excerpts of G&Bs Exam Under Oath  Page 3 of 12

Examination Under Oath of Donald Joseph Brata

Page 17

1  G&B, me, and asked that it be brought through his
2  property, which was situated on Highland Colony
3  Parkway behind Broadmoor Baptist Church up at the
4  top of the hill.
5      Q.    And that was Charles Evans?
6      A.    Yes. And with most things that
7  happen in Madison County and the City of Madison,
8  you have to go through the proper authorities.
9  And the road was laid out by the City of Madison,
10 and it just didn't happen to go through the
11 property that the Evanses owned. And so that was
12 the only other time I dealt with the Evanses
13 previous to when we entered into this contract to
14 sell the property.
15     Q.    Did you ever deal with Charles Evans
16 as an attorney?
17     A.    No.
18     Q.    All your dealings with him were as
19 a -- as a fellow landowner?
20     A.    Correct.
21     Q.    Okay. At any point in time, either,
22 you know, before or after the sale, did you deal
23 with Charles Evans as an attorney?
24     A.    No.
25     Q.    At the time you entered into the

Page 18

1   contract with Charles Evans, did you know that he
2   was an approved attorney for Mississippi Valley
3   Title?
4         A.    No.
5         Q.    Had you had any communications with
6   Mississippi Valley Title about Charles Evans --
7         A.    No.
8         Q.    -- as of the time you signed that
9   contract?
10        A.    No.
11        Q.    Did you at any point in time inquire
12  from Mississippi Valley of Mr. Evans' -- Charles
13  Evans' status with them?
14        A.    No.
15        Q.    And when I say "any time," I mean,
16  you know, either before or after the transaction.
17        A.    No.
18        Q.    Okay.  Now, Dewey Hembree is with the
19  McGlinchey Stafford firm, correct?
20        A.    Correct.
21        Q.    And William Smith is with the
22  Watkins & Eager firm?
23        A.    Correct.
24        Q.    And both are experienced real estate
25  attorneys, are they not?

Examination Under Oath of Donald Joseph Brata

Page 25

1  that the -- at closing, the Evanses were to pay
2  $5,000 in cash; is that right?
3       A.    $5 million in cash.
4       Q.    Excuse me.
5       A.    $5 million in cash.
6       Q.    Pardon me.
7       A.    Yeah.
8       Q.    Okay. Which would be -- you would
9  have -- $5 million in cash, and $11 million would
10 be owner financed, correct?
11      A.    Correct.
12      Q.    All right. You will agree in there
13 that there's nothing in the provisions of
14 paragraph 4 that says that the Evanses couldn't
15 borrow money to come up with the $5 million?
16      A.    Yeah, there's no prohibition in that
17 paragraph.
18      Q.    Okay. And do you know of any
19 prohibition in the contract to them borrowing
20 money to close?
21      A.    No.
22      Q.    Okay. And the understanding was, in
23 paragraph 5, is that once they paid $5 million,
24 that you would release a certain portion of the
25 property and which would be free and clear of the

Page 26

1    $11 million mortgage, correct?

2        A.    Correct.

3        Q.    And that was done, was it not?

4        A.    That was done.

5        Q.    You did, in fact, receive $5 million

6    at closing?

7        A.    Yes.

8        Q.    Okay.  Did the Evanses comply with

9    all of the requirements of the contract that's

10   been marked as Exhibit 3?

11           MR. CORY:  Are you talking about at

12   the time of closing?

13           MR. BRABEC:  Yes.

14           THE WITNESS:  Yes.

15   MR. BRABEC, CONTINUED:

16       Q.    Okay.  If you would, look at

17   paragraph 11.  It's actually on page 4.  It

18   says -- it says there, "In the event this

19   transaction fails to close due to wrongful refusal

20   or failure in breach of this contract on the part

21   of the purchaser to close, then in such event,

22   seller's sole remedy shall be to terminate this

23   contract and retain the earnest money."  Is that

24   correct?

25       A.    Correct.

Examination Under Oath of Donald Joseph Brata

Page 27

1   Q.   All right. But they did not default,
2   correct?
3            MR. CORY:  I think that's a legal
4   question. I mean, he can answer it if he
5   understands it, the context of it.
6            But you can -- you have to declare a
7   default.
8            THE WITNESS:  Yeah, I never declared
9   a default. They did not close, as specified, by
10  April 30th, but G&B agreed to keep the contract in
11  force, and eventually the transaction closed
12  July 23rd of 2008.
13  MR. BRABEC, CONTINUED:
14  Q.   Okay. Now, under paragraph No. 15,
15  there's Seller's Representations and Warranties?
16  A.   Uh-huh. Yes.
17  Q.   Okay. And I notice that there are no
18  purchaser's representations or warranties.
19  A.   Agreed.
20  Q.   Okay. So when you entered into this
21  agreement, there weren't any contingencies or
22  facts that had been represented to you that you
23  felt were important enough to include in the
24  contract?
25  A.   Yes. This agreement was presented to

Case 10-00040-NPO   Doc 275-8   Filed 12/22/10   Entered 12/22/10 15:42:13   Desc
Exhibit H - Excerpts of G&Bs Exam Under Oath   Page 8 of 12

Examination Under Oath of Donald Joseph Brata

Page 28

1   us and produced by William Smith.

2   Q.   Right. But you had input into this
3   document, correct?

4   A.   Correct.

5   Q.   And you -- you were represented by
6   very capable counsel?

7   A.   Correct.

8   Q.   And had there been any warranties or
9   representations that you needed to be included in
10  there, you could have brought that up to Mr. Smith
11  and to the Evanses, correct?

12  A.   Correct.

13  Q.   But you didn't?

14  A.   Correct.

15  Q.   And you see paragraph 17, it's an
16  integration clause?

17  A.   Yes.

18  Q.   And you agreed, just like the Evanses
19  agreed, that this was a fully-integrated contract
20  and that there were no representations made
21  outside of what was actually in the written
22  document?

23  A.   Correct.

24  Q.   And as we stand here today, were
25  there any representations that were made by the

Examination Under Oath of Donald Joseph Brata

Page 46

1  there's not. But that is a legal determination,
2  not a determination that this witness can make.
3  So it's not an effort to delay or obstruct. I
4  just don't think he can -- Mr. Brata can tell you
5  that answer.
6          MR. BRABEC: Okay. I'll move on.
7  MR. BRABEC, CONTINUED:
8     Q.    At any point in time, did
9  Charles Evans make any representations to G&B
10 about his authority with respect to Mississippi
11 Valley Title?
12    A.    No.
13    Q.    Okay. At any point in time did
14 Mississippi Valley Title give you any
15 representations concerning Charles Evans'
16 authority with respect to them?
17    A.    No.
18    Q.    All right. Did you rely on anything
19 that Mississippi Valley Title did to go through
20 with this agreement?
21    A.    To go through with the purchase and
22 sale agreement?
23    Q.    Yes, sir.
24    A.    No.
25    Q.    Okay. And as a matter of fact, as of

Page 47

1    December of 2007, G&B was bound to go through with
2    this agreement at least until March 31st, correct?
3        A.    Correct.
4        Q.    And then you waived the time
5    provision for closing.  So you were obligated to
6    close in July, were you not?
7        A.    Correct.
8              MR. CORY:  Just for the record, I'm
9    going to object, to the extent that you're calling
10   for legal conclusions.  Those are -- he's giving
11   you his opinion.  Whether he was legally obligated
12   or not is a far more complex question at that
13   point.  So. . .
14   MR. BRABEC, CONTINUED:
15       Q.    You understood that you were
16   obligated, right?
17       A.    Well, quite frankly, I did not
18   execute any amendments to this agreement, so I
19   don't know if I -- I think I could have stated to
20   Charles, "I've had enough of you," and walked
21   away.
22       Q.    Okay.
23       A.    Or had enough of William Smith.
24       Q.    But you -- you didn't, did you?
25       A.    I did not do that.

Case 10-00040-NPO   Doc 275-8   Filed 12/22/10   Entered 12/22/10 15:42:13   Desc
Exhibit H - Excerpts of G&Bs Exam Under Oath    Page 11 of 12

Examination Under Oath of Donald Joseph Brata

Page 117

1      A.      No.  We'll retract that.

2      Q.      Okay.  What about 13?  It seems to be
3  just a catchall of --

4              MR. CORY:  I think it's -- I think
5  it's already covered -- I mean, if you're able to
6  recover your deficiency judgment and your expenses
7  and costs, that's more of just a -- I assume
8  Richard's just summarizing.

9              THE WITNESS:  We'll retract 13.

10             MR. BRABEC:  Okay.  That's all I've
11 got on the claim form.  Let me look and see
12 what --

13             MR. CORY:  You want a break or. . .

14             MR. BRABEC:  Yeah, why don't we take
15 a break.  I don't want to hold y'all up.

16             (OFF THE RECORD.)

17 MR. BRABEC, CONTINUED:

18     Q.      Who did the title work on the
19 closing, the sale to Hanover?

20     A.      William Smith.  And on the closing
21 statement, I also saw a $800 fee to a First
22 Guarantee Title Company, which I believe is --
23 William Smith's brother works there.

24     Q.      Okay.  To your knowledge, did
25 Mississippi Valley do any of the title work on

Examination Under Oath of Donald Joseph Brata

Page 118

1   that transaction?
2       A.      I have no knowledge of that.  I did
3   not interact with anybody at Mississippi Valley
4   Title.
5       Q.      Okay.  Do you know of any
6   responsibilities that Mississippi Valley took on
7   besides issuing the owner's policy to G&B in
8   connection with your transaction?
9       A.      I think they also issued a title
10  policy to Hanover.  I saw in the closing statement
11  that Hanover paid 16,000 for title policy.
12      Q.      Okay.  Did you ever consider getting
13  a lender's policy, since you were going to take a
14  deed of trust on the property?
15      A.      I don't recall having a conversation
16  with Hembree regarding that.
17      Q.      Okay.
18          MR. CORY:  I want to be clear on
19  this, Joe, so it's clear.
20          THE WITNESS:  Okay.
21          MR. CORY:  Did you -- did you know
22  what type of policy you were getting, or do you
23  specifically remember if they said, We're going to
24  get you an owner's policy, or who said what?  I
25  mean, I don't know who said what.  Or was it more