**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

|  |  |
|---|---|
| **JON CHRISTOPHER EVANS AND JOINTLY ADMINISTERED RELATED CASES** | **Case No. 09-03763-NPO** |
| **DEBTORS** | **Chapter 7** |

---

| | |
|---|---|
| **G&B INVESTMENTS, INC.** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 10-00040-NPO** |
| **DEREK A. HENDERSON, TRUSTEE FOR THE BANKRUPTCY ESTATE OF JOHN CHRISTOPHER EVANS, ET AL** | **DEFENDANTS** |

---

**TITLE COMPANIES' MEMORANDUM IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST G&B INVESTMENTS, INC.**

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") file this Memorandum Brief in Support of Motion for Partial Summary Judgment against G&B Investments, Inc. ("G&B").

## I.    INTRODUCTION

The claims of G&B against the Title Companies differ greatly from all other claims before this Court. While Charles Evans was an approved attorney on all other transactions before this Court, he was not an approved attorney for the G&B transaction with Hanover Investment, Inc. ("Hanover"). Rather, Charles Evans acted solely in the capacity of a purchaser (or a representative of the purchaser) with regard to G&B. Hanover entered into a purchase agreement with G&B to obtain approximately 105 acres of property. The agreement required

Hanover to pay $5 million at closing and to execute a deed of trust with regard to approximately

77 acres to secure a promissory note from Hanover to G&B for $11 million.  G&B got exactly

what it bargained for.  It is undisputed that Hanover fully performed under the purchase

agreement.  The only agreement breached by Hanover was on the $11 million promissory note

executed by Hanover in favor of G&B.

The Title Companies did not insure the note between G&B and Hanover.  Rather, the

owner's title insurance policy issued by the Title Companies to G&B insured against any defects

in the title conveyed from G&B to Hanover.  G&B did not even make a claim under the owner's

title policy until October 11, 2010, almost three months after it had asserted these claims against

the Title Companies.  The undisputed facts establish that no defects exist in the title conveyed to

G&B.  Unwilling to accept the risk of doing business, G&B attempts to reach the perceived

"deep pockets" of the Title Companies by manufacturing unprecedented and baseless tort claims.

In essence, G&B claims that if the Title Companies had caught Charles Evans earlier, it would

not have closed the sale to Hanover.  Therefore, G&B frivolously claims that the Title

Companies should be liable to it in tort for all losses incurred in the Hanover transaction.

The undisputed facts and law, however, establish that G&B's claims fail.  The Title

Companies seek summary judgment on all tort-based claims asserted by G&B in its Second

Amended Complaint against the Title Companies.[1]  These claims include allegations of

negligence (Counts Three and Four) and agency (Count Seven).  G&B's sworn testimony and

the indisputable facts make clear that no genuine issue of material fact remains on these

respective claims.  Accordingly, this Court should enter summary judgment for the following

four independent reasons:

---

[1] The Title Companies also filed a motion for declaratory judgment on G&B's contractual claims asserted in the Second Amended Complaint.  The motion for declaratory judgment and this motion for partial summary judgment address all claims asserted by G&B against the Title Companies.

1.  G&B's tort claims raise an issue of first impression in Mississippi. The majority of other jurisdictions and the modern trend hold that a title insurance company, as a matter of law, cannot be liable in tort to its insureds. The majority rule is supported by basic Mississippi insurance and contract principles and provides the most well-reasoned approach. Under the twin-aims of *Erie*, this Court should adopt the majority rule and enter judgment as a matter of law in favor of the Title Companies on all negligence claims asserted by G&B.

2.  Even if this Court elects to adopt a rule permitting tort-based claims against a title insurance company, G&B's tort claims fail as a matter of law. The undisputed facts fail to establish that the Title Companies owed any legal duty to G&B beyond the terms of the owner's insurance policy.

3.  G&B's agency claim fails because the undisputed facts establish that no agency relationship existed between Charles Evans and the Title Companies with regard to any transactions with G&B. During the transaction between G&B and Hanover Investments, LLC, Charles Evans acted solely in his capacity as a purchaser (or representative of the purchaser). Charles Evans did not act as an approved attorney or title agent on behalf of the Title Companies for any transactions for which G&B was involved.

4.  Finally, because G&B bound itself to sell the property long before any of the transactions complained of, nothing the Title Companies could have done would have erased G&B's obligation to sell the property to Hanover.

Because there are no remaining genuine issues of material fact, judgment as a matter of law in favor of the Title Companies on the tort and agency claims asserted by G&B is proper.

## II.   STATEMENT OF FACTS

**A.   <u>Background Facts Regarding the Transaction Between G&B and Hanover</u>**

The material facts necessary for this Court to grant summary judgment are simple and undisputed. In December of 2007, G&B entered into a contract to sell approximately 104 acres referred to as Tract IV to 463 Development Company, LLC ("463 Development"). (Exhibit "A", Contract).[2] Unless otherwise stated, this transaction, will be referred to as the "G&B Transaction." Prior to the closing, 463 Development assigned its rights under the contract to Hanover Investments ("Hanover"). (Exhibit "B", Assignment from 463 Development to

---

[2] All Exhibits referenced herein are attached to the Title Companies' Motion for Partial Summary Judgment Against G&B Investments, Inc.

Hanover).  463 Development and Hanover were represented by the law firm of Watkins & Eager

in the G&B Transaction.  G&B was represented by the law firm of McGlinchey Stafford.

Charles Evans signed the contract as "authorized agent" of 463 Development.  (Exhibit

"A", Contract).  The contract, which totaled $16 million, required 463 Development to pay $5

million dollars cash at closing and provide a promissory note in favor of G&B for the remaining

$11 million.  (Exhibit "A", Contract).  Reflecting the $5 million cash payment, G&B agreed to

release approximately 28 acres to 463 Development.  (Exhibit "A", Contract).  As a result of the

promissory note for $11 million, G&B retained a security interest in the remaining 77 acres

through a purchase money deed of trust.  (Second Am. Compl. ¶ 19).

On July 23, 2008, Hanover exercised its right to purchase Tract IV from G&B.  (Second

Am. Compl. ¶ 25).  Charles Evans signed the closing statement, promissory note, and purchase

money deed of trust on behalf of Hanover.  (Exhibit "C", Closing Statement; Exhibit "D",

Promissory Note; Exhibit "E", Purchase Money Deed of Trust).  Hanover complied with all the

requirements of the contract by providing the $5 million cash and the promissory note worth $11

million secured by the purchase money deed of trust.  (Second Am. Compl. ¶ 25).

**B.**     **Material Facts**

The Title Companies issued an owner's title insurance policy to G&B on July 22, 2008,

bearing policy number OP-109631 (the "Owner's Policy").  (Exhibit "F", Owner's Policy;

Second Am Compl. ¶ 26; Exhibit "G", G&B Depo., p. 11).  The Owner's Policy was issued by

the Title Companies through Watkins & Eager, a title agent.  (Exhibit "F", Owner's Policy;

Exhibit "H", G&B EUO, p. 117-118).  Charles Evans did not act as an approved attorney or title

agent on behalf of the Title Companies with regard to any transactions involving G&B.  (Exhibit

"H", G&B EUO, p. 17-18).  In fact, at the time of the G&B Transaction, G&B was not even

aware that Charles Evans was an approved attorney for the Title Companies. (Exhibit "H", G&B EUO, p. 17-18). It is undisputed that the Owner's Policy is the only communication and/or correspondence between G&B and the Title Companies. (Exhibit "G", G&B Depo, p. 23-24; Exhibit "H", G&B EUO, p. 46). It is also undisputed that Charles Evans acted solely in his capacity as a purchaser (or representative of the purchaser) during the transaction between G&B and Hanover. (Exhibit "H", G&B EUO, page 17-18).

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Wright v. Ford Motor Co.*, 508 F.3d 263, 274 (5th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). The court should review all pleadings, depositions, admissions, and other evidence to determine if a genuine issue of material fact exists. *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995). The moving party satisfies its burden by showing an absence of "genuinely" disputed material facts, and pointing to evidence that it is entitled to a judgment. *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989). The moving party need only point out the absence of genuinely disputed material facts and "need not negate the elements of the non-movant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

To avoid summary judgment, G&B "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *EMCASCO Ins. Co. v. American Intern. Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). This requires "significant probative evidence" that would allow a reasonable fact-finder to rule in favor of G&B on all essential claim elements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 322-23. G&B cannot meet

this burden simply by relying on unsubstantiated assertions, improbable inferences, or

unsupported speculation because these are not competent summary judgment evidence. *Forsyth*

*v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

Based on the undisputed facts and law discussed below, this Court should enter judgment

as a matter of law in favor of the Title Companies as to the tort-based claims asserted by G&B.

## IV.   ARGUMENT

### A.   As a Matter of Law, the Title Companies Cannot be Liable in Tort to its Insureds Because the Relationship Between a Title Insurer and its Insureds is Based Purely on Contract

In its Second Amended Complaint, G&B alleges that the Title Companies are liable

based on tort principles of negligence.  Specifically, G&B alleges that the Title Companies were

negligent for (1) failure to monitor, supervise, and audit Charles Evans; (2) negligent

misrepresentation; and (3) negligent failure to disclose the existence of multiple commitments or

policies on the same property in question.  (Second Am. Compl. ¶ 51-65).

The issue of a title insurer's tort liability is an issue of first impression in Mississippi.  In

the absence of a final decision by the Mississippi Supreme Court on the issue at hand, it is the

duty of the federal court to determine, in its best judgment, how the Mississippi Supreme Court

would resolve the issue if presented with the same case.  *Am. Int'l Specialty Lines Ins. Co. v.*

*Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).  This process is typically referred to as an

"Erie guess," based on the U.S. Supreme Court's decision in *Erie R. Co. v. Tompkins*, 304 U.S.

64, 78-80 (1938).  The majority of jurisdictions and the modern trend hold that a title insurer

may not be liable in tort because the relationship between a title insurer and its insured is based

on contract law.  This rule is based on the fact that parties to a contract elect to reduce their

duties, rights, responsibilities, and obligations to writing for more predictable results.  The

majority rule finds significant support from basic Mississippi contract and insurance principles.

This Court should follow the majority rule and enter an order that, as a matter of law, the Title

Companies cannot be liable to G&B under a tort theory.

> 1. **Basic Mississippi insurance principles recognize that the relationship between insurer and insured is strictly one of contract and not tort.**

Mississippi has long held that "the relation between the policy holder and the [insurance]

company [is] one of contract, measured by the terms of the policy." *Equitable Life Assurance*

*Soc. of the U.S. v. Weil*, 60 So. 133, 134 (Miss. 1912) (citations omitted); *Szumigala v.*

*Nationwide Mut. Ins. Co.*, 853 F.2d 274, 280, n.7 (5th Cir. 1988) (describing the insurance

relationship as "one that is contractual in nature...."). Indeed, "[i]t is clear that the relationship

between an insurance company and its insured is contractual in nature, with the rights and duties

set out by the provisions of the insurance policy." *Sessoms v. Allstate Ins. Co.*, 634 So. 2d 516,

519 (Miss. 1993) (citing *Cauthen v. National Banks Life Ins. Co.*, 88 So. 2d 103 (Miss. 1956)).

Mississippi courts interpret insurance policies according to contract law. *Am. States Ins.*

*Co. v. Nethery*, 79 F.3d 473, 475 (5th Cir. 1996) (citing *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713

F.2d 1106, 1109 (5th Cir. 1983)). "Like all other contracts, insurance policies which are clear

and unambiguous are to be enforced according to their terms as written." *Sessoms*, 634 So. 2d at

519 (citing *Davidson v. State Farm Fire & Cas. Co.*, 641 F. Supp. 503 (N.D. Miss. 1986) and

*Aero International v. United States Fire Ins. Co.*, 713 F.2d 1106 (5th Cir. 1983)).

 "Tort law principles should not dictate judicial construction of insurance policies....

Insurance contracts are construed in accordance with the plain language of the policies as

bargained for by the parties…" *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 70 (Miss. 1998).[3]

---

[3] The *Lewis* case involves the interpretation of a homeowners insurance policy. *Lewis v. Allstate Ins. Co.*, 730 So.
2d at 67. In *Lewis*, the Mississippi Supreme Court stated that insurance policies are contracts of adhesion and thus,
ambiguities should be construed in favor of the insured. *Id*. at 70. Title insurance policies, however, have not been

Stated simply, the Court may not construe "a contract differing from that made by the parties themselves, or [] enlarge an insurance company's obligations where the provisions of its policy are clear." *State Auto. Mut. Ins. Co. v. Glover*, 176 So. 2d 256, 258 (Miss. 1965).

Mississippi's basic contract and insurance principles are consistent with the majority rule described below and support a determination by this Court that title insurers may not be liable in tort.

> **2.     The Court should adopt the majority rule regarding tort liability of a title insurance company.**

Whether a title insurance company may be found liable in tort to its insured is an issue of first impression in Mississippi.  The vast majority and the modern trend of states that have addressed this issue, have either favorably discussed or expressly followed the rule that a title insurer is not liable in tort to the insured for duties performed under the contract unless the title insurer affirmatively assumes some independent duty outside the contract.  The Court should adopt the majority rule for the following reasons.

> **a.     The relationship between the title insurance company and its insured is based solely on the insurance policy.**

The relationship between the title insurer and the insured is purely contractual.  "A title insurance policy is a contract of indemnity…. [T]he only duty imposed by a title insurance policy is the duty to indemnify the insured against losses caused by defects in title…. [Thus, the] issuance of a [title] policy did not constitute a representation regarding the status of the property's title; rather, it constituted an agreement to indemnify the [insured] against losses

---

held out to be contracts of adhesion.  In fact, the Fifth Circuit has suggested that title insurance policies are arms-length transactions because the policies are drafted and promulgated by the American Land and Title Association ("ALTA").  *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 496-97, FN5 (5th Cir. 2004)(citing Michael F. Jones & Rebecca R. Messall, *Mechanic's Lien Title Insurance Coverage for Construction Projects: Lenders and Insurers Beware*, 16 REAL EST. L.J. 291, 306-07 (1988)).

caused by any defects." *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310  (Tex. 1994); 1 Am

Jur 2d *Abstracts of Title* § 16 (2010) (A title insurance policy is simply "a contract for

indemnification under which the insurer is obligated to indemnify the insured against losses

sustained in the event that a lien or encumbrance affecting title to property is discovered.").

One leading explanation of this contractual relationship, which has been cited by

numerous courts[4], comes from the New Jersey Supreme Court:

> [T]he relationship between the company and the insured is essentially contractual.  The
> end result of the relationship between the title company and the insured is the issuance of
> the policy.  To this extent, the relationship differs from other relationships conceivably
> sounding in both tort and contract, such as the relationship between physician and patient,
> to which plaintiff alludes.  Although the relationship between physician and patient is
> contractual in its origins, the purpose of the relationship is to obtain the services of the
> physician in treating the patient.  The patient reasonably expects the physician to follow
> the appropriate standard of care when providing those services.  By contrast, the title
> company is providing not services, but a policy of insurance.  That policy appropriately
> limits the rights and duties of the parties.
>
> From this perspective, the insured expects that in consideration for payment of the
> premium, it will receive a policy of insurance.  The insurer's expectation is that in
> exchange for that premium it will insure against certain risks subject to the terms of the
> policy.  If the title company fails to conduct a reasonable title examination or, having
> conducted such an examination, fails to disclose the results to the insured, then it runs the
> risk of liability under the policy.

*Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 220 (N.J. 1989) (citations

omitted); *Greenberg v. Stewart Title Guar. Co.*, 171 Wis. 2d 485, 496 (Wis. 1992) ("There was

no obligation under the [title insurance] contract to search the title, thus no duty could arise to

search the title with due care and skill.").  Again, the title searcher provides services in the form

of reviewing title and producing a comprehensive review of title called an abstract.  The title

insurer simply contracts to indemnify the insured should any problems arise in the chain of title.

Consistent with the nature of insurance, the title insurer rather than the insured assumes any risk

---

[4] *See e.g., Ruger v. Funk*, 1996 Del. Super. LEXIS 34 (Del. Super. Ct. Jan. 22, 1996); *Culp Constr. Co. v.
Buildmart Mall*, 795 P.2d 650 (Utah 1990); *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147 (Wis.
1992); *Hulse v. First Am. Title Co.*, 33 P.3d 122 (Wyo. 2001).

that the description of title in the subsequent policy is incorrect.

Put differently, the contract for title insurance and the contract for a title search are separate and distinct and the "doctrine of skill or negligence has no application to a contract of title insurance." *Citibank v. Chicago Title Ins. Co.*, 632 N.Y.S. 2d 779, 781 (Sup. Ct. App. Div. 1995). This idea fits perfectly with the concept that a title insurer will not be liable in tort unless it voluntarily assumes duties outside the contract because "title insurance only insures against damage resulting from defects in the insured's title in the property, and does not represent that the contingency insured against will not occur." *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 764 P.2d 423, 426 (Id. 1988).

Adopting the majority rule also recognizes the clear distinction between the functions of searching title and insuring title. For example, a title searcher, often called an abstractor, enters into a services contract to conduct a comprehensive review of the chain of title for a particular piece of property. *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 562 A.2d 208, 220 (N.J. 1989). By contrast, a title insurer enters into an insurance contract to indemnify the insured with respect to its proper place in the chain of title should any problems arise. *Id*. The Utah Supreme Court has described the difference as follows:

> The function, form, and character of a title insurer is different from that of an abstractor. One who hires a title insurance company does so for the purpose of obtaining the assurance or guarantee of obtaining a certain position in the chain of title rather than for the purpose of discovering the title status. A title company's function is generally confined to the practice of insurance, not the practice of abstracting.

*Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 654 (Utah 1990).

A title searcher or abstractor provides title abstract or certificate of title. A title insurance company typically provides title insurance commitments and policies. The information contained in a title commitment and a title policy is simply to identify the property and the

particular state of title to be insured.  *First Midwest Bank v. Stewart Title Guar. Co.*, 843 N.E.2d

327, 335 (Ill. 2006); s*ee also Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147, 149 (Wis.

1992) ("A title commitment is a document which describes the property as the title insurer is

willing to insure it and contains the same exclusions and general and specific exceptions as later

appear in the title insurance policy.").  A "title insurer is not in the business of supplying

information when it issues a title commitment or a policy of title insurance." *First Midwest*

*Banks*, 843 N.E.2d at 336.

Discussing the relationship between a title insurance company and its insured, the Texas

Court of Appeals has properly explained that "[t]he title insurance company is not, as is an

abstract company, employed to examine title."  Rather, the title insurance company agrees to

indemnify the insured in the event a title defect is discovered.  Thus, the relationship between the

parties is limited to that of indemnitor and indemnitee." *Houston Title Co. v. Ojeda de Toca*, 733

S.W.2d 325, 327 (Tex. Ct. App. 1987).  The contractual relationship between G&B and the Title

Companies is one of indemnification.  and This Court may not alter or amend the clear and

unambiguous terms of the Owner's Policy, which is the only evidence of any relationship

between G&B and the Title Companies.

> **b.**     **Subjecting a title insurer to tort liability would render the actual
> terms of the insurance policy meaningless.**

Where G&B and the Title Companies had no communication other than the Owner's

Policy, itself, there can be no plausible argument that the Title Companies assumed any

additional duty.  Without the assumption of a legal duty, it is axiomatic that no breach may

occur.  Likewise, if this Court were to permit a cause of action in tort to proceed based on the

undisputed facts of this case, the terms and conditions of the Owner's Policy would be rendered

meaningless.[5]  The sole relationship between G&B and the Title Companies in an indemnity

agreement for defects in title.  The Title Companies were not requested by G&B to provide, and

did not provide, an abstract or report on the status of title.

Describing current industry practices, a U.S. District Court for the Eastern District of

Michigan explained:

> As in other states [like Mississippi], parties in Michigan generally purchase title
> insurance, rather than relying on an abstract, because they prefer the certainty of
> insurance.  In purchasing insurance, a buyer acquires a contractual right against the
> insurer for coverage of title defects.  In purchasing an abstract, a buyer merely obtains an
> examination of title.  With an abstract, a real estate buyer can obtain damages for title
> defects only through tort litigation.  To protect the rights and expectations of the parties, a
> title insurer should be liable in accordance with the terms of the title policy only and
> should not be liable in tort.  To hold otherwise does violence to the whole concept of
> insurance.

*Mickam v. Joseph Louis Palace Trust*, 849 F. Supp. 516, 521 (E.D. Mich. 1993).  Following this

line of thought, a Delaware Superior Court noted the following:

> If the insured could seek recovery in tort for the failure of an insurer to discover defects
> in title, the policy limits agreed to by the parties would become meaningless.  The
> insureds have paid for a policy providing for a certain level of indemnification.  They
> have paid for no more.  Therefore, recovery is limited to that provided for in the contract.
> *In other words, no reasonable land purchaser [or lender] would consider a title
> insurance company as certifying that no title defect exists, when the whole purpose of the
> policy is to spell out the rights and responsibilities of parties if a defect does exist.*

*Ruger v. Funk*, 1996 Del. Super. LEXIS 34, *29 (Del. Super. 1996) (emphasis added).

This sound logic and reasoning applies equally in Mississippi.  This Court should adopt

the majority rule that, as a matter of law, the Title Companies owed no duties to G&B beyond

the terms, conditions, limitations, exceptions and exclusions of the Owner's Policy.  To do

otherwise would effectively alter, diminish, or negate the contract entered into by the parties.

Such a rule ignores the purpose of title insurance altogether, which is that specifics risks of title

---

[5] See the Title Companies Motion for Declaratory Judgment filed simultaneously with this motion for an analysis of
G&B's contract-based claims.

defects as outlined in the policy are shifted from the insured to the insurer.  Ignoring this premise would detrimentally alter the insurance industry.  This Court should adopt the majority rule which properly recognizes the purpose and intent of insurance and basic contract principles of Mississippi.

### 3.       G&B's Tort Claims Fail under Established Mississippi Law.

As discussed above, G&B alleges that the Title Companies were negligent for (1) failure to monitor, supervise, and audit Charles Evans; (2) negligent misrepresentation; and (3) negligent failure to disclose the existence of multiple commitments or policies on the same property in question.  (Second Am. Compl., ¶ 51-65).  By adopting the majority rule in this case, the Court need not reach an analysis of the specific elements of G&B's tort claims.  Even if this Court's *Erie* guess recognizes tort liability for a title insurance company, however, Mississippi law makes clear that G&B's negligence claims fail.

### a.       The Title Companies owed no legal duty to G&B to monitor, supervise or audit Charles Evans.

Even if a Mississippi court would permit a tort claim, G&B's claims for negligent hiring should be dismissed because Charles Evans was not an employee of the Title Companies. Mississippi recognizes that "a master [or employer] cannot be liable for the negligence of a fellow employee who was hired with due care."  *Jones v. Toy*, 476 So. 2d 30, 31 (Miss. 1985). In order to prove negligent hiring, the plaintiff must show "(1) that [the employer] knew or should have known of some incompetence on the part of [the employee] and (2) that [the employer] failed to do anything about it."  *Raiola v. Chevron U.S.A., Inc.*, 872 So. 2d 79, 86 (Miss. App. 2004) (citing *Jones*, 476 So. 2d at 31).  G&B has not asserted that Charles Evans was an employee for the Title Companies.  More importantly, it is indisputable that Charles Evans was not an employee and that he was not paid by the Title Companies.

13

The Court should also dismiss G&B's negligent training and supervision claims.  The

Mississippi Court of Appeals has stated "that specific evidence of an employer's actual or

constructive knowledge of its employee's dangerous or violent tendencies is necessary in order to

create a genuine issue of material fact on an improper training or supervision theory of liability."

*Holmes v. Campbell Props.*, 2010 Miss. App. LEXIS 243, at *18 (Miss. App. May 18, 2010).

Further, Mississippi law makes clear that "employers do not have a duty to supervise their

employees when the employees are off-duty or not working.  Moreover, an employer's duty to

supervise does not include a duty to uncover his employees' concealed, clandestine, personal

activities." *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay*, 42 So. 3d 474, 489

(Miss. 2010) (quoting *Tichenor v. Roman Catholic Church of the Archdiocese of New Orleans,*

32 F.3d 953, 960 (5th Cir. 1994) (internal quotations omitted)). *See also Williams v. U.S. Fid. &*

*Guar. Co.,* 854 F.2d 106, 109 (5th Cir. 1988).  Again, Charles Evans was not an employee of the

Title Companies.  This is undisputed.  Even if he were, the Title Companies had no duty to

uncover Charles Evans' "concealed, clandestine, personal activities."  *Baker Donelson*, 42 So. 3d

at 489.

The Title Companies are also entitled to judgment as a matter of law on G&B's claim for

failure to audit Charles Evans.  The Title Companies have diligently researched and found no

reported cases where any court has imposed upon a title insurer a tort duty to audit its approved

attorneys.  No such duty, however, has been imposed with regard to title agents.  The only

reported cases found have held that a title insurance company owes no duty to its insured to

monitor and/or audit title agents.  In *Bluehaven Funding, LLC v. First American Title Ins. Co.*,

the Eight Circuit held that a title insurer owes no common law tort duty to its insureds or other

third parties to monitor or audit the title insurer's title agents.  *Bluehaven Funding, LLC v. First*

*Am. Title Ins. Co.*, 594 F.3d 1055, 1161 (8th Cir. 2010) (applying Missouri law).

Additionally, when a title insurer audits its title agents, the right to audit is by either

statute or contract and not based on the common law of tort. *See e.g. Proctor v. Metropolitan*

*Money Store Corp.*, 579 F. Supp. 2d 724, 726-27 (D. Md. 2008) (statutory duty); *Fidelity Nat'l*

*Title Ins. Co. v. Mussman*, 930 N.E.2d 1160, 1166 (Ind. Ct. App. 2010) (contractual duty);

*Bluehaven Funding, LLC v. First Am. Title Ins. Co.*, 594 F.3d 1055, 1159 (8th Cir. 2010)

(contractual duty); *First Am. Title Ins. Co. v. First Alliance Title, Inc.*, 2010 U.S. LEXIS 58433,

at *31-32 (E.D. Va. 2010) (contractual duty)*; See also Haley v. Corcoran*, 659 F. Supp. 2d 714,

725 n. 11 (D. Md. 2009) (no cause of action or other liability to third parties attaches simply

because of statutory duty to review).

Audits are conducted for the sole benefit of the title insurer and not for the insured or

some other third party.  As one court stated, "[a]n audit occurs after the fact to verify that the

transaction occurred as contemplated and to verify the risk assumed under the policy issued."

*Fidelity*, 930 N.E.2d at 1168.  Additionally, the *Bluehaven* court stated, "[the title insurer's

contractual] right to review [the title agent's] escrow files and accounts was for [the title

insurer's] own benefit and protection, and not for the benefit of any third party."  *Bluehaven*

*Funding*, 594 F.3d at 1161.  Clearly, if a title insurer is not under a duty to audit its title agents,

then it follows that no such duty applies to approved attorneys.

     **b.**     **G&B's claims for negligent and fraudulent or intentional
misrepresentation fail as a matter of law based on the undisputed
facts.**

To succeed on its negligent misrepresentation claim, G&B must prove the following the

elements:

(1) a misrepresentation or omission of a fact;

(2) that the representation or omission is material or significant;

(3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities;

(4) that the plaintiff reasonably relied upon the misrepresentation or omission; and

(5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

*Mladineo v. Schmidt*, 2010 Miss. LEXIS 569, at *25-26 (Miss. Oct. 28, 2010) (quoting

*Hazlehurst Lumber Co., Inc. v. Miss. Forestry Comm'n*, 983 So. 2d 309, 313 (Miss. 2008)).  The

standard required to establish a fraudulent or intentional misrepresentation in even more

stringent.  *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992).

G&B admits that the Owner's Policy is the only document that it received from the Title

Companies (Exhibit "G", G&B Depo., p. 23-24; Exhibit "H", G&B EUO, p. 46), but G&B

cannot point to any provision in the Owner's Policy that explicitly or implicitly made such a

promise. G&B's argument fails as a matter of law.

> c.    **The Title Companies owed no legal duty to G&B to disclose their dealings with other parties.**

G&B's final negligence claim is based on the misplaced assertion that the Title

Companies owed a legal duty to G&B to disclose their dealings with other parties.  G&B claims

that the Title Companies somehow owed a duty to G&B to inform it that the Evans brothers were

involved in other transactions regarding Tract IV.  G&B is wrong.  After diligent research on the

issue, the Title Companies are unable to find a single case supporting G&B's argument.

In a negligence action, "the plaintiff bears the burden of producing evidence sufficient to

establish the existence of the conventional tort elements of duty, breach of duty, proximate

causation, and injury."  *Prewitt v. Vance*, 16 So. 3d 37, 40 (Miss. App. 2009) (quoting *Palmer v.

Biloxi Reg'l Med. Ctr.,* 564 So.2d 1346, 1355 (Miss.1990)).  "While duty and causation both

involve elements of foreseeability, duty is an issue of law, and causation is generally a matter for

the jury.  Juries are not instructed in, nor do they engage in, consideration of the policy matters

and the precedent which define the concept of duty….[T]he existence vel non of a duty of care is

a question of law decided by the Court."  *Rein v. Benchmark Construction Co.*, 865 So. 2d 1134,

1143 (Miss. 2004).

The issuance of title policies and commitments is part of the Title Companies'

underwriting process.  This underwriting process is solely for the benefit of the Title Companies.

This concept is supported through the well-reasoned decision by the Eight Circuit Court of

Appeals in *Bluehaven Funding*.  594 F.3d 1055 (8th Cir. 2010).  The *Bluehaven Funding* court

held that an audit was strictly for the benefit of the title insurer and not for any third party.  *Id*. at

1161.  This same principle applies to the underwriting process of the Title Companies.  To rule

otherwise would create a counter-cause-of-action for the Title Companies against lenders for

alleged failures by the banks in their own underwriting process with regard to making loans.

Such a result would lead to a windfall of prolonged, fact-intensive, and costly litigation.

Further, the undisputed facts render G&B's argument illogical.  It is undisputed that the

Title Companies issued a title insurance commitment to the Bank of Forest on July 17, 2008

pertaining to a portion of the Tract IV property.  (Exhibit "I", 2008 Bank of Forest

Commitment).  G&B incorrectly stated in its Second Amended Complaint (Second Am. Compl.,

¶64-65) and incorrectly represented to the Court at the hearing on the Title Companies' motion

to dismiss G&B's First Amended Complaint[6] that additional title insurance policies were issued

---

[6] At the hearing on the Title Companies' motion to dismiss G&B First Amended Complaint, counsel for G&B
incorrectly stated that numerous title insurance policies and commitments were issued by the Title Companies for
Tract IV prior to the G&B transaction on July 23, 2008.  Counsel for G&B also incorrectly stated that commitments
and policies issued by the Title Companies prior to the G&B transaction misrepresented the status of title.  The only
issued form preceding the G&B transaction from the Title Companies is a commitment to the Bank of Forest, which
correctly stated that title was vested in G&B Investments, Inc.

by the Title Companies to other parties in this adversary proceeding regarding Tract IV prior to

the G&B transaction on July 23, 2008.  The undisputed facts and G&B's testimony confirm

otherwise.  (Exhibit "I", 2008 Commitment to Bank of Forest[7]; Exhibit "J", Lender's Policy to

Heritage Bank[8]; Exhibit "K", Lender's Policy to Bank of Forest[9]; Exhibit "L", Lender's Policy to

Merchants & Farmers Bank[10]; Exhibit "M", 2009 Commitment to Bank of Forest[11]; Exhibit "G",

G&B Depo., p. 22).  Specifically, G&B testified as follows:

> Q.    And I -- as we sit here today, does G&B have any knowledge of a title
> insurance policy issued by the title companies regarding Tract 4 that
> predate the owner's policy issued to G&B, which is dated July 22nd,
> 2008?
>
> A.    No.

(Exhibit "G", G&B Depo., p. 22).

It is also important to note that each of the instruments for which G&B complains was

filed of record after the G&B Transaction and after the documents arising out of the G&B

Transaction were filed of record.  This is indisputable.  (See footnotes 7-11).  Simply put, the

only form issued by the Title Companies prior to the G&B transaction was the 2008 Bank of

Forest commitment, which correctly stated that title was vested in G&B.  For this reason alone,

---

[7] The 2008 Bank of Forest commitment was issued by the Title Companies on July 17, 2008.  The loan was allegedly closed on July 21, 2008.  The deed of trust allegedly securing the lien of Tracts T4 and T5 was filed on September 17, 2008 in book 2354 and page 391 of the Madison County Chancery Court records.

[8] The Heritage Bank lender's policy was issued by the Title Companies on October 28, 2008.  The loan was allegedly closed on July 21, 2008.  The deed of trust allegedly securing the lien of Tract T6 was filed on October 28, 2008 in book 2365 and page 1 of the Madison County Chancery Court records.

[9] The 2008 Bank of Forest lender's policy was issued on by the Title Companies on September 17, 2008.  The loan was allegedly closed on July 21, 2008.  The deed of trust allegedly securing the lien of Tracts T4 and T5 was filed on September 17, 2008 in book 2354 and page 391 of the Madison County Chancery Court records.

[10] The Merchants & Farmers Bank lender's policy was issued on by the Title Companies on January 6, 2009.  The loan was allegedly closed on July 18, 2008.  The deed of trust allegedly securing the lien of Tracts T2 and T3 was filed on January 6, 2009 in book 2382 and page 30 of the Madison County Chancery Court records.

[11] The 2009 Bank of Forest commitment was issued on by the Title Companies on August 26, 2009.  The loan was allegedly closed on August 27, 2009.  The deed of trust allegedly securing the lien of Tract T3 was filed on September 18, 2009 in book 2489 and page 497 of the Madison County Chancery Court records.

G&B's tort claim as to the alleged failure of the Title Companies to disclose the existence of other commitments or policies.

### d. Charles Evans did not act as agent or approved attorney for the Title Companies at any point during the G&B transaction.

In Count Seven of its Second Amended Complaint, G&B alleges that the Title Companies should be held liable for the actions of Charles Evans based on agency principles. (Second Am. Compl. ¶¶ 75-79). However, G&B cannot present any facts or evidence indicating an agency relationship. To the contrary, the facts are undisputed that Charles Evans was not acting on behalf of the Title Companies with regard to any aspect of the G&B Transaction. Rather, G&B admits that Charles Evans was acting solely on behalf of Hanover. (Exhibit "H", G&B EUO, page 17-18). For this reason alone, G&B's agency claims fail as a matter of law.

To the extent G&B attempts to bootstrap Charles Evans' status as an approved attorney for the Title Companies on other transactions for purposes of creating liability in favor of G&B, those claims also fail as a matter of law. In Mississippi, "the general law of agency applies to insurers' relationships with their agents." *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss. 1990). An agent's authority may be based on actual authority or apparent authority. *Id*. "If an agent had apparent authority to bind his or her principal, then the issue of actual authority need not be reached." *Id*. (citing *Baxter Porter & Sons Well Servicing Co., Inc v. Venture Oil Corp.*, 488 So. 2d 793, 796 (Miss. 1986)).

### i. G&B cannot point to any facts or evidence indicating apparent authority.

"Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to

have." *Andrew Jackson*, 566 So. 2d at 1180 (quoting *Ford v. Lamar Life Ins. Co.*, 513 So. 2d 880, 888 (Miss. 1987)).  Mississippi employs a three-prong test to determine the existence of apparent authority.  This test requires G&B to establish:

> (1) acts or conduct on the part of the principal indicating the agent's authority,
>
> (2) reasonable reliance on those acts, *and*
>
> (3) a detrimental change in position as a result of such reliance.

*Id*. at 1181 (citing *Lamar Life Ins. Co.*, 513 So. 2d at 888) (emphasis added).

Regarding the first prong, the facts are undisputed that G&B cannot point to any "acts or conduct on the part of the [Title Companies] indicating [Charles Evan's] authority."  In its examination under oath, G&B testified as follows:

> Q.    Did you ever deal with Charles Evans as an attorney?
>
> A.    No.
>
> Q.    All your dealings with him were as a -- as a fellow landowner?
>
> A.    Correct.
>
> Q.    Okay.  At any point in time, either, you know, before or after the sale, did you deal with Charles Evans as an attorney?
>
> A.    No.
>
> Q.    At the time you entered into the contract with Charles Evans, did you know that he was an approved attorney for Mississippi Valley Title?
>
> A.    No.
>
> Q.    Had you had any communications with Mississippi Valley Title about Charles Evans –
>
> A.    No.
>
> Q.    -- as of the time you signed that contract?
>
> A.    No.

> Q.    Did you at any point in time inquire from Mississippi Valley of Mr. Evans' – Charles Evans' status with them?
>
> A.    No.
>
> Q.    And when I say "any time," I mean, you know, either before or after the transaction.
>
> A.    No.

(Exhibit "H", G&B EUO, page 17-18).  G&B further testified as follows:

> Q.    At any point in time, did Charles Evans make any representations to G&B about his authority with respect to Mississippi Valley Title?
>
> A.    No.
>
> Q.    Okay.  At any point in time did Mississippi Valley Title give you any representations concerning Charles Evans' authority with respect to them?
>
> A.    No.

(Exhibit "H", G&B EUO, page 46).  This testimony alone by G&B clearly establishes that the Title Companies are entitled to judgment as a matter of law of G&B's agency claims.

G&B's testimony establishes that the following facts are undisputed: (1) neither Charles Evans nor the Title Companies made any representations to G&B about Charles Evans' authority for or on behalf of the Title Companies; and (2) G&B knew that Charles Evans acted in the capacity of a purchaser (or representative of the purchaser)[12] and not on behalf of the Title Companies.  Thus, as a matter of law, G&B cannot meet the first prong of the apparent authority.

G&B's claims under agency similarly fail because no reasonable reliance exists.   After admitting that neither Charles Evans nor the Title Companies made any representations to G&B regarding Charles Evans' authority, G&B testified as follows:

> Q.    All right.  Did you rely on anything that Mississippi Valley Title did to go through with this agreement?

---

[12] See Exhibit __, EUO, page 17-18.

A. To go through with the purchase and sale agreement?

Q. Yes, sir.

A. No.

(Exhibit "H", G&B EUO, page 46).  Because G&B admits that it did not rely on anything that

the Title Companies did, G&B cannot prove the second prong of the apparent authority test.

Similarly, G&B cannot meet the third prong of the apparent authority test.  It is

impossible for G&B to change its position, detrimentally or otherwise, when G&B did not rely

on anything done by the Title Companies.

As a matter of law, the undisputed facts demonstrate that the Title Companies cannot be

liable for Charles Evans' actions based on apparent authority.  This Court should grant summary

judgment in favor of the Title Companies on all agency claims asserted by G&B against the Title

Companies.

   **ii.** **G&B cannot demonstrate any facts or evidence that the Title
     Companies gave Charles Evans actual authority.**

Because G&B cannot show apparent authority, it must establish that an actual agency

relationship existed between Charles Evans and the Title Companies in order to succeed on its

agency claim.  *See Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss.

1990) ("If an agent had apparent authority to bind his or her principal, then the issue of actual

authority need not be reached.") (citations omitted).  Actual authority is "the power of the agent

to effect the legal relations of the principal by acts done in accordance with the principal's

manifestations of consent to him," and it may be either express or implied.  *Butler v. Bunge

Corp.*, 329 F. Supp. 47, 55 (N.D. Miss. 1971) (quoting RESTATEMENT, AGENCY (2d ed.) § 7).

"An express agency is an actual agency created as a result of the oral or written agreement of the

parties, and an implied agency is also an actual agency, the existence of which as a fact is proved

by deductions or inferences from the other facts and circumstances of the particular case,

including the words and conduct of the parties." *Id*. (quoting 3 AM. JUR. 2D *Agency* § 18, at

429).

Regarding express agency, it is indisputable that  the Title Companies did not have any

oral or written agreements giving Charles Evans the authority to enter into the G&B Transaction

on behalf of the Title Companies.  No such agreement existed and G&B has not identified any

such agreement.

As for an implied agency, only one conclusion can be implied from the words and

conduct of the parties involved: With regard to G&B, Charles Evans was not acting on behalf of

the Title Companies for any reason.  Charles Evans has never been a title agent.  While Charles

Evans was an approved attorney upon whom the Title Companies would rely for purposes of

searching and certifying title, Charles Evans never served in this capacity with regard to G&B.

As discussed above, it is undisputed that Charles Evans acted solely in the capacity of a

purchaser (or a representative for the purchaser) in all dealings with G&B.  (Exhibit "H", G&B

EUO, page 17-18).  Charles Evans signed the contract of sale as "Authorized Agent of 463

Development" (Exhibit "A", Contract) and the closing documents as "Authorized Agent of

Hanover Investments."  (Exhibit "C", Closing Document).  Charles Evans made no

representations to G&B regarding his authority from the Title Companies.  (Exhibit "H", G&B

EUO, page 46).  This fact is undisputed.  The Title Companies did not make any representations

to G&B about Charles Evans' authority.  (Exhibit "H", G&B EUO, page 46).  This fact is

undisputed.  Additionally, G&B did not rely on any action of the Title Companies regarding the

sale and completion of the G&B Transaction with Charles Evans.  (Exhibit "H", G&B EUO,

page 46).  This fact is undisputed.  The only rational conclusion from these facts is that Charles

Evans acted separately, independently, and distinctly from the Title Companies with regard to

the G&B transaction.

> **e.  G&B was already legally bound under the purchase agreement to sell the property to Hanover, so whatever the Title Companies did or did not do was immaterial.**

Finally, even if the Title Companies had disclosed to G&B the fact that one commitment

had been issued on the subject property prior to the G&B transaction, it did not relieve G&B of

its duties under the purchase agreement with Hanover.  G&B admits that the purchase agreement

did not contain any contingency or exit provisions based on the purchaser's conduct other than to

pay $5 million in cash at closing and to execute a promissory note for $11 million and deed of

trust on 77 acres as security for the note:

> Q.  Okay.  Now, under paragraph No. 15 [of the purchase agreement], there's Seller's Representations and Warranties?
>
> A.  Uh-huh.  Yes.
>
> Q.  Okay.  And I notice that there are no purchaser's representations or warranties.
>
> A.  Agreed.
>
> Q.  Okay.  So when you entered into this agreement, there weren't any contingencies or facts that had been represented to you that you felt were important enough to include in the contract?
>
> A.  Yes.  This agreement was presented to us and produced by William Smith.
>
> Q.  Right.  But you had input into this document, correct?
>
> A.  Correct.
>
> Q.  And you -- you were represented by very capable counsel?
>
> A.  Correct.

> Q. And had there been any warranties or representations that you needed to be included in there, you could have brought that up to Mr. Smith and to the Evanses, correct?
>
> A. Correct.
>
> Q. But you didn't?
>
> A. Correct.

(Exhibit "H", G&B EUO, page 27-28). Further, G&B admits that Hanover fully performed under the purchase agreement. Specifically, G&B testified as follows:

> Q. Okay. Did the Evanses comply with all of the requirements of the [purchase] contract that's been marked as Exhibit 3?
>
> ***
>
> A. Yes.

(Exhibit "H", G&B EUO, p. 26). Although G&B asserts that had they known that G&B was borrowing money to pay the $5 million at closing they would not have closed the loan, they admit that the purchase agreement did not limit or restrict Hanover from borrowing the $5 million. (Exhibit "H", G&B EUO, p. 25). As a result, G&B admittedly was obligated to close the transaction with Hanover because all provisions of the purchase agreement were satisfied. (Exhibit "H", G&B EUO, p. 46-47).

Because Hanover did not breach the purchase contract, G&B was obligated to sell the property to Hanover. The fact that the Title Companies issued one title commitment six days before the G&B transaction to a third party is immaterial. Moreover, the title commitment did not obligate any party to purchase or sell the property. It merely promised to issue a title insurance policy at some point in the future if certain conditions precedent were satisfied.

G&B cannot satisfy its *prima facie* case by establishing that the Title Companies owed any legal duty to G&B outside the express terms of the Owner's Policy. This Court should adopt

the majority view that a title insurance company is not subject to tort liability absent some

independent duty assumed outside of the insurance contract.  Even if this Court elects to rule

otherwise, however, G&B's tort claims against the Title Companies fail as a matter of law.

## V.    CONCLUSION

FOR THESE REASONS, the Title Companies respectfully request that this Court grant

their motion for partial summary judgment, award expenses and attorney fees to Title

Companies, and grant any additional relief deemed appropriate by this Court.

**RESPECTFULLY SUBMITTED,** this the 22nd day of December 2010.

MISSISSIPPI VALLEY TITLE INSURANCE
COMPANY and OLD REPUBLIC TITLE
INSURANCE COMPANY

BY:   /s/ *William C. Brabec*
        William C. Brabec (MSB No. 4240)
        M. Scott Jones (MSB No. 102239)
        Lindsey N. Oswalt (MSB No. 103329)
        Benjamin B. Morgan (MSB No. 103663)
        **ADAMS AND REESE LLP**
        111 E. Capitol Street, Suite 350 (39201)
        Post Office Box 24297
        Jackson, MS  39225-4297
        Telephone:      601-353-3234
        Facsimile:      601-355-9708

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, a copy of the foregoing has been served by electronic filing through the ECF System, which provides electronic notice to all parties of record, including the following:

William Liston
wlist3@aol.com

Terry Levy
tlevy@danielcoker.com

Lawrence Deas
ldeas@aol.com

Richard Bradley
rbradley@danielcoker.com

Kristina Johnson
kjohnson@watkinsludlam.com

Jeffrey Tyree
jktyree@harrisgeno.com

Dale Danks
ddanks@dmc-law.net

Jeff Rawlings
rrm_h@bellsouth.net

Michael Cory
mc@dmc-law.net

Mike MacInnis
mikems@bellsouth.net

Michael Simmons
mike@cs-law.com

Derek Henderson
d_henderson@bellsouth.net

This the 22nd day of December, 2010.

/s/ *M. Scott Jones*
M. Scott Jones