## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

        **JON CHRISTOPHER EVANS**               **Case No. 09-03763-NPO**
        **AND JOINTLY ADMINISTERED**
        **RELATED CASES**

        **DEBTORS**                           **Chapter 7**

---

**G&B INVESTMENTS, INC.**                    **PLAINTIFF**

**VS.**                    **ADV. PROC. NO. 10-00040-NPO**

**DEREK A. HENDERSON, TRUSTEE**
**FOR THE BANKRUPTCY ESTATE OF**
**JOHN CHRISTOPHER EVANS, ET AL**              **DEFENDANTS**

---

## TITLE COMPANIES' MEMORANDUM IN SUPPORT OF MOTION
## FOR DECLATORY JUDGMENT ON CONTRACTUAL CLAIMS
## ASSERTED BY G&B INVESTMENTS, INC.

---

Pursuant to Rule 7001(9) of the Bankruptcy Rules of Civil Procedure and 28 U.S.C. §2201(a), Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") move for declaratory judgment against G&B Investments, Inc. ("G&B") on the contractual claims asserted in G&B's Second Amended Complaint [Dkt. No. 88] ("Second Am. Compl."). The Court should grant declaratory judgment and enter an order dismissing these contractual claims with prejudice.

### I.      INTRODUCTION

G&B recently asserted a claim under an owner's title insurance policy issued to G&B by the Title Companies. Through this motion, the Title Companies seek a declaratory judgment

from the Court that the owner's title insurance policy does not provide coverage.  The owner's

policy is an agreement that the Title Companies will insure that G&B possessed clear and

marketable title as of the effective date of the owner's policy.  Under the owner's policy, the

dispositive question is whether G&B possessed clear and marketable title as of the effective date

in the owner's policy: July 22, 2008.  Because it is undisputed that G&B possessed clear and

marketable title as of July 22, 2008, the Title Companies request that this Court enter a

declaratory judgment that G&B has no contractual claims and the Title Companies have fully

satisfied their obligations under the owner's policy issued to G&B and that the Court enter an

order dismissing G&B's claims for breach of contract and breach of good faith and fair dealing.

## II.    STATEMENT OF FACTS

A.    **Background Facts**

In December of 2007, G&B entered into a contract to sell approximately 104 acres

referred to as Tract IV to 463 Development Company, LLC ("463 Development"), an entity

controlled by Charles Evans and Jon Christopher Evans.  (Exhibit "A", Contract).[1]  Unless

otherwise stated, this agreement – contract through closing – will be referred to as the "G&B

Transaction."  The contract, totaling $16 million, required 463 Development to pay $5 million

dollars cash at closing and provide a promissory note in favor of G&B for the remaining $11

million.  (Exhibit "A", Contract).  In return for the $5 million cash payment, G&B agreed to

completely release approximately 28 acres to 463 Development.  (Exhibit "A", Contract).  As a

result of the promissory note for $11 million, G&B retained a security interest in the remaining

77 acres through a purchase money deed of trust.  (Second Am. Compl. ¶ 19).  Essentially, G&B

sold the 28 acres free and clear, but G&B owner-financed the remaining 77 acres.

---

[1] The Exhibits cited herein are attached to the Title Companies Motion for Declaratory Judgment on
Contractual Claims Asserted by G&B Investments, Inc.

Prior to the closing, 463 Development assigned its rights under the contract to Hanover Investments ("Hanover"), another Evans-controlled entity.  (Exhibit "B", Assignment from 463 Development to Hanover).  On July 23, 2008, Hanover exercised its right to purchase Tract IV from G&B and complied with all the requirements of the contract.  (Second Am. Compl. ¶ 25; ).

G&B purchased an owner's title insurance policy from the Title Companies, bearing policy number OP-109631, and containing an effective date of July 22, 2008 (the "Owner's Policy").  (*See also* Second Am Compl. ¶ 26).  It is undisputed that Charles Evans was not an agent or approved attorney with regard to the Owner's Policy (Exhibit "C", G&B EUO, p. 88-89, 96-97); rather, the law firm of Watkins & Eager acted as the title agent for the Owner's Policy issued to G&B.  (Exhibit "D", Owner's Policy; Exhibit "C", G&B EUO, p. 88).  Despite financing a portion of the property, G&B did not purchase a lender's policy from the Title Companies.  (Second Am. Compl. ¶ 26; Exhibit "C", G&B EUO, p. 118).

The Owner's Policy insured that G&B possessed clear and marketable title at the time of the conveyance to Hanover.  (Exhibit "D", Owner's Policy).  Neither G&B nor any other party in interest has identified an alleged title defect preceding July 22, 2008—the effective date in the Owner's Policy.  To the contrary, G&B admits that it possessed clear and marketable title to Tract IV.  (Exhibit "C", G&B EUO, p. 35-36, 74).

**B.**     **Material Facts**

The sole questions of material fact for consideration by this Court are:

1) Did G&B have good title as of July 22, 2008, the effective date under the Owner's Policy?

2) Has any third-party asserted a claim against G&B on the basis that the title conveyed by G&B to Hanover was unmarketable?

The answer to both of these questions is undisputed.  G&B admits that it had good title as of the

effective date of the Owner's Policy.  (Exhibit "C", G&B EUO, p. 35-36, 58-59).  G&B also

admits that no claims were (or are) asserted against the title conveyed by G&B to Hanover.

(Exhibit "C", G&B EUO, p. 12-13).

As a result of these undisputed facts, this Court should enter a declaratory judgment that

the Title Companies have no additional obligations under the Owner's Policy based on the

claims presented by G&B.

### III.    DECLARATORY JUDGMENT STANDARD

Declaratory judgment may be granted pursuant to 28 U.S.C. § 2201(a), which

provides:

> any court of the United States, upon the filing of an appropriate pleading,
> may declare the rights and other legal relations of any interested party
> seeking such declaration, whether or not further relief is or could be
> sought.  A declaratory judgment shall have the force and effect of a final
> judgment or decree and shall be reviewable as such.

A declaratory judgment action is ripe for adjudication if it addresses an actual controversy.  *Orix*

*Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000).  "As a general rule, an actual

controversy exists where 'a substantial controversy of sufficient immediacy and reality [exists]

between parties having adverse legal interests.'"  *Id*. (quoting *Middle South Energy, Inc. v. City*

*of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986).

### IV.    ARGUMENT

In its Second Amended Complaint, G&B asserts five causes of action against the Title

Companies.  Counts One and Two of the Second Amended Complaint are not directed at the

Title Companies.  Counts Three and Four of the Second Amended Complaint are based on

theories of negligence.  Count Seven asserts a theory of agency relationship.  Those allegations

are not addressed in this motion.

The sole issues addressed in this motion for declaratory judgment are contained in Counts

Five and Six: breach of contract and breach of the implied duty of good faith and fair dealing.

A.    **The Title Companies did not Breach the Owner's Policy Issued to G&B.**

In Count Five of its Second Amended Complaint, G&B alleges that the Title Companies

breached the Owner's Policy.  To establish that claim, G&B must prove by a preponderance of

the evidence:  (1) the existence of a valid and binding contract; (2) that the Title Companies

breached the contract; and (3) that G&B has been thereby damaged monetarily.  *See Warwick v.*

*Matheney*, 603 So. 2d 330, 336 (Miss. 1992).  It is undisputed that G&B and the Title Companies

entered into a valid and binding contract: the Owner's Policy.  Through this motion, the Title

Companies seek a declaratory judgment that no breach of contract has occurred.

Mississippi courts interpret insurance policies according to contract law.  *Am. States Ins.*

*Co. v. Nethery*, 79 F.3d 473, 475 (5th Cir. 1996) (citing *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713

F.2d 1106, 1109 (5th Cir. 1983)).  "Like all other contracts, insurance policies which are clear

and unambiguous are to be enforced according to their terms as written."  *Sessoms v. Allstate Ins.*

*Co.*, 634 So. 2d 516, 519 (Miss. 1993) (citing *Aero International v. United States Fire Ins. Co.*,

713 F.2d 1106 (5th Cir. 1983)).  Courts should examine the "four corners" of a contract to

determine the terms of the agreement.  *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc*., 908 So.2d

107, 111 (Miss. 2005).  "Insurance contracts are construed in accordance with the plain language

of the policies as bargained for by the parties, with any ambiguities interpreted liberally in favor

of the insured."  *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 70 (Miss. 1998).  However, the Court

may not construe "a contract differing from that made by the parties themselves, or [] enlarge an

insurance company's obligations where the provisions of its policy are clear."  *State Auto. Mut.*

*Ins. Co. v. Glover*, 176 So. 2d 256, 258 (Miss. 1965).

G&B alleges that the Title Companies breached the Owner's Policy based on the

following provisions, which are located under the heading "Covered Risks":

> MISSISSIPPI VALLEY TITLE INSURANCE COMPANY…and OLD REPUBLIC
> NATIONAL TITLE INSURANCE COMPANY, insure, as of Date of Policy and …after
> Date of Policy, against loss or damage not exceeding the Amount of Insurance, sustained
> or incurred by the Insured by reason of:
>
> \*\*\*
>
> 2.      Any defect in or lien or encumbrance on the Title.  This Covered Risk includes
> but is not limited to insurance against loss from:
>
> (a)      A defect in the Title caused by:
>
> (i)      forgery, fraud, undue influence, duress, incompetency, incapacity,
> or impersonation;
> (ii)      failure of any person or Entity to have authorized a transfer or
> conveyance;
> (iii)      a document affecting Title not properly created, executed,
> witnessed, sealed, acknowledged, notarized, or delivered;
>
> \*\*\*
>
> 3.      Unmarketable Title.

(Second Am. Compl. ¶ 68).  G&B confirmed in its examination under oath that its claims solely

rest on these two provisions.  (Exhibit "C", G&B EUO, p. 79-81).  G&B also made a blanket

request for the Title Companies to determine whether any other coverage is available based on

the facts presented.  To date, the Title Companies are unaware of any facts supporting a title

claim under the Owner's Policy.  (Exhibit "C", G&B EUO, p. 79-81).

**1.      The Title Companies are not liable under the Owner's Policy for any alleged
defects in G&B's title that occurred after the date of the policy.**

G&B's reproduction of the pertinent policy provisions omits important language

regarding the Title Companies' liability for acts after the date of the policy.  The policy actually

reads as follows:

MISSISSIPPI VALLEY TITLE INSURANCE COMPANY…and OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, insure, as of Date of Policy and, *to the extent stated in Covered Risks 9 and 10*, after Date of Policy, against loss or damage not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

(Exhibit "D", Owner's Policy) (emphasis added).  Additionally, the Owner's Policy specifically

excludes coverage for "[d]efects, liens, encumbrances, adverse claims, or other matters …

attaching or created subsequent to Date of Policy (however, this does not modify or limit the

coverage provided under Covered Risks 9 and 10)…."  (Exhibit "D", Owner's Policy, p. 2,

Exclusion 3(d)).

The omitted language and the exclusion clearly limit the Title Companies' risks for

actions that occurred after the date of policy.  The Title Companies agreed to insure all the

Covered Risks as of the effective date, which is July 22, 2008.  (Exhibit "D", Owner's Policy)

However, the Title Companies liability after the date of the policy is limited "to the extent stated

in Covered Risks 9 and 10."  (Exhibit "D", Owner's Policy).  Similar to Covered Risks 1-8,

Covered Risks 9-10 provide coverage to the extent the title conveyed by the owner (G&B) to the

purchaser (Hanover) is found to be defective in some manner.  G&B has not alleged coverage

under Covered Risk 9 and/or 10.  The Title Companies are also unaware of any facts to support

that a claim under Covered Risks 9 and/or 10.  Stated simply, no party in this litigation, including

G&B, has identified any potential defect in the title conveyed by G&B to Hanover.  Despite this

fact, G&B attempts to maintain a claim for coverage under Covered Risks 2 and 3 of the

Owner's Policy.  (Second Am. Compl. ¶ 68); (Exhibit "C", G&B EUO, p. 79-81).

G&B's Owner's Policy is unlike any other title insurance policy at issue in the Evans-

related litigation.  All the other title insurance policies issued by the Title Companies were

lender's title insurance polices.  Under a lender's policy, the Title Companies insure that the

Lender maintains its respective status (first lien, second lien, etc.) in the chain of title.  Should

that status be disrupted due to a reason not excluded under the lender's policy, the Title

Companies have the right to either cure the defect in title or pay the lender the amount of its loss

due to the title defect.  The scope of the Lender's Policy is prospective in that the Title

Companies insure a Lender's status in title beginning on the date the policy is issued and

continuing until the loan is repaid in full.  By contrast, the scope of the Owner's Policy is

retroactive in that the Title Companies insured that G&B possessed clear and marketable title as

of the effective date of the Owner's Policy.

In other words, the Title Companies are obligated to resolve G&B's claim if a third party

asserts that it has a claim to title prior to the date of the Owner's Policy.  G&B does not assert

any claims by a third-party which precede the effective date of the Owner's Policy and the Title

Companies are not aware of any.  The only claim asserted against G&B's title was asserted by

the Chapter 7 bankruptcy trustee for Hanover regarding G&B's foreclosure in October of 2009.

The trustee's claim did not pertain to the title G&B conveyed to Hanover.  Regardless, the

trustee and G&B have resolved their claims and this Court has entered an order confirming the

settlement. [Dkt. No. 176].

In light of the differences between lender policies and owner policies and due to the

contractual language of the Owner's Policy, the Title Companies request that this Court enter an

order that the Title Companies are not liable under the Owner's Policy for anything that affected

or altered G&B's title after the date of the policy.

**2.      G&B does not have a valid claim under Covered Risks 2 or 3 of the Owner's Policy.**

G&B does not have a valid claim under the terms of the contract.  The relationship

between G&B and the Title Companies is governed by one contract – the Owner's Policy.  *See*

*Sessoms v. Allstate Ins. Co.*, 634 So. 2d 516, 519 (Miss. 1993) ("It is clear that the relationship

between an insurance company and its insured is contractual in nature, with the rights and duties

set out by the provisions of the insurance policy."). G&B admits that the Owner's Policy is the

only policy purchased from the Title Companies. (Exhibit "E", G&B Depo., p. 12).

Additionally, G&B admits that the Owner's Policy is the only communication – written or oral –

that it received from the Title Companies. (Exhibit "E", G&B Depo., p. 24).

In the Owner's Policy, the Title Companies agreed to insure that G&B, at the time of the

transfer to Hanover, possessed clear and marketable title to Tract IV. (Exhibit "D", Owner's

Policy). G&B admits that the Owner's Policy insured G&B "against the risk of loss or damage

sustained or incurred by G&B as a result of any defect in or lien or encumbrance on the Title."

(Second Am. Compl. ¶ 26.) G&B not only clearly understands the scope of the Owner's Policy

but also admits that it was indeed the owner of the property at the time of transfer to Hanover:

> Q.    All right. What's your understanding of what an owner's policy is supposed to cover?
>
> A.    My understanding is, an owner's policy says that yes, you, indeed, are the owner of the property.
>
> Q.    And as I understand it, G&B was, in fact, the owner of the property. Correct?
>
> A.    Correct.

(Exhibit "C", G&B EUO, p. 37). Despite this understanding, G&B maintains that the Title

Companies breached the contract.

> **a.    The Title Companies are not liable under Covered Risk 2 because as of June 22, 2008 (the effective date), there was no "defect in or lien or encumbrance on [G&B's] Title."**

As shown above, G&B points to Covered Risk 2 as a potential basis for the Title

Companies breach. Covered Risk 2 provides that the Title Companies will insure as of the

effective date of policy against loss or damage if caused by:

2.  Any defect in or lien or encumbrance on the Title.  This Covered Risk includes but is not limited to insurance against loss from:

(a)  A defect in the Title caused by:

(i)  forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

(ii)  failure of any person or Entity to have authorized a transfer or conveyance;

(iii)  a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

(Second Am. Compl. ¶ 68); (Exhibit "D", Owner's Policy).

Attempting to fall under this section, G&B's argues that three fraudulent transactions entered into by the Evans brothers affected G&B's title and should be covered under the Owner's Policy.  While G&B may be correct in stating that the transactions were fraudulent, G&B incorrectly states that the fraudulent actions created a defect in G&B's title.  To the contrary, none of the defects for which G&B complains had any impact on the conveyance to Hanover.  Further, none of the alleged defects precede the effective date of the Owner's Policy: July 22, 2008.

G&B refers to three deeds of trust that were allegedly entered into prior to the G&B Transaction:

- Deed of trust from Town Park of Madison, LLC to Merchants & Farmers (Second Am. Compl., ¶ 28) (attached as Exhibit "F", Town Park Deed of Trust),

- Deed of trust from White Oaks Investment Company, LLC to Bank of Forest (Second Am. Compl., ¶ 30) (attached as Exhibit "G", White Oaks Deed of Trust); and

- Deed of trust from Twinbrook Run Development Company, LLC to Heritage Banking Group (Second Am. Compl., ¶ 32) (attached as Exhibit "H", Twinbrook Deed of Trust).

As discussed below, none of these transactions altered the status of G&B's title prior to the effective date of the Owner's Policy.

In Mississippi, the priority of instruments regarding real property is based on the time of

filing and is controlled by Miss. Code Ann. § 89-5-5, which states:

> Every conveyance, covenant, agreement, bond, mortgage, and deed of trust shall
> take effect, as to all creditors and subsequent purchasers for a valuable
> consideration without notice, *only from the time when delivered to the clerk to be*
> *recorded;* and no conveyance, covenant, agreement, bond, mortgage, or deed of
> trust which is unrecorded or has not been filed for record, shall take precedence
> over any similar instrument affecting the same property which may be of record,
> to the end that with reference to all instruments which may be filed for record
> under this section, the priority thereof shall be governed by the priority in time of
> the filing of the several instruments, in the absence of actual notice.

Miss. Code Ann. § 89-5-5 (2010) (emphasis added).

The G&B Transaction took place on July 23, 2008.  (Second Am. Compl., ¶ 25).  The

deed of conveyance from G&B to Hanover was filed of record on <u>July 25, 2008</u>[2] in the Madison

County Chancery Court records at book 2338 and page 304.  (Exhibit "I", Warranty Deed from

G&B to Hanover).  The deed of trust from White Oaks Development Company, LLC to Bank of

Forest was filed of record on <u>September 17, 2008</u> in the Madison County Chancery Court

records at book 2354 and page 391.  (Exhibit "G", White Oaks Deed of Trust); (Second Am.

Compl., ¶ 30).  The deed of trust from Twinbrook Run Development Company, LLC to Heritage

Banking Group was filed of record on <u>October 29, 2008</u> in the Madison County Chancery Court

records at book 2365 and page 1.  (Exhibit "H", Twinbrook Deed of Trust); (Second Am.

Compl., ¶ 32).  The deed of trust from Town Park of Madison, LLC to Merchants & Farmers

was filed of record on <u>January 6, 2009</u> in the Madison County Chancery Court records at book

2382 and page 30.  (Exhibit "F", Town Park Deed of Trust); (Second Am. Compl., ¶ 28).

In other words, the instruments representing the three transactions that G&B asserts

altered it's title were filed of record <u>after</u> the G&B Transaction and <u>after</u> the documents arising

---

[2] The date of filing on each instrument is identified by the chancery clerk's stamp, located on the last page
of each instrument.

out of the G&B Transaction were filed of record.  As stated above, the deed of conveyance from

G&B to Hanover was filed of record on July 25, 2008.  Thus, as of July 25, 2008, Hanover and

not G&B was the official owner of record of Tract IV.   More importantly, each alleged defect

was filed after the effective date of the Owner's Policy: July 22, 2008.  All three deeds of trust

which G&B argues affected its title to Tract IV were filed of record on September 17, 2008

(White Oaks); October 29, 2008 (Twinbrook Run); and January 6, 2009 (Town Park).  As a

result, G&B's title that it conveyed to Hanover was clear, marketable, and not altered in any way

by the three transactions described above.  Thus, based on Mississippi's priority statute, G&B's

title was not altered at the time of the transfer to Hanover.

In its examination under oath, G&B admits that these three alleged title defects were

recorded after the closing of the G&B Transaction:

> Q.      Okay.  Thank you.  Do you know when these deeds of trust -- the phony deeds of
> trust were filed?
>
> A.      Your question is:  When were they recorded?
>
> Q.      Yes.
>
> A.      No, I don't.
>
> Q.      Okay.  Do you know whether they were recorded before or after the closing of the
> sale to Hanover?
>
> A.      They were recorded after.

(Exhibit "C", G&B EUO, p. 81).

The Owner's Policy specifically excludes coverage for "[d]efects, liens, encumbrances,

adverse claims, or other matters … attaching or created subsequent to Date of Policy…."

(Exhibit "D", Owner's Policy, p. 2, Exclusion 3(d)).  Because the deeds of trust for all three

transactions were filed of record subsequent to the date of the Owner's Policy, the liens created

are specifically excluded.

Notably, G&B owner-financed a portion of the sale to Hanover Investments, and in this

regard, G&B acted as a lender.  (Second Am. Compl. ¶ 25.)  Had G&B procured a lender's

policy of title insurance, then the Title Companies may have been liable for defects in the title

that arose after the point of sale.  However, G&B did not have a lender's policy; rather, it had an

owner's policy.  (Second Am. Compl. ¶ 26.); (Exhibit "C", G&B EUO, page 118).  This is

undisputed by G&B.  (Second Am. Compl. ¶ 26.); (Exhibit "C", G&B EUO, page 118).

**b.     The Title Companies are not liable under Covered Risk 3 because as of June 22, 2008 (the effective date), G&B possessed marketable title.**

The Owner's Policy defines "Unmarketable Title" as "Title affected by an alleged or

apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the

Title to be released from the obligation to purchase, lease, or lend if there is a contractual

condition requiring the delivery of marketable title."  (Exhibit "D", Owner's Policy, p. 3, Section

1(k)).  The prospective purchaser for the G&B Transaction was Hanover.

Additionally, G&B expressly admits that it had marketable title as of the date of the G&B

Transaction, which was the day after the effective date of the Owner's Policy:

> Q.     Now, at the time that you entered into this contract, did G&B Investments have good, clear title to the property?
>
> A.     Yes.
>
> Q.     Did it have marketable title?
>
> A.     Yes.
>
> Q.     Were there any defects in the title, that you were aware of?
>
> A.     No.
>
> Q.     Okay.  Now, at the time you closed, were you aware of any defects in the title?

> A.     No.
>
> Q.     Were there any defects when you closed?
>
> A.     Not to my knowledge.

(Exhibit "C", G&B EUO, p. 35-36).  In the same examination under oath, G&B also testified as

follows:

> Q.     Okay.  All right.  Let's go to Covered Risks, Paragraph No. 3, "Unmarketable
>        title."  Do you believe that G&B's title was unmarketable?
>
> A.     Yes.
>
> Q.     As of the date of that policy?
>
> A.     No.
>
> Q.     But it later became unmarketable?
>
> A.     Correct.

(Exhibit "C", G&B EUO, p. 74).

Even assuming the property became unmarketable after the date of the policy, any

resulting damage is not covered by an Owner's Policy.  Again, because the deeds of trust were

filed after the G&B Transaction, G&B's title could not have been rendered unmarketable as of

the date of the policy.  Except in limited circumstances which G&B has not alleged and for

which facts do not exist, the Owner's Policy does not cover loss arising after the date of the

policy.  Thus, no coverage exists under Covered Risk 3 because title was indeed marketable as of

the date of the policy.

**3.     G&B improperly seeks to impose duties and responsibilities upon the Title
        Companies that are not within the four corners of the Owner's Policy.**

Because G&B does not have a valid claim under the Owner's Policy, it advances two

novel and baseless theories of the Title Companies' alleged breach.  First, G&B asserts that the

Title Companies breached the contract "by failing to list all of the potential liens/encumbrances and/or defects of title on the subject property, of which they had actual or constructive knowledge...." (Second Am. Compl. ¶ 69). Second, G&B asserts that the Title Companies breached the contract "by entering into the contract without disclosing the full extent of their knowledge regarding any potential encumbrances and the unmarketability of title to the property resulting from the transactions involving Tract IV for which they issued the faulty lender's policies." (Second Am. Compl. ¶ 69). An examination of the "four corners" of the Owner's Policy reveals that neither theory supports a valid breach of contract claim. *See Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So.2d 107, 111 (Miss. 2005).

**a.    The Title Companies did not contract to provide a list "of the potential liens/encumbrances and/or defects of title on the subject property."**

A breach of contract action is appropriate when a contracting party fails to perform one of its promises in the contract. Here, the Title Companies did not promise G&B that it would "list all of the potential liens/encumbrances and/or defects of title on the subject property."

The Owner's Policy does not contain any provision or language that could objectively be interpreted to require the Title Companies to "to list all of the potential liens/encumbrances and/or defects of title on the subject property." (Exhibit "D", Owner's Policy). Not only is the policy void of any such language, but there is no evidence that G&B ever requested the Title Companies to produce such information in any other manner. (Exhibit "C", G&B EUO, p. 117-118). G&B cannot point to any other responsibilities that the Title Companies undertook on behalf of G&B regarding the G&B Transaction. (Exhibit "C", G&B EUO, p. 117-118).

G&B's main allegation is that the Title Companies, by issuing the Owner's Policy, represented that no other policies were issued for Tract IV. However, G&B cannot point to any

provision within the "four corners" of the contract that supports such an alleged representation.

In its 30(b)(6) deposition, G&B testified as follows:

> Q.    Mr. Brata, you -- G&B obtained this title insurance policy that's dated July 22nd, 2008, correct?
>
> A.    Correct.
>
> Q.    And at that time, as of July 22nd, 2008, did G&B have an understanding that this policy of insurance was a representation that no other title insurance policies had been issued regarding Tract 4?
>
> A.    Correct.
>
> Q.    Okay.  Could you direct me to the provision in the policy that G&B based that understanding upon?  And take your time to review it.
>
> A.    I am not a lawyer[3] or somebody who's an expert in title policies, so I am unable to find the clause.
>
> Q.    Okay.  So as we sit here today, G&B can't identify any provision that it states, as a matter of fact, is a representation that no other policy had been issued at that time; is that correct?
>
> A.    Correct.

(Exhibit "E", G&B Depo., p. 25-26).  G&B cannot point to any such representation within the "four corners" of the contract because no such representation exists.  Put simply, the Title Companies did not enter into a contract that represented that no other title commitments or policies existed on Tract IV.

G&B attempts to re-write the Owner's Policy to state that it is "inherently wrong" to issue multiple policies on a piece of property.  (Exhibit "C", G&B EUO, p. 50).  To the contrary, the Title Companies and G&B entered into a contract of indemnity for the status if title as of the effective date of the Owner's Policy.  The Owner's Policy does not have any contractual terms that can be construed as a representation that no other title insurance policies would be issued on

---

[3] Donald Joseph Brata, President of G&B and 30(b)(6) deponent, has a law degree and is well-aware of basic contract principles.  (Exhibit "C", G&B EUO, p. 6).

the same property.  G&B's argument is further misplaced considering the fact that each title

insurance policy issued by the Title Companies and for which G&B complains was issued <u>after</u>

July 22, 2008.

G&B attempts to convert a contract of indemnity into a guaranty of title and, in so doing,

confuses the purpose and function of title insurance.  "A title policy is a contract of indemnity,

not a guaranty and provides reimbursement for actual loss only.  A title insurance policy

provides for indemnity only to the extent that the insured's security is impaired and to the extent

of the resulting loss that it sustains."  *Gibraltar Sav. v. Commonwealth Land Title Ins. Co.*, 905

F.2d 1203, 1205 (8th Cir. 1990) (citing *Diversified Mortgage Investors v. U.S. Life Ins. Co.*, 544

F.2d 571, 574 n. 2 (2d Cir. 1976) (internal quotations omitted)).  The Title Companies entered

into an indemnity contract with G&B and did not guarantee the state of title.

Ignoring the above principles, G&B attempts to manufacture a breach of contract claim

that enlarges the scope of the contract.  *See State Auto. Mut. Ins. Co. v. Glover*, 176 So. 2d 256,

258 (Miss. 1965) (holding that a court may not "enlarge an insurance company's obligations

where the provisions of its policy are clear").  Recognizing long-standing principles of

Mississippi law, this Court should enter a declaratory judgment in favor of the Title Companies

because G&B's breach of contract claim is baseless.

**b.      The Title Companies did not breach the contract "by entering into the
          contract" or by failing to disclose other information.**

Under its second theory, G&B asserts that the Title Companies breached the contract "by

entering into the contract without disclosing the full extent of their knowledge regarding any

potential encumbrances and the unmarketability of title to the property resulting from the

transactions involving Tract IV for which they issued the faulty lender's policies."  (Second Am.

Compl. ¶ 69).  This allegation confuses tort and contract principles and is an attempt to

17

superimpose nonexistent duties into the contract.

As a matter of common sense and basic contract law, the Title Companies could not have breached the contract "by entering into the contract." A breach of contract cannot occur until there is a contract to breach. Similarly, a breach of contract cannot simultaneously occur with the creation of the contract. A contract must exist before a party may breach the contract. As a result of this basic contract principle, G&B's breach of contract claim fails as a matter of law.

The main trust of G&B's second theory is that the Title Companies failed to disclose certain information about the property. Again, no language in the Owner's Policy supports, whether explicitly or implicitly, imposing such a duty upon the Title Companies. (Exhibit "D", Owner's Policy). In fact, G&B has failed to point to any language in the Owner's Policy that expressly states or implies such a requirement. (Exhibit "E", G&B Depo., p. 25-26). Again, G&B is attempting to impose upon the Title Companies a contractual duty that is not found within the four-corners of contract. Such an attempt must be rejected as a matter of law.

G&B's second theory for breach of contract is actually a repetition of its claim for negligent misrepresentation and negligent failure to disclose, which is found in Count Four of G&B's Second Amended Complaint. (Second Am. Compl. ¶¶ 62-65). G&B regurgitates this negligence cause of action under the guise of contract law. As stated in the Title Companies' memorandum in support of summary judgment for G&B's tort claims, a title insurer cannot be liable in tort to its insureds because the relationship is strictly contractual. (*See* Memo for Summary Judgment as to G&B's Tort and Agency Claims). Because the Owner's Policy does not impose on the Title Companies the duties alleged, G&B attempts to enlarge the contract by imposing tort-based duties through a breach of contract action. The Court should enter a declaratory judgment on G&B's breach of contract claims in favor of the Title Companies.

**B.**     <u>**The Title Companies did not Breach thier Duty of Good Faith and Fair Dealing.**</u>

In Count Six of its Second Amended Complaint, G&B alleges that the Title Companies breached their "duty of good faith and fair dealing, which included both their duty to refrain from hindering or preventing performance of the contract, and also required affirmative action on their part to cooperate to achieve the purpose of the contract." (Second Am. Compl., ¶ 72.)

**1.     The Title Companies did not breach their duty of good faith and fair dealing because the Title Companies have completely fulfilled their responsibilities under the Owner's Policy.**

Mississippi recognizes that "every contract contains an implied covenant of good faith and fair dealing in performance and enforcement." *Blue Diamond v Liberty Mut. Ins. Co.*, 21 F. Supp. 2d 631, 633 (S.D. Miss. 1998) (citing *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992)). The Mississippi Supreme Court has described this duty as follows:

> In recent years, courts have often supplied a term requiring both parties to a contract to exercise what is called 'good faith' or sometimes 'good faith and fair dealing.' This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

*Cenac*, 609 So. 2d at 1272 (quoting Farnsworth, Contracts, § 7.17, 526-27 (1982)). Put differently, "[g]ood faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with *justified expectations of the other party*." *Id.*, at 1272 (citing Restatement (Second) of Contracts § 205, 100 (1979)) (emphasis added). "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id*.

As explained above, the Tile Companies did not breach the contract. Because the Title

Companies did not breach the contract, the Title Companies did not breach the covenant of good faith and fair dealing found in the contact. *Cothern v. Vickers, Inc.*, 759 So. 2d 1241, 1249 (Miss. 2000) (finding that defendant complied with contract and did not breach covenant of good faith and fair dealing); *Johnston v. Palmer*, 963 So.2d 586, 593-95 (Miss. App. 2007) (finding no breach of the covenant of good faith and fair dealing when defendant complied with contract terms.)); *West v. Nationwide Trustee Services, Inc.*, 2010 WL 3122801, * 2 (S.D. Miss. August 4, 2010) (the duty of good faith and fair dealing is not breached when the contract underlying contract is not breached)(citing *Grand Hous., Inc. v. Bombardier Capital, Inc.*, 2005 WL 673267, at * 4 (5th Cir. Mar. 23, 2005) (finding no bad faith where defendant "at all times acted within its contractual authority")).  The duty of good faith and fair dealing focuses on performance under the contract, and the Title Companies have completely performed their obligations under the Owner's Policy.

In all respects, the Title Companies complied with the terms of the Owner's Policy and have acted within their contractual authority.  The Title Companies agreed to insure that G&B, as of the effective date of the Owner's Policy, possessed clear and marketable title to Tract IV. (Exhibit "D", Owner's Policy).  As explained above, G&B possessed clear and marketable title when it transferred title to Hanover.  Additionally, G&B has not produced any evidence that its title was defective as of the effective date of the Owner's Policy or at the time of the transfer to Hanover.  As a result, G&B has no claim under the Owner's Policy.  Thus, the Title Companies completely and faithfully fulfilled their duties under the Owner's Policy and should not be liable for any breach of good faith and fair dealing.

## 2. The Title Companies are not liable for bad faith because G&B has failed to present any facts or evidence corresponding to the necessary elements of claim for bad faith refusal to pay an insured's claim.

In its Second Amended Complaint, G&B does not expressly allege bad faith on the part

of the Title Companies, but to the extent G&B seeks to recover punitive damages for the tort of

bad faith refusal to pay an insured's claim, G&B must show three elements. First, "the insured

must demonstrate that the claim or obligation was in fact owed." *Essinger v. Liberty Mut. Fire

Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) (quoting JACKSON, MISS. INS. LAW, § 13:2).

Second, "the insured must demonstrate that the insurer has no arguable reason to refuse to pay

the claim or to perform its contractual obligation." *Id.* Third, "the insured must demonstrate that

the insurer's breach of the insurance contract 'results from an intentional wrong, insult, or abuse

as well as from such gross negligence as constitutes an intentional tort.'" *Id.* (quoting *Caldwell

v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095 (Miss. 1996)).

Based on G&B's own admissions, it cannot meet any of the elements required for bad

faith. The Title Companies agreed to insure that G&B possessed clear and marketable title to

Tract IV as of July 22, 2008. (Exhibit "D", Owner's Policy). As explained above, G&B

possessed clear and marketable title to the property on this date. G&B does not and cannot

dispute this fact. Thus, G&B has no claim under its owner's policy, and the Title Companies do

not owe G&B any claim or obligation.

Even if G&B had a valid claim under the Owner's Policy, G&B cannot prove that the

Title Companies had no arguable reason to deny its claim or refuse to pay. To the contrary, the

Title Companies have not denied G&B's claim. After receiving G&B's first notice of claim on

October 11, 2010, the Title Companies scheduled an examination under oath and requested G&B

to provide documents and information supporting its claim. The Title Companies took an

examination under oath of G&B on November 5, 2010.  Rather than outright denying G&B's claim, the Title Companies filed this motion for declaratory judgment to determine the Title Companies' obligations and responsibilities, if any, regarding G&B's claim under the Owner's Policy.

Both Mississippi courts and federal courts interpreting Mississippi law have long held that the filing of a declaratory judgment to determine the rights, obligations, or liability under an insurance policy is expressly not bad faith.  *Employers Mut. Cas.Co. v. Tompkins*, 490 So. 2d 897, 905 (Miss. 1986); *Allstate Ins. Co. v. Ashley*, 998 F.2d 300, 305 (5th Cir. 1993); *Scottsdale Ins. Co. v. A.F.C. Inc*., 2007 WL 2475935, * 1 (S.D. Miss. Aug. 28, 2007); *Mutual Assurance, Inc. v. Banks*, 113 F. Supp. 2d 1020, 1024 (S.D. Miss. 2000); *Stratford Ins. Co. v. Cooley*, 985 F.Supp. 665, 673 (S.D. Miss. 1996) ("[u]nder no circumstances could it reasonably be concluded that [the insurer] acted in bad faith by instituting this declaratory judgment action to determine a legitimate coverage dispute rather than contributing its policy limits to a pre-litigation settlement ...").

G&B simply states that it is entitled to recover under the Owner's Policy, but it has not shown why it is entitled to recover.  Thus, it is entirely reasonable that the Title Companies would not resolve a claim simply based on an insured misplaced belief.  A reason for title resolution must exist under the contract, and a lack thereof is arguable reason to deny a claim.

As a result of these undisputed facts, it is evident that the Title Companies did not hinder or prevent performance under the contract because no valid contractual claim actually exists under the contract.  Because the Title Companies have fulfilled all their obligations under the owner's policy issued to G&B, the Court should hold, as a matter of law, that G&B cannot sustain its allegation of bad faith.

## V.     CONCLUSION

FOR THESE REASONS, the Title Companies respectfully request that this Court grant their motion for declaratory judgment, award expenses and attorney fees to Title Companies, and grant any additional relief deemed appropriate by this Court.

**RESPECTFULLY SUBMITTED,** this the 22nd day of December 2010.

MISSISSIPPI VALLEY TITLE INSURANCE
COMPANY and OLD REPUBLIC TITLE
INSURANCE COMPANY

BY:  /s/ *William C. Brabec*
     William C. Brabec (MSB No. 4240)
     M. Scott Jones (MSB No. 102239)
     Lindsey N. Oswalt (MSB No. 103329)
     Benjamin B. Morgan (MSB No. 103663)
     **ADAMS AND REESE LLP**
     111 E. Capitol Street, Suite 350 (39201)
     Post Office Box 24297
     Jackson, MS  39225-4297
     Telephone:     601-353-3234
     Facsimile:      601-355-9708

## CERTIFICATE OF SERVICE

I hereby certify that on this day, a copy of the foregoing has been served by electronic filing through the ECF System, which provides electronic notice to all parties of record, including the following:

William Liston
wlist3@aol.com

Terry Levy
tlevy@danielcoker.com

Lawrence Deas
ldeas@aol.com

Richard Bradley
rbradley@danielcoker.com

Kristina Johnson
kjohnson@watkinsludlam.com

Jeffrey Tyree
jktyree@harrisgeno.com

Dale Danks
ddanks@dmc-law.net

Jeff Rawlings
rrm_h@bellsouth.net

Michael Cory
mc@dmc-law.net

Mike MacInnis
mikems@bellsouth.net

Michael Simmons
mike@cs-law.com

Derek Henderson
d_henderson@bellsouth.net

This the 22nd day of December, 2010.

/s/ *M. Scott Jones*
M. Scott Jones