## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **JON CHRISTOPHER EVANS**<br>**AND JOINTLY ADMINISTERED**<br>**RELATED CASES** | **Case No. 09-03763-NPO** |
| **DEBTORS.** | **Chapter 7** |

| | |
|---|---|
| **G&B INVESTMENTS, INC.** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 10-00040-NPO** |
| **DEREK A. HENDERSON, TRUSTEE**<br>**FOR THE BANKRUPTCY ESTATE OF**<br>**JOHN CHRISTOPHER EVANS, ET AL** | **DEFENDANTS** |

## TITLE COMPANIES' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT ON MERCHANTS
## & FARMERS BANK'S CROSS-CLAIM

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") file this Memorandum in Support of Motion for Summary Judgment on Merchants & Farmers Bank's ("M&F") Cross-Claim [Dkt. No. 62] (the "Cross-Claim"). Because all of M&F's claims fail as a matter of law, this Court should grant Title Companies' Motion for Summary Judgment in its entirety.

## I.  INTRODUCTION

The Title Companies issued a lender's title insurance policy to M&F that insured against any title defects on the property identified in the policy. Despite the fact that M&F "asserts that it has a valid first lien and security interest as against" that property, M&F still filed a Cross-Claim against the Title Companies. *See* Cross-Claim at ¶ 29. M&F asserts that: (1) "M&F is

1

entitled to determination, allowance, and immediate payment in full of all its claims against the

Title Companies"; and (2) the Title Companies "negligently supervised" Charles Evans, whose

only connection with the Title Companies was as an approved attorney. *See* Cross-Claim at

¶ ¶ 41-44. M&F also claims that the Title Companies, "through theories of *respondeat superior*

and/or by vicarious liability," are liable for the wrongful acts of Charles Evans, against whom

M&F alleges fraud, negligent misrepresentation, breach of contract, and breach of duty of good

faith and fair dealing. *See* Cross-Claim at ¶¶ 32, 34.

None of these claims is valid. Charles Evans has never been an employee of the Title

Companies; the Title Companies cannot be vicariously liable for his actions; the Title Companies

have not breached the lender's title insurance policy; and the tort claims against the Title

Companies are not recognized under Mississippi law.

Simply put, M&F concedes that it has a first priority lien on the property, and there are

no title defects. Accordingly, the Title Companies have no further obligations under the policy.

Despite conceding it has a "valid first lien and security interest," M&F seeks to expand the terms

of the insurance contracts. Such a result would effectively rewrite the clear and unambiguous

terms of the title insurance policy and, instead, create a loan insurance policy. The Title

Companies did not insure any bank loan; rather, the Title Companies simply agreed to either cure

any title defect or indemnify M&F for any loss arising from a defect in title under the terms,

conditions, exceptions, exclusions and limitations of the title insurance policies. There is no title

defect, and the Title Companies, thus, have no obligation. Accordingly, this Court should enter

judgment as a matter of law on all claims in M&F's Cross-Claim for the following reasons:

1) M&F's contractual claims under the title insurance policy fail as a matter of law because M&F and the Title Companies agree that there is no title defect.

2) M&F's claims under vicarious liability fail as a matter of law because the Charles

4/229742.3

Evans was neither an employee nor an agent for the Title Companies with regard to any transaction involving M&F.

3) Because the Title Companies did not, as a matter of law, breach the title insurance policy, M&F's claim of breach of duty of good faith and fair dealing necessarily fails.

4) The issue of whether a title insurance company may be liable in tort to its insured is an issue of first impression in Mississippi. The overwhelming majority of jurisdictions hold that a title insurance company cannot be liable in tort (absent evidence of bad faith) to its insureds because their relationship is purely contractual. Under the twin-aims of *Erie*, this Court should adopt the majority rule and enter judgment as a matter of law in favor of the Title Companies on the tort claims asserted by M&F.

Because there are no remaining genuine issues of material fact, summary judgment in favor of the Title Companies on all claims is proper.

## II. <u>MATERIAL FACTS</u>

On July 18, 2008, M&F made a loan to Town Park of Madison, LLC ("Town Park"). *See* Trustee's Complaint at ¶ 61.2 (incorporated in the Cross-Claim at ¶ 29). On the same day, Town Park executed a note and deed of trust to M&F. *Id.* The amount of the note was just over three million dollars, and the deed of trust was signed by "Jon C. Evans, Managing Member." *Id.* Although M&F deposited the funds (just over three million dollars) into Charles Evans' trust account on the day of the loan (July 18, 2008), the deed of trust was not recorded until more than five months later on January 6, 2009. *Id.* This note and deed of trust covered Parcels T-2 and T-3, as defined in the Trustee's Complaint. *Id.* On the date that the deed of trust was recorded— more than five months after the loan closed and M&F disbursed the loan proceeds—the Title Companies issued a lender's title insurance policy to M&F, policy no. LP107073 (the "Lender's Policy"). *See* Lender's Policy, attached as Exhibit 1.[1] Two days later, by a letter dated January 8, 2009, Charles Evans provided the Lender's Policy to M&F. *See* Cross-Claim at ¶ 35.

---

[1] All references to attached Exhibits are attached to the Title Companies' Motion for Summary Judgment.

3

Although title for parcels T-2 and T-3 was in the name of Hanover Investments, LLC ("Hanover") at the time M&F made its loan to Town Park, Hanover executed a warranty deed conveying title to Town Park on September 11, 2009. *See* Trustee's Complaint at ¶ 61.2 (incorporated in the Cross-Claim at ¶ 29). At that point, title was properly in M&F's borrower's name, Town Park, where it remains today. M&F admits that it has a "valid first lien and security interest as against Parcels T-2 and T-3," and "has a first, perfected security interest by the Deed of Trust." *See* Cross-Claim at ¶ 29.

## III. <u>SUMMARY JUDGMENT STANDARD</u>

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party points to an absence of proof on claims as to which the non-movant has the burden of proof at trial, "the nonmoving party must rebut with 'significant probative' evidence." *Johnson v. Davidson Ladders, Inc.*, 403 F.Supp.2d 544, 547 (N.D. Miss. 2005) (citing *Ferguson v. National Broadcasting, Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978)). Put differently, "the nonmoving litigant is required to bring forward significant probative evidence demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982). A non-moving party to a motion for summary judgment is not entitled to rely on general allegations or denials, but must come forth with significant probative evidence demonstrating the existence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Of course, not every fact will defeat a motion for summary judgment. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical

4/229742.3

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). Instead, the nonmoving party "must come forward with 'specific facts showing that

there is a *genuine issue for trial.*'" *Id.* (emphasis in original) (quoting Fed. R. Civ. Proc. 56(e)).

A fact issue is "material" only if a reasonable jury could return a verdict for the non-moving

party based on the evidence adduced. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If

the evidence could not lead a rational trier of fact to find for the non-movant, then there is no

genuine issue for trial. *Id.* Where the evidence presented at summary judgment "establishes that

one of the essential elements of a plaintiff's cause of action does not exist as a matter of law...all

other contested issues of fact are rendered immaterial." *Davidson Ladders,* 403 F.Supp.2d at 547

(citing *Celotex*, 477 U.S. at 323).

    Under these standards, the Title Companies' Motion for Summary Judgment should be

granted in its entirety. By M&F's own admission, it has a valid first lien and security interest.

*See* Cross-Claim at ¶ 29. Accordingly, the Title Companies have no further obligation under the

Lender's Policy—which insures against title defects—because no title defects exist. Similarly,

the tort claims against the Title Companies fail for the reasons discussed below.

## IV. ANALYSIS

### A. M&F's Vicarious Liability Claims Fail as a Matter of Law.

    In its Cross-Claim, M&F alleges that the Title Companies are liable for the acts of

Charles Evans "under the doctrine of vicarious liability or the doctrine of respondeat superior."

*See* Cross-Claim at ¶ 34.[2]   The undisputable facts confirm, however, that that the Title

---

[2] M&F makes claims of negligent misrepresentation, breach of contract, breach of duty of the good faith and fair dealing, and fraud against Charles Evans. M&F only makes these allegations against the Title Companies through the theories of vicarious liability and respondeat superior. As discussed below, the Title Companies would be entitled to summary judgment even if these claims were made directly against them. These claims are not adequately made against the Title Companies, however, because, as a matter of law, the Title Companies are not liable for Charles Evans' actions under theories of vicarious liability or respondeat superior.

4/229742 3

Companies cannot be vicariously liable for Charles Evans' actions.

**1.     The Title Companies cannot be liable under a theory of respondeat superior because Charles Evans was never an employee of the Title Companies**.

M&F's respondeat superior claims fail because Charles Evans was never an employee of the Title Companies. "Generally, an employer is liable for the negligent acts of its employee done in the course and scope of his employment under the doctrine of respondeat superior, but an employer is not liable for the negligence of an independent contractor." *McKee v. Brimmer*, 39 F.3d 94, 96 (5th Cir. Miss. 1994) (citing *W.J. Runyon & Son, Inc. v. Davis*, 605 So. 2d 38, 45 (Miss.1992).   The doctrine of respondeat superior is "a derivative claim [against an employer] arising solely out of the negligent conduct of its *employee* within the scope of his or her employment." *Crawford Logging, Inc. v. Estate of Irving*, 41 So. 3d 687, 690 (Miss. 2010) (emphasis added). Thus, a threshold requirement of respondeat superior is the existence of an employee/employer relationship, which does not exist here.

Charles Evans was never employed or paid by the Title Companies. *See* Affidavit of Parrish Fortenberry, attached as Exhibit 3.   Accordingly, M&F has not and cannot provide any evidence to the contrary.   Because Charles Evans was never an employee of the Title Companies, M&F's respondeat superior claim fails as a matter of law for this reason alone.

**2.     The Title Companies are not liable under general agency principles because Charles Evans possessed neither apparent nor actual authority**.

M&F's remaining vicarious liability claims are grounded in agency.   Specifically, M&F alleges that Charles Evans was "an approved attorney/agent of the Title Companies" and, therefore, the "Title Companies are liable for [his] wrongful acts." *See* Cross-Claim at ¶ 34. Evans, however, had no express or apparent authority to bind the Title Companies. Moreover, the Title Companies did not issue the Lender's Policy until more than five months after M&F

6

closed the loan and disbursed the funds. Accordingly, M&F could not have relied on any actual or apparent authority in making the loan to Town Park. Thus, this claim fails for a second reason.

In Mississippi, "the general law of agency applies to insurers' relationships with their agents." *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss. 1990). An agent's authority may be based on actual authority or apparent authority. *Id.* "If an agent had apparent authority to bind his or her principal, then the issue of actual authority need not be reached." *Id.* (citing *Baxter Porter & Sons Well Servicing Co., Inc v. Venture Oil Corp.*, 488 So. 2d 793, 796 (Miss. 1986)).

**a.    Charles Evans did not have apparent authority to act on behalf of the Title Companies.**

"Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Andrew Jackson*, 566 So. 2d at 1180 (citing *Ford v. Lamar Life Ins. Co.*, 513 So. 2d 880, 888 (Miss. 1987)). Mississippi employs a three-prong test to determine the existence of apparent authority. This test requires M&F to establish:

(1) acts or conduct on the part of the principal indicating the agent's authority;

(2) reasonable reliance on those acts; *and*

(3) a detrimental change in position as a result of such reliance.

*Id.* at 1181 (citing *Lamar Life Ins. Co.*, 513 So. 2d at 888) (emphasis added). M&F's agency claims fail under all three prongs.

First, there is no evidence of any acts or conduct by the Title Companies indicating that Charles Evans possessed any authority to act on behalf of the Title Companies. Instead, M&F

7

merely asserts that Charles Evans was an "approved attorney/agent." M&F has provided only

two documents that reference both Charles Evans and the Title Companies: (1) a January 8, 2009

letter from Charles Evans to M&F, enclosing the Lender's Policy (the "Letter", attached as

Exhibit 2) and (2) Schedule A of the Lender's Policy which states it was "Prepared for" Charles

Evans.[3] *See* Cross-Claim at Attachment A; Lender's Policy, Exhibit 1; Letter, Exhibit 2. Those

documents, however, contain no act or conduct by the Title Companies indicating that Charles

Evans had authority to act on behalf of the Title Companies.

The Letter, other than the greeting and subject line, states in its entirety:

> Please find enclosed herewith are the following documents:
>
> 1. The original "Deed of Trust" executed in favor of Merchants & Farmers Bank by Town Park of Madison, LLC.
>
> 2. An original policy of title insurance from Mississippi Valley Title Insurance Company reflecting the bank's first priority security interest in the subject property.
>
> Sincerely,
>
> Charles H. Evans.

*See* Cross-Claim at Attachment A; Letter, Exhibit 2. Nothing in the Letter indicates or implies

any act or conduct of the Title Companies suggesting that Charles Evans had authority to act on

behalf of the Title Companies. Additionally, this Letter was written by Charles Evans on his

own letterhead and addressed only to M&F. *Id.*

The Letter enclosed the Lender's Policy, which clearly states at Exhibit A that it was

"*Prepared for* Charles Evans." *See* Lender's Policy, Exhibit 1. The Lender's Policy makes

clear, however, that it was "*Issued by* Mississippi Valley Title Insurance Company and Old

---

[3] The only other document that M&F has provided is a Certificate of Title letter from Charles Evans, attached as Exhibit 4. This Certificate of Title makes no reference to the Title Companies, is written on Charles Evan's own letterhead, was sent directly to M&F, is not addressed to the Title Companies, and is nothing more than a certificate from Charles Evans to M&F that he examined the records pertaining to the property.

4/229742.3

Republic National Title Insurance Company." *Id.*

The Lender's Policy is clear and unambiguous. It was issued *by* the Title Companies *for* Charles Evans at the request of M&F. Charles Evans did not have authority to issue policies, and there is no evidence to the contrary. Accordingly, M&F's apparent authority claim fails under the first prong.

Similarly, M&F's apparent authority claim fails under the second prong because it cannot establish reasonable reliance on the Letter and Lender's Policy, when it received both of these over five months after making the loan to Town Park. M&F made the loan to Town Park on July 18, 2008 and disbursed loan proceeds that same day. *See* Trustee's Complaint at ¶ 61.2 (incorporated in the Cross-Claim at ¶ 29). Over five months later, in January of 2009, the Title Companies issued the Lender's Policy and Charles Evans sent the letter to M&F. *See* Letter, Exhibit 2. Because M&F made the loan to Town Park well before it received the letter and Lender's Policy, it was impossible for M&F to rely on these documents when it made the loan. Simply put, M&F could not possibly have possibly relied on the Title Companies' alleged acts or conduct to close the loan with Town Park when any alleged acts or conduct necessarily occurred after the loan between Town Park and M&F closed.

Because M&F could not have relied on any acts or conduct by the Title Companies, it certainly cannot have *detrimentally* relied, which is the third prong. Accordingly, this claim fails under all three prongs.

> **b.**   **Charles Evans lacked actual authority to act on behalf of the Title Companies.**

Because M&F cannot show apparent authority, it must establish that Charles Evans had actual authority on behalf of the Title Companies to succeed on its agency claim. *See Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1180 (Miss. 1990). M&F is unable to do so.

9

Actual authority is "the power of the agent to effect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him," and it may be either express or implied. *Butler v. Bunge Corp.*, 329 F. Supp. 47, 55 (N.D. Miss. 1971) (quoting RESTATEMENT, AGENCY (2d ed.) § 7). "An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties." *Id.* (quoting 3 AM. JUR. 2D *Agency* § 18, at 429).

Title Companies did not have any oral or written agreements giving Charles Evans the authority to act on behalf of the Title Companies. *See* Affidavit of Fortenberry, Exhibit 3. Because no evidence of actual authority exists or ever existed, M&F cannot identify any such agreement and its actual authority claim must be dismissed as a matter of law.

> **3.    As a matter of law, Charles Evans' status as "approved attorney" does not create an agency relationship with the Title Companies.**

Charles Evans was an approved attorney for the Title Companies. *See* Affidavit of Fortenberry, Exhibit 3. This simply means that the title insurance company will accept the approved attorney's opinion on land titles. *Southwest Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Lawyer Title Ins. Corp. v. Edmar Constr. Co.*, 294 A.2d 865, 866 (D.C. 1972). An approved attorney does not have the authority to bind a title insurance company. By contrast, a title agent may "issue binders, commitments, or policies on behalf of the title insurance company." James Bruce Davis, *The Law of Closing Protection Letters*, 36 Tort & Ins. L. J. 845, 846 (2001). An approved attorney is paid by the buyer or lender because the buyer or lender actually hires the attorney for representation throughout the real estate

4/229742.3

transaction.[4] *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1132 (3d Cir. 1993).

As an approved attorney, Charles Evans could only send the Title Companies applications for title insurance and his opinion on the title of the land stated on the application. *See* Affidavit of Fortenberry, Exhibit 3. The Title Companies made the ultimate decision whether or not to issue a commitment or policy. *Id.* The language of the Lender's Policy itself expressly states that it is "issued by" the Title Companies and "prepared for" Charles Evans. *See* Lender's Policy, Exhibit 1. Because Charles Evans was an approved attorney and not a title agent, he had no authority to issue commitments or policies. *Id.* Charles Evans could not bind the Title Companies in any way regarding title insurance. *Id.*

Additionally, Charles Evans did not, at any time, receive compensation from the Title Companies. *Id.* As an approved attorney, Charles Evans was to receive compensation from the lender (M&F) or the borrower (Town Park). Whether Charles Evans actually received such compensation is immaterial to the discussion of his relationship with the Title Companies. What is material is that the Title Companies did not pay Charles Evans. *Id.* Unlike an approved attorney, a title agent receives a portion of the premium for the title insurance policy, whereas an approved attorney (such as Charles Evans) does not. *See* Affidavit of Fortenberry, Exhibit 3.

Charles Evans was not a title agent for the Title Companies. *Id.* He did not issue or purport to issue any title insurance policies or commitments. *Id.* Rather, Charles Evans was merely an approved attorney. *Id.* Accordingly, there cannot possibly be a genuine issue of

---

[4] The Third Circuit explained:

> An attorney may act as an attorney-agent for hypothetical insurance company A and at the same time act as an approved attorney for insurance company B. If company A hires the attorney to perform a search and examination as an attorney-agent, he will receive as compensation from the insurance company the price fixed by the insurance companies through the rating bureau in the state in which the property is located. In contrast, if a buyer or lender hires the attorney either directly or by reference to company B's list of approved attorneys, the attorney bills the buyer or lender at whatever rate they negotiate.

*Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1132 (3d Cir. 1993).

4/229742.3

material fact on the issue of whether Charles Evans was an agent for the Title Companies.

For all of the reasons above, this Court should grant summary judgment in favor of the Title Companies on all vicarious liability claims, including respondeat superior and agency.

**B.     M&F's Contract-Based Claims Fail as a Matter of Law.**

M&F's contractual claims should also be dismissed. M&F acknowledges that it has a "valid first lien and security interest as against Parcels T-2 and T-3," and "has a first, perfected security interest by the Deed of Trust...as to Parcels T-2 and T-3..." *Id.* Still, M&F contends that it is entitled to "immediate payment in full of all its claims against the Title Companies." *See* Cross-Claim at ¶ 42. In addition, M&F makes claims of breach of contract and breach of duty of good faith and fair dealing against Charles Evans and, therefore (through vicarious liability), the Title Companies.[5]

Because M&F concedes it has a valid first lien and security interest, there is no title defect and the Lender's Policy makes clear that Title Companies have no obligation. Therefore, summary judgment is proper as to any contract-based cause of action asserted by M&F.

**1.     The Title Companies do not owe M&F any payment.**

M&F contends that the M&F is entitled to "immediate payment in full of all its claims against the Title Companies." *See* Cross-Claim at ¶ 42. This, however, ignores the terms of the Lender's Policy, which is a policy of indemnification that insures against title defects. *See* Lender's Policy, Exhibit 1. M&F concedes that no defects exist here. *See* Cross-Claim at ¶ 29. If a title defect existed, then the Title Companies could either pay for the loss or cure the defect. *See* Lender's Policy, Exhibit 1. Because no title defect exists, there is nothing to cure or pay.

M&F has a valid security interest in the property and is, therefore, not due any payment.

---

[5] As discussed above, the Title Companies are not liable for Charles Evans' actions. Still, for completeness, the Title Companies address these claims here as if they were adequately made against the Title Companies.

4/229742.3

Accordingly, the Title Companies are entitled to summary judgment on this claim.

### 2. The Title Companies did not breach the Lender's Policy

M&F claims that the Title Companies have breached the Lender's Policy. *See* Cross-Claim at ¶ 32. For its breach of contract claim, M&F must prove by a preponderance of the evidence: (1) the existence of a valid and binding contract; (2) that the Title Companies breached the contract; and (3) that M&F has been thereby damaged monetarily. *See Warwick v. Matheney*, 603 So. 2d 330, 336 (Miss. 1992).[6]

There is no question that the Lender's Policy is valid and enforceable. In addition, the Title Companies did not deny coverage under the Lender's Policy. To the contrary, the Title Companies owed no financial payout to M&F under the terms of the Lender's Policy, and therefore had no obligations which they could breach.

Under the Lender's Policy, the Title Companies insured that M&F had a first priority lien on Tracts T-2 and T-3. *See* Lender's Policy, Exhibit 1. Should a defect arise by reason not excluded under the Lender's Policy, the Title Companies are obligated to either cure the defect or pay the lender the amount of its loss due to the title defect. *Id.* As discussed above, there is no title defect and, accordingly, the Title Companies have nothing to cure or for which they owe any payment. Put differently, the Lender's Policy insured that M&F had a first priority lien on Tracts T-2 and T-3; M&F does have a first priority lien on these tracts; and, as a result, the Title

---

[6] Mississippi courts interpret insurance policies according to contract law. *Am. States Ins. Co. v. Nethery*, 79 F.3d 473, 475 (5th Cir. 1996) (citing *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1109 (5th Cir. 1983)). "Like all other contracts, insurance policies which are clear and unambiguous are to be enforced according to their terms as written." *Sessoms v. Allstate Ins. Co.*, 634 So. 2d 516, 519 (Miss. 1993) (citing *Aero International v. United States Fire Ins. Co.*, 713 F.2d 1106 (5th Cir. 1983)). Courts should examine the "four corners" of a contract to determine the terms of the agreement. *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So.2d 107, 111 (Miss. 2005). "Insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties, with any ambiguities interpreted liberally in favor of the insured." *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 70 (Miss. 1998). However, the court may not construe "a contract differing from that made by the parties themselves, or [] enlarge an insurance company's obligations where the provisions of its policy are clear." *State Auto. Mut. Ins. Co. v. Glover*, 176 So. 2d 256, 258 (Miss. 1965).

Companies have fulfilled their end of the contractual bargain. Thus, M&F lacks a valid breach

of contract claim.

### 3. The Title Companies did not breach the covenant of good faith and fair dealing because the Title Companies did not breach the contract.

The Title Companies could not have breached the covenant of good faith and fair dealing

because the Title Companies never breached the Lender's Policy. Mississippi recognizes that

"every contract contains an implied covenant of good faith and fair dealing in performance and

enforcement." *Blue Diamond v. Liberty Mut. Ins. Co.*, 21 F. Supp. 2d 631, 633 (S.D. Miss.

1998) (citing *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992)). The Mississippi Supreme

Court has described this duty:

> In recent years, courts have often supplied a term requiring both parties to a contract to exercise what is called 'good faith' or sometimes 'good faith and fair dealing.' This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

*Cenac*, 609 So. 2d at 1272 (quoting FARNSWORTH, CONTRACTS, § 7.17, 526-27 (1982)). Put

differently, "[g]ood faith is the faithfulness of an agreed purpose between two parties, a

purpose which is consistent with *justified expectations of the other party*." *Cenac v. Murry*, 609

So. 2d 1257, 1272 (Miss. 1992) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, 100

(1979)) (emphasis added). "The breach of good faith is bad faith characterized by some conduct

which violates standards of decency, fairness or reasonableness." *Id.*

Because, as discussed above, there is no cause of action for breach of contract, there can

4/229742.3

be no breach of the implied covenant of good faith and fair dealing. *See, e.g., Cothern v. Vickers, Inc.*, 759 So. 2d 1241, 1249 (Miss. 2000) (finding that defendant did not breach covenant of good faith and fair dealing because no breach of contract occurred); *Johnston v. Palmer*, 963 So.2d 586, 593-95 (Miss. App. 2007) (finding no breach of the covenant of good faith and fair dealing when defendant complied with contract terms.); *West v. Nationwide Trustee Services, Inc.*, 2010 WL 3122801, * 2 (S.D. Miss. August 4, 2010) (the duty of good faith and fair dealing is not breached when the contract underlying contract is not breached)(citing *Grand Housing, Inc. v. Bombardier Capital, Inc.*, 2005 WL 673267, at * 4 (5th Cir. Mar. 23, 2005) (finding no bad faith where defendant "at all times acted within its contractual authority")). Accordingly, this Court should grant summary judgment to the Title Companies on M&F's breach of the covenant of good faith and fair dealing claim.

## C.    M&F's Tort-Based Claims Fail as a Matter of Law

M&F alleges tort-related claims of negligent supervision of Charles Evans against the Title Companies, as well as claims of fraud and negligent misrepresentation against Charles Evans (and, therefore, Title Companies[7]). The issue of a title insurer's tort liability is an issue of first impression in Mississippi. In the absence of a final decision by the Mississippi Supreme Court on an issue, this Court must determine, in its best judgment, how the Mississippi Supreme Court would resolve the issue. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). This process is typically referred to as an "Erie guess," based on the U.S. Supreme Court's decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).

The Court should follow the vast majority and modern trend of jurisdictions and hold that a title insurer cannot be liable in tort because the relationship between a title insurer and its

---

[7] Again, the Title Companies are not liable for Charles Evans' actions. Still, for the sake of completeness, the Title Companies address these tort claims here as if they were adequately made against the Title Companies.

4/229742.3

insured is a contractual one.  This rule is based on the well-founded principle that parties to a contract elect to reduce their duties, rights, responsibilities, and obligations to writing for more predictable results.  This majority rule also finds significant support from basic Mississippi insurance principles.  This Court should follow the majority rule and enter an order that, as a matter of law, the Title Companies cannot be liable to M&F under a tort theory.

### 1.   Basic Mississippi insurance principles recognize that the relationship between insurer and insured is strictly contractual.

Mississippi has long held that "the relation between the policy holder and the [insurance] company [is] one of contract, measured by the terms of the policy." *Equitable Life Assurance Soc. of the U.S. v. Weil*, 60 So. 133, 134 (Miss. 1912) (citations omitted); *Szumigala v. Nationwide Mut. Ins. Co.*, 853 F.2d 274, 280, n.7 (5th Cir. 1988) (describing the insurance relationship as "one that is contractual in nature....").  Indeed, "[i]t is clear that the relationship between an insurance company and its insured is contractual in nature, with the rights and duties set out by the provisions of the insurance policy." *Sessoms v. Allstate Ins. Co.*, 634 So. 2d 516, 519 (Miss. 1993) (citing *Cauthen v. National Banks Life Ins. Co.*, 88 So. 2d 103 (Miss. 1956)).

Mississippi courts interpret insurance policies according to contract law. *Am. States Ins. Co. v. Nethery*, 79 F.3d 473, 475 (5th Cir. 1996) (citing *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1109 (5th Cir. 1983)).  "Like all other contracts, insurance policies which are clear and unambiguous are to be enforced according to their terms as written." *Sessoms*, 634 So. 2d at 519 (citing *Davidson v. State Farm Fire & Cas. Co.*, 641 F. Supp. 503 (N.D. Miss. 1986) and *Aero International v. United States Fire Ins. Co.*, 713 F.2d 1106 (5th Cir. 1983)).

"Tort law principles should not dictate judicial construction of insurance policies.... Insurance contracts are construed in accordance with the plain language of the policies as

16

4/229742.3

bargained for by the parties...." *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 70 (Miss. 1998).[8]

Stated simply, the Court may not construe "a contract differing from that made by the parties

themselves, or [] enlarge an insurance company's obligations where the provisions of its policy

are clear." *State Auto. Mut. Ins. Co. v. Glover*, 176 So. 2d 256, 258 (Miss. 1965).

Mississippi's basic contract and insurance principles are consistent with the majority rule

described below and support a ruling by this Court that title insurers cannot be liable in tort.

### 2.    The Court should adopt the majority rule regarding tort liability of a title insurance company.

Whether a title insurance company may be found liable in tort to its insured is an issue of

first impression in Mississippi.  The overwhelming majority and modern trend of states that have

addressed this issue[9] have either favorably discussed or expressly followed the rule that a title

---

[8] The *Lewis* case involves the interpretation of a homeowner's insurance policy. *Lewis v. Allstate Ins. Co.*, 730 So. 2d at 67.  In *Lewis*, the Mississippi Supreme Court stated that insurance policies are contracts of adhesion and thus, ambiguities should be construed in favor of the insured.  *Id.* at 70.  Title insurance policies, however, have not been held out to be contracts of adhesion.  In fact, the Fifth Circuit has suggested that title insurance policies are arms-length transactions because the policies are drafted and promulgated by the American Land and Title Association ("ALTA").  *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 496-97, FN5 (5th Cir. 2004)(citing Michael F. Jones & Rebecca R. Messall, *Mechanic's Lien Title Insurance Coverage for Construction Projects: Lenders and Insurers Beware*, 16 REAL EST. L.J. 291, 306-07 (1988)).

[9] *Chi. Title Ins. Co. v. Ark. Riverview Dev., LLC*, 573 F. Supp. 2d 1152, 1158-1160 (E.D. Ark. 2008) (describing the inconsistencies in Arkansas's law on the subject and ultimately following the majority rule); *Southland Title Corp. v. Superior Court*, 231 Cal. App. 3d 530, 536 (Cal. Ct. App. 1991) (recognizing the statutory mandate); *Lee v. Duncan*, 88 Conn. App. 319, 325-26 (Conn. App. Ct. 2005) (describing contract between title insurer and insured as "essentially contractual" and any search is conduct for the benefit of the title insurer, which thereby negates an insured's negligence claim against the title insurer); *Ruger v. Funk*, 1996 Del. Super. LEXIS 34, *299 (Del. Super. 1996); *La Minn. Riviera, LLC v. Lawyers Title Ins. Corp.*, 2007 U.S. Dist. LEXIS 77034, 6-7 (M.D. Fla. Oct. 15, 2007) (noting apparent discrepancies between the Florida Supreme Court and the Court of Appeals and deciding to follow the majority rule); *Anderson v. Title Ins. Co.*, 655 P.2d 82, 86 (Id. 1982); *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 764 P.2d 423 (Id. 1988); *First Midwest Bank v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 340 (Ill. 2006); *Commonwealth Land Title Ins. Co. v. Graoch Assocs.*, 2010 U.S. Dist. LEXIS 29318, at *4 (E.D. Ky. 2010) (setting forth majority rule by emphasizing contractual aspect of title insurance); *N.E. Properties v. Chicago Title Ins. Co.*, 660 A.2d 926, 928 (Me. 1995); *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 293-94 (4th Cir. 2002) (noting that "Maryland does not recognize a cause of action for negligence arising solely from a contractual relationship between two parties."); *Keckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961) ("The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort."); *Somerset Sav. Bank v. Chicago Title Ins. Co.*, 649 N.E.2d 1123, 1129 (Mass. 1995); *Private Lending & Purchasing v. First Am. Title Ins. Co.*, 766 N.E.2d 532, 536-39 (Mass. Ct. App. 2002); *Mickam v. Joseph Louis Palace Trust*, 849 F. Supp. 516, 521 (E.D. Mich. 1993); *Resolution Trust Corp. v. Ford Mall Assocs. Ltd. Partnership*, 819 F. Supp. 826 (D. Minn. 1991) (citing

4/229742.3

insurer is not liable in tort to the insured for duties performed under the contract unless the title

insurer affirmatively assumes additional duties outside the contract.  The Court should adopt this

rule for a number of reasons, as discussed below.

> a.    **The relationship between the title insurance company and its insured
> is based solely on the insurance policy.**

The relationship between the title insurer and the insured is purely contractual.  "A title

insurance policy is a contract of indemnity.... [T]he only duty imposed by a title insurance

policy is the duty to indemnify the insured against losses caused by defects in title.... [Thus, the]

issuance of a [title] policy did not constitute a representation regarding the status of the

property's title; rather, it constituted an agreement to indemnify the [insured] against losses

caused by any defects." *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310 (Tex. 1994); 1 AM

JUR 2D *Abstracts of Title* § 16 (2010) (A title insurance policy is simply "a contract for

indemnification under which the insurer is obligated to indemnify the insured against losses

sustained in the event that a lien or encumbrance affecting title to property is discovered."

A leading explanation of this contractual relationship, which has been cited by numerous

courts,[10] states:

---

cases stating the majority rule but finding the existence of tort liability because the title insurer assumed duties
outside the scope of the title insurance contract); NEV. REV. STAT. §§ 692A.015 & 692A.023 (2010); *Walker Rogge,
Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 220 (N.J. 1989); *Cottonwood Enter. v. McAlpin*, 810 P.2d 812,
814-15 (N.M. 1991); *Smirlock Realty Corp. v. Title Guar. Co.*, 418 N.E. 2d 650 (N.Y. 1981); *Citibank v. Chicago
Title Ins. Co.*, 632 N.Y.S. 2d 779 (Sup. Ct., App. Div. 1995); *Chicago Title Ins. Co. v. Hunington Nat'l Bank*, 719
N.E. 2d 955, 962 (Ohio 1999) (rejecting insured's negligence claim because of merger clause and disclaimer in title
insurance policy); *Womer v. Melody Woods Home Corp.*, 991 P.2d 873 (Or. Ct. App. 2000); *Chicago Title Ins. Co.
v. McDaniel*, 875 S.W.2d 310, 311 (Tex. 1994); *Bank of Commerce & Trust Co. v. Dye*, 1 Tenn. App. 486, 493
(Tenn. Ct. App. 1926) (title insurance company cannot be found negligent when searching a title for the purpose of
issuing title insurance because these "contracts [are] of an entirely different nature"); *Culp Constr. Co. v. Buildmart
Mall*, 795 P.2d 650, 654 (Utah 1990); *Chapman v. Uintah County*, 81 P.3d 761 (Ut. Ct. App. 2003); *Barstad v.
Stewart Title Guar. Co.*, 39 P.3d 984, 987 (Wash. 2002); *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147
(Wis. 1992); *Hulse v. First Am. Title Co. of Crook County*, 33 P.3d 122, 135 (Wy. 2001); *Layman v. Friedlander*,
2003 Va. Cir. LEXIS 51, at *3-5 (Va. Cir. Ct. 2003).

[10] *See e.g., Ruger v. Funk*, 1996 Del. Super. LEXIS 34 (Del. Super. Ct. Jan. 22, 1996); *Culp Constr. Co. v.
Buildmart Mall*, 795 P.2d 650 (Utah 1990); *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147 (Wis. 1992);
*Hulse v. First Am. Title Co.*, 33 P.3d 122 (Wyo. 2001).

4/229742.3

[T]he relationship between the company and the insured is essentially contractual. The end result of the relationship between the title company and the insured is the issuance of the policy. To this extent, the relationship differs from other relationships conceivably sounding in both tort and contract, such as the relationship between physician and patient, to which plaintiff alludes. Although the relationship between physician and patient is contractual in its origins, the purpose of the relationship is to obtain the services of the physician in treating the patient. The patient reasonably expects the physician to follow the appropriate standard of care when providing those services. By contrast, the title company is providing not services, but a policy of insurance. That policy appropriately limits the rights and duties of the parties.

From this perspective, the insured expects that in consideration for payment of the premium, it will receive a policy of insurance. The insurer's expectation is that in exchange for that premium it will insure against certain risks subject to the terms of the policy. If the title company fails to conduct a reasonable title examination or, having conducted such an examination, fails to disclose the results to the insured, then it runs the risk of liability under the policy.

*Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 220 (N.J. 1989) (citations omitted); *Greenberg v. Stewart Title Guar. Co.*, 171 Wis. 2d 485, 496 (Wis. 1992) ("There was no obligation under the [title insurance] contract to search the title, thus no duty could arise to search the title with due care and skill."). Again, the title searcher provides services in the form of reviewing title and producing a comprehensive review of title called an abstract. The title insurer simply contracts to indemnify the insured should any problems arise in the chain of title. Consistent with the nature of insurance, the title insurer—rather than the insured—assumes any risk that the description of title in the subsequent policy is incorrect.

Simply, the contract for title insurance and the contract for a title search are distinct and the "doctrine of skill or negligence has no application to a contract of title insurance." *Citibank v. Chicago Title Ins. Co.*, 632 N.Y.S. 2d 779, 781 (Sup. Ct. App. Div. 1995). A title insurer must not face tort liability unless it voluntarily assumes duties beyond the policy because "title

19

insurance only insures against damage resulting from defects in the insured's title in the

property, and does not represent that the contingency insured against will not occur." *Brown's

Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 764 P.2d 423, 426 (Id. 1988).

The majority rule also recognizes the clear distinction between the functions of searching

title and insuring title.  For example, a title searcher, often called an abstractor, enters into a

services contract to conduct a comprehensive review of the chain of title for a particular piece of

property. *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 562 A.2d 208, 220 (N.J. 1989).

By contrast, a title insurer enters into an insurance contract to indemnify the insured with respect

to its proper place in the chain of title should any problems arise. *Id.*  The Utah Supreme Court

described the difference as follows:

> The function, form, and character of a title insurer is different from
> that of an abstractor.  One who hires a title insurance company
> does so for the purpose of obtaining the assurance or guarantee of
> obtaining a certain position in the chain of title rather than for the
> purpose of discovering the title status.  A title company's function
> is generally confined to the practice of insurance, not the practice
> of abstracting.

*Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 654 (Utah 1990).

A title searcher or abstractor provides title abstract or certificate of title.  A title insurance

company typically provides title insurance commitments and policies.   The information

contained in a title commitment and title policy is simply to identify the property and the

particular state of title to be insured. *First Midwest Bank v. Stewart Title Guar. Co.*, 843 N.E.2d

327, 335 (Ill. 2006); *see also Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147, 149 (Wis.

1992) ("A title commitment is a document which describes the property as the title insurer is

willing to insure it and contains the same exclusions and general and specific exceptions as later

appear in the title insurance policy.").  A "title insurer is not in the business of supplying

information when it issues a title commitment or a policy of title insurance." *First Midwest Banks*, 843 N.E.2d at 336.

Discussing the relationship between a title insurance company and its insured, the Texas Court of Appeals has properly explained that "[t]he title insurance company is not, as is an abstract company, employed to examine title." Rather, the title insurance company agrees to indemnify the insured in the event a title defect is discovered. Thus, the relationship between the parties is limited to that of indemnitor and indemnitee." *Houston Title Co. v. Ojeda de Toca*, 733 S.W.2d 325, 327 (Tex. Ct. App. 1987). The contractual relationship between M&F and the Title Companies is one of indemnification. This Court may not alter or amend the clear and unambiguous terms of the Lender's Policy, which is the only evidence of any relationship between M&F and the Title Companies.

> **b.    Subjecting a title insurer to tort liability would render the actual terms of the insurance policy meaningless.**

Because M&F and the Title Companies had no communication other than the Lender's Policy itself, the Title Companies could not have assumed any additional duty. Without the assumption of a legal duty, it is axiomatic that no breach may occur. If this Court were to permit a cause of action in tort to proceed here, the terms and conditions of the Lender's Policy would be meaningless. The sole relationship between M&F and the Title Companies is an indemnity agreement for any defects in title (of which there are none here).

Describing current industry practices, a Michigan federal district court explained:

> As in other states [like Mississippi], parties in Michigan generally purchase title insurance, rather than relying on an abstract, because they prefer the certainty of insurance. In purchasing insurance, a buyer acquires a contractual right against the insurer for coverage of title defects. In purchasing an abstract, a buyer merely obtains an examination of title. With an abstract, a real estate buyer can obtain damages for title defects only through tort litigation. To

21

> protect the rights and expectations of the parties, a title insurer
> should be liable in accordance with the terms of the title policy
> only and should not be liable in tort. To hold otherwise does
> violence to the whole concept of insurance.

*Mickam v. Joseph Louis Palace Trust*, 849 F. Supp. 516, 521 (E.D. Mich. 1993). Following this

line of thought, a Delaware Superior Court noted the following:

> If the insured could seek recovery in tort for the failure of an
> insurer to discover defects in title, the policy limits agreed to by
> the parties would become meaningless. The insureds have paid for
> a policy providing for a certain level of indemnification. They
> have paid for no more. Therefore, recovery is limited to that
> provided for in the contract. *In other words, no reasonable land
> purchaser [or lender] would consider a title insurance company as
> certifying that no title defect exists, when the whole purpose of the
> policy is to spell out the rights and responsibilities of parties if a
> defect does exist.*

*Ruger v. Funk*, 1996 Del. Super. LEXIS 34, *29 (Del. Super. 1996) (emphasis added).

This applies equally in Mississippi. This Court should follow the majority rule that, as a

matter of law, the Title Companies owe no duties to M&F beyond the terms, conditions,

limitations, exceptions and exclusions of the Lender's Policy. To do otherwise would effectively

alter, diminish, or negate the contract entered into by the parties. Such a rule ignores the purpose

of title insurance altogether, which is that specific risks of title defects as outlined in the policy

are shifted from the insured to the insurer. Ignoring this premise would detrimentally alter the

insurance industry. This Court should adopt the majority rule that properly recognizes the

purpose and intent of insurance and basic contract principles of Mississippi.

### 3.     M&F's Tort Claims fail under established Mississippi law.

By adopting the majority rule in this case, the Court need not reach an analysis of the

specific elements of M&F's tort claims. Even if this Court were to depart from the majority rule,

however, Mississippi law makes clear that M&F's negligence and fraud claims fail. To succeed

4/229742.3

on its negligent misrepresentation claim, M&F must prove the following the elements:

(1) a misrepresentation or omission of a fact;

(2) that the representation or omission is material or significant;

(3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities;

(4) that the plaintiff reasonably relied upon the misrepresentation or omission; and

(5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

*Mladineo v. Schmidt*, 2010 Miss. LEXIS 569, at *25-26 (Miss. Oct. 28, 2010) (quoting *Hazlehurst Lumber Co., Inc. v. Miss. Forestry Comm'n*, 983 So. 2d 309, 313 (Miss. 2008)). The standard required to establish a fraudulent or intentional misrepresentation in even more stringent. *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992).

The only document that M&F received from the Title Companies is the Lender's Policy. It is impossible for M&F to have relied on the Lender's Policy when it made the loan to Town Park over five months prior to the issuance of the Lender's Policy. Thus, the Title Companies are due summary judgment on M&F's negligent misrepresentation claim. Because the Title Companies are entitled to summary judgment on the negligent misrepresentation claim, they are also entitled to summary judgment on M&F's fraudulent misrepresentation claim, which requires greater proof.

### 4.    M&F's claim of negligent supervision necessarily fails.

M&F's claim for negligent supervision is similarly meritless because Charles Evans was not an employee of the Title Companies. The Mississippi Court of Appeals has stated "that specific evidence of an *employer's* actual or constructive knowledge of its *employee's* dangerous

4/229742.3

or violent tendencies is necessary in order to create a genuine issue of material fact on an improper training or supervision theory of liability." *Holmes v. Campbell Props.*, 2010 Miss. App. LEXIS 243, at *18 (Miss. App. May 18, 2010) (emphasis added). As explained above, Charles Evans was never an employee for the Title Companies, meaning there is no possibility that the Title Companies can be liable for negligently supervising him. *See* Affidavit of Fortenberry, Exhibit 3.

This Court should adopt the majority view that a title insurance company is not subject to tort liability absent some independent duty assumed outside of the insurance contract. Even if this Court elects to rule otherwise, however, M&F's negligence and fraud claims against the Title Companies fail as a matter of law.

## V.    CONCLUSION

FOR THESE REASONS, the Title Companies respectfully request that this Court grant their motion for summary judgment, award expenses and attorney fees to Title Companies, and grant any additional relief deemed appropriate by this Court.

RESPECTFULLY SUBMITTED, this the 22nd day of December, 2010.

**MISSISSIPPI VALLEY TITLE INSURANCE COMPANY and OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

/s/ Mason E. Lowe
David W. Clark (MSB# 6112)
Mason E. Lowe (MSB# 102393)

OF COUNSEL
Bradley Arant Boult Cummings LLP
One Jackson Place,
188 East Capitol Street, Suite 400
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

24

4/229742.3

## CERTIFICATE OF SERVICE

I hereby certify that on this day, a copy of the foregoing has been served by electronic filing through the ECF System, which provides electronic notice to all counsel of record, including:

M. Scott Jones, Esq.
Adams and Reese, LLP
111 East Capitol Street, Ste. 350
Jackson, MS 39225-4297

William C. Brabec
Adams and Reese LLP
111 E Capitol St Ste 350
Jackson, MS 39201

R. Michael Bolen, Esq.
Office of the United States Trustee A. H.
McCoy Federal Building
100 West Capitol Street, Suite 706
Jackson, Mississippi 39269

Derek A. Henderson, Trustee
111 East Capitol Street, Suite 455
Jackson, Mississippi 39201

Kristina M. Johnson, Esq.
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800
Jackson, Mississippi 39205-0427

John G. Holaday, Esq.
Holaday & Moorehead, Attorneys
220 West Jackson Street
Ridgeland, Mississippi 39157-1406

Michael V. Cory, Jr., Esq.
Post Office Box 1759
Jackson, Mississippi 39205-0629

Richard A. Montague, Jr.
Post Office Box 1970
Jackson, Mississippi 39205-1970

Tylvestor O. Goss, Esq.
Davis Goss & Williams
1441 Lakeover Road
Jackson, Mississippi 39213

G. Todd Burwell, Esq.
618 Crescent Boulevard, Suite 200
Ridgeland, Mississippi 39157

Gene D. Berry, Esq.
Post Office Box 1631
Madison, Mississippi 39130

John G. Corlew, Esq.
Corlew Munford & Smith, PLLC
4450 Old Canton Road, Suite 111
Jackson, Mississippi 39211

Jeff D. Rawlings, Esq.
Post Office Box 1789
Madison, Mississippi 39130-1789

Terry R. Levy, Esq.
Post Office Box 1084
Jackson, Mississippi 39215-1084

Michael D. Smith, Esq.
Post Office Box 22626
Jackson, Mississippi 39225-2626

Stephen Smith, Trustee
Shelton & Smith, P. C.
5 Old River Place, Suite 107
Jackson, Mississippi 39202

Jeffrey K. Tyree, Esq.
Post Office Box 3380
Ridgeland, Mississippi 39158-3380

Community Bank
Patrick F. McAllister, Esq.
Williford McAllister & Jacobus
303 Highland Park Cove, Suite A
Ridgeland, Mississippi 39157-6059

Dodd Enterprises, LLC
R. Paul Randall, Jr.
Randall, Segrest & Weeks, PLLC
992 Northpark Drive, Suite A
Ridgeland, Mississippi 39157

Thomas R. Hudson, Esq.
BankPlus
1068 Highland Colony Parkway, Suite 200
Ridgeland, Mississippi 39157-8807

Michael S. MacInnis
Rawlings & MacInnis, P.A.
P.O. Box 1789
Madison, MS  39130-1789

This the 22nd day of December, 2010.


/s/ Mason E. Lowe
MASON E. LOWE