UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

IN RE:

**JON CHRISTOPHER EVANS,**                    **CAUSE NO. 09–03763–NPO**

**DEBTOR**                                    **CHAPTER 7**

*Jointly Administered with Related Cases*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**G&B INVESTMENTS, INC.**                     **PLAINTIFF**

**VS.**                                       **ADV. PROC. NO. 10–00040–NPO**

**DEREK A. HENDERSON, TRUSTEE FOR THE
BANKRUPTCY ESTATE OF JON CHRISTOPHER
EVANS, Et Al.**                               **DEFENDANTS**

### G&B INVESTMENTS, INC.'S, RESPONSE TO TITLE COMPANIES' MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW, G&B Investments, Inc. ("G&B"), and files its Response to Motion for Partial

Summary Judgment filed by Mississippi Valley Title Insurance Company and Old Republic National

Title Insurance Company (the "Title Companies"), and in support thereof would show as follows:


## I. BACKGROUND AND INTRODUCTION

The factual picture painted by the Title Companies in this case is not complete. They have

essentially cherry picked certain facts to present an artificial snapshot of what is a far more

complicated series of related events. Contrary to the Title Companies' summary judgment argument,

the claims asserted by G&B against the Title Companies cannot be viewed apart from the claims

made by the banks against the Title Companies as the specific fraudulent acts committed by Charles
Evans and Jon C. Evans against the Heritage Banking Group, the Bank of Forrest, Merchants and
Farmers and G&B were all part of the same fraudulent scheme. Also contrary to the Title
Companies' summary judgement argument, they should be legally responsible for not timely
discovering Charles Evans' multi-year ongoing fraudulent activity.

        In this particular case, G&B listed for sale approximately 100 acres of undeveloped
commercial property located in Madison Mississippi. Charles Evans, using his status as an
"Approved Attorney" for the Title Companies, hatched a fraudulent scheme to borrow approximately
$5 million dollars from multiple banks which he then turned around and used as the down payment
toward the $16 million dollar total sale price for the G&B property. Stated another way,
unbeknownst to G&B, Charles Evans used G&B's land as the collateral for the bank loans even
though he did not yet own the property. Charles Evans was able to do this by using his status and
authority as an "Approved Attorney" for the Title Companies to dupe Heritage Banking Group,
Merchants and Farmer's Bank, and Bank of Forrest into collectively lending $5 million dollars
secured by portions of the G&B land that he did not actually own. Being successful in duping the
banking institutions, Charles Evans then turned around and used the $5 million dollars to complete
the purchase of the 100 acres even though the contract with G&B required the $5 million to be cash
in hand. Charles Evans ability to borrow $5 million dollars on G&B's property without G&B
knowing it would not have been possible had the Title Companies taken reasonable steps to
supervise and audit their "Approved Attorneys".

        Also contrary to the Title Companies' summary judgment argument, G&B did not get what
it bargained for. After paying the initial down payment, Charles Evans never made another payment.

Moreover, G&B only agreed to provide owner financing based on Charles Evans ability to pay $5 million dollars of his own cash at the closing. (Contract; Ex. 1). G&B did not agree that Charles Evans could raise the required $5 million dollars in equity by G&B's land as collateral for bank loans. As one of the principals of G&B clearly explained, "if I would have known that the Evanses had to borrow money against G&B land to close this transaction, we would not have done the deal with them." (Brata EUO pp. 24, 66; Ex. 2).

Because of the appearance that Charles Evans was financially strong enough to come to the closing with $5 million dollars in cash, G&B agreed to finance the balance of $11 million, and further agreed to take a Deed of Trust on approximately 70 acres so that Charles Evans could proceed with constructing a high rise condominium building (similar to the Barrington in Jackson) and a 10,000 square foot office building on the unsecured portion of the land. Again, G&B would never have consummated the transaction had G&B known that the down payment had been fraudulently obtained from multiple banking institutions, or that Charles Evans was not financially strong enough to close the transaction without using a portion of the land itself as collateral for the $5 million dollar down payment. As a result, G&B ended up with a deficiency in foreclosure in excess of $4 million dollars. The existence of these fraudulently obtained loans also ultimately lead to the assertion of equitable liens by the Title Companies, and the various banks, against the unsecured portion of the property causing G&B further damage and loss.

However, *none* of this would have occurred had the Title Companies properly supervised the actions of its "Approved Attorneys", and had timely identified the wrongful actions of Charles Evans that had been ongoing long before the closing of the G&B transaction. The negligent and/or grossly negligent actions of the Title Companies not only allowed, but even facilitated, Charles Evans'

fraudulent schemes. The Title Companies were the ONLY ones in a position to have prevented the

ongoing fraud, and their complete lack of oversight of their agents and underwriting procedures

injured their customers (G&B and the various lending institutions), all of which were issued some

type of title insurance by the Title Companies.

## II. PERTINENT FACTS

### A.    The Title Companies Did Not Properly Supervise And Audit Their Attorneys

Mississippi Valley's parent, Old Republic National Title Insurance Company owns 100

percent of the outstanding stock of Mississippi Valley. Mississippi Valley and Old Republic jointly

issue title policies to insureds. (Pamplet, Ex. 3). At the time the fraud in this case occurred,

Mississippi Valley Title Company was "the #1 Title insurer in Alabama and Mississippi" while Old

Republic was ranked "among the nation's 50 largest publically held insurance organizations."

(Pamplet, Ex. 3). According to Old Republic's own marketing material, it possesses "an unwavering

belief in being independent and innovative, mindful of tradition while ever aware that the changing

dynamics of business require new initiatives."   These policies are issued through a system of

"Authorized Agents" and "Approved Attorneys".   "Approved Attorneys" certify title; submit

applications for issuance of title commitments; submit applications for title policies; deliver the

commitments and policies; collect whatever fee is to be charged; and act as the primary contact with

the insured. (Freeman deposition pp. 30, 34, 38, 40-43, 49; Ex. 4 and Fortenberry deposition pp. 69-

72; Ex. 5). They are also free to advertise their status as an "Approved Attorney" to get real estate

work from banks. (Fortenberry deposition pp. 54-5; Ex. 5)

According to Section 1.2 of the Title Companies' *Mississippi Agents Manuel*, it is clear the

Title Companies understand that the general public rely on the stamp of approval of a title

commitment and/or title insurance policy and/or promise of a title insurance policy in going forward

with the financing and closing of land transactions.  (MAM, Section 1.2 p.1-2 ; Ex. 6).  Providing

title commitments and policies is accomplished through the Title Companies' "Approved Attorneys"

and "Authorized Agents." (Brad Jones Deposition p. 32, Ex. 7).

In Section 1.3 of the *Mississippi Agents Manuel*, the Title Companies explain their process

for selecting "Approved Attorneys":

> An attorney is approved when the Company is assured that his professional
> competence, *integrity*, and diligence have met our requirements.  As long as
> these requirements are *maintained*, the attorney may expect a lasting
> relationship with the Company.  (Emphasis added).

However, the record shows that the only steps taken to assure themselves of the integrity of Charles

Evans was a very cursory application process in 2002. (Application file, Ex. 8).  Furthermore, before

the G&B transaction the Title Companies did not have "any process to audit approved attorneys."

(Partin deposition pp. 162, 163; Ex. 9).

The *Mississippi Agents Manual*, which includes the Title Companies' only written

underwriting guidelines says:

> [t]he principal underwriting objective of Mississippi Valley Title Insurance
> Company/Old Republic National Title Insurance Company is to know that the title
> to the interest in the real estate being insured is good, so that its policyholders may
> enjoy peaceful, undisturbed possession thereof.  To accomplish this our first concern
> is the careful selection and appointment of well qualified, experienced agents and
> examining attorneys who are familiar with and knowledgeable in prudent title
> examining and underwriting procedures in their area.

(MAM; Ex. 6).  The entire underwriting department at Mississippi Valley consisted at all relevant

times of 2 employees:  Carolyn Freeman who is the Vice President, Senior Underwriter, and a

secretary. (Freeman deposition p. 9; Ex. 4).  However, according to Mrs. Freeman she actually only

spends about half of her time doing "underwriting". *Id.* at pp. 226-228. The other half of her time is spent answering the phone. *Id.* at pp. 228-29.

Mrs. Freeman also testified that the Title Companies did not do anything to actually check the work of their "Approved Attorneys". *Id.* at pp. 22, 83-84. There was no system to randomly checking title certifications; no system for checking to see if an "Approved Attorney" had a financial interest in the transaction; and no system for confirming the accuracy of any of the information provided. *Id.* at pp. 84-87, 89-93, 125-26, 137-39, 147, 153, 157-58, 168-69, 171, 188-91, 200-1, 216-218, 237. Mrs. Freeman was not sure who, if anyone, was responsible for supervising the "Approved Attorneys". *Id.* at pp. 44-46. Mrs. Freeman did not even know that Jon C. Evans and Charles Evans were brothers although a quick fact check would have revealed this relationship, and indeed should have revealed it, considered both Evans' signatures were on many of the same certificates of title/applications involving the same transactions.. *Id.* at p. 29. Yet, despite not knowing the answer to any of these important questions, Mrs. Freeman held the position of Senior Underwriter.

In Section 1.3 of the *Mississippi Agents Manual*, the Title Companies affirmatively represent that they "will weigh underwriting risks, if there any are present." (MAM, Section 1.3, p. 1-3 ; Ex. 6). However, the record is clear that the Title Companies did not actually look for any underwriting risks. In the Title Companies' own Manual they also say that good underwriting requires that "[a]ll documents should be recorded as soon as possible." (MAM, Article 21, p. 21-3 ; Ex. 6). Yet again, they do not actually have any system in place to actually enforce this acknowledged good underwriting practice. The Title Companies' own Manual also says that in order to avoid "fraud/forgery", good underwriting precludes the issuance of "any commitment or policy insuring

title to land in which agent, his partners, or employees have any financial interest." (MAM, Article 21, p. 21-10; Ex. 6). Again, there was no actual policy or procedure in place to assure or confirm that this good underwriting practice was followed. Finally, according to the Title Companies' own Manual, avoiding fraud through good underwriting also requires that no commitment or policy be issued "based on a certificate of title from an attorney that has any financial interest in the property to be insured." (MAM, Section 1.5, p. 1-4; Ex. 6). Section 1.5 of the *Mississippi Agents Manual* specifically states in bold:

> **DO NOT ACCEPT A CERTIFICATE OF TITLE FROM AN ATTORNEY THAT HAS ANY FINANCIAL INTEREST IN THE PROPERTY BEING CERTIFIED**

But again, there was no actual policy or procedure in place to enforce this acknowledged good practice. The "underwriting" that was done was undeniably more form than substance. As a practical matter the Title Companies did nothing more than simply check to make sure that the "Approved Attorneys" filled out the right forms without actually looking at the substance of those forms, and then waited for their insureds to call and tell them when there were problems.

The *Mississippi Agents Manual* specifically addresses the importance of preventing fraud and outlines certain steps that should be taken to prevent "Approved Attorneys" from engaging in fraud. Based on the Title Companies' own Manual, there can be no argument made that the very type of fraud that occurred in this case was something that was unforeseeable. Despite knowledge that fraud by approved attorneys and agents was always a possibility, and is relatively easy to accomplish, the Title Companies took no affirmative action to deter or prevent fraud by its "Approved Attorneys." Accordingly, the Title Companies were negligent in failing to properly implement and follow reasonably prudent procedures for supervising and monitoring their Approved Attorneys, including

Charles Evans. (Affidavit of George Pierson; Ex. 10).

Prior to the G&B transaction, the Title Companies were specifically aware of two separate instances of fraud involving the utilization of the same piece of property to obtain multiple mortgages. (Jones deposition pp. 25-34; Ex. 7). As with the fraud of Charles Evans, these two instances of fraud were not discovered by the Title Companies, but rather as a result of title claims. It was only after discovery of Charles Evans' longtime fraudulent scheme that the Title Companies began looking at developing a program to "mitigate our risk with approved attorneys." *Id.* at p. 45.

### B. The Appropriate Policies And Procedures

Title insurance companies have a general duty to ensure that their approved attorneys properly manage their business accounts through which funds are handled to fund loan closings; to regularly conduct onsite inspections and audits; to properly supervise and oversee the work of their authorized agents who are dealing with the general public. (Affidavit of George Pierson, Ex. 10). The Title Companies in this case should have had policies and procedures in place that provided for the monitoring, auditing, and supervising of their Approved Attorneys and Authorized Agents in connection with the issuance of title commitments and policies. *Id.* This would include very basic things like annual inspections of escrow accounts; random inspections of files; production of vesting documents and abstracts prior to issuance of policies. *Id.*

As a practical matter, the Title Companies did not have any policies or procedures to actually enforce good underwriting practices. They did not require documents to be timely filed. They did not require vesting documents to be attached. It was only after the Charles Evans' fiasco that the Title Companies even implemented a policy whereby the "Approved Attorneys" were required to attach copies of vesting documents to their applications. (Jones deposition pp. 103-105; Ex. 7). A

general prohibition against approved attorneys working on transactions involving close family relations, or direct financial interests should have been checked and enforced. The appearance of Jon Evans' signature on many of the applications submitted by Charles Evans should have alerted the Title Companies that Charles Evans' brother, and possibly Charles Evans himself, had a financial interest in the transaction(s). Ultimately, had the Title Companies had any meaningful auditing or underwriting procedures, they would have detected and discovered the ongoing fraudulent activities of Charles Evans much sooner. (Pierson Affidavit; Ex. 10).

### C.    Approved Attorney Charles Evans

The Title Companies gave Charles Evans the title of "Approved Attorney". The Title Companies expressly authorized Charles Evans to take certain actions and make certain representations on their behalf to third parties. (Jones affidavit p. 2; Ex. 11). Using his status as an "Approved Attorney" for the Title Companies, he was able over a 6 year period to have more than 100 title insurance policies to be issued to various lenders. (Jones deposition pp. 111-112; Ex. 7). Charles Evans did this by misrepresenting "the true ownership of and encumbrances upon certain land in title certificates provided to the Title Companies and various lenders." (Jones affidavit p. 2; Ex. 11). Amazingly, "[e]ach of the business entities obtaining loans based on these title insurance policies and to whom loan proceeds were disbursed was owned and/or controlled by Jon Christopher Evans and Charles H. Evans, Jr. and/or participated in the common scheme and enterprise of Jon Christopher Evans and/or Charles H. Evans, Jr." (Jones affidavit p. 2; Ex. 11).

### D.    Charles Evans Fraudulent Actions (made possible by his status as an "Approved Attorney") Began Long Before The G&B Transaction

According to the Federal Court Indictment of Charles Evans, beginning in January 2003, and

continuing to October 2009, Charles Evans and Jon Evans were engaged in an conspiracy to commit fraud by securing mortgage or loan proceeds from financial institutions by misrepresenting the ownership of the real property that was being offered as security for the mortgage or loan. (Indictment; Ex. 12). Charles Evans and Jon Evans on many occasions covertly and fictitiously subdivided multi-acre tracts on paper; manipulated legal descriptions; manipulated title history; manufactured false warranty deeds; double pledged existing property; performed false title work; issued false certificates of title; and disbursed mortgage proceeds to corporations that were owned or controlled by them. *Id.* Contrary to the representations made by Charles Evans in certificates of title, record title to the subject property was almost never transferred into the subsequent entity owned and controlled by Charles and Jon Evans. *Id.* These facts are further confirmed by the testimony of the Title Companies that they have received at least 65 claims on title policies issued in reliance upon the title certificates provided by Charles Evans. (Jones affidavit p. 3; Ex. 11).

### E. The G&B Transaction

In the fall of 2007, G&B Investments, Inc. ("G&B") negotiated a transaction with Charles H. Evans, Jr., and Jon C. Evans for the sale and purchase of an approximately one hundred acre tract of land located in Madison County, Mississippi (and commonly referred to generally in this litigation as Tract 4). Theses negotiations led to the signing of a contract in December 2007, whereby Charles Evans, on behalf of 463 Development Company, LLC, agreed to purchase Tract 4 from G&B. The contract price was $16,000,000.00, with $5,000,000.00 to be paid in cash at closing and the balance to be owner financed by G&B. [Contract, Ex. 1]. Both Charles Evans and his brother, Jon C. Evans were present at the closing. William Smith, an "Authorized Agent" for Mississippi Valley Title was the closing attorney for Charles Evans and sold G&B a questionable Owners Title Policy. Both prior

to and at the closing, Charles Evans, William Smith and Jon Evans represented to G&B that Charles

Evans was paying $5,000,000.00 in cash as equity at the closing. [Closing Statement; Ex. 13].

Based on these representations, G&B agreed to owner finance the the remaining balance with only

70 of the acres being secured by a Deed of Trust. The $5,000,000 dollar down payment was not a

payment for the unsecured 30 acres but was rather the equity payment for the entire 100 acres.

(Brata EUO p. 54; Ex. 2 and Brata Deposition pp. 31-59; Ex. 14).

The closing actually occurred on July 23, 2008, with Charles Evans paying $5,000,000.00

in cash to G&B. Prior to the closing, the original purchasing entity, the 463 Development Company,

assigned the Agreement of Sale and Purchase of Property to Hanover Investments, Inc., LLC.

("Hanover"). G&B subsequently discovered that the purported $5,000,000.00 in equity had actually

been obtained by Charles Evans under a fraudulent scheme that actually used parts of G&B's

property to obtain loans from various banks. (Brata Deposition pp. 31-59; Ex. 14) The execution

of this scheme would not have been possible if Charles Evans had not been an "Approved Attorney"

for the Title Companies and/or if the Title Companies had not exercised grossly inadequate oversight

of the actions of its "Approved Attorneys".

Charles Evans used his position of trust as an "Approved Attorney", as well as his knowledge

of the shortcomings in the policies and procedures of the Title Companies, to perpetuate a fraud that

at its core involved fraudulently pledging and obtaining G&B's land. The first part of this particular

scheme (which is not disputed by the Title Companies) occurred on July 18, 2008 when Merchants

and Farmers Bank made a $3,000,000.00 loan to Charles and Jon Evans (through a special purpose

entity known as Town Park of Madison, LLC) in return for a Promissory Note and Deed of Trust to

Merchants and Farmers Bank for approximately 21.5 acres of the land. The problem was that this

land was actually owned by G&B. Charles Evans did not actually record the Deed of Trust until January 6, 2009, at which time a lenders policy was issued to Merchants and Farmers Bank by Mississippi Valley Title. This particular transaction is document and described in more detail in the Response filed by Merchants and Farmers Bank which is incorporated herein by reference.

The second part of this particular scheme (which is not disputed by the Title Companies) occurred on July 21, 2008 when Charles Evans again used his position of trust as an "Approved Attorney" for the Title Companies to fraudulently obtain a loan in the amount of $1,296,500.00 from Bank of Forrest. This was accomplished by giving a Deed of Trust and Promissory Note executed by Jon C. Evans from another special purpose entity (White Oaks Investment Company, LLC) to Bank of Forrest along with the representation that Charles Evans would deliver a lenders insurance policy from the Title Companies. The Note and Deed of Trust was for another 4.5 acres portion of the real property known as Tract 4 which was still owned by G&B. At the time of closing, the Title Companies provide a Binder to Bank of Forrest. The Title Companies then issued a lenders title policy to Bank of Forrest on September 17, 2008. (Partin deposition pp. 25-26, 36-37, 49-50; Ex. 9). This particular transaction is document and described in more detail in the Response filed by Bank of Forest which is incorporated herein by reference.

The third part of this scheme (which is not disputed by the Title Companies) also took place on July 21, 2008 when Charles Evans again used his position of trust as an "Approved Attorney" to obtain another loan, this one in the amount of $781,980.00 from Heritage Banking Group. This was accomplished by having Jon Evans give a Promissory Note and Deed of Trust to Heritage Banking Group from a special purpose entity called Twin Brook Road Development Company, LLC, supposedly secured by a 3.0 acre portion of the real property known as Tract 4. Of course, the land

was also still owned by G&B. In making this loan, Heritage Banking Group relied on the

representation of Charles Evans that he would provide a lenders policy from Title Companies.

Mississippi Valley Title ultimately issued a lenders policy to Heritage Banking Group on October

28, 2008. As a result of the fraud in this particular transaction, the Title Companies paid Heritage

Banking Group $430,000 on its title claim. (Partin deposition pp. 138-139, 149-50; Ex. 9). This

particular transaction is documented and described in more detail in the Response filed by Heritage

Banking Group which is incorporated herein by reference.

All of these loan proceeds fraudulently obtained by Charles Evans (as an "Approved

Attorney" for the Title Companies) and were ultimately used to close the transaction with G&B

involved using parts of G&B owned land as security. Given these circumstances, it is not surprising

that Charles Evans and Hanover never made a payment thereby defaulting on the promissory note

with G&B. As a result of this default, pursuant to the Deed of Trust G&B purchased the

approximately 70 secured acres at foreclosure for the total sum of $7,000,000.00. The ultimate loss

to G&B was $4,556,717.40.

### F.    The Negligence Of The Title Companies Enabled Charles Evans To Perpetrate A Fraud Against G&B And The Banks.

When Jim Partin, the 30(b)(6) designee for Mississippi Valley Title Company was asked if

he had "an opinion as to how the [banks' title] claims could have been prevented, he said:

> There would have been additional procedures. And that is something that
> Mississippi Valley, I think, is now addressing. But the truth of the matter is, fraud
> is fraud, and no matter what procedures you put in place, fraudsters seem to find a
> way to get around them and defraud people. So even though we put new procedures
> in place, people like Charles Evans are going to constantly be finding ways to get
> around those procedures. (Partin deposition pp. 158-159; Ex. 9).

What the Title Companies are essentially doing is making light of their obligation to at least try to

prevent or discover fraud by their "Approved Attorneys." According to the Title Companies there is no reason to try because the "fraudsters" will always find a way around whatever procedures are put in place. Parish Fortenberry, the other 30(b)(6) designee for Mississippi Valley, even went as far as to say that the problem with "fraud" is that "its so easy to record fraudulent deeds and fraudulent cancellations." (Fortenberry deposition pp. 61, 83-85; Ex. 5). Clearly the Title Companies are fully aware of the risk of fraud by their "Approved Attorneys" but have consciously chosen to take no preventative actions. As a practical matter the law must impose some responsibility and accountability, not necessarily to prevent all fraud, but to at least take reasonable steps to make it more difficult and to put in place systems that will enable discovery of an ongoing fraud within a reasonable time. In this particular situation the Title Companies are attempting to wash their hands of any obligation whatsoever for preventing or discovering fraud by its "Approved Attorneys". This Court should not allow that to happen as the law does provide a remedy.

Even after the closing of the G&B transaction, the lax oversight of the Title Companies prevented them from detecting even more fraudulent activity involving the very same land. On April 27, 2009, Charles Evans again used his position as an "Approved Attorney" to fraudulently obtain a $828,750.00 loan from Bankfirst. This was accomplished through a Promissory Note and Deed of Trust from Landsdown Group, LLC (another special purpose entity) that was signed by Jon Evans and conveyed approximately 3 acres of the real property known as Tract 4. As with all the other transactions the land was not actually owned by Landsdown Group, LLC. And yet again on August 27, 2009, Charles Evans used his status as an "Approved Attorney" to obtain a fraudulent loan from Bank of Forrest in the amount of $451,450.00. This loan was accomplished by having Jon Evans give Bank of Forrest a Promissory Note and Deed of Trust from a special purpose entity known as

White Oaks supposedly secured by another 5.54 more acre portion of the land known as Tract 4. Of course White Oaks did not own the land. In both of these transactions the secured property was actually owned by Hanover. (Fortenberry deposition pp. 139-140; Ex. 5).

All of this could have been prevented by simply inspecting Charles Evans' escrow account as the Title Companies concede that fraudulently obtained loan proceeds were commingled in Evans' escrow account and that checks were "flying out of there for all kinds of different things, including interest payments and apparently personal expenses." (Partin deposition pp. 25-6; Ex. 9). In the case of Hanover (i.e., the entity that purchased the G&B property), Hanover never wrote a check and never even had a banking account. (Partin deposition p. 26; Ex. 9). Moreover, the Title Companies admit that in looking at the bank records for Charles Evans:

> it's apparent that he was not disbursing the loans to the individual entities that were the borrowers. That could be oversight, that would be – it could be negligent. But considering what we know now, it looks like most of it was fraud as far as the monies. (Partin deposition p. 26; Ex. 9)

It is clear that a simple inspection of the escrow account would have stopped the fraud given the fact that the loan proceeds were never paid to the borrowing entity! Any type of cursory check would have also found that Charles Evans repeatedly violated the prohibition against an "Approved Attorney" from having a financial interest in the transaction. Yet the Title Companies never had an actual procedure in place for enforcing, or checking on compliance with this policy. And despite knowledge that the Escrow account of Charles Evans was not being used properly, the Title Companies still do not audit the escrow accounts or files of their "Approved Attorneys". (Jones deposition pp. 99-101; Ex. 7).

These wrongful actions by Charles Evans would not have been possible if Charles Evans had

not been cloaked with the stamp of approval and authority of an "Approved Attorney" for the Title

Companies, or if the Title Companies had taken the most basic steps to audit and supervise their

"Approved Attorneys". They failed to do this knowing lenders were relying on the title certificates

that were being provided to "advance funds to Jon Christopher Evans, Charles H. Evans, Jr. and/or

others." (Jones affidavit p. 3; Ex. 11).

## III.    APPLICABLE LAW AND ARGUMENT

### A.    Charles Evans Was An Agent Or Servant Of The Title Companies

As this Court is well aware, the party moving for Summary judgment bears the burden of

demonstrating that there is no genuine issue of material fact. The Mississippi Supreme Court has

held specifically held "that a question of whether an agency relationship exists, or whether a party

is an independent contractor, is a question of fact to be resolved by the jury." *Savory v. First Union*

*Nat. Bank of Delaware*, 954 So.2d 930, 932 (Miss 2007). In the *Savory* case, the Court cited the

following approvingly from 3 Am.Jur.2d *Agency* section 372 (1986):

> when the facts pertaining to the existence or non-existence of an agency are
> conflicting, or conflicting inferences may be drawn from the evidence, the question
> presented is one of fact for the jury . . . .

In addition, in deciding whether a plaintiff in tort has made out a jury issue as to respondeat superior,

the trial court must "accept as true all testimony and reasonable inferences favorable to the plaintiff."

*Leaf River Forest Products, Inc. v. Harrison*, 392 So.2d 1138, 1140 (Miss. 1981).

The rule of *respondeat superior* reaches as far back in common law. As the Mississippi

Supreme Court explained in 1929:

> [t]he master who puts a servant in a place of trust or responsibility, or commits him
> the management of his business or care of his property, is justly held responsible
> when the servant through lack of judgment or discretion, or from infirmity of temper,

or under the influence of passion aroused by the circumstances and the occasion goes beyond the strict line of duty and authority and inflicts an unjustifiable injury upon another. Gill v. Dantzler Lumber Co., 121 So. 153, 156(Miss. 1929).

According to Section 1 of the Restatement (Second) of Agency, "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *See* Restatement (Second) of Agency §1. Section 3(2) of the Restatement of Agency describes a "special agent" as being "an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service." *Id.* at §3(2). A master "is subject to liablity for the torts of his servants committed while acting in the scope of their employment." *Id.* §219(1). There are also certain situations in which the a master is subject to liability for the acts of the servant even when though the servant is acting outside the scope of the agency. These include situations where "the master was negligent or reckless" and situations where "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *Id.* at § 219(2)(b)&( c). The Mississippi Court Of Appeals in *Bailey v. Worton*, 752 So.2d 470, 476 (Miss. Ct. App. 2000) has also specifically stated that:

[o]n principles of estoppel, a principal, having clothed an agent with semblance of authority, will not be permitted, after others have been led to act in reliance on appearances thus produced, to deny, to the prejudice of such others, what he has theretofore tacitly affirmed as to the agent's powers.

Looking at the specific facts in this case in the light most favorable to G&B, there is little question that at the very least there are disputed issues of fact as to whether Charles Evans was acting as an agent or servant of the Title Companies when he fraudulently pledged G&B land. Under agency principles, as well as under general negligence principles, the Title Companies can also be

held liable for Charles Evans' actions when he used the "Approved Attorney" status and stamp of approval to fraudulently obtain loans from three banks by using G&B's property as collateral for the loans.

In addition, in accordance with Section 83-15-3 of the Mississippi Code specifically dealing with Title Insurance, "persons who are practicing attorneys at law may act as agent for any such company without" the need for obtaining any additional license. During the course of the many individual frauds perpetrated over the years by Charles Evans, he was using his status as an agent or servant of the Title Companies to actually perpetuate the frauds. The United States Supreme Court has also held "[t]he relationship between client and attorney, regardless of the variations in particular compensation agreements or the amount of skill and effort the attorney contributes, is a quintessential principal-agent relationship." *CIR v. Banks*, 543 U.S. 426, 436 (2005) (as quoted by *O.W.O. Investments, Inc. v. Stone Investment Co., Inc.*, 32 So.3d 439, 447 (Miss. 2010). A principal-agent relationship is a fiduciary relationship resulting from the manifestation of consent by one to another that the one shall act on the other's behalf and subject to its control, and consent by the other so to act. *O.W.O Investments, Inc. v. Stone Investment Co., Inc.*, 32 So.3d at 447 (citation omitted). Once the agent-principal relationship is created, an agent may bind his or her principal through either actual, or apparent authority. *Id.* (citing *Barnes, Broom, Dallas & McLeod, PLLC v. Estate of Cappaert*, 991 So.2d 1209, 1211 (Miss. 2008). Apparent authority is found to exist "when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Id.*

In this particular case Charles Evans was acting not just as an "attorney" for the Title

Companies, but more specifically as their "Approved Attorney" (and arguably an insurance agent)

when he did things like soliciting business for the Title Companies, certifying title for the Title

Companies, preparing and submitting applications for title commitments and policies, delivering title

commitments and policies to insureds, and collecting insurance premiums. For these reasons alone,

the Title Companies' Motion for Partial Summary Judgment must be denied.

Further with respect to the agency/servant issue, G&B incorporates by reference herein the

Responses filed by Heritage Banking Group, Bank of Forest, and Merchants and Farmers Bank on

these issues.

**B.      The Title Companies Had A Duty To Supervise, Monitor, Control And Audit
         Their Approved Attorneys**

The Title Companies are also incorrect in their contention that the Title Companies had no

legal duty or obligation to monitor, control and audit its "Approved Attorneys". (Affidavit of George

Pierson; Ex. 10, and Brata Deposition pp. 31-59; Ex.14). While the Title Companies cite numerous

cases in support of this contention, all of their cases are either distinguishable on the facts or are not

explained fully.   This is because Mississippi law is perfectly clear that the retention of an

incompetent employee after the employer has had reasonable notice, either direct or constructive,

of such incompetence, constitutes negligence on the part of the master; and the employer is

chargeable with knowledge of the incompetency of the employee if by the exercise of due care he

could have ascertained such incompetence. *Hamilton Bros. v Weeks*, 124 So. 798, 800 (Miss. 1929).

The Defendants cited *Jones v Toy*, 476 So.2d 30, 31 (Miss. 1985) for the proposition that "an

employer cannot be held liable for the negligence of an employee who was hired with due care."

However, the Defendants neglected to include the next sentence of the opinion in which the

Mississippi Supreme Court stated, "[h]owever, the master or employer may be charged with the employee's negligence and held liable for resulting injuries if the master knew or should have known of the fellow servant's incompetence." *Id.* In *Toy*, the Court reversed the JNOV in part because it found that the City of Hattiesburg knew or should have known of its employee's dangerous propensities but apparently disregarded them. *Id.* at 32. Similar to *Toy*, the Title Companies in this case should have known or discovered the fraud of Charles Evans.

The Title Companies also cite *Holmes v Campbell Properties*, 47 So.3rd 721, 729 (Miss. 2010) for the principle that "specific evidence of an employer's actual or constructive knowledge of its employee's dangerous or violent tendencies is necessary in order to create an issue of material fact on an improper training or supervision theory of liability." In *Holmes*, the court found that the employer had no prior actual or constructive knowledge of the servant's violent nature nor was there any indication of an atmosphere of violence at the car wash where he worked. As such, the court concluded that it was unable to locate any evidence tending to show a fact issue for the jury to resolve. *Id.* However, the *Holmes* case is fully distinguishable from the G&B case because our record shows multiple facts that could lead the trier of fact to conclude that the fraud by Charles Evans should have been discovered much sooner (and by the Title Companies themselves rather than by their insureds). The G&B case also does not involve a single fraudulent event, but rather, a series of fraudulent schemes over the course of many years.

The Title Companies also cite *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v Seay*, 42 So.3d 474, 489 (Miss. 2010) in support of the assertion that an employer's duty to supervise does not include a duty to uncover his employees' "concealed, clandestine, personal activities." This decision is also clearly distinguishable in that Evans' activities at issue in this case were not personal

activities. Charles Evans used his status as an "Approved Attorney" to defraud the banks using G&B owned property as security and then subsequently closed the G&B transaction with the fraudulently obtained $5 million dollars. In fact, the differences between this matter and the *Baker Donelson* case are obvious in that the *Baker Donelson* case specifically cites *Williams v. U.S. Fid. & Guar. Co.*, 854 F.2d, 106, 109 (5th Cir. 1988) as follows, "[t]he <u>Restatement (2d) of Torts Section 317</u> narrowly limits an employer's duty to control a servant's conduct outside the scope and place of employment to instances in which the servant is 'using a chattel of the master.'" In this case Evans routinely used the chattel of his employer (i.e. his status as an "Approved Attorney" and all the rights and privileges that went along with that stamp of approval). Furthermore, any reasonable method of monitoring Evans would have uncovered the fraud long before G&B was injured.

The Title Companies also relied on the case of *Bluehaven Funding, LLC v. First American Title Ins. Co.*, for the proposition that "a title insurer owes no common law tort duty to its insured or other third parties to monitor or audit the title insurer's agents." This case is also fully distinguishable. The *Bluehaven* court based its decision on the fact that there was an "Agency Agreement" between the parties which "clearly disclaimed any duty to third parties . . .." *Bluehaven Funding, LLC v. First American Title Ins. Co.*, 594 F.3d 1055, 1061 (8th Cir. 2010). However, in the G&B case there was no written contract between Charles Evans and the Title Companies. Moreover, the *Bluehaven* case involved a single action of escrow mismanagement.

Further with respect to the failure to supervise, control and audit issues, G&B incorporates by reference herein the Responses filed by Heritage Banking Group, Bank of Forest, and Merchants and Farmers Bank on these issues. For these reasons as well, the Motion for Partial Summary Judgment of the Title Companies must be denied.

### C.    The Title Companies Can Be Liable In Tort

The Title Companies erroneously suggest that they cannot be liable in tort. However, the

cases cited by the Title Companies in their Motion For Partial Summary Judgment are simply not

applicable to the type of tort claims that are being asserted in this case. The cases cited generally

deal with a title company's failure to detect a defect in title. They have nothing to do with failing

to supervise and audit title companies agents and attorneys.[1]

For example, in *Culp Const. Co. v Buildmart Mall*, 795 P.2d 650, 654 (Utah 1990) which

was cited by the Title Companies, the court held that the title company did not owe a duty to abstract

the title. But the court further held that breaches of duty that are independent of the contract may

give rise to actions in tort. *Id* Importantly, the court found that summary judgment on the issue of

negligent misrepresentation was inappropriate because the decision in *Beck* did not preclude a

separate independent tort. *Id* at 655.

In *Walker Rogge, Inc. vs Chelsea Title & Guaranty*, 562 A.2d 208, 220 (N.J. 1989), also cited

by the Title Companies, the court compared the relationship between title companies and physicians.

The court found that a patient reasonably expects the physician to follow appropriate standards of

care when providing services. On the other hand, the court found that the title company were not

providing services but policies of insurance. *Id.* However, as this Court is aware, this matter is not

about the title policy and a failure to provide correct title, but rather this case is about the Title

Companies' alleged failure to supervise and monitor its agents and attorneys. Furthermore, G&B,

---

[1]However, it should be noted that jurisdictions are split on the question of whether a title insurance company may be exposed to liability in tort for negligence in searching records. This was recognized in a case cited by the Title Companies, *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147, 149-50 (Wis. 1992).

had a right to reasonably expect that the Title Companies would not allow an "Approved Attorney"

to engage in years of fraudulent activity culminating from G&B's standpoint in the fraudulent

pledging of G&B's own land as security for loans that were then used to close the sale of G&B's

land.

Further with respect to the liability in tort issue, G&B incorporates by reference herein the

Responses filed by Heritage Banking Group, Bank of Forest, and Merchants and Farmers Bank on

these issues.

**D.      Subjecting The Title Companies To Tort Liability Does Not Render the Terms
          of The Insurance Policy Meaningless**

As G&B has already set out above, its tort claims for the failure to discover the conduct of

Charles Evans are not specifically based on the issuance of the Owners policy to G&B (even though

it is evidence of the lax underwriting and supervision by the Title Companies).  As a practical matter

the title companies should be responsible for the torts of their agents and servants the same as any

other business.  For these reasons as well the Motion of the Title Companies must be denied.

**E.      The Title Companies Were Negligent In Issuing G&B An Owners Policiy
          Rather Than A Lenders Policy**

G&B does have a claim against the Title Companies for the negligent issuance of an Owners'

Policy to G&B that cost approximately $27,000.00.  On the date of the closing the Title Companies

sold G&B an Owners' Policy when a Lender's policy was the appropriate policy if any was

necessary.

The Title Companies describe "Owner's Policies" as follows:

> This policy covers the homebuyers equity in the home. Because a policy safeguarding
> the lenders security interest may not ensure the buyer's right to the use and enjoyment
> of the property, it is wise for you, the homebuyer, to protect yourself with an owner's

policy. This policy should be purchased for the full value of your property. . .. This is a one-time premium which will protect your equity for as long as you own the property.

The Title Companies admit that the appropriate policy would have been a lenders policy. (Partin deposition p. 167; Ex. 9). It is very unusual to issue an owners policy to the seller the day before the closing. An owner's policy is typically given to the buyer because with few exceptions "whatever happens after the effective date is not covered." (Partin deposition pp. 116-17; Ex. 9). The purpose of an owner's title insurance policy is "to ensure owner's title." (Partin deposition p. 113; Ex. 9). "But in general terms, the policy protects the insured while they own the property, and if they sell the property, it may protect them against any warranty claims against that insured. Its, frankly, a complicated document, and as you might have heard, you just have to look at the facts of each individual property and transaction to determine whether there is coverage." (Partin deposition pp. 114-15; Ex. 9). For these reasons, the policy issued was illusory at best. But perhaps more important, the owners policy issued to G&B by an "Authorized Agent" for the Title Companies did not disclose that three banks had already loaned money on parts of the land being sold in reliance of the representations and actions of one Charles Evans as an "Approved Attorney" for Mississippi Valley Title. See *Lane v. Oustalet,* 873 So.2d 92, 96 (Miss 2004)(explaining the principle that the "law agency generally imputes knowledge and information received by an agent in conducting the business of a principal to the principal, even where that knowledge or information is not communicated by the agent to the principal.").

## IV. CONCLUSION

G&B has conclusively demonstrated the existence of multiple material issues of fact with respect to each element of their claims for negligence, negligent supervision, negligent monitoring,

agent liability and respondeat superior.  For these reasons the Motion of the Title Companies for

Partial Summary Judgment must be denied.

This the 4th day of January, 2011.

                              Respectfully submitted,

                              G&B INVESTMENTS, INC.


                              BY:    s/ Dale Danks, Jr._____
                                     DALE DANKS, JR.


OF COUNSEL:
DALE DANKS (MSB# 5789)
ddanks@dmc-law.net
MICHAEL V. CORY, JR. (MSB# 9868)
mc@dmc-law.net
Danks, Miller & Cory
(An Association of Professional Corporations)
213 S. Lamar Street, 39201
P.O. Office Box 1759
Jackson, Mississippi 39215-1759
Telephone: 601.957.3101
Facsimile: 601.957.3160

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2011, I electronically filed the foregoing with the Clerk of

the Court using the ECF system which sent notification of such filing to counsel of record.

M. Scott Jones, Esq.
Adams and Reese, LLP
Scott.jones@arlaw.com
Attorneys for Miss. Valley Title
Ins. Co. and Old Republic
National Title Ins. Co.

William C. Brabec, Esq.
Adams & Reese, LLP
bill.brabec@arlaw.com
Attorneys for Miss. Valley Title
Ins. Co. and Old Republic National
Ins. Co.

Mason E. Lowe, Esq.
Bradley Arant Boult Cummings LLP
mlowe@babc.com
Attorney for Mississippi Valley Title

Derek A. Henderson, T1
d_henderson@bellsouth.net
Trustee for Jon Christopher Evans
And the Jointly Administered Estates

Stephen Smith, Ch. 7 Trustee
Stephen@smithcpafirm.com
Trustee for Charles H. Evans, Jr.

Jeffrey Kyle Tyree, Esq.
Harris Jernigan & Geno, PLLC
jktyree@harrisgeno.com
Attorney for Trustee Stephen Smith

R. Michael Bolen, U.S. Trustee
USTPRegion05.JA.ECF@usdoj.gov

J. Mark Franklin III, Esq.
McKay Simpson Lawler
mfranklin@mckaysimpson.com
Attorney for Bank First Financial

W. Lawrence Deas, Esq.
Deas & Deas
lawrence@deaslawfirm.com

William Liston, III, Esq.
Liston/Lancaster PLLC
Wlist3@aol.com

Kristina M. Johnson, Esq.
kjohnson@watkinsludlam.com
Attorney for Bank of Forest

John G. Corlew, Esq.
Corlew, Munford & Smith, PLLC
jcorlew@cmslawyers.com
Attorney for Bank of Forest

Kathy K. Smith, Esq.
Corlew, Munford & Smith, PLLC
Attorney for Bank of Forest

G. Todd Burwell, Esq.
tburwell@gtbpa.com
Attorney for Bank of Forest

Tylvester O. Goss, Esq.
Davis Goss & Williams
bankruptcy@dgwlaw.com
Attorney for Jon Cristopher Evans,
Debtor

Patrick F. McAllister, Esq.
Williford, McAllister & Jacobus, LLP
pmcallister@wmjlaw.com
Attorney for Community Bank

Richard Montague, Esq.
Wells, Moore, Simmons & Hubbard
rmontague@wellsmoore.com
Attorney for G&B Investments, Inc.

Ashlee Ellis Hederman
Wells, Moore, Simmons & Hubbard
hederman@wellsmoore.com
Attorney for G&B Investments, Inc.

Rory Paul Randall, Jr., Esq.
Randall Segrest & Weeks, PLLC
prandall@randallsegrest.com
Attorney for Dodd Enterprises

Richard C. Bradley, III., Esq.
Daniel Coker Horton & Bell, P.A.
rbradley@danielcoker.com
Attorney for Charles H. Evans, Jr.

This the 4th day of January, 2011.

Janet McMurtray, Esq.
Watkins Ludlam Winter & Stennis
jmcmurtray@watkinsludam.com
Attorney for Bank of Forrest

Jeff D. Rawlings, Esq.
jeffdrawlings@bellsouth.net
Attorney for Merchants & Farmers

Michael S. MacInnis, Esq.
Rawlings & MacInnis, P.A.
mikems@bellsouth.net
          Attorney for Merchants & Farmers

Michael D. Simmons, Esq.
Cosmich, Simmons & Brown, PLLC
mike@cs-law.com
Attorney for Heritage Banking

Gene D. Berry, Esq.
genedberry@berryfirm.net
Attorney for BankFirst Financial Ser.

Terry R. Levy, Esq.
Daniel Coker Horton & Bell, P.A.
tlevy@danielcoker.com
Attorney for Charles H. Evans. Jr.

s/ Dale Danks. Jr.