# Deposition of Carolyn Freeman

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

JON CHRISTOPHER EVANS         Case No. 09-03763-NPO
AND JOINTLY ADMINISTERED
RELATED CASES

DEBTORS.                      Chapter 7

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

G&B INVESTMENTS, INC.                    PLAINTIFF

V.                  ADV. PROC. NO. 10-00040-NPO

DEREK A. HENDERSON, TRUSTEE
FOR THE BANKRUPTCY ESTATE OF
JON CHRISTOPHER EVANS, ET AL.         DEFENDANTS

* * * * * * * * *
DEPOSITION OF CAROLYN WILLIAMS
Taken at the offices of
Adams and Reese,
111 Capitol Street, Suite 350,
Jackson, Mississippi,
on Thursday, November 18, 2010,
beginning at approximately 9:20 a.m.

* * * * * * * * *

APPEARANCES NOTED HEREIN


CHRISTY R. SIEVERT, CSR, RPR
PROFESSIONAL COURT REPORTING, LLC
Registered Professional Reporter
Certified Shorthand Reporter
Mississippi CSR No. 1421
Post Office Box 320928
Jackson, Mississippi 39232-0928
www.procourtreporting.com



**Professional Court Reporting, LLC**
**601.919.8662**



EXHIBIT
4

# Deposition of Carolyn Freeman

2

```
 1                    APPEARANCES
 2
 3  COUNSEL FOR MISSISSIPPI VALLEY TITLE
    INSURANCE and OLD REPUBLIC NATIONAL
 4  TITLE INSURANCE COMPANY:
 5      MR. POWELL G. OGLETREE, JR.
        MR. M. SCOTT JONES
 6      Adams and Reese, LLP
        111 East Capitol Street, Suite 350
 7      Jackson, Mississippi  39201
 8      MR. DAVID CLARK
        Bradley, Arant, Boult & Cummings
 9      Post Office Box 1789
        Jackson, Mississippi  39215
10
11  COUNSEL FOR BANK OF FOREST:
12      MR. WILLIAM LISTON, III
        MR. LUKE PORTERA
13      Liston & Lancaster
        2648 Ridgewood Road, Suite B
14      Jackson, Mississippi  39216
15
    COUNSEL FOR MERCHANTS & FARMERS BANK:
16
        MR. JEFF D. RAWLINGS
17      Rawlings & MacInnis
        1296 Highway 51
18      Madison, Mississippi  39110
19
    COUNSEL FOR CHARLES EVANS:
20
        MR. TERRY R. LEVY
21      Daniel, Coker, Horton & Bell
        4400 Old Canton Road, Suite 400
22      Jackson, Mississippi  39211
23
24
25
```

**Deposition of Carolyn Freeman**

```
 1   (Continued:)

 2   COUNSEL FOR G&B INVESTMENTS, INC.:

 3      MR. MICHAEL CORY
        MR. DALE DANKS, JR.
 4      Danks, Miller & Cory
        213 South Lamar Street
 5      Jackson, Mississippi  39201

 6

        ALSO PRESENT:
 7

        DONALD JOSEPH BRATA
 8      W. PARRISH FORTENBERRY

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Deposition of Carolyn Freeman**

4

```
 1                    TABLE OF CONTENTS
                                              PAGE
 2

 3   Title Page.....................................  1

 4   Appearance Pages........................... 2, 3

 5   Table of Contents.............................  4

 6   Exhibit Pages.................................  6

 7   Stipulation Page..............................  6

 8
     DEPOSITION OF CAROLYN FREEMAN:
 9
         By Mr. Liston.............................  7
10       By Mr. Rawlings........................... 186
         By Mr. Cory............................... 198
11       By Mr. Jones.............................. 241

12   Signature Page................................ 243

13   Certificate Page.............................. 244

14

15

16

17

18

19

20

21

22

23

24

25
```

## Deposition of Carolyn Freeman

9

```
 1    "Valley" or "Mississippi Valley," or I may just
 2    say "MVT."  May we have the agreement that if I do
 3    that, then you understand that I'm talking about
 4    your employer?
 5         A.     Yes.
 6         Q.     Okay.  Thank you.
 7                Could you tell me what your current
 8    employment position is with MVT?
 9         A.     I'm vice president, senior
10    underwriter.
11         Q.     All right.  How long have you held
12    that position?
13         A.     I'm not sure of the exact. . .
14         Q.     It wasn't last week, was it?
15         A.     No.
16         Q.     All right.  Let's do this.  Let me
17    start with your educational history.  I want to
18    know where you grew up, where you went to school,
19    how far you went in school, and then I'll talk to
20    you about your employment background.
21         A.     Okay.
22         Q.     All right.  Go ahead, tell me where
23    you grew up.
24         A.     I graduated from Union High School.
25         Q.     In Union, Mississippi?
```

**Deposition of Carolyn Freeman**

```
 1        Q.      Okay.  If it doesn't disclose any
 2   issues about estates, if it doesn't disclose any
 3   deceased persons, and it just says fee simple
 4   titles in Company XYZ, what kind of underwriting
 5   can you do on something like that?  Just curious.
 6        A.      If the attorney has certified it,
 7   then it is what it is.
 8        Q.      Okay.  So if he certifies it, and
 9   there's nothing on the application that gives you
10   a reason to want to review it, then there's
11   nothing to review, you're relying on his
12   certification?
13        A.      Right.
14        Q.      Okay.  Are you employed in any way by
15   Old Republic?
16        A.      It's a joint company.
17        Q.      Okay.  What do you mean by that when
18   you say "joint company"?
19        A.      Mississippi Valley/Old Republic.
20        Q.      Okay.  Who -- when you get a
21   paycheck, what name is on the paycheck other than
22   yours?  Who -- in other words, does it say
23   Mississippi Valley Title, at the top, is paying
24   you, or does it say Mississippi Valley and Old
25   Republic on your paycheck?
```

**Deposition of Carolyn Freeman**

```
 1    Gulf States Directory?

 2          A.      No.

 3          Q.      Never heard of that?

 4          A.      I know that they do the Yellow Books.

 5          Q.      Did you know he had family members in

 6    town?

 7          A.      No.

 8          Q.      Did you know he had a brother named

 9    Chris or Jon C. Evans?

10          A.      He never -- he never told me about

11    him.

12          Q.      Okay.  Did you have knowledge,

13    independent of what Charles may have told you,

14    that he had a brother out there named Chris Evans

15    or Jon C. Evans?

16          A.      I didn't -- I didn't know his family.

17          Q.      Okay.  There's some loans that I've

18    seen that involve a guy named Jon C. Evans.  Were

19    you aware, generally, that Valley was issuing

20    commitments and/or policies on transactions that

21    involved a guy named Jon C. Evans?

22                  MR. JONES:  Object to form.

23                  THE WITNESS:  I don't recall him.

24    MR. LISTON, CONTINUED:

25          Q.      Okay.  Would you talk to Charles on
```

## Deposition of Carolyn Freeman

30

```
 1    the phone -- Charles Evans on the phone
 2    frequently, or most of the time did he just appear
 3    at the office, and that's where you saw him?
 4         A.      I have talked to him on the phone.
 5         Q.      Okay.  Would you engage in e-mails
 6    with him back and forth from time to time?
 7         A.      I don't recall.
 8         Q.      Okay.  As -- was Charles Evans an
 9    agent of Valley or an approved attorney for Valley
10    as you understand those terms?
11         A.      He was an approved attorney.
12         Q.      Okay.  And you mentioned he was on
13    the -- an approved attorney list?
14         A.      Uh-huh (affirmative response).
15         Q.      Right?  Is a copy of that list
16    maintained at your office -- in your department?
17         A.      Yeah, I've got a list.
18         Q.      Okay.  At any given time, you can
19    figure out who the approved attorneys are?
20         A.      Yes.
21         Q.      And that would be important to you,
22    wouldn't it?
23         A.      Yes, it would.
24         Q.      Because approved attorneys are
25    allowed to certify title to the company?  Is that
```

## Deposition of Carolyn Freeman

34

1    commitment gets issued depends entirely on what

2    your department does?

3          A.       Right.

4          Q.       What kinds of acts do you believe the

5    approved attorney is authorized to perform on

6    behalf of Valley?

7                   MR. JONES:  Object to form.

8                   THE WITNESS:  He's not -- now,

9    rephrase the question.

10   MR. LISTON, CONTINUED:

11         Q.       Sure.  The approved attorney submits

12   the application to Valley for issuance of a

13   commitment or policy, right?

14         A.       He submits it, yeah.

15         Q.       On that -- and he's authorized to do

16   that, right?  Valley --

17         A.       What do you mean by "authorized"?

18         Q.       Well, Valley allows the approved

19   attorneys to submit those applications?

20         A.       He's an approved attorney of

21   Mississippi Valley.

22         Q.       Well, I understand, but that's not my

23   question to you.  Okay.  Valley allows approved

24   attorneys to submit applications to Valley, right?

25         A.       Uh-huh (affirmative response).

## Deposition of Carolyn Freeman

```
 1        A.       Not required.
 2        Q.       Okay.  But if you have a question,
 3   you can ask someone, like --
 4        A.       Yes.
 5        Q.       -- legal counsel?  Right?
 6        A.       Yes.
 7        Q.       Okay.  And then if you issue a
 8   commitment or a policy, you would send it, then,
 9   to whom?  The approved attorney?
10        A.       It could go back to the approved
11   attorney.
12        Q.       Okay.  Do you send the commitments
13   and policies to the insurers?
14        A.       Only if I'm requested.
15        Q.       Okay.  So typically, it goes back to
16   the approved attorney?
17        A.       Right.
18        Q.       Do you send the approved attorney a
19   letter requesting that the approved attorney
20   collect whatever fee Valley has for either the
21   commitment or the policy?
22        A.       Yes.
23        Q.       So as far as you know, the insured is
24   not billed directly by the company?
25                 MR. JONES:  Object to form.
```

# Deposition of Carolyn Freeman

40

```
 1        Q.      Okay.  And if you're sending the

 2   policy and the commitments to the approved

 3   attorney, then do you expect the approved attorney

 4   will be the one to deliver those to the insureds?

 5        A.      He's the one that's requesting it for

 6   them, yes.

 7        Q.      Okay.  So -- but you don't do it.  If

 8   you send it to him, you expect that he'll be the

 9   one to --

10        A.      Right.

11        Q.      -- deliver it, correct?

12        A.      Right.

13        Q.      Now, for all those things that I

14   mentioned -- the approved attorney submits the

15   application, you assume he's done title work, you

16   send him the commitments and policies, he's the

17   one that's supposed to pay Valley, he gets billed

18   for these things, you think that he'll deliver the

19   policies to the insureds -- for all those things,

20   those are things that Valley, to your knowledge,

21   and you and your department, allow the approved

22   attorney to do, correct?

23               MR. JONES:  Object to form.

24   MR. LISTON, CONTINUED:

25        Q.      I mean, that's just typical ordinary
```

## Deposition of Carolyn Freeman

```
 1   business?
 2                MR. JONES:  Object to form.
 3   MR. LISTON, CONTINUED:
 4        Q.    Nothing out of the ordinary, is it?
 5        A.    I mean, I don't do the company rules
 6   or --
 7        Q.    I'm not asking that.
 8        A.    -- setting it up --
 9        Q.    I'm not asking that.
10        A.    -- of what we do.
11        Q.    As far as you know, based on your
12   experience, Valley doesn't have a problem with the
13   approved attorney doing any of those things we
14   talked about, does it?
15                MR. JONES:  Object to form.
16                THE WITNESS:  That would be outside
17   the scope of what I do.
18   MR. LISTON, CONTINUED:
19        Q.    I'm not asking whether you make
20   rules.  I'm asking your experi- -- about your
21   experience.  In your experience, those kinds of
22   things we discussed that you said, yeah, the
23   approved attorney does those things, are things
24   that happen all the time at Valley, correct?
25                MR. JONES:  Same objection.
```

## Deposition of Carolyn Freeman

1   MR. LISTON, CONTINUED:

2        Q.     I'm not trying to trick you.  I'm

3   just trying to ask.

4        A.     What are you asking me?

5        Q.     I'm asking you, all the things you've

6   indicated the approved attorneys have done and do,

7   in your experience, are things that are typical in

8   the ordinary course of business in Valley, aren't

9   they?

10             MR. JONES:  Object to form.

11             THE WITNESS:  They can certify titles

12   to us.

13   MR. LISTON, CONTINUED:

14        Q.     Sure.  And you send them the -- you

15   send them the commitments and policies, right?

16        A.     If they ask for them to come back to

17   them.

18        Q.     Sure.  And nobody at Valley has ever

19   told you, you couldn't do that, have they?

20        A.     I'm not sure.  No.

21        Q.     Well, you do it, right?

22        A.     Yeah.

23        Q.     You don't think you're violating the

24   rules, do you?

25        A.     No.

# Deposition of Carolyn Freeman

43

```
 1        Q.      Okay.  Well, you do that on a
 2  frequent basis, don't you?
 3        A.      Yes.
 4        Q.      I mean, they collect the premiums,
 5  send them in to Valley, don't they?
 6        A.      Yes.
 7        Q.      Okay.  Valley bills them for the
 8  premiums, right?
 9        A.      (Nods head affirmatively.)
10        Q.      I mean, these are things that happen
11  all the time, don't they?
12        A.      Yeah, we bill the customer, whoever,
13  you know.
14        Q.      Okay.  If you're requested to?
15        A.      Right.
16        Q.      Okay.  I'm just asking you, as far as
17  you know, because you've worked in the
18  underwriting department with Valley for over ten
19  years, is there anything unusual or wrong about
20  the kinds of things that the approved attorneys do
21  or are allowed to do that -- or do they violate
22  some rule of Valley I don't know about?
23                MR. JONES:  Object to form.
24  MR. LISTON, CONTINUED:
25        Q.      As far as you know, you're doing your
```

## Deposition of Carolyn Freeman

44

```
 1   job within the rules, right?
 2        A.      As far as I know.
 3        Q.      Okay.  Does anybody, to your
 4   knowledge, supervise in any way the approved
 5   attorneys?
 6                MR. JONES:  Object to form.
 7   MR. LISTON, CONTINUED:
 8        Q.      Have you ever --
 9        A.      I'm not sure.
10        Q.      -- heard that?
11        A.      It wouldn't be my department.
12        Q.      Okay.  I understand -- and this may
13   not be your department -- that sometimes agents of
14   the company that are outside the home office are
15   audited.  Would that be escrow doing that?
16        A.      I'm not sure who does that.
17        Q.      Okay.  To your knowledge, are there
18   any audits that are ever conducted of approved
19   attorneys?
20        A.      I'm not -- I mean, that's not my
21   department.
22        Q.      That's fine.  If you don't know,
23   fine.  Now, you -- look, I'm probably not going to
24   get another chance to ask you questions, so, in
25   fairness, I want to ask you everything I can think
```

**Deposition of Carolyn Freeman**

45

1  of.  All right?  Just bear with me.  If you don't

2  know, you don't know.

3         Were you -- have you ever been aware

4  of whether Valley had any procedure or system in

5  place to supervise approved attorneys and see if

6  their methods for certifying title meet Valley's

7  approval?

8         MR. JONES:  Object to form.

9         THE WITNESS:  That's outside the

10 scope of my. . .

11 MR. LISTON, CONTINUED:

12    Q.    Sure.  But you've never heard of

13 anything like that, have you?

14    A.    I mean, I don't know.

15    Q.    No, no.  Do you -- have you ever

16 heard of anything like that at Valley?  I'm not

17 asking you to speak on behalf of the company.  I'm

18 asking you, have you ever heard that Valley had

19 any system in place, procedure in place, to

20 supervise the approved attorneys?

21    A.    It's -- you know, that's not -- I

22 don't do that, so I don't know what they do.

23    Q.    Okay.

24    A.    Okay.

25    Q.    You've never heard about it?

## Deposition of Carolyn Freeman

46

```
 1        A.       Right.
 2        Q.       That's what I'm trying to find out.
 3                 You may not know the answers to some
 4   of these questions, Ms. Freeman, but again, I'm
 5   going to have to ask you.  Are the approved
 6   attorneys allowed to advertise to the public that
 7   they are, in fact, approved attorneys for Valley?
 8        A.       I don't know.
 9        Q.       You don't know what they're allowed
10   to do in that regard?
11        A.       No.
12        Q.       Do you guys at Valley send out
13   certificates or notices or anything they can put
14   up in their offices that say:  You're an approved
15   attorney?
16        A.       I don't know.
17        Q.       Is there anything that you've ever
18   seen at Valley that is in writing that would be
19   sent to the approved attorney or sent to a bank or
20   a lender or anybody else that says approved
21   attorneys are only allowed to do certain acts, and
22   here they are?
23                 MR. JONES:  Object to form.
24   MR. LISTON, CONTINUED:
25        Q.       Have you ever seen anything like
```

# Deposition of Carolyn Freeman

49

1       Q.      You would confer with the approved

2    attorney?

3       A.      (Nods head affirmatively.)

4       Q.      Right?

5       A.      I would just issue it.

6       Q.      They can take it or leave it,

7    couldn't they?

8               Well, I don't know of circumstances

9    that have arisen in your experience, but I imagine

10   that somewhere along the line, some information

11   needed to flow from your department to the insured

12   or you had questions that the insured needed to

13   answer for your department to make decisions.  Is

14   that fair?  Has that ever happened?

15      A.      Not as to whether we would insure or

16   not insure.

17      Q.      Okay.  Well, in the event you ever

18   needed to communicate with an insured or get

19   information from the insured, and you had an

20   approved attorney in there, would you go through

21   the approved attorney to do that?

22      A.      I would rely on getting the

23   information from him.

24      Q.      Okay.  Do you know how the binder

25   fees are determined?

**Deposition of Carolyn Freeman**

```
 1        Q.     All right.  Look at 1.3, please,
 2  ma'am.  It's on page Bates No. 253b. I think it's
 3  1-3 at the bottom.  Would you agree with me --
 4  I'll just ask the question and -- without having
 5  to go through it.  Would you agree with me it's
 6  just crucially important that the approved
 7  attorney's title certification to Valley be
 8  accurate?
 9        A.     Well, we're relying on him --
10        Q.     Right.
11        A.     -- for accuracy.
12        Q.     I mean, you don't go behind him and
13  do title work, do you?
14        A.     No.
15        Q.     So you're taking his word for it
16  about who owns that title at the time he submits
17  those documents to you, correct?
18        A.     Right.
19        Q.     Okay.  Has Valley ever, to your
20  knowledge, gone behind the approved attorney's
21  certification of title to try to determine whether
22  or not that certification was, in fact, accurate?
23             MR. JONES:  Object to form.
24             THE WITNESS:  I'm not sure.
25  MR. LISTON, CONTINUED:
```

**Deposition of Carolyn Freeman**

84

```
 1        Q.      You're not aware of any instances?

 2        A.      I'm not aware of it.

 3        Q.      Okay.  Has there ever been any system

 4   or program in place at Valley to, for lack of

 5   better words, check up on approved attorneys from

 6   time to time by taking the certifications that --

 7   in some random sampling and doing title research

 8   to see if the certifications had been accurate?

 9        A.      I'm not aware of it.

10        Q.      Okay.  Look at page Bates No. 254,

11   please, ma'am.  At the very bottom, there's

12   something down there in bold that says, "Do not

13   accept a certificate of title from an attorney

14   that has any financial interest in the property

15   being certified."  Okay.  Has that always been

16   Valley's policy, to your knowledge?

17        A.      To my knowledge.

18        Q.      Okay.  Is there a policy at Valley

19   about accepting certificates of title from

20   attorneys who have relatives that have a financial

21   interest in a transaction?

22               MR. JONES:  Object to form.  She's

23   not here to testify -- she can testify as to her

24   own knowledge, but as far --

25               MR. LISTON:  That's what I'm asking.
```

# Deposition of Carolyn Freeman

```
 1                THE WITNESS:  Not that I know of.
 2   MR. LISTON, CONTINUED:
 3        Q.      Do you know of any?
 4        A.      I don't know.  Not to my knowledge.
 5        Q.      Even if it's not in writing, have you
 6   ever been aware that Valley discourages approved
 7   attorneys from working on matters where their
 8   relatives -- could be their mother, father,
 9   sister, brother -- have some financial interest in
10   the property transaction?
11        A.      I'm not aware.
12        Q.      No one's ever said that to you --
13        A.      No.
14        Q.      -- that you know of?
15        A.      That I recall.
16        Q.      Okay.  Have you ever had an occasion
17   to invoke this policy because you found out an
18   approved attorney had some interest in the
19   property that was the subject of the transaction?
20        A.      I've had attorneys try to certify to
21   their own title.
22        Q.      Okay.  That would qualify, wouldn't
23   it?  What about partners in law firms, have you
24   ever had attorneys in the same law firm try to
25   certify the other's title?
```

## Deposition of Carolyn Freeman

86

```
 1        A.      Not that I'm aware of.
 2        Q.      Would that be a no-no, or is that
 3   okay?
 4                MR. JONES:  Again, to her knowledge.
 5                THE WITNESS:  I don't know.
 6   MR. LISTON, CONTINUED:
 7        Q.      To your knowledge.  That's all I'm
 8   asking about today, is your knowledge.
 9        A.      I don't know.
10        Q.      I guess the reason for the rule here
11   is that you don't want an attorney who's got a
12   financial interest in the property doing his own
13   title work because he might have some incentive
14   not to do it accurately.  Would you agree with
15   that?
16        A.      Well, you wouldn't want him
17   certifying to his own, no.
18        Q.      Right.  What steps, to your
19   knowledge, does Valley take to inquire of approved
20   attorneys whether or not they're doing things
21   which might violate this rule?
22        A.      I'm not involved in. . .
23        Q.      Does the approved attorney
24   communicate with any department other than yours
25   before the title insurance policy is issued, to
```

**Deposition of Carolyn Freeman**

 1   your knowledge?

 2        A.        To my knowledge, no.

 3        Q.        Okay.  Have you ever made any

 4   inquiries of approved attorneys whether they had a

 5   financial interest in a transaction?

 6        A.        Not to my knowledge.

 7        Q.        Okay.  To your knowledge, are

 8   approved attorneys sent this rule that they cannot

 9   certify title where they have a financial interest

10   in the property?

11        A.        I'm not sure what they're privileged

12   to.

13        Q.        Is there any system or procedure in

14   place, that you know about, where inquiry is made

15   of approved attorneys to rule out them having

16   financial interests in a transaction or to at

17   least make them certify somewhere and say:  I am

18   not interested in this transaction?  Anything like

19   that?

20        A.        I'm not aware of it.

21        Q.        Is it fair to say that as the senior

22   underwriter, you have never been informed of

23   anything that Valley does to make sure this rule

24   is followed?

25                  MR. JONES:  Object to form.

## Deposition of Carolyn Freeman

89

```
 1        A.      What do you mean by similar name?
 2        Q.      Let's say there's two brothers out
 3   there called Evans, and one Evans is certifying
 4   title for another Evans.  Do you think you'd pick
 5   that up and ask questions about it?
 6        A.      I'm not sure.
 7        Q.      Okay.  Would you at least -- if you
 8   saw that, that one Evans is certifying title for
 9   another Evans, would you at least inquire of the
10   approved attorney who that other Evans was?
11        A.      I'm not sure.
12        Q.      Okay.  Have you ever had an occasion
13   to do that, that you know of?
14        A.      Not that I recall.
15        Q.      Not just with anybody named Evans.
16   Could be anybody named Smith, or any similar
17   names.  Ever had an occasion?
18        A.      Not that I recall.
19        Q.      How would you know if -- that an
20   attorney has got an interest in the transaction if
21   instead of the title being in the attorney's name,
22   it's in a name of a company that the attorney
23   owns?
24             MR. JONES:  Object to form.
25   MR. LISTON, CONTINUED:
```

## Deposition of Carolyn Freeman

```
 1        Q.      Would you be able to pick that up?

 2        A.      Not from the application.

 3        Q.      Okay.  But if there was some --

 4   something on these applications that made that

 5   attorney indicate whether he did or did not have

 6   an interest in the land, either directly or

 7   indirectly, then that would -- you'd know it from

 8   that, wouldn't you?

 9        A.      If it -- if he. . .

10               MR. JONES:  Object to the form of

11   that question, too.  I'm sorry.

12   MR. LISTON, CONTINUED:

13        Q.      I mean, I know there's nothing like

14   that on the application.  Right?

15        A.      Right.

16        Q.      But if there was an affirmative

17   question to the attorney -- approved attorney on

18   the apps that he has to certify whether he does or

19   does not have some interest in the land, then that

20   would be one way of checking this, right?

21        A.      If he's a crook, he's not going to

22   tell you.

23        Q.      That may be a good point.  May be a

24   good point.  But at least you would have made the

25   inquiry, right?
```

## Deposition of Carolyn Freeman

```
 1        A.      Yeah.
 2        Q.      Okay.  Would you look at the page
 3   Bates No. 258, please, ma'am.  At the bottom, it's
 4   marked page 2-1, and the page I have says at the
 5   top, The Application and Attorney's First
 6   Certificate.  Do you see that?
 7        A.      Uh-huh (affirmative response).
 8        Q.      Okay.  I'm going to read this, and
 9   just tell me if I read it correctly.  "This form
10   is designed for use in those circumstances where
11   it is contemplated that a commitment will be
12   required.  The form is completed by an approved
13   attorney of the company, and a commitment to
14   insure is issued with certain exceptions and under
15   certain conditions.  This enables the insured to
16   proceed with disbursement of his funds with
17   assurances as to the quality of title he is
18   obtaining."  Did I read that correctly?
19        A.      Yes.
20        Q.      Okay.  Now, do you disagree -- you're
21   a senior underwriter.  You issue these documents.
22   Do you disagree that the commitment assures an
23   insured that he can go ahead and proceed with
24   disbursement of funds because he's been informed
25   about the quality of the title?
```

### Deposition of Carolyn Freeman

```
 1              MR. JONES:  Object to form.
 2   Commitment itself is the best evidence.
 3              THE WITNESS:  He would have to
 4   satisfy the conditions and stipulations.
 5   MR. LISTON, CONTINUED:
 6       Q.     Well, I understand that.  And I think
 7   I've told you earlier I'm not challenging that.
 8   Right?  But I'm just asking you my question right
 9   now.
10       A.     And what is your question?
11       Q.     My question is:  This sentence says
12   the commitment "enables the insured to proceed
13   with disbursement of his funds with assurances as
14   to the quality of title he is obtaining."  Do you
15   disagree with that?
16       A.     Not to my knowledge.
17       Q.     Okay.  And this is the form -- I'm
18   sorry, Bates No. page 260.  This is the form, at
19   least in this manual, for the application of
20   attorney's first certificate, correct?
21       A.     Yes, sir.
22       Q.     And is this the form that you're
23   familiar with, I mean, that you still use?
24       A.     It's not the current application.
25       Q.     Okay.  Is it one that has been used?
```

**Professional Court Reporting, LLC**
**601.919.8662**

## Deposition of Carolyn Freeman

```
 1        A.      Yes.
 2        Q.      All right.  Right at the top, the
 3   first couple of blank lines, it identifies what
 4   about the fee simple ownership?
 5        A.      It's vested in.
 6        Q.      Who it's vested in, correct?
 7        A.      Uh-huh (affirmative response).
 8        Q.      And that's the first thing you
 9   require the attorneys to tell you as -- in the
10   underwriting department, right?
11               MR. JONES:   Object.
12               THE WITNESS:   That's the first
13   question asked on the application, yes.
14   MR. LISTON, CONTINUED:
15        Q.      Right.  And you take that information
16   and you put that on the schedule that goes with
17   the commitment, correct?
18        A.      Yes.
19        Q.      Okay.  And you accept that from an
20   approved attorney without question?
21        A.      He certified it.
22        Q.      Right.  And you don't go behind him
23   in your department to try to figure out whether or
24   not that's accurate or inaccurate, do you?
25        A.      No.  He's certifying the title.
```

## Deposition of Carolyn Freeman

125

```
 1   paragraph.
 2        A.      (Reviews document.)  Oh, you're
 3   talking about up here?
 4        Q.      Second paragraph, second line.  It
 5   talks about "for a valuable consideration."  Do
 6   you see that?
 7        A.      Uh-huh (affirmative response).  Yes,
 8   I do.
 9        Q.      To your knowledge, is that talking
10   about the fee for the commitment, the binder fee?
11        A.      I'm not sure.
12        Q.      Okay.  Now, you signed this
13   commitment, as I understand it.  Does that --
14        A.      Yes.
15        Q.      -- mean that you underwrote it before
16   you issued it?
17        A.      Certainly.
18        Q.      Okay.  Tell me what underwriting you
19   did on this before issuing this commitment.
20        A.      I reviewed the commitment -- the
21   application and -- well, I may not have personally
22   entered this one.  I don't know if I did or
23   didn't.  Okay?
24        Q.      You mean drafted the schedules?
25        A.      Exactly.
```

**Deposition of Carolyn Freeman**

```
 1        Q.      Okay.
 2        A.      But I would have reviewed the
 3   commitment against the title work.
 4        Q.      I understand.
 5        A.      Before I signed it.
 6        Q.      Okay.  All right.
 7        A.      And then I would have delivered it.
 8        Q.      Okay.  And is it fair to say that
 9   when you did that, you didn't find anything that
10   caused you any concern?
11        A.      I just took it from his certificate.
12        Q.      Okay.  And as we've talked about
13   already, but now we're talking about this specific
14   document, neither you nor anyone with Valley,
15   to your knowledge, undertook to check behind
16   Charles Evans' certificate to see if his
17   certificate was, in fact, accurate?
18              MR. JONES:  Object to form.
19              THE WITNESS:  Not to my knowledge.
20   MR. LISTON, CONTINUED:
21        Q.      Okay.  Let's look at the schedule,
22   please, ma'am, Schedule A.  Do you -- do you know,
23   as you sit here today, whether you prepared this
24   schedule or whether somebody else prepared it?
25        A.      I'm not sure.
```

**Deposition of Carolyn Freeman**

1    2008, to 8:00 a.m., right?

2        A.    Right.

3        Q.    Okay.  And then he's got the exhibits

4    that -- A and B to it, which is something, isn't

5    it, that Valley would have reviewed when it came

6    in, to make use --

7        A.    The legal --

8        Q.    -- use of that information on its

9    documents, right?

10       A.    The legal and the exceptions.

11       Q.    Okay.

12             COURT REPORTER:  I'm sorry, what was

13   the. . .

14             THE WITNESS:  The exceptions -- the

15   legal and the exceptions.

16             COURT REPORTER:  Thank you.

17   (EXHIBIT NO. 9 WAS MARKED FOR THE RECORD.)

18   MR. LISTON, CONTINUED:

19       Q.    Here's Exhibit 9, please, ma'am.

20   Here is my question to you.  Is this a true and

21   correct and complete copy of the title commitment

22   issued by Valley for the 2008 White Oaks loan?

23             MR. JONES:  It doesn't have the

24   actual cover page.

25             MR. LISTON:  Yeah, with the exception

**Deposition of Carolyn Freeman**

1   of that.   Maybe I missed pulling that.

2             MR. JONES:   Hang on a second.   Maybe

3   I can help you out here.

4   MR. LISTON, CONTINUED:

5         Q.      Other than the cover page, does it

6   appear to be a complete copy?

7             MR. JONES:   We'll stipulate the cover

8   page on 7 would be the same as it is on --

9             MR. LISTON:   That's fine.   It doesn't

10  have any real substantive stuff on it, though.

11            THE WITNESS:   It appears to be.

12  MR. LISTON, CONTINUED:

13        Q.      All right.   Thank you, ma'am.

14            And, again, Valley would have issued

15  this commitment after receiving an application of

16  attorney's first certificate, correct?

17        A.      Yes.

18        Q.      You signed it, which means you issued

19  the commitment?

20        A.      No.

21        Q.      Okay.

22        A.      It doesn't mean that I actually

23  drafted it.

24        Q.      Well, I guess I'm not really asking

25  about who drafted Schedule A or B, but I'm asking

## Deposition of Carolyn Freeman

1   about who issued it on behalf of Valley.  Was it

2   you, because you signed the bottom of it?

3             MR. JONES:  Object to form.

4             You can answer, to the extent you

5   know.

6   MR. LISTON, CONTINUED:

7      Q.    Isn't that your signature at the

8   bottom of the page 1?

9      A.    Yeah, it's my signature.

10      Q.    What does that mean you did, then?

11      A.    Means I reviewed the commitment.

12      Q.    Okay.  Did your --

13      A.    But it doesn't mean that I prepared

14   it also.

15      Q.    Well, I'm not asking that question

16   yet.  But by the fact that you signed it, does

17   that mean now the company's issuing the

18   commitment?

19      A.    It was issued and delivered, yes.

20      Q.    Okay.  Now, did you underwrite it

21   before you signed it?

22      A.    I would have reviewed the

23   certificate.

24      Q.    Okay.  Would you have reviewed the

25   schedules after they were prepared?

**Deposition of Carolyn Freeman**

1    White Oaks loan.  Do you remember looking at the
2    commitment for this?
3          A.      I think so.
4          Q.      Had a legal description in Schedule
5    A, didn't it?
6          A.      Yes.
7          Q.      Okay.  Does anybody in underwriting
8    or at Valley look at the legal description that's
9    been given, or on the commitment, and then compare
10   that to the legal description that's given in the
11   attorney's final certificate to make sure they're
12   the same, dealing with the same piece of property?
13         A.      We don't proof them word for word.
14         Q.      Well, I understand that.  But do you
15   generally look at it and say:  Yeah, that looks
16   like the same tract of land that we issued the
17   commitment on?
18         A.      Right.  Right.
19         Q.      That's all I'm trying to find out.
20         A.      Yeah.
21         Q.      Okay.  So -- and to do that, you'd
22   have to review these exhibits, wouldn't you?
23         A.      Yeah.
24   MR. JONES, CONTINUED:
25         Q.      Okay.  Now, look at Exhibit A,

# Deposition of Carolyn Freeman

153

1   on the same page that they have to look at, isn't
2   it?  Whoever looks at it.
3        A.      It's on that page, but they wouldn't
4   be reviewing it for names on it.  They would be
5   reviewing it for legal description.
6        Q.      Okay.  Is there any effort that, to
7   your knowledge, Valley ever undertook to figure
8   out the identity of people who have ownerships in
9   companies or limited liability companies that were
10  involved in these insurance policies?
11              MR. JONES:  Object to form.
12              THE WITNESS:  Not that I'm aware of.
13  MR. LISTON, CONTINUED:
14       Q.      Do you know how you do that?
15       A.      I don't, no.
16       Q.      Have you ever gotten on the internet
17  and gone to the Mississippi Secretary of State's
18  website and looked up a company?
19       A.      No, I haven't.
20       Q.      Okay.  Is Valley -- anyone from
21  Valley ever told you that needed to be done or
22  suggested it should be done to figure out who are
23  the people who really have an interest in these
24  financial transactions?
25              MR. JONES:  Object to form.

**Deposition of Carolyn Freeman**

```
 1   doesn't have an interest in these properties by

 2   virtue of the fact that his brother has promised

 3   him something?

 4        A.      I don't know.

 5        Q.      No way of knowing, do you?

 6        A.      (Shakes head negatively.)

 7        Q.      Weren't Valley's procedures to

 8   determine these things insufficient if they can't

 9   even cover these kind of items?

10              MR. JONES:  Object to form.

11              THE WITNESS:  That's outside the

12   scope of what I do.

13   MR. LISTON, CONTINUED:

14        Q.      Well, you don't make the rules, I

15   know that.

16        A.      Right.

17        Q.      But you know there's a rule that says

18   an attorney is not supposed to have a financial

19   interest in the transaction your company is

20   issuing insurance on?

21        A.      Right.

22        Q.      Okay.  And I asked you what the

23   company does to figure that out, and I think you

24   told me, essentially, nothing that you know of.

25   Correct?
```

## Deposition of Carolyn Freeman

```
 1         A.      I mean, I wouldn't be involved in
 2   what they do.
 3         Q.      Okay.  But you don't know of any
 4   procedure, do you, as the underwriter, that the
 5   company has ever tried or attempted to figure out
 6   who are the people that really own interest in
 7   transactions in which the company is issuing
 8   insurance?
 9                 MR. JONES:  Object to form.
10                 THE WITNESS:  I'm not --
11   MR. LISTON, CONTINUED:
12         Q.      If you do, I want to know about it.
13         A.      I'm not aware.
14         Q.      Take a look at this piece of paper,
15   ma'am.  I'll mark it.
16         (EXHIBIT NO. 13 WAS MARKED FOR THE RECORD.)
17   MR. LISTON, CONTINUED:
18         Q.      It's Exhibit 13.  What kind of
19   document is this, if you know?
20         A.      Affidavit and agreement of the owner
21   and the contractor.
22         Q.      Is this an older form of a document
23   that Valley used to use?
24         A.      I don't know if it's been updated or
25   not.
```

# Deposition of Carolyn Freeman

```
 1                  MR. JONES:  Consider your source.
 2                  MR. LISTON:  Actually quoted somebody
 3   in the room.  It wasn't me.
 4                  Let's go off the record for just a
 5   minute.
 6                  (OFF THE RECORD.)
 7   MR. LISTON, CONTINUED:
 8        Q.    Does Valley, in the underwriting
 9   department or anywhere else within Valley, to your
10   knowledge, track property that's the subject of
11   its insurance policies by property description or
12   plat or any other means?
13        A.    Not that I'm aware of.
14        Q.    Okay.  In other words, if you're
15   insuring the same piece of property multiple
16   times, how would Valley know that?  Is there a way
17   to know that?
18        A.    I'm not sure you could -- you can
19   research by owner.
20        Q.    Okay.  Well, if it's the same
21   description over and over, would that be something
22   that it would have to be picked up in the
23   underwriting department to be caught?
24                  MR. JONES:  Object to form.
25                  THE WITNESS:  Well, you can't
```

## Deposition of Carolyn Freeman

1   research it by legal.

2   MR. LISTON, CONTINUED:

3        Q.      Well, I don't understand your answer.

4   What do you mean?

5        A.      There's no way to look up to see if

6   you have insured that before or not by the legal

7   description.

8        Q.      There's no system in place to do

9   that?

10       A.      Right.

11       Q.      If you wanted to make an inquiry,

12  "Are we insuring the same piece of property for

13  different owners," there's no searchable method of

14  finding that?

15       A.      Not that I'm aware of.

16       Q.      Okay.  Hence my question.  In order

17  for Valley to catch something like that, it's got

18  to pick it up in underwriting when the

19  applications come in, does it not?

20            MR. JONES:  Object to form.

21  MR. LISTON, CONTINUED:

22       Q.      If it's not detected in underwriting

23  at that stage, it gets in Valley, and there's no

24  way to search it and determine it, is there?

25            MR. JONES:  Object to form.

## Deposition of Carolyn Freeman

```
 1        Q.      That's the only possible way, isn't
 2   it?
 3                MR. JONES:  You're asking to her
 4   knowledge?
 5                MR. LISTON:  Yeah.
 6                THE WITNESS:  As to my knowledge.
 7   MR. LISTON, CONTINUED:
 8        Q.      Is there any other way you know of
 9   that it could even possibly be caught by Valley?
10        A.      Not that I'm aware of.
11        Q.      Okay.  Is there any method at Valley
12   that you're aware of in underwriting for trying to
13   detect whether documents that are being submitted
14   to Valley are fraudulent?
15                MR. JONES:  Object to form.
16                THE WITNESS:  What documents are you
17   speaking to?
18   MR. LISTON, CONTINUED:
19        Q.      Applications and attorney
20   certifications.
21        A.      We don't check behind them.
22        Q.      Well, I know that.  But I'm asking
23   you, is there any program in place that you've
24   ever been aware of that's, for lack of better
25   words, called fraud detection procedures?
```

**Deposition of Carolyn Freeman**

188

```
 1        Q.      I'm sorry?
 2        A.      They can fill in for you.
 3        Q.      And who fills in for you?
 4        A.      Morton Matrick.
 5        Q.      Anybody else?
 6        A.      Parrish Fortenberry.
 7        Q.      But generally, that's part of your
 8  job description?
 9        A.      Yes.
10        Q.      Sign the policy that's issued?
11        A.      Yes.
12        Q.      What do you do to determine whether
13  you can sign it or not?
14        A.      I check the certificate submitted
15  with it.
16        Q.      From the attorney?
17        A.      From the attorney.
18        Q.      So you take a look -- you put the
19  certificate in front of you, the --
20        A.      Right.
21        Q.      -- physical certificate, and you
22  compare it to what?
23        A.      Well, I look at -- take the
24  information from the certificate.
25        Q.      You type it?  Who prepares the
```

## Deposition of Carolyn Freeman

```
 1    physical policy?  Or in that -- in this instance,
 2    who prepared that one?
 3         A.    It was prepared in the underwriting
 4    department.
 5         Q.    So your department prepared that --
 6         A.    Yes.
 7         Q.    -- based upon what information?
 8         A.    The certificate that would have been
 9    submitted with it.
10         Q.    So you pulled everything from that
11    certificate?
12         A.    Yes.  The information comes from the
13    approved attorney's certificate of title.
14         Q.    And is there any distinction between
15    how you treat an approved attorney and an agent as
16    far as --
17         A.    I don't deal with agents.
18         Q.    Is that your operating procedure, you
19    take the certificate of title, type it into the
20    policy?
21         A.    You take the information from the --
22         Q.    Yes, ma'am.
23         A.    -- certificate, yes.
24         Q.    Is the legal description retyped?
25         A.    Sometimes it's retyped, sometimes
```

**Deposition of Carolyn Freeman**

1  it's e-mailed to us.

2       Q.     But you take it, and do you proof it

3  as it -- after it comes in, how -- how do you

4  verify that the transition is accurate --

5              MR. CLARK:  Object --

6  MR. RAWLINGS, CONTINUED:

7       Q.     -- from the policy to the -- or from

8  the certificate to the policy?

9              MR. CLARK:  Object to the form.

10             You can go ahead.

11             THE WITNESS:  We take the legal from

12  the attorney's certificate and put it in the

13  policy.

14  MR. RAWLINGS, CONTINUED:

15       Q.     But as you know, from your years of

16  experience, that's somewhat tedious at times with

17  the calls and descriptions.  Do you do anything to

18  proof it for accuracy?

19       A.     If we type the legal, we proof it.

20       Q.     Against the certificate of title?

21       A.     Yes.

22       Q.     Do you look at any underlying

23  transactional documents?  Or in this case, did

24  you, before you signed that?

25       A.     Did I look at it?

## Deposition of Carolyn Freeman

```
 1                MR. CLARK:  Object to the form.
 2   MR. RAWLINGS, CONTINUED:
 3        Q.     By that, I mean any conveyance deeds,
 4   any documents in the chain of title.
 5        A.     No.  We don't go behind approved
 6   attorneys.
 7        Q.     Have you ever?
 8        A.     I don't know if they have in the
 9   past.
10        Q.     All right.  Other than reviewing a
11   certificate of title, translating -- or
12   transitioning it into the policy, what else did
13   you do to determine that you could sign that?
14        A.      I proofed the information in the
15   policy against the information in the certificate.
16        Q.     At that time --
17        A.     At the date of it, filing date and
18   time.
19        Q.     At that time in 2009, was that a --
20   the standard policy?
21        A.     As far as I know, yes.
22        Q.     Did you have different types of
23   policies -- policy forms?
24        A.     Got long forms, short forms.
25                COURT REPORTER:  I'm sorry?
```

**Deposition of Carolyn Freeman**

```
 1   start with a V.  Sometimes numbers mean something
 2   and tell you something, and sometimes they're just
 3   sequential.
 4        A.     It's just sequential.
 5        Q.     So there's no information about who
 6   issues the policy or anything based on the number
 7   or the type of policy?
 8        A.     No.
 9        Q.     But if you've got a binder number for
10   a transaction, you could look that up and see if
11   it was actually a binder issued or a commitment
12   issued?
13        A.     Right.
14               MR. JONES:  Object to form.
15   MR. CORY, CONTINUED:
16        Q.     Is that right?
17        A.     It would be in that file with the
18   policy, if it --
19        Q.     And --
20        A.     -- was one issued.
21        Q.     I didn't mean to interrupt you.  Let
22   me ask you this.  When an application for a
23   commitment comes in, whether it be faxed or
24   mailed, however it comes in to the underwriting
25   department, do you actually set up a file?
```

**Deposition of Carolyn Freeman**

```
 1        A.      We open a file, yes.
 2        Q.      And the file is -- what's -- is the
 3   file -- the V number or whatever number, is --
 4        A.      Yes.
 5        Q.      -- that how it's filed?
 6        A.      Yes.
 7        Q.      And that file -- once a policy is
 8   issued, if a policy is issued, that goes in the
 9   same file, or is there a separate file for the
10   policy?
11        A.      No, it's all in one file.
12        Q.      And would -- are there -- and you may
13   have already answered this.  But if you issued a
14   policy, would there always be a commitment issued
15   when it's an approved attorney involved in the
16   transaction?
17        A.      Not necessarily.
18        Q.      Is there -- is that the normal way
19   that it's done, or the usual way, you get a
20   commitment first and then a policy?
21        A.      It varies.  Sometimes the
22   instrument's already recorded, and then that way
23   you bypass on the commitment and issue the policy.
24        Q.      Now, William Smith -- do you know
25   William Smith?
```

## Deposition of Carolyn Freeman

```
 1    extent you're assuming a commitment is issued.  I
 2    mean, if a commitment is issued.
 3    MR. CORY, CONTINUED:
 4        Q.      And subject to that, obviously
 5    commitments may not always issue just --
 6        A.      Right.
 7        Q.      -- because they're requested.
 8                Is -- when you issue a commitment,
 9    are you also giving them the pricing information
10    at that time?
11        A.      Yes.
12        Q.      Are you -- is Valley paid anything
13    for the commitment?
14        A.      Yes.
15        Q.      And then are they paid again for the
16    policy itself?
17        A.      It's on one statement.
18        Q.      All right.  Just help me so I
19    understand procedurally.  You get the application
20    in for a commitment, say for a closing, I don't
21    know, two days from now, if not -- I mean, assume
22    it's not Saturday two days from now.  Would you
23    turn around and send a -- do you get paid before
24    you issue the commitment?
25        A.      No.
```

## Deposition of Carolyn Freeman

```
 1       Q.      You get paid when the -- when the
 2  closing occurs?
 3       A.      Yes.
 4       Q.      And you're paid in full at that
 5  point?
 6               MR. JONES:  Object to form.
 7  MR. CORY, CONTINUED:
 8       Q.      Let's talk generally.  I'm not trying
 9  to -- I just want to make sure I understand the
10  procedure.  Mean, you get the -- if the closing --
11  if you issue a commitment and the closing occurs
12  tomorrow on the transaction, when do you -- when
13  does Valley normally get the money for the
14  commitment and title policy?  Or is there a normal
15  time?
16       A.      It varies.
17       Q.      Is it -- is it usually within a day
18  or two after the closing, or is it --
19       A.      Some send it the day after closing.
20  Some send it with the final.  It just varies.
21       Q.      Okay.  So you may -- that's what I
22  was trying to get to.  You may not get paid --
23  Valley may not get its money until the approved
24  attorney gets everything together and gets you the
25  final?
```

## Deposition of Carolyn Freeman

```
 1        A.      Right.
 2        Q.      Are you notified when the closing --
 3   or is underwriting notified when a closing occurs
 4   on a commitment?  I mean, do you actually know --
 5        A.      No, not usually.
 6                MR. JONES:  Object to form.
 7   MR. CORY, CONTINUED:
 8        Q.      So when a commitment is issued, is
 9   there a timeframe that it's good for?
10        A.      Six months.
11        Q.      So they -- the -- an approved
12   attorney has the ability to -- can rely on that
13   commitment for up to six months, and the pricing?
14                MR. JONES:  Object to form.
15   MR. CORY, CONTINUED:
16        Q.      Is that generally speaking?
17                MR. JONES:  Again, the language of
18   the commitment itself would be the best evidence
19   there.
20   MR. CORY, CONTINUED:
21        Q.      But as far as -- but -- well, yeah,
22   that's fine.  I'll move on.
23                Does Valley have an underwriting
24   manual?
25        A.      It's got an agent's manual.
```

**Deposition of Carolyn Freeman**

 1   just generally speaking, in your mind?

 2            MR. JONES:  I'm going to object to

 3   the compound question.  There's some statements in

 4   there, and then you made several comments that he

 5   wrote policies, which she testified earlier he

 6   didn't.

 7            MR. CORY:  Right.

 8   MR. CORY, CONTINUED:

 9       Q.    Clarifying -- he's clarified my

10   question a little bit.  I'm just -- of the

11   approved -- let me rephrase it.

12            Of the approved attorneys, do you

13   know who the ones that write -- not write -- who

14   are the ones that submit more applications and you

15   issue more binders and policies for, who are the

16   most frequent you deal with?

17       A.    I don't -- I mean, you don't really

18   think about it, you know.

19       Q.    Well, are there hundreds of people

20   you deal with, or is it 30 or 40 or 20?  I'm just

21   trying to get a general idea of what you see --

22       A.    I don't know the exact number.  It

23   varies, you know.

24       Q.    In a given month -- I mean, let's use

25   this month, November.  Do you know how many

## Deposition of Carolyn Freeman

```
 1   commitments you've issued?

 2        A.      Not a total number, no.

 3        Q.      What's your -- just an estimate of

 4   what you would issue?

 5        A.      I don't know what it would average

 6   out to be.

 7        Q.      I mean, are we talking about --

 8        A.      Four or five, you know.

 9        Q.      Four or five so far this month?

10        A.      Per day.

11        Q.      Oh, okay.  That's what I --

12        A.      And that's a total guess.

13        Q.      But on a -- on a monthly basis, what

14   would the range be for the last six months?  Just

15   an estimate.

16        A.      I don't have any idea.

17        Q.      I mean, have you -- in the last 12

18   months, have you issued less than a hundred in a

19   given month?  Commitments.

20        A.      I don't know.

21        Q.      Have you -- what's the most you've

22   issued?

23        A.      I don't know that, either.

24        Q.      Have you ever issued a thousand

25   commitments in a month?
```

**Deposition of Carolyn Freeman**

```
 1        A.      I doubt a thousand, but I don't know.
 2        Q.      Did you work a full day yesterday?
 3        A.      Yeah.
 4        Q.      How many did you issue yesterday?
 5        A.      I don't know.
 6        Q.      Two? three? four? five? six? ten?
 7        A.      I don't know.  I didn't look at the
 8   work list.
 9        Q.      So if -- when you go home and
10   somebody says, "How busy were you?" you just. . .
11        A.      Well, all of my business -- business
12   is not policies and binders.
13        Q.      Tell me what else you do besides
14   policies and binders, then.
15        A.      Answer the phone.
16        Q.      Answer the phone?  Are you the
17   receptionist too, or. . .
18        A.      With questions that people have.
19        Q.      From insureds, from banks, from --
20   are you fielding questions from. . .
21        A.      It varies.  All different kinds of
22   people.
23        Q.      Well, tell me what your -- what your
24   job description is.
25        A.      I'm an underwriter and issue policies
```

**Professional Court Reporting, LLC**
**601.919.8662**

**Deposition of Carolyn Freeman**

1   and binders.

2        Q.      But you just told me that's not what

3   you do all day.  So what's the rest of the day?

4        A.      Well, if the phone rings, I answer

5   it.

6        Q.      But you've got an extension, so

7   there's something that triggers them to give them

8   to you if -- do you take general calls?

9        A.      A lot of them are general.

10       Q.      Is there -- you can -- how would you

11  generate a report that showed how many commitments

12  you've issued and how many policies have been

13  issued out of the underwriting department in the

14  last couple of years?

15       A.      I'd have go back through the work

16  list to get that number.

17       Q.      On a -- on a day-to-day basis, what

18  percentage of your time is spent dealing with

19  underwriting issues for approved attorneys versus

20  these other calls?

21       A.      50 percent of the time, underwriting.

22       Q.      Do you have a job description,

23  written job description?

24       A.      Not that I know of.

25       Q.      Do you get annual or quarterly or

**Deposition of Carolyn Freeman**

1      A.      Right.

2      Q.      And there's no -- there's not --

3  outside of the underwriting department, on a -- on

4  a typical basis, there's no one else in the

5  organization of Mississippi Valley that would be

6  involved in the issuance of a commitment for an

7  approved attorney, normally?

8      A.      Normally.

9      Q.      And the same thing, as far as you

10 know, when the -- when the underwriting department --

11 we're looking at Exhibit 10 -- issues a policy, an

12 owner's or a lender's policy, the countersigning

13 by you or someone in underwriting or someone when

14 you're not there, that's the last step?

15     A.      Yes.

16     Q.      And normally, nobody else other than

17 underwriting is looking when it's an approved

18 attorney?

19     A.      Right.

20     Q.      Now, you mentioned earlier that you

21 keep notes or kind of a work list -- I don't want

22 to put words in your mouth -- but on a legal pad?

23     A.      Uh-huh (affirmative response).

24     Q.      You have to say yes or no.  I know

25 it's late.

1

 1            IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2

 3

    IN RE:
 4
       JON CHRISTOPHER EVANS          Case No. 09-03763-NPO
 5     AND JOINTLY ADMINISTERED
       RELATED CASES
 6
       DEBTORS.                        Chapter 7
 7
    ******************************************************
 8
    G&B INVESTMENTS, INC.                   PLAINTIFF
 9
       V.               ADV. PROC. NO. 10-00040-NPO
10
    DEREK A. HENDERSON, TRUSTEE
11  FOR THE BANKRUPTCY ESTATE OF
    JON CHRISTOPHER EVANS, ET AL.          DEFENDANTS
12
                      * * * * * * * * *
13
                        **EXHIBITS**
14
            **DEPOSITION OF CAROLYN WILLIAMS**
15
               Taken at the offices of
16                  Adams and Reese,
            111 Capitol Street, Suite 350,
17              Jackson, Mississippi,
            on Thursday, November 18, 2010,
18       beginning at approximately 9:20 a.m.

19                  * * * * * * * * *

20          APPEARANCES NOTED HEREIN

21  _____
            **CHRISTY R. SIEVERT, CSR, RPR**
22     **PROFESSIONAL COURT REPORTING, LLC**
          Registered Professional Reporter
23          Certified Shorthand Reporter
            Mississippi CSR No. 1421
24            Post Office Box 320928
          Jackson, Mississippi 39232-0928
25            www.procourtreporting.com

2

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | No. 1 | Brochure | 53 |
| 3 | No. 2 | Underwriting manual | 56 |
| 4 | No. 3 | Invoice | 96 |
| 5 | No. 4 | Invoices | 97 |
| 6 | No. 5 | Letters from Mississippi | |
| 7 | | Valley Title Insurance Company to Charles Evans | 111 |
| 8 | No. 6 | Application and Attorney's | |
| 9 | | First Certificate for 2009 White Oaks Loan | 116 |
| 10 | No. 7 | Commitment for Title Insurance | 121 |
| 11 | No. 8 | Application and Attorney's | |
| 12 | | First Certificate for 2008 White Oaks Loan | 135 |
| 13 | No. 9 | Commitment for Title Insurance | 137 |
| 14 | No. 10 | Loan Policy of Title Insurance | |
| 15 | | on 2008 White Oaks Loan | 143 |
| 16 | No. 11 | Application and Attorney's | |
| 17 | | Final Certificate for 2008 White Oaks loan | 143 |
| 18 | No. 12 | Composite exhibit | 154 |
| 19 | No. 13 | Affidavit and Agreement | 158 |
| 20 | No. 14 | 6/24/04 Letter from Marilyn Womack to Charles Evans | 160 |
| 21 | No. 15 | Application for Approved Attorneys List | 164 |
| 22 | | | |
| 23 | No. 16 | Owner's Policy of Title Insurance | 204 |
| 24 | | | |
| 25 | | | |