# Deposition of Brad Jones

1 (Pages 1 to 4)

Page 1

[Caption/court information — illegible]

APPEARANCES

COUNSEL FOR MISSISSIPPI VALLEY TITLE
INSURANCE and OLD REPUBLIC NATIONAL
TITLE INSURANCE COMPANY:
  MR. WILLIAM C. BRABEC
  MR. M. SCOTT JONES
  Adams and Reese, LLP
  111 East Capitol Street, Suite 350
  Jackson, Mississippi 39201
  MR. MASON LOWE
  Bradley, Arant, Boult & Cummings
  Post Office Box 1789
  Jackson, Mississippi 39215

COUNSEL FOR BANK OF FOREST:
  MR. WILLIAM LISTON, III
  Liston & Lancaster
  2648 Ridgewood Road, Suite B
  Jackson, Mississippi 39216

Page 3

TABLE OF CONTENTS
                                          PAGE
Title Page ............................... 1
Appearance Page .......................... 2
Table of Contents ........................ 3
Exhibit Page ............................. 4
Stipulation Page ......................... 5

DEPOSITION OF BRAD JONES:
  By Mr. Liston ........................... 6

Signature Page ........................... 132
Certificate Page ......................... 133

Page 4

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| No. 1 | Affidavit of Robert Jones | 106 |

Professional Court Reporting, LLC
601.919.8662


EXHIBIT 7

## Deposition of Brad Jones

7 (Pages 25 to 28)

Page 25

1 ask, really.
2     MR. BRABEC: Is that a question?
3     MR. LISTON: Yeah.
4 MR. LISTON, CONTINUED:
5     Q. How do you respond to that?
6     MR. BRABEC: I object to the form.
7     MR. LISTON: I'll ask it better at
8 trial.
9     THE WITNESS: I didn't hear a
10 question in that.
11 MR. LISTON, CONTINUED:
12     Q. Why did you want to become a
13 certified fraud examiner?
14     A. Because I had an interest in the
15 subject matter.
16     Q. What gave you an interest in it?
17     A. I don't know.
18     Q. Don't you think that your job sort of
19 involves that, anyway?
20     A. I mean, I've had claims before that
21 have involved fraud.
22     Q. You have?
23     A. I have.
24     Q. Just -- how did you conclude that,
25 that it involved -- those claims involved fraud?

Page 26

1     A. Well, the two instances that I can
2 think of, the perpetrator pled guilty.
3     Q. Was that -- were either of them named
4 Evans?
5     A. I'm sorry?
6     Q. Were either of them named Evans?
7     A. No.
8     Q. Okay. Who -- tell me who that was.
9     A. It was one that was James Wynn Threatt.
10 And --
11     Q. Oh, yeah, I know him. Who else?
12     A. Todd Phillips.
13     Q. Were either -- were those related
14 transactions, or were those completely separate
15 incidences?
16     A. Those were completely separate.
17     Q. Threatt was doing what that was
18 fraudulent, to your understanding?
19     A. Mr. Threatt was -- he would sell a
20 house to three different people, and each person
21 would mortgage the house one or two times.
22     Q. He's a guest of the federal
23 government now, isn't he?
24     A. He is.
25     Q. Okay. What about Mr. Phillips,

Page 27

1 Todd Phillips, what was -- what was his fraudulent
2 scheme?
3     A. He would have a piece of property
4 that had a mortgage on it, and he would prepare an
5 authority to cancel or -- you know, satisfaction
6 for that mortgage, and he would forge the bank
7 officer's signature to it and would record it in
8 the land records, make the title appear to be
9 clear, and then go out and seek a new lender to
10 loan money based on his apparently clear title.
11     Q. Both of them involved utilizing the
12 same piece of property multiple times in some sort
13 of transaction that benefitted them, right?
14     A. Both of them involved multiple
15 mortgages on the same piece of property.
16     Q. Okay. When did those instances
17 occur, or arise, to your knowledge?
18     A. I'm not real good with dates, but,
19 you know, I know Mr. -- the fraud involving
20 Mr. Phillips happened first, probably -- may have
21 been discovered in 2006, 2007, sometime in there,
22 maybe late 2005. And then Mr. Threatt's fraud
23 came to light sometime thereafter.
24     Q. Okay. Threatt is not an attorney, is
25 he? Or do you know?

Page 28

1     A. I don't know.
2     Q. I think he was -- owned a car
3 dealership?
4     A. I've heard that.
5     Q. What about Phillips, what did he do
6 for a living?
7     A. To my knowledge, it was just a real
8 estate developer.
9     Q. Okay. Who were the attorneys in
10 those instances that were certifying title to
11 Mississippi Valley Title?
12     A. I don't know that anybody certified
13 to us on the -- involving Mr. Threatt. I believe
14 Bill McGehee in Natchez provided a certificate on
15 Mr. Phillips' -- one of his properties. I don't
16 know if that certificate was to us or not.
17     Q. How did -- how did Mississippi Valley
18 Title become involved in the Threatt and the
19 Phillips matters? I mean, what happened to get
20 your company involved? I assume you had to issue
21 a policy.
22     A. Right, policies -- policies were
23 issued.
24     Q. Okay. Did Mississippi Valley Title
25 issue multiple policies on the same parcels of

## Deposition of Brad Jones

Page 29

1. land or house -- same houses in either Threatt or
2. the Phillips matter?
3. A. I don't remember that being the case.
4. Q. Okay. How many policies did
5. Mississippi Valley have involved in the Threatt
6. matter?
7. A. I don't remember.
8. Q. Okay. Was Mississippi Valley Title,
9. in your estimation, the victim of Threatt's
10. fraudulent scheme? Or one of the victims?
11. A. We were a victim.
12. Q. Okay. In what way? Tell me how it
13. impacted your company.
14. A. Well, we had policies issued that
15. didn't correctly reflect the status of title, in
16. which we either had to cure or pay the claims.
17. Q. Okay. Who were the insureds under
18. those policies? And was there more than one with
19. regard to Threatt, more than one policy?
20. A. There was more than one. I couldn't
21. tell you who the insureds were.
22. Q. Okay. Were they lenders?
23. A. Yes. Like, national level lenders,
24. like -- it was residential properties.
25. Q. Right. I've seen some of his houses.

Page 30

1. Generally, I think they needed a lot of repair,
2. but they had high appraisals on them. Is that
3. your recollection?
4. A. I recall there being one property
5. that I saw some pictures of that needed a lot
6. of -- a lot of repairs.
7. Q. Is that the one where the tree was
8. growing through the center of the house?
9. A. I did not see that one.
10. Q. Okay. How is it that -- in the
11. Threatt case, how did it occur that Valley issued
12. a title policy on one of the Threatt's residential
13. properties where the certification title was
14. wrong?
15. A. Well, I don't know that there was a
16. certificate of title on those. But what
17. Mr. Threatt was doing is, he was playing on the
18. lag times between closings and recording of
19. instruments in between the first title search and
20. closing, and he would play on the lag time and go
21. to three different attorneys and set up three
22. different transactions, you know, in or around the
23. same time.
24. Q. You know, I don't want to impugn
25. anybody, but were any attorneys involved with him

Page 31

1. in the -- as coconspirators, for lack of a better
2. word, that you know of?
3. A. I don't know that I've ever seen any
4. facts that suggested any attorney was involved.
5. Q. I think in -- I think he's the only
6. one to have gone to jail out of whatever
7. fraudulent activity he was doing. Is that your
8. understanding as well?
9. A. That's the only one -- he's the only
10. one I'm aware of.
11. Q. Okay. Now, in the Threatt matter,
12. here's what I'm trying to find out. Were the
13. policy -- the policies or commitments issued by
14. Valley, or both?
15. A. Well, what do you mean "issued by
16. Valley"?
17. Q. Okay. Did Valley issue any title
18. commitments on any of the Threatt properties that
19. was later determined to be part of a fraudulent
20. scheme by Threatt?
21. A. Okay. I'm having trouble with the
22. "Valley" issue part of your question.
23. Q. Your employer, MVT, "issues" -- I'm
24. putting that word in quotes -- title commitments
25. on occasion, does it not?

Page 32

1. A. Yes.
2. Q. Okay. Your employer "issues" title
3. policies on occasion, right?
4. A. Yes, sir.
5. Q. Sometimes your -- that's done through
6. your company's approved agents. I put the word
7. "agent" in quotes. Correct?
8. A. That's correct.
9. Q. Okay. And I know there are certain
10. lawyers running around out there that are your
11. company's agents that have the authority to
12. actually issue commitments and policies. Correct?
13. A. That's correct.
14. Q. Okay. In the Threatt matter, did --
15. were -- what were issued? Were commitments and
16. policies issued?
17. A. I don't remember if both were issued
18. or not.
19. Q. Okay. Policies were, obviously?
20. A. That's correct.
21. Q. Okay. Were those policies issued by
22. employees of MVT or outside authorized agents with
23. MVT?
24. A. In that case, they were done by
25. issuing agents.

**Professional Court Reporting, LLC**
**601.919.8662**

## Deposition of Brad Jones

Page 33

1  Q.  Okay. Do you know who those people
2  were in the Threatt matter as you sit here right
3  now, without researching it?
4  A.  Brent Southern.
5  Q.  Okay. Now, were all of them
6  Brent Southern's, or were any other agents
7  involved? Was he the only agent involved?
8  A.  He was the only policy-issuing agent
9  from Mississippi Valley Title.
10 Q.  Okay. Were other policies issued
11 directly by Mississippi Valley Title in the
12 Threatt matter?
13 A.  Not that we're aware of.
14 Q.  Okay. Were the policies that
15 Brent Southern issued erroneous in some manner
16 with regard to their statement of title or who
17 owned the properties?
18 A.  In some of them, I remember the title
19 was not vested as it was insured to be.
20 Q.  Okay. That's what I'm trying to get
21 to. Now, what did Threatt do -- I mean, you
22 probably have told me this. What did Threatt do
23 that caused Southern to issue a policy that said
24 title was vested in someone who actually didn't
25 own the title?

Page 34

1  A.  Well, Mr. Threatt had Mr. Southern
2  check title. As I remember, at the time title was
3  checked, it was -- the title, as it was checked,
4  turned out to be, you know, as it was. And then
5  sometime after title was checked, other
6  instruments would get recorded that would make
7  title other than as it was checked.
8  Q.  Did anyone other than you work on the
9  Threatt matters, that came through your company --
10 or other people in the company?
11 A.  I feel like there were, but I don't
12 remember who.
13 Q.  Did the Threatt matter arise before
14 the company became aware that Charles Evans and
15 Chris Evans also were engaged in a fraudulent
16 scheme?
17 A.  We discovered the Threatt claims
18 before we discovered the Evans claims.
19 Q.  What was the period of time between
20 the two, to the best of your knowledge?
21 A.  I couldn't tell you. I don't
22 remember.
23 Q.  Okay. Was it like a year or
24 something like that? Months? Do you know?
25 A.  I just don't have a good memory of

Page 35

1  time frames and that kind of thing.
2  Q.  Okay. That's fair.
3  Did your company engage in any
4  inquiry when the Threatt matter arose, or when it
5  came to your company's knowledge, about steps your
6  company could take to maybe prevent similar types
7  of fraud from affecting your company?
8  A.  I don't recall doing anything.
9  Q.  Were you a certified fraud examiner
10 at the time the Threatt matter arose?
11 A.  I don't remember how the timing fell
12 on that.
13 Q.  Okay. Have you since concluded that
14 there's some step, some procedure, some system
15 your company might be able to put in place that
16 would be designed to guard against the kind of
17 fraud that was involved in the Threatt matter? Or
18 have you put any thought into it?
19 A.  I don't recall doing that.
20 Q.  Okay. Let's talk about Phillips a
21 little bit. When did that --
22 A.  Could we take a break before we get
23 to --
24   MR. LISTON: Let's take a break.
25   THE WITNESS: -- Phillips? I mean,

Page 36

1  this looks like a good transition.
2   MR. LISTON: Yes.
3   (OFF THE RECORD.)
4  MR. LISTON, CONTINUED:
5  Q.  Let's talk about the Phillips matter
6  a little bit. I just want to get the same general
7  understanding. You can talk, if you want, or I
8  can ask you individual questions. Here's what I
9  want to know. I want to know how you understand
10 Mr. Phillips' scheme worked, how it impacted your
11 company, and whether your company issued any --
12 either issued it directly or through authorized
13 agents, any commitments or policies that had some
14 information on them that ended up being erroneous,
15 such as information about who owned property or
16 who title was vested. Do you want to tell me what
17 you understand about those issues, or do you want
18 me --
19 A.  I'll let you ask the questions.
20   MR. BRABEC: I object to the form.
21 MR. LISTON, CONTINUED:
22 Q.  I'm just trying to speed it up.
23 A.  Yeah. I'll let you ask the
24 questions.
25 Q.  Okay. Tell me what you understand

Professional Court Reporting, LLC
601.919.8662

# Deposition of Brad Jones

Page 45

1  A. No. That had no effect on anything
2  with the company.
3  Q. Has anybody from the company, since
4  you obtained that certification, talked to you
5  about utilizing your training as a certified fraud
6  examiner in the course of your work with MVT?
7  A. To some extent, that's come up
8  recently.
9  Q. Okay. After the Evans matter came to
10 light?
11 A. That's correct.
12 Q. Okay. Will you tell me what
13 discussions you've had within the company -- I'm
14 not talking about with a lawyer representing you
15 in this litigation -- representing your company.
16 Okay? I'm talking about with your coworkers, what
17 discussions you've had with them on that issue,
18 including who it was you were talking to.
19 A. Mark Higdon has asked me to help
20 develop a program to mitigate our risk with
21 approved attorneys.
22 Q. Okay. Now, have you begun that work?
23 A. I have.
24 Q. Okay. Tell me how -- what you've
25 done in that regard as far as designing that

Page 46

1  program.
2  A. Developed background checks to run on
3  applicants. Helped develop application -- revise
4  or develop an application, you know, to become an
5  approved attorney. We also developed a contract
6  that we hadn't previously had so that we could --
7  you know, would have a contract with approved
8  attorneys.
9  Q. Okay. Were you involved in any of
10 the changes to the applications that approved
11 attorneys submit that results in the issuance of
12 title commitments or title policies?
13 A. I'm sorry, would you repeat that?
14 Q. Yeah.
15 A. I'm sorry.
16 Q. The company typically, as I
17 understand it, receives an application from an
18 approved attorney requesting the issuance of
19 either a commitment or a policy.
20 A. That's correct.
21 Q. Okay. It's my understanding that
22 since the Evans matter came to light, that
23 application process has changed somewhat.
24 A. That's correct.
25 Q. And my understanding of how it's

Page 47

1  changed is that now, in addition to the
2  application itself, the company requires the
3  approved attorney to attach copies of the
4  title-vesting documents upon which he relies for
5  the certification made in the application.
6  A. If my memory serves me correctly,
7  they were required to attach some documents, some
8  docu- -- some title documents like that.
9  Q. Okay. Has that application process
10 changed in any other way, to your knowledge, since
11 the Evans matter?
12 A. Mr. Fortenberry was really the one in
13 charge of that component, and -- I mean, I know
14 it's changed and that there are new applications
15 and that sort of thing, but I don't remember the
16 details of that.
17 Q. My question is, were the changes in
18 the application process that we've just talked
19 about a result of any work you did on those
20 issues, with regard to this request that you
21 employ your certified fraud examiner experience
22 and training on behalf of the company?
23 A. I'm not sure I'm following you.
24 Q. Let me ask it a simpler, better way.
25 Were the applications changed to something you

Page 48

1  devised, or someone else in the company?
2  A. Mr. Fortenberry was primarily
3  responsible for that.
4  Q. Okay. Did you work on the issue?
5  Did you work on that?
6  A. I may have reviewed them in the --
7  you know, as he was developing them, I may have
8  reviewed them a time or two, but not much work on
9  that.
10 Q. Did Mr. Fortenberry discuss with you,
11 in the course of developing the new application or
12 application process, what his thoughts were as to
13 how this might help solve some problems?
14 A. I had -- recall some brief discussion
15 with him, but I don't recall anything about how it
16 would affect the Evans situation.
17 Q. Well, what do you remember
18 Mr. Fortenberry saying, if anything, with regard
19 to how a new application or new application
20 process would benefit the company?
21 A. I really don't remember much of
22 anything he said. I mean, I do -- I do remember
23 that the certificate was going to be addressed
24 directly to Mississippi Valley Title as opposed to
25 being addressed to an issuing agent.

## Deposition of Brad Jones

25 (Pages 97 to 100)

Page 97

1  A.  No, not that I'm aware of.
2  Q.  It's more of a subjective analysis,
3  then, right?
4  A.  That's correct.
5  Q.  Okay. And essentially -- I'm just
6  trying to boil this down. What you want to see
7  are people with clean records, right?
8  A.  That's correct.
9  Q.  Right. And if there's too many
10 negative things that come up from these searches,
11 then some subjective determination is made that,
12 you know, maybe that -- a possibility that that
13 person is an unsavory character, and we might not
14 need to associate ourselves with him?
15 A.  I think that's fair.
16 Q.  Okay. All right. Let me ask you
17 about a few things, because I'm badly wanting to
18 go to lunch, which means I want this deposition to
19 end. As I understand it -- well, let me start
20 here. You've certified -- become certified as a
21 fraud examiner, right?
22 A.  That's correct.
23 Q.  You participated in measures that MVT
24 is now putting in place to try to guard on the
25 front end against fraud occurring by qualifying

Page 98

1  the approved attorney process. Fair?
2  A.  I'm not sure I understand that, but...
3  Q.  Well, you've instituted these
4  background checks, revised application contract
5  with the approved attorney. That's obviously for
6  some purpose, right?
7  A.  Right. I mean, it's to check the
8  applicants out, see if they're worthy to be on the
9  list.
10 Q.  Check the character of the people
11 that want to become approved attorneys?
12 A.  That's correct.
13 Q.  Okay. Because you figure if people
14 are of good character, they might not defraud us?
15 A.  That's correct.
16 Q.  Okay. Before these things were put
17 in place, as I understand it from the depositions
18 that have already occurred, MVT did not have any
19 system or procedure in place to verify that the
20 information being given to it by an approved
21 attorney with regard to title was, in fact,
22 accurate.
23 A.  I mean, that's outside of my realm of
24 what I do. I don't know.
25 Q.  That's fair. That's fair. Has any

Page 99

1  discussion ever occurred, to your knowledge,
2  within MVT, of auditing the approved attorneys'
3  escrow accounts from time to time?
4  A.  That -- I mean, I've heard mention
5  that we don't audit. I don't know that I've heard
6  a lot beyond that.
7  Q.  Has anyone suggested they should be
8  audited?
9  MR. BRABEC:  You mean anybody
10 in-house or besides your client?
11 MR. LISTON:  In-house.
12 THE WITNESS:  Yeah.
13 MR. LISTON, CONTINUED:
14 Q.  In-house at MVT.
15 A.  I don't know. Maybe -- I mean, I
16 don't know if anybody's suggested that they be
17 audited or not. We're not currently auditing.
18 Q.  Right. Do you know of any reason why
19 that could not be done from time to time? "That"
20 being auditing an approved attorney's escrow
21 account.
22 A.  I mean, that's -- I mean, I don't
23 know if we have the right to do that or not. You
24 know, in the past, we haven't had a contract with
25 the approved attorneys, and so I don't know if we

Page 100

1  have a right to do that or not.
2  Q.  Yeah, but you could put it in some
3  sort of contract, couldn't you? Couldn't you say
4  to an approved attorney, "Look, if you want to
5  associate with us as an approved attorney from
6  time to time, you let us audit your escrow
7  account"?
8  A.  I mean, you can put anything you
9  wanted to in a contract.
10 Q.  Right. But is any -- that -- is
11 there any reason that could not have been done
12 before the Charles Evans matter arose, that you
13 know of?
14 A.  I mean, you know, I don't know, you
15 know, what the company considered before that
16 arrised or what they were thinking or, you know,
17 what constraints would have been there or anything
18 like that.
19 Q.  Now, I'm not asking you to speak on
20 behalf of the company. I want you to understand
21 that. I'm just asking you as an individual, based
22 on your experience, do you know of any reason why
23 the company could have -- could not have
24 instituted a system whereby escrow accounts of
25 approved attorneys were audited from time to time

## Deposition of Brad Jones

26 (Pages 101 to 104)

Page 101

1 before, let's say, 2006?
2  A.  Well, you know, like I said before,
3 before then, we did not have a contract or any --
4 you know, to my knowledge, we didn't have a right
5 to do that.
6  Q.  But you could have if you wanted it,
7 couldn't you? I mean, they don't have a right to
8 be an approved attorney, but if they want to be
9 one, you can put certain conditions on there,
10 right?
11  A.  I guess they -- I mean, you're -- I
12 guess they could do whatever they wanted to do,
13 you know, as long as they had a right to do it.
14  Q.  Okay. What about auditing the files
15 of approved attorneys, have you ever heard anyone
16 at MVT discuss a system or proposed system whereby
17 from time to time, an MVT representative would go
18 into an approved attorney's office and select
19 files on property transactions which your company
20 had insured and just go through those files, see
21 what's in there?
22  A.  I'm sorry, your question in that is,
23 what have I heard?
24  Q.  Yeah. Has there been any discussion
25 of a system that, to your knowledge, within MVT?

Page 102

1  A.  And -- I mean, I don't know. There
2 may have been.
3  Q.  Okay. Do you recall anything
4 specific, or...
5  A.  No, I'm saying I don't -- I'm not
6 recalling a discussion of that sort.
7  Q.  Okay. Is there any reason that you
8 know of why a system like that could not have been
9 put into place at least two years before the
10 Charles Evans matters came to light?
11  A.  I mean, again, we didn't have a
12 contract with them, so...
13  Q.  Do you know the analogy in my mind?
14 NFL. Guys don't have a right to play in the NFL,
15 do they? And then the NFL drug tests them, right?
16 I mean, they don't have to take a drug test, but
17 they do if they want to play in the NFL. That's
18 probably a bad analogy compared to the facts of
19 this case, but what I'm saying is, if MVT wanted
20 to -- the lawyers don't have a right to become an
21 approved attorney. Couldn't MVT say you can be an
22 approved attorney on the condition that you let us
23 audit your escrow account, you let us audit your
24 files from time to time, couldn't you?
25     MR. BRABEC: Object to the form. NFL

Page 103

1 is a monopoly.
2 MR. LISTON, CONTINUED:
3  Q.  I mean, if you want to put a system
4 in place, you couldn't have done it, right? I
5 want to know what you have to say about that. Why
6 couldn't you?
7  A.  I mean, I -- I mean, I guess they
8 could have done whatever they wanted to do as long
9 as they had a right to do it.
10  Q.  Right. Contractually or otherwise?
11  A.  Right.
12  Q.  Okay. Do you know of any reason why
13 that could not have been done, presuming you --
14 the contractual right was there?
15  A.  I mean, I don't -- I don't -- I don't
16 know what was going on at that time.
17  Q.  Okay. Now MVT requires the
18 attorneys -- approved attorney to attach copies of
19 vesting documents to its applications, right?
20  A.  I believe that's correct.
21  Q.  Okay. Any reason why that could not
22 have been done at least two years before the
23 Charles Evans matter arose, that you know of?
24  A.  I don't -- I don't know.
25  Q.  Okay. Has MVT ever requested the

Page 104

1 approved attorney to produce, along with an
2 application, copies of abstracts or title --
3 actual title research work that was done to
4 support his certification opinion?
5  A.  I don't -- I don't know.
6  Q.  Do you know of any reason why that
7 could not have been done at least a couple of
8 years before the Charles Evans matter arose?
9  A.  Any reason that what could not have
10 been done?
11  Q.  Tell the attorney that in addition to
12 an application for a commitment or a policy, you
13 also have to produce the abstract you rely on or
14 other actual title research whereby you arrive at
15 your opinion as to who owned the title.
16     MR. BRABEC: Object to the form.
17 That's well beyond his expertise. But if he
18 knows, he can answer.
19 MR. LISTON, CONTINUED:
20  Q.  I'm just asking is it done, has it
21 been discussed, do you know of any reason it
22 couldn't have been done two years before the Evans
23 matter arose?
24     MR. BRABEC: And I object to the
25 form. It's compound.

Professional Court Reporting, LLC
601.919.8662

## Deposition of Brad Jones

Page 105

1  MR. LISTON: No, it's not.
2  MR. BRABEC: It's three separate
3  questions
4  MR. LISTON: I'm trying to get to
5  lunch.
6  THE WITNESS: I mean, that's really --
7  I mean, you know, it's outside of what I do, and I
8  don't really know.
9  MR. LISTON, CONTINUED:
10  Q. You just don't have anything
11  responsive to that question today, right?
12  A. I mean, I -- you're talking about
13  something that's outside of what I work on, and
14  I
15  Q. Okay That's fair. That's fair.
16  Now, are you aware with this policy --
17  I've seen it in writing in some of the MVT stuff --
18  that an approved attorney is not supposed to have
19  an interest in the transaction on which the
20  approved attorney is certifying title?
21  A. There may be something to that. I
22  don't -- I don't know what you're -- you know,
23  what you're speaking of, but there may be
24  something to that effect.
25  Q. Okay. Have you ever heard that

Page 106

1 within MVT?
2  A. I may have
3  Q. Okay Is there any rule that you've
4 ever heard within MVT or any policy -- I don't
5 want to get wedded to the rule thing -- that we
6 don't need to issue policies when a family member
7 of the approved attorney has an interest in that
8 transaction, and the approved attorney is
9 certifying the title?
10  A. I mean, I don't -- I don't -- I can't
11 recall those discussions, if there were any
12  Q. Okay. We don't have the exhibits
13 with us that we had at some of those prior depos.
14 This is a copy of that affidavit. I think we made
15 it Exhibit 2
16  A. Could we --
17  Q. You want to take a break?
18  A. Yeah.
19  (OFF THE RECORD.)
20  MR. LISTON: Let's make this Exhibit
21 1 to his deposition
22  (EXHIBIT NO. 1 WAS MARKED FOR THE RECORD.)
23 MR. LISTON, CONTINUED:
24  Q. All right Do you recognize this
25 document?

Page 107

1  A Yes
2  Q. Okay It purports to be an affidavit
3 that you signed under oath, correct?
4  A. That's correct.
5  Q. Do you recall -- and it's got
6 exhibits attached to it, I think A through G. Is
7 that correct?
8  A. It appears to be correct
9  Q. Okay Now, what was the purpose of
10 filing this?
11  A. I think you'd have to talk to the law
12 firm about why they needed -- they needed to file
13 this, and they asked me to --
14  MR. BRABEC: Don't --
15  THE WITNESS: -- you know, asked me
16 to --
17  MR. BRABEC: Don't talk about --
18  THE WITNESS: Okay
19  MR. BRABEC: -- what -- communications
20 between the lawyers
21 MR. LISTON, CONTINUED:
22  Q. Yeah, I don't want to know about your
23 communications with --
24  A. Okay.
25  Q. Well, here's my -- here's why I asked

Page 108

1 the purpose. You see at the top, it's got some
2 coded information that I'll represent to you is
3 the kind of information you see on PACER
4 documents. You see?
5  A. That's correct.
6  Q. Okay. And when I looked it up on
7 PACER, I didn't see any motion that this was --
8 this affidavit was connected to. Usually when you
9 see an affidavit filed, you see it in support of
10 some motion. Do you know what it was connected
11 to? Was it connected to some motion?
12  A. I don't know.
13  Q. Okay You just know you were asked
14 to execute it?
15  A. That's correct.
16  Q. All right Did you prepare it, or
17 did someone prepare it for you?
18  A. I think it -- I may have had a role
19 in preparing it, but I think it may have been
20 prepared, to some extent, by someone else, too
21  Q. Okay I'm sure it was based on some
22 information you gave the person that prepared it
23 Fair?
24  A. Based on some documents.
25  Q. Okay. Did you review and read this

## Deposition of Brad Jones

28 (Pages 109 to 112)

### Page 109

1 affidavit before you signed it?
2   A.   I did.
3   Q.   Okay. Did you review the exhibits
4 attached to it before you signed the affidavit?
5   A.   I reviewed them at some point.
6   Q.   Okay. And you signed this under
7 oath, correct?
8   A.   That's correct.
9   Q.   Now, on the first paragraph of it, it
10 says number 1. Do you see that?
11   A.   Yes.
12   Q.   It says you're making this affidavit
13 on your own personal knowledge.
14   A.   That's correct.
15   Q.   Is that, in fact, true?
16   A.   That's correct.
17   Q.   You do have personal knowledge of the
18 matters alleged in this affidavit?
19   A.   Well, from my investigation of what
20 is going on, yes, sir.
21   Q.   Okay. That's fair. You investigated
22 these things, right?
23   A.   Right. Or I had been investigating.
24   Q.   And this affidavit is consistent with
25 what you determined in your investigation?

### Page 110

1   A.   That's correct.
2   Q.   All right. Now, there's several
3 parts of it, and I'm going to try to ask a global
4 question, just skip over going through things in
5 detail. There's several parts of this affidavit
6 -- and do you want to -- do you want to read
7 through this? Or have you before today?
8   A.   I haven't read it in some -- quite
9 some time, probably since we did it.
10   Q.   Okay. If you need to read it to
11 answer this question, that's fine, you can do it.
12   A.   Okay.
13   Q.   There's several parts of this
14 affidavit that allege that Jon Christopher Evans
15 and his brother, Charles H. Evans, were involved
16 in a fraudulent scheme as described in this
17 affidavit. Okay?
18   A.   Okay.
19   Q.   You would agree with that?
20   A.   Probably so.
21   Q.   Okay. And is it fair to say, then,
22 it's, in fact, your opinion and was your written
23 testimony, for lack of a better word, in this
24 affidavit that the Evans brothers were, in fact,
25 engaged in a fraudulent scheme?

### Page 111

1   A.   That's correct.
2   Q.   Okay. And this will skip a bunch of
3 questions, too. If you need to read the
4 affidavit, fine. Does this affidavit make out
5 what you understood to be the details, the
6 methods, the modus operandi of the fraudulent
7 scheme in which the Evans brothers were engaged?
8   A.   The affidavit is intended to reflect
9 the scheme that they were involved with. And it
10 didn't -- it doesn't detail everything, but it
11 gives some examples.
12   Q.   I got you. That's a fair answer.
13 Look at Paragraph No. 8, please, sir. It says,
14 "Mississippi Valley Title relied on the title
15 certificates provided by Charles H. Evans, Jr., to
16 issue over 100 title insurance policies to various
17 lenders." Fair?
18   A.   Okay.
19   Q.   Okay. Did I read it correctly?
20   A.   I didn't follow you word for word,
21 but I think so.
22   Q.   All right. It says what it says. We
23 can agree to that?
24   A.   Yeah.
25   Q.   Now, what's the date range? Do you

### Page 112

1 know a date range on those 100 title insurance
2 policies? I know they ended sometime around
3 September 1, 2009. What's the earliest date, that
4 you know of, that one of these 100 title insurance
5 policies came into being?
6   A.   I don't recall specifically, but I'm
7 thinking maybe a four to six-year timeframe.
8   Q.   If that's your best answer, I'll live
9 with it. If there's something in the document you
10 want to reference, take your time.
11   A.   You know, that's the best answer I
12 can come up with, but, of course, I stand to be
13 corrected on that.
14   Q.   Okay. Take a look at Paragraph No. 10,
15 please, sir.
16   A.   Okay.
17   Q.   Paragraph No. 10 says, "Each of
18 the business entities obtaining loans based on
19 these title insurance policies and to whom loan
20 proceeds were disbursed was on and/or controlled
21 by Jon Christopher Evans and/or Charles H. Evans,
22 Jr." And I'm going to stop there, because that's
23 all I want to ask you about. All right?
24   A.   Okay.
25   Q.   Now, do you have information that