## Deposition of James Partin

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

JON CHRISTOPHER EVANS            Case No. 09-03763-NPO
AND JOINTLY ADMINISTERED
RELATED CASES

DEBTORS.                                    Chapter 7

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

G&B INVESTMENTS, INC.                       PLAINTIFF

V.                    ADV. PROC. NO. 10-00040-NPO

DEREK A. HENDERSON, TRUSTEE
FOR THE BANKRUPTCY ESTATE OF
JON CHRISTOPHER EVANS, ET AL.               DEFENDANTS

\*\*\*\*\*\*\*\*\*\*

30(b)(6) DEPOSITION OF
MISSISSIPPI VALLEY TITLE INSURANCE COMPANY,
THROUGH ITS REPRESENTATIVE,
JAMES D. PARTIN

Taken at the offices of
Adams and Reese,
111 Capitol Street, Suite 350,
Jackson, Mississippi,
on Tuesday, November 23, 2010,
beginning at approximately 9:00 a.m.

\*\*\*\*\*\*\*\*\*\*

APPEARANCES NOTED HEREIN

CHRISTY R. SIEVERT, CSR, RPR
C. BETHANY CAMMACK, CSR
PROFESSIONAL COURT REPORTING, LLC
Registered Professional Reporter
Certified Shorthand Reporter
Mississippi CSR No. 1421
Post Office Box 320928
Jackson, Mississippi 39232-0928
www.procourtreporting.com

COPY

EXHIBIT
9

## Deposition of James Partin

2

```
 1                   APPEARANCES
 2
    COUNSEL FOR MISSISSIPPI VALLEY TITLE
 3  INSURANCE and OLD REPUBLIC NATIONAL
    TITLE INSURANCE COMPANY:
 4
       MR. POWELL G. OGLETREE, JR.
 5     MR. WILLIAM C. BRABEC
       MR. M. SCOTT JONES
 6     Adams and Reese, LLP
       111 East Capitol Street, Suite 350
 7     Jackson, Mississippi  39201
 8     MR. DAVID CLARK
       Bradley, Arant, Boult & Cummings
 9     Post Office Box 1789
       Jackson, Mississippi  39215
10
11  COUNSEL FOR BANK OF FOREST:
12     MR. W. LAWRENCE DEAS
       Deas & Deas
13     Post Office Box 7282
       Tupelo, Mississippi  38802
14
15  COUNSEL FOR MERCHANTS & FARMERS BANK:
16     MR. JEFF D. RAWLINGS
       Rawlings & MacInnis
17     1296 Highway 51
       Madison, Mississippi  39110
18
19  COUNSEL FOR CHARLES EVANS:
20     MR. TERRY R. LEVY
       Daniel, Coker, Horton & Bell
21     4400 Old Canton Road, Suite 400
       Jackson, Mississippi  39211
22
    COUNSEL FOR G&B INVESTMENTS, INC.:
23
       MR. DALE DANKS, JR.
24     MR. MICHAEL CORY
       Danks, Miller & Cory
25     213 South Lamar Street
       Jackson, Mississippi  39201
```

**Professional Court Reporting, LLC**
**601.919.8662**

## Deposition of James Partin

```
 1
    COUNSEL FOR HERITAGE BANK:
 2
       MR. MICHAEL SIMMONS
 3     Cosmich, Simmons & Brown
       The Plaza Building
 4     120 North Congress Street, Suite 400
       Jackson, Mississippi 39201
 5
 6  ALSO PRESENT:
 7     DONALD JOSEPH BRATA
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Deposition of James Partin

25

```
 1       A.      I think -- Item 2 and Item 3, I think
 2  I mentioned.
 3       Q.      Okay.  Can you explain how
 4  Mississippi Valley considers Bank of Forest not to
 5  have complied or fulfilled the requirements of
 6  Item 2?
 7       A.      As I understand, Bank of Forest sent
 8  the loan proceeds to Charles Evans, and Charles
 9  Evans may not have actually transmitted the loan
10  funds to the borrower.
11       Q.      Do you know where Mr. Evans
12  transferred the loan proceeds?
13       A.      They were all commingled in his
14  escrow account, and I think a lot of people are
15  still looking to where those funds went.
16       Q.      I think that's true.
17               Do you have any knowledge -- or does
18  Mississippi Valley have any knowledge as to where
19  the consideration -- or loan proceeds may have
20  been sent, if not to the borrower?
21       A.      No.  They were all commingled in
22  Evans' escrow account and checks were -- you know,
23  I can tell you that checks were flying out of
24  there for all kinds of different things, including
25  interest payments and apparently personal
```

**Professional Court Reporting, LLC**
**601.919.8662**

**Deposition of James Partin**

1   expenses.

2       Q.      Is there any document or other

3   evidence, that you're aware of on behalf of the

4   company now, that this -- these loan proceeds

5   didn't get to the borrower?

6       A.      I don't think the borrower ever had

7   an account.  I don't think I've ever seen a -- we

8   would have to go back and look, but I don't think

9   we've ever seen a check to Hanover -- I'm sorry,

10  White Oaks.

11      Q.      Item 3, mechanics' or materialmen's

12  liens.  Can you explain to me how Mississippi

13  Valley feels Bank of Forest failed to comply with

14  the requirements of Item 3?

15      A.      We required an affidavit from the

16  borrower and did not get that affidavit.

17      Q.      When you say "affidavit," you just

18  mean an owners and -- owners and contractors

19  affidavit?

20      A.      Of no construction.

21      Q.      One of the three sisters documents

22  that are generally signed at every closing?

23      A.      I don't know what the three sisters

24  are, but the affidavit stating that there's no

25  construction on the property for a certain period

## Deposition of James Partin

1    that a particular entity is vested in title other

2    than, if you comply with the requirements of the

3    commitment, we will issue a policy pursuant to

4    whatever exceptions are not complied with.

5        Q.      In this particular instance, the 2009

6    White Oaks loan, Charles Evans prepared a

7    certificate of title and sent it to Mississippi

8    Valley, correct?

9        A.      Correct.

10       Q.      And Mississippi Valley took the

11   information from that certificate of title and

12   put it in their commitment and sent it back to

13   Charles Evans to be delivered to Bank of Forest;

14   is that right?

15               MR. JONES:  Mr. Fortenberry testified

16   on all this stuff, too.  I'll give you -- if

17   you're just setting up a question, that's fine,

18   but he testified as to all this last week.

19               THE WITNESS:  I believe that's what

20   Mr. Fortenberry testified to, yes.

21   MR. DEAS, CONTINUED:

22       Q.      Sitting here, can you think of any

23   way that the proposed insured in this instance,

24   the Bank of Forest, could have known that the

25   written statement in Mississippi Valley's

**Deposition of James Partin**

1    commitment, the fee simple title, in the land

2    vested in G&B Investments was inaccurate, other

3    than doing another title search?

4         A.     They could have asked Chris or

5    Charles Evans, I think.

6         Q.     So -- and Charles being the one who

7    issued the flawed certificate of title to

8    Mississippi Valley in the first place?

9         A.     Yes.

10        Q.     Other than that, can you think of any

11   way they might have known?

12        A.     They might have called G&B and asked

13   them if they were going to give a deed for this

14   property.

15        Q.     Fair enough.  Mississippi Valley has

16   taken the position with several pleadings, and I

17   think in Mr. Fortenberry's deposition, that this

18   commitment is not a statement of the quality of

19   title or an abstract of title, based on a -- on a

20   condition, No. 4 on page 2.  If I could get you to

21   look at Condition 4.

22        A.     (Reviews document.)  Yes.

23        Q.     They've cited that.  Now, do you have

24   any knowledge as to why that condition was

25   included in the condition language in these

**Deposition of James Partin**

1    as a party?

2        A.      I don't know that that's the case.

3    G&B -- it probably would have been best practice

4    to include G&B.  But I think we did defend against

5    the G&B claims, and now those claims have been

6    resolved.

7        Q.      Those claims have been resolved now,

8    in 2010, right?

9        A.      Yes.

10       Q.      Okay.  By way of the title resolution

11   order entered last month?

12       A.      And the trustee's settlement with

13   G&B.

14       Q.      Okay.  And I guess my -- and I

15   appreciate that, but I guess my -- maybe my

16   question was bad, and I'll try to ask it again.

17               How did Mississippi Valley intend to

18   cure the title deficiencies, or title issues, with

19   regard to the 2008 White Oaks collateral without

20   including all the parties who had lawsuits pending

21   of record related to that parcel?

22               MR. JONES:  And I would object to the

23   extent that it calls for revealing any

24   attorney-client privilege regarding matters that

25   our law firm was retained to handle.  You can ask

**Deposition of James Partin**

1   him about communications that they may have had

2   with Gene Berry or Todd Burwell, who was retained

3   for the Bank of Forest, but I don't believe you're

4   entitled to any curative actions that our law firm

5   has been involved in.

6   MR. DEAS, CONTINUED:

7       Q.      Was Adams & Reese working for

8   Mississippi Valley Title with regard to these

9   claims at the time that Gene Berry filed the

10  lawsuit attempting to cure the problems with the

11  2008 White Oaks loan?

12              MR. JONES:  What was the date of that

13  lawsuit?  Do you have it?

14              MR. DEAS:  I believe it was September

15  the 19th or so, 2- -- September 24th, maybe.

16  Somewhere right in that area, 2009.

17              MR. JONES:  I can stipulate we filed

18  an action against Charles Evans on September 18th.

19  How about that?

20  MR. DEAS, CONTINUED:

21      Q.      I don't -- I don't -- if that's -- if

22  that's the case, that Adams & Reese was working

23  for Valley at that point in time, I don't want to

24  know anything about Valley's communications with

25  Adams & Reese.  What I'm asking is -- well, what

## Deposition of James Partin

```
 1    MR. DEAS, CONTINUED:

 2         Q.     What's the -- what's the total amount

 3    of the bond?

 4         A.     75 million over a $5 million

 5    retention.

 6         Q.     So it -- in layman's terms,

 7    $5 million self-insurance?

 8         A.     Yes.

 9                MR. DEAS:  That's all I have for you.

10    Thank you, Mr. Partin.

11                THE WITNESS:  You're welcome.

12                     EXAMINATION

13    BY MR. CORY:

14         Q.     Mr. -- is it Partin?  I wasn't here

15    when --

16         A.     Yes.

17         Q.     Did I pronounce that correctly?

18         A.     Yes.

19         Q.     I'm Michael Cory, and I represent

20    G&B, and I just have a few questions for you this

21    morning.  Or this afternoon now.

22                Generally speaking, can you tell me

23    what -- just in very general terms, what the

24    purpose of an owner's title insurance policy is?

25         A.     It's to ensure owner's title.
```

## Deposition of James Partin

```
 1       Q.      Does an owner's title insurance
 2  policy -- is there some point in time or some
 3  event that occurs when the coverage obligations
 4  terminate under an owner's policy?
 5       A.      Yes, and --
 6       Q.      That may be too --
 7       A.      Yes and no.  Not necessarily by
 8  operation of the policy.  But in general terms,
 9  the policy protects the insured while they own the
10  property, and if they sell the property, it may
11  protect them against any warranty claims against
12  that insured.
13              Implicit in that is that if they sell
14  it, for instance, by quitclaim deed, there's very
15  little potential or no potential for any warranty
16  claim.  So not necessarily as a part and parcel of
17  the policy, but there would not be any potential
18  for claims at that point.
19              Also, the policy has certain company
20  exceptions, exclusions, and things like that that,
21  even while the owner is still in title, may
22  exclude coverage.  It's, frankly, a complicated
23  document, and as you might have heard, you just
24  have to look at the facts of each individual
25  property and transaction to determine whether
```

## Deposition of James Partin

1    there is coverage.

2         Q.     But there are -- there is coverage

3    that may survive even after the owner transfers or

4    sells or conveys title to the insured property?

5         A.     Yes.

6         Q.     In this particular case with G&B,

7    did -- an owner's policy was issued to G&B for

8    property that was sold literally at the same

9    time -- or simultaneous with the -- I mean, the

10   policy issued actually after the fact on a land

11   transaction where the owner was selling the

12   property, so the -- were you aware of that in this

13   particular case?

14              MR. BRABEC:  Object to the form.

15              THE WITNESS:  Even though the policy

16   may have been issued after the transaction, the

17   effective date of the policy, I believe, was a day

18   or two before the transaction where G&B sold

19   the property.

20   MR. CORY, CONTINUED:

21        Q.     And my question -- I'm not trying to

22   say when it was effective or not effective.  But

23   you're aware that in this case, the owner's policy

24   was issued to an owner for a transaction where the

25   owner was selling at essentially the same time the

**Deposition of James Partin**

1  policy was issued?

2       A.     No, it was issued with an effective

3  date prior to the date of the transaction where

4  the insured sold it.  The key in any title

5  insurance policy is the effective date.  Anything

6  that happens -- generally speaking, with few

7  exceptions, whatever happens after the effective

8  date is not covered.

9       Q.     Is it normal to issue -- so there's

10  nothing unusual about an owner's policy being

11  issued the day before a transaction, then?

12      A.     Yes, it is unusual.

13      Q.     Tell me what makes that unusual, in

14  your mind.

15      A.     Well, if an insured gets an owner's

16  policy, they typically get it when they buy the

17  property, when they acquire the property.

18      Q.     And I'm going to ask you to

19  speculate, but -- so I may get an objection as

20  well on that.  But what would be the reasons you

21  might see, other than just a scrivener's error on

22  the date, that an owner's policy would be issued

23  the day before the closing date, like we had here?

24  Or are you aware of any other reason that that

25  might occur other than in error?

## Deposition of James Partin

1        A.        Not necessarily a scrivener's error.

2    I mean, we understand the policy was issued with

3    the effective date of -- I think it was July 22nd.

4    And it's just very unusual for a policy to be

5    issued that late in the ownership.

6        Q.        Have you ever seen -- in your

7    experience, have you ever seen an owner's policy

8    issued to an owner within 24 hours of the closing

9    of a transaction where the owner actually vested

10    himself of title?

11        A.        No, I haven't.

12        Q.        Do you -- does -- do you have any

13    information or does Valley have any information or

14    knowledge as to why that was done in this case?

15        A.        I don't have any knowledge.  I've

16    seen some speculation that there was some problem

17    that there was -- that somebody at Watkins & Eager

18    suggested it might be advantageous to get an

19    owner's policy.

20        Q.        Now, as far as the protection that

21    the policy provides in a situation like we have

22    here where G&B sold the policy the next day --

23        A.        Sold the policy?

24        Q.        I mean, sold the property,

25    transferred the title to the property the day

**Deposition of James Partin**

138

```
 1        A.       I'm not sure who closed that
 2  transaction.  Seems to me that there were several
 3  other lawyers involved.  I know McGlinchey was
 4  involved.  There was another firm, I believe.  I'm
 5  not sure who actually closed that transaction.
 6  Watkins & Eager issued the owner's policy.
 7                        EXAMINATION
 8  BY MR. SIMMONS:
 9        Q.       Good afternoon.  I'm Mike Simmons.  I
10  represent Heritage Banking Group, and I've got
11  some questions for you.
12                   Were you involved at all in
13  investigating or adjusting the claim made by
14  Heritage Bank under the lender's title policy?
15        A.       Generally speaking, yes.
16        Q.       Okay.  Can you tell me what your
17  involvement was?
18        A.       Really, it was fairly routine.  We
19  decided to pay the claim under the policy and got
20  an appraisal and paid Heritage Bank $430,000.
21        Q.       Do you have an understanding of what
22  the title defect was?  And this is a loan from
23  Heritage Bank to Twinbrook Run Development
24  Company, LLC, which was an entity owned by
25  Jon Christopher Evans.  Do you have an
```

## Deposition of James Partin

139

 1  understanding of the problem with the title in

 2  that matter?

 3       A.       Honestly, I don't remember, although

 4  I think there was a prior lien.

 5       Q.       Okay.

 6       A.       Generally.

 7       Q.       As I understand it, the title to

 8  that tract, which I think has been variously

 9  identified -- and in this action, we're calling it

10  Tract T-6.  Title to that particular tract went

11  from G&B to Hanover to Lansdowne Group, and then

12  Lansdowne Group gave the deed of trust to

13  BankFirst, but title was never conveyed to

14  Twinbrook Run Development.  Does that sound

15  familiar?

16       A.       Yes.

17       Q.       Okay.  Under the title policy issued

18  to Heritage Banking Group -- I've got a copy of it

19  here, if you'd like.  It's not a very good copy,

20  but it's. . .

21               Under this title policy, it's my

22  understanding there is -- there are a variety of

23  provisions within the policy under which

24  Mississippi Valley Title can pay a claim.  Is that

25  generally correct?

## Deposition of James Partin

149

1    agree you're not insuring that the bank is not

2    going to lose money on its loan to its borrower,

3    correct?

4    A.    Generally speaking, that's correct.

5    We insure the value of the property, not the

6    payment of the loan in full.  If that's what

7    you're asking.

8    Q.    That's exactly what I was asking.

9    The -- would you agree that the

10   security, that being the property that was subject

11   to the loan from Heritage to Twinbrook Run

12   Development, from Heritage Bank's perspective, the

13   title was worth nothing, correct?

14   A.    For the sake of this payment, we

15   assumed it was worth nothing, as effected by the

16   other lien and the title defect.

17   Q.    And it was never worth anything,

18   correct?

19   A.    Not necessarily.  If the Evanses had

20   paid off the prior lien, it would have been worth

21   the value of whatever it was worth.

22   Q.    But they -- as far as you know, they

23   did not pay off the prior lien, did they?

24   A.    I believe that's correct.

25   Q.    And Twinbrook Run Development -- you

## Deposition of James Partin

 1   agreed with me at the beginning of my questioning,

 2   Twinbrook Run Development never had any interest

 3   in this property, correct?

 4        A.      I believe that's correct.

 5        Q.      So from the title company's

 6   perspective, Twinbrook Run Development couldn't

 7   convey anything as to this property, could it?

 8   Deed of trust, for example?

 9        A.      It could, but it wasn't effective to

10   create a lien.

11        Q.      Wasn't that the purpose of a deed of

12   trust, to create a lien?

13        A.      Yes.

14             MR. SIMMONS:  That's all I have.

15   Thank you, sir.

16             MR. BRABEC:  Let's take a break.

17                (OFF THE RECORD.)

18             MR. CLARK:  I'm David Clark, and I'll

19   be representing Mississippi Valley Title with

20   respect to the questioning that M&F Bank does.

21   So. . .

22             MR. RAWLINGS:  We're ready?

23             MR. CLARK:  And we have -- also,

24   Mr. Partin is designated for just certain of the

25   items in Merchants & Farmers Bank's 30(b)(6)

**Deposition of James Partin**

1      A.      But we have not precluded any

2  additional claims.  We'll look at anything.  This

3  is an ongoing matter.  It always is in these types

4  of situations.

5      Q.      Are you aware of any Mississippi

6  Valley or Old Republic procedures that were

7  breached or controls that were -- that failed in

8  this transaction, in the Town Park transaction,

9  as relates to the policy that was issued?

10              MR. CLARK:  I'm not sure that's

11  within the -- what he's been designated for.  But

12  if he has other information --

13              MR. RAWLINGS:  That has to do with

14  the claims process.

15              COURT REPORTER:  I'm sorry?

16              MR. RAWLINGS:  That has to do with

17  the claims process.

18              THE WITNESS:  I'm not aware of any.

19  MR. RAWLINGS, CONTINUED:

20      Q.      Do you have an opinion as to how the

21  claims could have been prevented?

22      A.      There would have been additional

23  procedures.  And that is something that

24  Mississippi Valley, I think, is now addressing.

25  But the truth of the matter is, fraud is fraud,

**Deposition of James Partin**

1   and no matter what procedures you put in place,

2   fraudsters seem to find a way to get around them

3   and defraud people.  So even though we put new

4   procedures in place, people like Charles Evans are

5   going to constantly be finding ways to get around

6   those procedures.

7        Q.      Well, that sounds like something more

8   than negligence.  Is there an allegation of fraud

9   on your -- on the part of MVT as to Mr. Evans?

10       A.      Yes, that's part of our situation.

11       Q.      And I think counsel previously

12  touched on a question that I wanted to address.

13  What part of the Town Park transaction in

14  particular would have been a forgery?

15              MR. CLARK:  Object to the form.

16              THE WITNESS:  I don't recall the

17  specifics of the -- you're talking about the

18  Merchants & Farmers deed of trust, a forgery in

19  that?

20  MR. RAWLINGS, CONTINUED:

21       Q.      Yes, sir.  In the transaction itself.

22  And I'll give you some predicate facts.  At the

23  time that M&F took its deed of trust, that we've

24  all discovered that Hanover was the title owner,

25  and the corrective deed that you addressed earlier

## Deposition of James Partin

```
 1    companies do things to mitigate losses under the
 2    claims process, correct?
 3          A.      You mean to mitigate exposure?
 4          Q.      Front-end prevention, so to speak.
 5          A.      Yes.
 6          Q.      Would audits be considered part of
 7    that process?
 8          A.      It is in some cases.
 9          Q.      When does Mississippi Valley conduct
10    an audit?
11          A.      Well, Mississippi Valley didn't have
12    any processes to audit approved attorneys.
13                  COURT REPORTER:  Audit -- I'm sorry?
14                  THE WITNESS:  Approved attorneys.
15    MR. RAWLINGS, CONTINUED:
16          Q.      Do you now?
17          A.      I'm not sure.  That's --
18                  MR. CLARK:  Objection.  I don't know
19    that that's --
20                  THE WITNESS:  That's something that I --
21                  MR. CLARK:  -- an area of his
22    designation.
23                  But go ahead, you can answer.
24                  THE WITNESS:  I don't know.  That's
25    something that I think Mr. Fortenberry spoke to.
```

## Deposition of James Partin

1   I've not investigated that.

2   MR. RAWLINGS, CONTINUED:

3       Q.      Now, you've said there are -- there's

4   no audit process for an approved attorney?

5       A.      There was, at the time of these

6   transactions, no audit process, that's correct.

7       Q.      All right.  And at the time of these

8   transactions, was there an audit process in place

9   for agents?

10      A.      I believe so.  But again,

11  Mr. Fortenberry would speak to that.

12      Q.      You have no information or knowledge

13  of the audit process?

14      A.      No.

15              MR. CLARK:  That's also not his area

16  of designation.

17              THE WITNESS:  I've not investigated

18  that.

19              MR. RAWLINGS:  Well, I disagree.

20  Number 1, which is one of the ones that he's a

21  co-designee on, deals with all the allegations in

22  the second amended complaint, counter-claims, and

23  cross-claims.  But I take it from his answer that

24  he's not familiar with it, so that moots that

25  issue.

## Deposition of James Partin

 1   claims because they had never had an owner's

 2   policy before.

 3        Q.      But you understood that G&B was

 4   taking a lien at the same time?

 5        A.      I understand that is what happened,

 6   yes.

 7        Q.      Wouldn't it have been the more

 8   appropriate policy to be issued at that time?

 9        A.      Yes.

10        Q.      Do you know why it wasn't?

11        A.      No.

12               MR. RAWLINGS:   Those are all the

13   questions I have.

14               (CONCLUDED AT 2:26 P.M.)

15

16

17

18

19

20

21

22

23

24

25