# Deposition of Parrish Fortenberry

1 (Pages 1 to 4)

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
JON CHRISTOPHER EVANS          Case No. 09-03763-NPO
AND JOINTLY ADMINISTERED
RELATED CASES
DEBTORS.                       Chapter 7
*********************************************
G&B INVESTMENTS, INC.          PLAINTIFF
V.                             ADV. PROC. NO. 10-00040-NPO
DEREK A. HENDERSON, TRUSTEE
FOR THE BANKRUPTCY ESTATE OF
JON CHRISTOPHER EVANS, ET AL.  DEFENDANTS

**********

30(b)(6) DEPOSITION OF
MISSISSIPPI VALLEY TITLE INSURANCE COMPANY,
THROUGH ITS REPRESENTATIVE,
PARRISH FORTENBERRY
Taken at the offices of
Adams and Reese,
111 Capitol Street, Suite 350,
Jackson, Mississippi,
on Friday, November 19, 2010,
beginning at approximately 9:00 a.m.

**********

APPEARANCES NOTED HEREIN

CHRISTY R. SIEVERT, CSR, RPR
PROFESSIONAL COURT REPORTING, LLC
Registered Professional Reporter
Certified Shorthand Reporter
Mississippi CSR No. 1421
Post Office Box 320928
Jackson, Mississippi 39232-0928
www.procourtreporting.com

## Page 2

APPEARANCES

COUNSEL FOR MISSISSIPPI VALLEY TITLE
INSURANCE and OLD REPUBLIC NATIONAL
TITLE INSURANCE COMPANY:
 MR. POWELL G. OGLETREE, JR.
 MR. M. SCOTT JONES
 Adams and Reese, LLP
 111 East Capitol Street, Suite 350
 Jackson, Mississippi 39201
 MR. DAVID CLARK
 MR. ROB DODSON
 Bradley, Arant, Boult & Cummings
 Post Office Box 1789
 Jackson, Mississippi 39215

COUNSEL FOR BANK OF FOREST:

 MR. WILLIAM LISTON, III
 Liston & Lancaster
 2648 Ridgewood Road, Suite B
 Jackson, Mississippi 39216
 MR. W. LAWRENCE DEAS
 Deas & Deas
 Post Office Box 7282
 Tupelo, Mississippi 38802

COUNSEL FOR MERCHANTS & FARMERS BANK:
 MR. JEFF D. RAWLINGS
 Rawlings & MacInnis
 1296 Highway 51
 Madison, Mississippi 39110

COUNSEL FOR CHARLES EVANS:
 MR. TERRY R. LEVY
 Daniel, Coker, Horton & Bell
 4400 Old Canton Road, Suite 400
 Jackson, Mississippi 39211

## Page 3

(Continued:)
COUNSEL FOR G&B INVESTMENTS, INC.:
 MR. MICHAEL CORY
 MR. DALE DANKS, JR.
 Danks, Miller & Cory
 213 South Lamar Street
 Jackson, Mississippi 39201
COUNSEL FOR HERITAGE BANK:
 MR. MICHAEL SIMMONS
 Cosmich, Simmons & Brown
 The Plaza Building
 120 North Congress Street, Suite 400
 Jackson, Mississippi 39201

ALSO PRESENT:

 DONALD JOSEPH BRATA

## Page 4

TABLE OF CONTENTS
PAGE

Title Page.................................. 1
Appearance Page............................. 2
Table of Contents........................... 3
Exhibit Page................................ 4
Stipulation Page............................ 5

DEPOSITION OF PARRISH FORTENBERRY:

By Mr. Liston............................... 6
By Mr. Cory................................. 167
By Mr. Rawlings............................. 190

Signature Page.............................. 199

Certificate Page............................ 200

EXHIBIT 2

Professional Court Reporting, LLC
601.919.8662

Case 10-00040-NPO   Doc 342-2   Filed 01/04/11   Entered 01/04/11 21:11:36   Desc
Exhibit Parish Fortenberry depo excerpts   Page 2 of 18

Deposition of Parrish Fortenberry

5 (Pages 17 to 20)

Page 17

1  agents and goes out and visiting them. And if
2  people apply to become an agent or an approved
3  attorney, he talks with them.
4          Brad Jones handles claims. Then
5  you've got Carolyn Freeman, who does the issuance
6  of policies out of the home office in -- for
7  property in Mississippi. That's primarily --
8  although, I do some myself.
9      Q.  Now, is it fair to describe Carolyn's
10 area as underwriting?
11     A.  Yeah. I mean, that's kind of what it
12 is. It's -- you know, if you go back to historic,
13 since we've been in business so long, you sort of
14 have more people that did that before computers
15 were developed. So there were more people. It's
16 now devolved down to it's Carolyn and an
17 assistant.
18     Q.  Got you. Sorry to interrupt.
19     A.  No, no problem.
20         The you've got several counsel.
21 Morton Matrick is vice president and -- I'm sorry,
22 executive vice president and underwriting counsel,
23 who answers underwriting questions from either --
24 from Carolyn or just from agents or attorneys that
25 call. You've got me. And then you've got Mark

Page 18

1  Higdon who is the executive vice president, COO,
2  secretary and treasurer, who does general
3  oversight of the different individuals. And the
4  president is Mike Sellari.
5          And that's just -- that's -- just to
6  be clear, that's the Mississippi office. We have
7  offices in Alabama and Tennessee as well.
8  MR. LISTON, CONTINUED:
9      Q.  Did you know John Cossar?
10     A.  Yeah.
11     Q.  What was John's position with -- I
12 assume he is no longer with the company? Or he's
13 retired or...
14     A.  He's more or less retired. He's
15 chairman emeritus. He was the chairman and
16 president.
17     Q.  What was his job, chairman and
18 president?
19     A.  Uh-huh (affirmative response.)
20     Q.  So he was in Mr. Sellari's position
21 when he was here?
22     A.  Right. In the present position,
23 Mr. Sellari isn't chairman. Rande Yeager is
24 chairman.
25     Q.  I understand.

Page 19

1          What do you know about -- or what did
2  you know about Charles Evans before September 1st
3  of 2009?
4      A.  Personally, I didn't know him. As
5  far as the company goes, he had been -- he was on
6  our approved attorney list.
7      Q.  Okay. Had you heard that name before
8  September 1, 2009?
9      A.  Personally, yes.
10     Q.  Just from, what, working at Valley?
11     A.  Working at Valley.
12     Q.  Did you -- were you cognizant of what
13 his role was with Valley, if any?
14     A.  No.
15     Q.  Okay. Did you know whether or not he
16 was an approved attorney or an agent or anything?
17     A.  No, I didn't have any reason to. He,
18 like a number of people, would come and pick up
19 policies or -- you know, that walks by my office,
20 so I knew his face.
21     Q.  Have you had an occasion -- I guess
22 you probably have -- to study any documents about
23 his relationship with Valley?
24     A.  Yes.
25     Q.  Okay. Over in the room of massive

Page 20

1  documents, there's some things that I found I want
2  to ask you about.
3      A.  Okay.
4      Q.  I think this is Exhibit 15 to
5  Ms. Freeman's deposition. Would you see if you
6  can find that, please, sir. It's going to be
7  toward the end.
8          Have you ever met Charles Evans?
9      A.  No.
10     Q.  Okay. Did you know anything before
11 September 1, 2009, about Chris Evans?
12     A.  No. Personally, no.
13     Q.  Or that they were brothers?
14     A.  I personally, no.
15     Q.  Okay. Have you made an inquiry
16 within the company to determine if anyone there
17 knew about Charles having a brother named Chris
18 and whether Chris owned, directly or indirectly,
19 any interest in entities to which insurance was
20 issued?
21     A.  Yes, I have. And prior to that time,
22 no one has any specific recollection that he was
23 the brother.
24     Q.  Okay. Did anyone recognize the name
25 Chris Evans or Jon C. Evans when you made that

# Deposition of Parrish Fortenberry

6 (Pages 21 to 24)

## Page 21

1  inquiry?
2  A. Well, I mean, my inquiry was after
3  September 2009, so, I mean, obviously, they did.
4  As far as whether or not it was from before that
5  or not, nobody has --
6  Q. You don't know?
7  A. I don't know.
8  Q. Take a look at this Exhibit 15.
9  A. Okay.
10  Q. And I'm not going to represent to you
11  that this is a complete copy of a file pertaining
12  to Charles Evans, but I will represent to you that
13  all of these documents came from that file. Okay?
14  A. Okay.
15  Q. And they do bear MVT Bates numbers.
16  A. Okay.
17  MR. LISTON: I raised this question
18  yesterday with you, Scott. Can we stipulate that
19  anything that has a MVT Bates number on it is
20  authentic, or, I mean, is a correct copy of the
21  original?
22  MR. JONES: And the only reason I'm
23  going to -- if it is a Valley Title document that
24  we don't dispute, we will stipulate to that. But
25  the reason I hesitate on that is because we have

## Page 22

1  obtained a lot of documents in this case, and a
2  lot of those documents came from other people that
3  might bear our Bates number, and we certainly
4  can't stipulate that that's a true and correct
5  copy.
6  But I believe the documents you're
7  referring to in Exhibit 15 are documents that came
8  from the approved attorney file. It's not a
9  complete copy of that file, but I think --
10  Do you agree?
11  THE WITNESS: Yeah.
12  MR. JONES: -- we can stipulate that
13  the documents that -- the collection of documents
14  that you have produced as Exhibit 15 to
15  Ms. Freeman's deposition, we can stipulate these
16  are true and correct.
17  MR. LISTON: Okay. I just wrote
18  myself a note to try to cover this issue at the
19  end of the depo and do it globally. So maybe I'll
20  remember to do it today.
21  MR. LISTON, CONTINUED:
22  Q. Let's take a look at this.
23  A. Okay.
24  Q. These are in order. I'm not going to
25  say the Bates number unless I want to direct you

## Page 23

1  to a particular page in Exhibit 15 to Ms. Freeman's
2  deposition.
3  A. Okay.
4  Q. Are all these documents, to your
5  knowledge, from a file that Valley maintained on
6  Charles Evans?
7  A. They appear to be, yes.
8  Q. Okay. And were these documents
9  created by Valley?
10  A. They appear to be.
11  Q. The first thing here, it says,
12  "Application For Approved Attorney List," and it's
13  back in April 11, 1984.
14  A. Yes.
15  Q. Did you find anybody from the company
16  that -- in any inquiry you made that was working
17  back in 1984 that was involved with Mr. Evans'
18  application at that time?
19  A. Nobody had any specific recollection
20  of the application at that time.
21  Q. Okay. Is it the company's practice
22  to check with the people that the attorney lists
23  as references?
24  A. Yes.
25  Q. Okay. Take a look at the bottom of

## Page 24

1  this page. I think the last person he listed is a
2  Jon Christopher Evans.
3  A. Yes.
4  Q. Do you know whether or not anyone
5  from the company checked with Jon Christopher
6  Evans, who was listed as a reference for Charles
7  Evans?
8  A. I don't know.
9  Q. The next page of this exhibit, it
10  looks like this application was approved, and he
11  was accepted as an approved attorney about May 1,
12  1984.
13  A. Yes.
14  Q. Now, he was assigned a number on this
15  page, 525294?
16  A. Yes.
17  Q. What's the significance of that
18  number?
19  A. Well, it was just a designation to
20  keep up -- try to keep up with who was who.
21  Q. I have seen -- you were in here
22  yesterday?
23  A. Yes.
24  Q. And you were --
25  A. For part of the day.

Deposition of Parrish Fortenberry

8 (Pages 29 to 32)

Page 29

1  A.  Nobody has any recollection of any
2  particular problem. Usually, there would be
3  something if there had been a particular problem.
4  People come on and off the list every year. We
5  ask approved attorneys and agents to submit
6  their -- a copy of their E&O.
7      He either was -- decided not to get
8  out -- as far as just generally what happens, he
9  either decided he didn't want to do real estate
10 anymore and just didn't submit his E&O, or just
11 decided, whatever, he didn't want to be on the
12 list, so he would have gone off the list.
13  Q.  So for whatever reason, he decides he
14 wants to be back on the list?
15  A.  Yes.
16  Q.  And he reapplies in 2002?
17  A.  Yes.
18  Q.  And, again, Valley asks for him a
19 list of personal and professional references?
20  A.  Yes.
21  Q.  And, again, he lists Chris Evans down
22 there for a reference?
23  A.  Yes.
24  Q.  You're aware that that's his brother,
25 of course?

Page 30

1  A.  I am now.
2  Q.  Did anyone from Valley check with
3  Chris Evans?
4  A.  I don't believe so. I'm not sure if
5  you have the reference letters that were in here.
6  Yeah, you do. There wasn't a ref- --
7      MR. JONES: It doesn't have all of
8  them.
9      THE WITNESS: It doesn't have all of
10 them.
11     We send -- when we check with people,
12 we send reference letters out. We may ask other
13 people, too, that we don't send reference letters
14 to, but -- so we at least sent it to those, and we
15 didn't send a reference letter to Chris.
16 MR. LISTON, CONTINUED:
17  Q.  Okay. The next several pages of
18 documents in this exhibit are in-house review
19 sheets?
20  A.  Yes.
21  Q.  It looks like they're sent to some of
22 the different people you mentioned --
23  A.  Yes.
24  Q.  -- when you were describing the
25 company?

Page 31

1  A.  Yes.
2  Q.  And all of them, I think, people
3  write "no comment," "no comment," "no comment"?
4  A.  Right.
5  Q.  I take it, since he was approved in
6  2002, "no comment" was good?
7  A.  Yes. Yeah.
8  Q.  Had there been a comment --
9  A.  Right.
10  Q.  -- he might not have been approved?
11  A.  Right. Well -- right.
12  Q.  Unless it was a glowing comment?
13  A.  Right. Yeah.
14  Q.  All right.
15  A.  We get a lot of these that go
16 through, and we just -- if there's something to
17 say, we would go and tell them. Otherwise, we
18 just say "no comment" if there's nothing we know.
19  Q.  There is a page in here that at the
20 bottom is Bates 201.
21  A.  Okay.
22  Q.  And I think this is a February 1,
23 2002, letter to Thomas J. Lowe, Jr. --
24  A.  Yes.
25  Q.  -- from Valley?

Page 32

1  A.  Yes.
2  Q.  And this is one of the letters that
3  Valley would have sent out to the references
4  listed on the 2002 application, right?
5  A.  Yes. Yes.
6  Q.  And I notice down here that the No. 4
7  question presented to Mr. Lowe was, "Do you feel
8  that we would be safe in accepting his/her
9  opinions on land titles?"
10  A.  Yes.
11  Q.  What's the necessity of asking a
12 question like that?
13  A.  Because if we're going to be issuing
14 title insurance policies and commitments on it, we
15 don't want to have a lot of claims, so we want to
16 make sure that they're experienced in real estate
17 so that we can safely issue and not get a lot of
18 claims.
19  Q.  I mean, it's pretty self-explanatory,
20 but, in fact, when somebody is an approved
21 attorney and they submit a title certification to
22 Valley -- right?
23  A.  Uh-huh (affirmative response).
24  Q.  -- Valley is literally accepting what
25 they say as to the certification of the title?

Professional Court Reporting, LLC
601.919.8662

## Deposition of Parrish Fortenberry

9 (Pages 33 to 36)

Page 33

1  A.  Yeah, we're relying on their
2  certification, yes.
3  Q.  Because Valley, as I understand it,
4  don't go behind those lawyers?
5  A.  Correct.
6  Q.  Doesn't recheck their title work and
7  doesn't -- hasn't formed its own conclusion
8  whether or not that certification is, in fact,
9  accurate?
10  A.  Right. We're relying on them as --
11  Q.  Completely relying, right?
12  A.  Yes. As licensed attorneys.
13  Q.  Skip over two pages, please, sir.
14  A.  Okay.
15  Q.  For the next several pages in here,
16  maybe even more than several, what appears are
17  copies of, for lack of better words, declaration
18  pages from Mr. Evans' insurance.
19  A.  Okay.
20  Q.  E&O insurance, right?
21  A.  Yes. Yes.
22  Q.  And certificates of liability
23  insurance?
24  A.  Yes.
25  Q.  That Valley obviously obtained

Page 34

1  because at the bottom it says "Mississippi Valley
2  Title"?
3  A.  Right.
4  Q.  And that goes on for a long time.
5  And I think what we have here in this exhibit is
6  from year 2003 all the way up to sometime in 2009.
7  A.  Okay.
8  Q.  Now, does Valley obtain these kind of
9  documents because it wants to assure itself that
10  the approved attorney is insured in case that
11  approved attorney is negligent in certifying the
12  title?
13  A.  Yes.
14  Q.  Because Valley's having to rely
15  solely on that approved attorney for the validity
16  and accuracy of the title work?
17  A.  Correct.
18  Q.  Okay. And in the event an approved
19  attorney was negligent in certifying a title, then
20  Valley recognizes that that might expose Valley to
21  liability, not to that approved attorney but to
22  Valley's insured?
23  A.  Correct.
24  Q.  Take a look, please, sir, to the next
25  to the last page.

Page 35

1  A.  Okay.
2  Q.  Now, this is a letter dated
3  September 25, 2009, to Hancock Bank about
4  Mr. Evans from Mark Higdon, executive vice
5  president of Valley?
6  A.  Yes.
7  Q.  I assume multiple letters of this
8  nature were sent out to different banks and/or
9  others around the time that Valley realized that
10  Mr. Evans' work was not legitimate?
11  A.  We sent --
12  MR. JONES: Object to the form on
13  that one.
14  THE WITNESS: We sent out to anyone
15  who had received a closing protection letter from
16  us, we sent this letter to them.
17  MR. LISTON, CONTINUED:
18  Q.  Okay. Well, the necessity of sending
19  out this letter was what? Let me ask it that way.
20  A.  Well, because a closing protection
21  letter is open-ended, so it doesn't have a date.
22  It says until you are otherwise notified. So if a
23  bank was relying on that closing protection
24  letter, we wanted to let them know not to rely on
25  the closing protection letter.

Page 36

1  Q.  Okay. I have not seen a closing
2  protection letter.
3  A.  Okay.
4  Q.  I don't know if it was produced
5  because it would be like finding a needle in a
6  haystack.
7  A.  It has been produced.
8  Q.  Maybe I need to figure out the Bates
9  number of it or something. Tell me what a closing
10  protection letter is and what it says.
11  MR. JONES: I'm just going to object.
12  I'll let him answer the question, but he's not
13  designated for defining what those terms are or
14  what commitments are or what policies are.
15  MR. LISTON: I understand. But I
16  assure you, he has more knowledge of that than I
17  do, and that's why I'm asking.
18  THE WITNESS: It's an agreement to
19  indemnify under the terms and conditions that are
20  stated in the closing protection letter for
21  certain events.
22  MR. LISTON, CONTINUED:
23  Q.  Okay. An agreement by whom to
24  indemnify whom?
25  A.  Mississippi Valley to indemnify the

# Deposition of Parrish Fortenberry

13 (Pages 49 to 52)

Page 49

1  speak to closing protection letters?
2      MR. JONES: Yes.
3      MR. LISTON: I'll take you at your
4  word. Okay. We'll move one.
5  MR. LISTON, CONTINUED:
6      Q.  Now you're back --
7      A.  Okay.
8      Q.  -- speaking on behalf of Valley.
9      A.  Okay. Sure.
10     Q.  The last letter we were looking at in
11 this exhibit, the September 25, '09 letter to
12 Hancock Bank, in essence, this letter revokes
13 whatever representation or promise was contained
14 in that closing protection letter that was sent to
15 Hancock Bank?
16     A.  Right. Well, can I -- actually, let
17 me be clear about --
18     Q.  Sure.
19     A.  -- what I mean by revoked. If
20 they've already taken action in reliance on it,
21 then that's not. It's a matter of for future
22 notice, not to take further actions.
23     Q.  I understand. It's just withdrawing
24 the letter?
25     A.  Right. Yeah.

Page 50

1      Q.  That's what I was trying to find out.
2          Was Evans ever paid any compensation,
3  remuneration, commission, salary, fee, anything
4  for causing Valley to issue any title commitments
5  or causing Valley to issue any title policies?
6      MR. JONES: Object to the form. I'm
7  not sure it changes the answer, but which Evans
8  are we talking about?
9      MR. LISTON: Oh. The lawyer Evans.
10     THE WITNESS: Charles?
11     MR. JONES: They're both lawyers.
12     THE WITNESS: Well -- for Charles,
13 no.
14 MR. LISTON, CONTINUED:
15     Q.  Right. Now, I'm trying to understand
16 this -- and maybe it's just because I don't work
17 in this area of the law. What's the incentive for
18 a lawyer to do whatever is required with Valley to
19 become an approved attorney and meet Valley's
20 standards in that regard if he's not receiving any
21 compensation for that from Valley?
22     MR. JONES: Object to the form.
23 MR. LISTON, CONTINUED:
24     Q.  Can you explain that to me?
25     A.  There are -- I mean, there's a number

Page 51

1  of reasons. One of which is there are attorneys
2  that think since they're representing the bank,
3  getting title insurance, that they don't want a
4  conflict that it may -- they want to get the best
5  protection. They may try to negotiate a lower
6  rate than the standard rates.
7          There are other issues that if they
8  don't do enough real estate work, they don't
9  really justify the expenses associated with a
10 title insurance agent, so underwriters may not be
11 willing to put them on the list. But if they want
12 to practice real estate, typically, a requirement
13 from a bank is to get them title insurance. So
14 they need to have a source for title insurance,
15 and they could -- you know, if they like doing
16 title work, their own title searches, they do get
17 paid by their clients for the title search.
18     Q.  So the benefit to the lawyer who
19 wants to become an approved attorney is what? I'm
20 trying to boil down what you just said to
21 something.
22     MR. JONES: Object to the form.
23     THE WITNESS: Because -- well, the --
24 as part of the closing, if they're doing real
25 estate, and somebody asks them for title

Page 52

1  insurance, just like if it's somebody asked for a
2  termite certificate, they've got to call someone
3  to get it. And they're not going to get it from
4  our -- at least from the home office. If they're
5  not on a list from us, they can call somebody
6  else. I'm not sure if you have to be on anybody
7  else's list in order to get title insurance from
8  them.
9  MR. LISTON, CONTINUED:
10     Q.  Right. Banks, from time to time at
11 least, want their transactions insured, right?
12     A.  Yes.
13     Q.  Want the title to property against
14 which they loan money insured?
15     A.  Yes.
16     Q.  So they want to deal with attorneys
17 who have the ability to procure that insurance for
18 them?
19     A.  If they're not going to obtain it
20 directly, yes.
21     Q.  Right. And a lawyer who is an
22 approved attorney can represent to the bank not
23 only can I do your closing work, but I also can
24 solve your concern about obtaining title insurance
25 for this transaction?

Case 10-00040-NPO   Doc 342-2   Filed 01/04/11   Entered 01/04/11 21:11:36   Desc
Exhibit Parish Fortenberry depo excerpts   Page 7 of 18

Deposition of Parrish Fortenberry

14 (Pages 53 to 56)

Page 53

1  MR. JONES: Object to the form.
2  THE WITNESS: You know, I don't know
3  what --
4  MR. LISTON, CONTINUED:
5  Q.  Maybe not solve it, but I have a
6  means and a relationship I can contact Valley, I
7  can submit the paperwork, and I can go -- you
8  know, I can be your intermediary to get this title
9  insurance issued.
10  A.  Yeah. They --
11  Q.  Fair?
12  A.  Yeah. They can call and ask on
13  their -- on the bank's behalf to get title
14  insurance.
15  Q.  So the benefit to the lawyer may be
16  that it opens up areas of representation that
17  would not otherwise exist for that lawyer because
18  now he has at least some relationship with Valley
19  by which title insurance may result?
20  MR. JONES: Objection.
21  THE WITNESS: A representation as in
22  like an attorney representing a client, you mean?
23  MR. LISTON, CONTINUED:
24  Q.  I don't remember what words I used.
25  A.  Okay. Well -- okay. Lawrence says

Page 54

1  yes. So, yeah.
2  Q.  Okay. Now, are the approved
3  attorneys, as far as Valley is concerned, allowed
4  to market themselves to banks as approved
5  attorneys for Valley?
6  A.  No. Well, we would not want them
7  to -- I mean, we don't control what they do or
8  what they say, so... If we found out they
9  were, we would take them off our list, typically.
10  Q.  Well, the word "market" is a big
11  word.
12  A.  Right.
13  Q.  I don't mean publish things in the
14  newspaper.
15  A.  Right.
16  Q.  I don't mean put things on
17  television. What I mean is, if they see a banker
18  at lunch, can they say, Hey, you know, I happen to
19  be an approved attorney for Valley, and I'd be
20  happy to talk to you about any closing work,
21  property transaction work the bank may have?
22  A.  I don't think we have any stated
23  rules one way or the other on that.
24  Q.  Doesn't that, in fact, happen,
25  though?

Page 55

1  MR. JONES: Object to the form; calls
2  for speculation.
3  THE WITNESS: I would assume it does.
4  And if the bank has any questions, they're
5  certainly capable of calling and asking if the
6  person is, and we'll tell them if they are.
7  MR. LISTON, CONTINUED:
8  Q.  Right. And, in fact, the banks would
9  want the attorneys to tell them that, would they
10  not, because they'd want to know which attorneys
11  can do the work, send it to Valley, get the title
12  insurance issued, that they would like to have
13  before they go do the transaction?
14  MR. JONES: Object to the form; calls
15  for speculation.
16  THE WITNESS: The -- I've never
17  really seen any bank care where it's coming from,
18  the title insurance. It's typically that they can
19  obtain title insurance. So, I mean, about the
20  question of whether or not, you know, because it's
21  Valley, I don't know.
22  MR. LISTON, CONTINUED:
23  Q.  Are there two kinds of title
24  insurance policies, roughly? Lender policies and
25  owner policies?

Page 56

1  A.  Generally. And there are variations
2  of those. And you can't have leasehold owners
3  policies or lenders policies.
4  Q.  How does Valley's business break down
5  in percentage of lender versus owner?
6  A.  It would be -- we issue more lenders
7  policies than owners, but I'm not sure, though,
8  what that break would be.
9  MR. JONES: We've been going about an
10  hour. Do you want to take a break?
11  MR. LISTON: Yeah, sure.
12  (OFF THE RECORD.)
13  MR. LISTON, CONTINUED:
14  Q.  I take it that it's Valley's position
15  that Mr. Charles Evans was not an agent of the
16  company?
17  A.  Correct.
18  Q.  At least not an express agent of the
19  company?
20  A.  Correct.
21  MR. JONES: Object to the form.
22  MR. LISTON, CONTINUED:
23  Q.  Okay. And that he was an approved
24  attorney for the company?
25  A.  Yes.

Deposition of Parrish Fortenberry

15 (Pages 57 to 60)

Page 57

1  Q.  Let me talk to you about the
2  company's procedures, if any, with regard to
3  supervision of approved attorneys.
4  A.  Okay.
5  Q.  Is there any?
6  A.  No.
7  Q.  Okay. Certainly, the company doesn't
8  check behind the work of the -- title work of the
9  approved attorney?
10  A.  Correct. Yes.
11  Q.  To determine whether or not each
12  individual certification of title is accurate?
13  A.  Yes.
14  Q.  Or is free from fraud?
15  A.  Right.
16  Q.  Right? The company, as I understand
17  it, doesn't even do any random/spot checking of
18  approved attorneys' certification work?
19  A.  Right.
20  Q.  Is there a reason for that?
21  A.  Well, just relying on the attorney as
22  a member in good standing of the Bar.
23  Q.  Okay. How much does the company
24  charge to do an abstract title?
25  A.  It depends on the type of property.

Page 58

1  If it's metes and bounds, it's -- I think it's
2  like 250, plus an hourly rate, depending on how
3  difficult and how time-consuming it is.
4  Q.  Okay. So the 250 base fee, plus an
5  hourly rate?
6  A.  Right.
7  Q.  What does the company charge to do a
8  title certificate?
9  A.  The company doesn't do title
10  certificates. It's just title reports.
11  Q.  Okay. And is that synonymous with
12  abstract, title report?
13  A.  Technically, no. A lot of people
14  just in business use the phrase abstract. I mean,
15  abstract is truly a derainment of title, showing
16  every item of record versus a title report
17  summary.
18  Q.  Has any -- to your knowledge, your
19  company knowledge, has the company ever considered
20  employing any measures to check whether or not its
21  approved attorneys' title work meets company
22  standards?
23       MR. JONES: Object to the form.
24       THE WITNESS: Well, have we ever
25  considered it? Was that the question?

Page 59

1  MR. LISTON, CONTINUED:
2  Q.  Right. Have you ever considered it?
3  Has it ever been discussed within the company
4  whether or not the company should, in some manner,
5  at least on a random basis, check the work of
6  approved attorneys, the title work, to make sure
7  it meets company standards?
8  A.  Prior to the Evans stuff?
9  Q.  Prior to September 1, 2009.
10  A.  I don't recall any specific
11  discussion of that. It's -- you know, a lot of
12  what -- you know, we try to consider all of our
13  risks and try to do what we can to limit those
14  risks for our own claims, but I don't remember any
15  specific discussions of that.
16  Q.  Since you put it in those terms, how
17  does, if the company does attempt to limit its
18  risks, that certification from an approved
19  attorney would be in error, or at worst,
20  fraudulent?
21  A.  Well, we have a -- well, the
22  procedure to put -- before we put somebody on a
23  list is to make sure they are a
24  licensed-in-good-standing member of the Bar and
25  check references, that they have E&O. And then

Page 60

1  beyond that, obviously, if we get claims, we keep
2  up with that. If we have any -- just calls from
3  complaints on lenders, people that just deal with
4  agents.
5       I mean, we have such a small Bar,
6  there's -- usually word gets around if there are
7  any problems. We keep up with whatever the Bar
8  publishes on, if there are any disciplinary
9  proceedings. So it's just for our own benefit in
10  trying to keep -- make sure we don't have any
11  claims, sort of summary.
12  Q.  Okay. What I'm trying to find out,
13  A, whether the company has ever considered any
14  measures to try to check whether or not its
15  approved attorneys are meeting company standards
16  with the title work they submit, and, B, whether
17  or not the cost of checking, i.e., obtaining
18  abstracts, was considered in that discussion.
19       MR. JONES: Object to the form.
20  MR. LISTON, CONTINUED:
21  Q.  Do you have any knowledge --
22  corporate knowledge on those issues?
23       MR. JONES: Object to the form.
24       THE WITNESS: I don't -- I don't. I
25  don't recall.

Professional Court Reporting, LLC
601.919.8662

Case 10-00040-NPO   Doc 342-2   Filed 01/04/11   Entered 01/04/11 21:11:36   Desc
Exhibit Parish Fortenberry depo excerpts   Page 9 of 18

Deposition of Parrish Fortenberry

17 (Pages 65 to 68)

Page 65

1   Q.   As I understand it, he typically did
2   title research for the purpose of certifying title
3   to Valley. You assume he did?
4   A.   Well, I don't -- I don't know why he
5   did it. He, in fact, filled out our application
6   and certificate of title.
7   Q.   Right. Valley would assume that
8   either he or someone under his control had done
9   some title research to back up that certification,
10  right?
11  A.   Yes.
12  Q.   Okay. Would hope he had, right?
13  A.   Right.
14  Q.   And Valley knew before at least the
15  2008 White Oaks loan involving Bank of Forest,
16  that Charles Evans and its other approved
17  attorneys were doing title research, hopefully, to
18  back up their title certifications to Valley?
19       MR. JONES: Object to the form.
20       THE WITNESS: I'm sorry, I didn't
21  follow your question.
22  MR. LISTON, CONTINUED:
23  Q.   Yeah. I'm just saying, approved
24  attorneys for eons, Valley has known for eons that
25  approved attorneys are out there doing title

Page 66

1   research --
2   A.   Yes.
3   Q.   -- for the purpose of certifying
4   title to Valley, right?
5   A.   Right.
6   Q.   Long before 2008?
7   A.   Yes.
8   Q.   Okay. Of course, the approved
9   attorneys are allowed to, and Valley expects them
10  to, make title certifications to Valley?
11       MR. JONES: Object to the form.
12       THE WITNESS: Well, they're not -- I
13  mean, saying "allowed" would be saying that we
14  have some control over them. I mean, they --
15  MR. LISTON, CONTINUED:
16  Q.   I'm not asking that.
17  A.   Okay. I mean, they fill out
18  applications, and we choose to insure or not based
19  on those applications.
20  Q.   Okay. Matter of fact, that's what
21  the approved attorney is for, right? I mean,
22  that's the whole reason the approved attorney
23  exists is so that Valley can have someone to rely
24  on to certify title to it?
25  A.   Right. We don't do the search

Page 67

1   ourselves, right.
2   Q.   Right. The approved attorney is --
3   I'm going to use the word "allow," but -- let's
4   not use that word. The approved attorney prepares
5   the applications for title commitments and title
6   policies and sends them to Valley?
7   A.   Right.
8   Q.   Valley accepts those?
9   A.   Well. . .
10  Q.   Unless it --
11  A.   Unless it chooses not to.
12  Q.   -- chooses not to?
13  A.   I mean. . . Yeah.
14  Q.   Okay. If there's a need for
15  additional information in order for Valley to
16  issue a commitment or policy, to come from the
17  prospective insured, does Valley communicate with
18  that insured directly, or does it go through the
19  approved attorney to obtain that?
20  A.   No, we'd ask their lawyer, the
21  closing attorney.
22  Q.   Okay. Who may happen to be the
23  approved attorney?
24  A.   Right.
25  Q.   Valley, as I understand it, collects

Page 68

1   any binder fees and any premium fees from the
2   approved attorney who submitted the application
3   for either the commitment or the policy?
4   A.   Typically, yes.
5   Q.   Okay. In this case, are you familiar
6   with whether Valley ever billed, sent an invoice,
7   anything, to the Bank of Forest for any fees or
8   premiums?
9        MR. JONES: Object to the form.
10       THE WITNESS: I'm not familiar with
11  it. I believe we send it to their attorney.
12  MR. LISTON, CONTINUED:
13  Q.   Okay. Being who, Charles Evans?
14  A.   Yes.
15  Q.   Now, you said "their attorney."
16  Whose attorney?
17  A.   The bank's attorney.
18  Q.   How do you know he's the bank's
19  attorney?
20  A.   He's the closing attorney.
21  Q.   How do you know they hired him?
22  A.   Well, he represented --
23  Q.   Are you assuming it?
24  A.   Well, he represented he did. I guess
25  he would represent that he did.

Deposition of Parrish Fortenberry

18 (Pages 69 to 72)

Page 69

1  Q. Where did Charles Evans represent
2  he -- to Valley that he was representing the Bank
3  of Forest? Have you seen that in writing?
4  A. No, not in writing. Well, he called
5  and asked on their behalf, and that's typically
6  representing the lender and the purchaser.
7  Q. How do you know he wasn't
8  representing a guy named Chris Evans?
9  A. I believe aren't there cases that say
10 that, the ethics rules?
11 Q. Are we going to talk some law?
12 A. Not really.
13 Q. Do you want to talk law?
14 A. Not particularly.
15 Q. I'm just asking you factually.
16 A. Factually, no.
17 Q. You adopted the word "their." I want
18 to find out what your basis is. Do you know for a
19 fact --
20 A. Oh, no.
21 Q. -- Charles Evans was representing the
22 Bank of Forest?
23 A. No.
24 Q. Okay. And approved attorneys
25 transmit the binder fees and the premiums to

Page 70

1  Valley, don't they?
2  A. Typically.
3  Q. Okay. And the approved attorneys
4  receive from Valley the title commitments?
5  A. Typically.
6  Q. And deliver them to whoever needs
7  them, correct?
8  A. Typically, yes.
9  Q. And the approved attorneys receive
10 from Valley the title policies, and, again,
11 deliver those to whoever might need them, right?
12 A. Yes, typically.
13 Q. In the typical course of these
14 things, I know there are probably exceptions, but
15 Valley has little to no contact with the insured
16 before the title policy is issued, correct?
17 A. Correct.
18 Q. Okay. So the only person with whom
19 the insured would be in contact, as a conduit for
20 Valley, is going to be that approved attorney?
21 A. Typically. I mean, they're certainly
22 able to call us and ask if they have something --
23 any questions.
24 Q. Okay. I've heard some number or seen
25 some number in this litigation of the total amount

Page 71

1  of -- it may be premiums that Valley received due
2  to any acts of Charles Evans. And by "acts," I
3  mean applications for commitments or policies.
4  What's that number?
5  A. The -- I don't know the breakdown.
6  The total of commitment fees, title insurance
7  premiums and fees for endorsements, there were
8  some endorsements to policies, it was about
9  195,000 over this course of -- since 2002 to 2009.
10 Q. Is it fair to say -- I know the
11 payout is more than the premium. Mr. Jones
12 pointed that out the other day.
13 A. Slightly.
14 Q. But is it fair to say with every
15 transaction that Charles Evans submitted for
16 approval to Valley, Valley had a financial
17 interest in that transaction? That was a bad
18 question.
19 A. Uh-huh (affirmative response).
20 Q. It was vague. Let me rephrase it.
21 A. Please.
22 Q. Every time Charles Evans did anything
23 on behalf of the Bank of Forest in regards to the
24 2008 or 2009 White Oaks loan, Valley made or stood
25 to make either a binder fee or a premium off that?

Page 72

1  A. Well, anything -- well, if he
2  submitted an application and -- for a title
3  certificate for a commitment, then, yes, we would
4  make a fee off the commitment fee or if he
5  submitted it for a premium -- a policy and we
6  issued the policy, yes, we would make a premium
7  off the policy.
8  Q. And those are the two things he did,
9  right? He submitted applications for commitments
10 for policies --
11 A. Just in general --
12 Q. -- that involved the Bank of Forest?
13 A. Well, in 2008, on that loan, yes, on
14 both. On the 2009, he only submitted the first
15 certificate for a commitment.
16 Q. Didn't he submit an application for
17 the policy in 2009, or did it not get that far?
18 A. No, it did not get that far.
19 Q. Okay. That's fine.
20    All right. Let's look at documents.
21 I'm going to get you guys on that side of the
22 table to shuffle through these, if that's okay.
23 Take a look at No. 1, please, sir.
24 A. Okay.
25 Q. This is a brochure -- or a copy of a

Professional Court Reporting, LLC
601.919.8662

## Deposition of Parrish Fortenberry

21 (Pages 81 to 84)

### Page 81

1  A.  That statement is on the schedules.
2  And if you read the remainder of the jacket,
3  that's what it insures.
4  Q.  Well, I'm sure. It's all about
5  insuring something. But that statement is in
6  there, correct?
7  A.  The statement is in there.
8  Q.  And it's in writing, right?
9  A.  Yes.
10  Q.  And who wrote it?
11     MR. JONES: Object to the form.
12     THE WITNESS: It was whoever issued
13  the policy.
14  MR. LISTON, CONTINUED:
15  Q.  Who worked for whom?
16  A.  On which policy?
17  Q.  On any policy that Valley issues.
18  Who wrote that schedule?
19     MR. JONES: Object to the form.
20     THE WITNESS: Either the agents or
21  the company.
22  MR. LISTON, CONTINUED:
23  Q.  Okay. Not Charles Evans, right?
24  A.  No.
25  Q.  Okay. Take a look at Bates No. page

### Page 82

1  253(a).
2  A.  Okay.
3  Q.  There's a section there, 1.2, it goes
4  from that page to the next, called "Basic Title
5  Insurance Process."
6  A.  Okay.
7  Q.  Is this a fair summary of the --
8  Valley's title insurance process, including those
9  parts of it that reference what an approved
10  attorney does or does not do?
11  A.  I haven't read it, so I'd have to
12  read it.
13  Q.  Please read it.
14  A.  Okay. (Reviews document.)
15     (OFF THE RECORD.)
16     MR. LISTON: Back on.
17  MR. LISTON, CONTINUED:
18  Q.  You've read Section 1.2 out of this
19  exhibit?
20  A.  Yes.
21  Q.  All right. Does 1.2 fairly summarize
22  what Valley's title insurance process was, at
23  least before September 1, 2009?
24  A.  Yeah, that's basically...
25  Q.  Has it changed?

### Page 83

1  A.  Since then?
2  Q.  Yes.
3  A.  A little bit, yes.
4  Q.  Tell me how.
5  A.  I'm trying to think of how it's
6  different. We changed the certification form,
7  require actual copies of documents now. Do a
8  little -- do additional background search on if
9  somebody wants to become an approved attorney or
10  an agent. I think those are the fundamental
11  changes.
12  Q.  Okay. I think y'all -- before
13  September 2009, you didn't charge the approved
14  attorneys a fee to make an application for
15  approved attorney, and now they are charged a fee?
16  A.  Right.
17  Q.  What other screening criteria do you
18  have that you didn't have then?
19  A.  I think that's everything. I think
20  it's just the investigation. With that fee, they
21  go back and run some different independent
22  searches. So...
23  Q.  Okay. You mentioned that the form of
24  the application and title certification has
25  changed and now attorneys are required to attach

### Page 84

1  documents?
2  A.  Right.
3  Q.  What kind of documents?
4  A.  The vesting deed and the deeds of
5  trust.
6  Q.  Okay. So in other words, when an
7  attorney represents to Valley that fee simple
8  title of the property is in a certain party,
9  they're actually required to attach that
10  instrument which shows that fee simple title is in
11  that party, right?
12  A.  Right. There would be such a
13  document, yes.
14  Q.  Okay. Was it feasible for Valley to
15  have had those measures before 2008?
16     MR. JONES: Object to the form; calls
17  for speculation.
18     THE WITNESS: Yes.
19  MR. LISTON, CONTINUED:
20  Q.  Any reason you can tell me why Valley
21  did not have those measures before 2008?
22  A.  We've been in business for 70 years.
23  Never been a necessity or a problem or needed it.
24  And so, I mean, there are certainly -- you can
25  forge -- unfortunately, you can forge deeds and

Case 10-00040-NPO    Doc 342-2    Filed 01/04/11    Entered 01/04/11 21:11:36    Desc
Exhibit Parrish Fortenberry depo excerpts    Page 12 of 18

Deposition of Parrish Fortenberry

26 (Pages 101 to 104)

### Page 101

1  MR. JONES: Object to the form.
2  THE WITNESS: I mean, I wouldn't --
3  well, yeah, it's -- the general guidelines, yeah.
4  MR. LISTON, CONTINUED:
5  Q. All right. Guidelines, that's fine.
6  2.1, "This form is designed" -- I'm sorry, strike
7  it.
8  At the top it's entitled, "The
9  Application and Attorney's First Certificate."
10  And then it says, "This form is designed for use
11  in those circumstances where it is -- where it is
12  contemplated that a commitment will be required.
13  The form is completed by an approved attorney of
14  the company, and a commitment to insure is issued
15  with certain exceptions and under certain
16  conditions. This enables the insured to proceed
17  with disbursement of his funds with assurances as
18  to the quality of title he is obtaining."
19  Okay. You understand that language?
20  A. Uh-huh (affirmative response).
21  Q. Right?
22  A. Uh-huh (affirmative response).
23  Q. It's talking about a commitment?
24  A. Uh-huh (affirmative response).
25  Q. It's talking about an insured

### Page 102

1  receiving a commitment and then being able to
2  proceed with disbursement of the funds with
3  assurance that the quality of the title is good,
4  correct?
5  MR. JONES: Object to the form.
6  MR. LISTON, CONTINUED:
7  Q. It doesn't say closing protection
8  letter in there anywhere, does it?
9  A. That particular sentence, no.
10  Q. And this was written by whom?
11  A. This is written by MVT to our
12  attorneys, who are also agents.
13  Q. Okay. Are the schedules to the
14  commitments part of the commitment?
15  A. Oh, Schedule A and Schedule B?
16  Q. Yes.
17  A. I mean, it's those, together with the
18  jacket, would be the commitment.
19  Q. Does MVT recognize that the
20  commitments, including their schedules, will be
21  provided to the insureds or prospective insureds?
22  MR. JONES: Object to the form.
23  THE WITNESS: That would be the
24  typical process.
25  MR. LISTON, CONTINUED:

### Page 103

1  Q. I'm going to just try to ask you
2  these questions, and you can look at -- I'll
3  reference them in my questions. Talking about
4  Exhibit 3 to Ms. Freeman's deposition, it is --
5  these are two pages of invoices. I don't think
6  the Bank of Forest is referenced on either one,
7  but one invoice is dated in 2004 and the other in
8  2005.
9  A. Okay.
10  Q. They're directed -- they're from
11  Valley to Charles Evans, showing where he's being
12  invoiced for what appear to be either premiums or
13  binder fees.
14  A. Okay.
15  Q. Would you agree with me that was the
16  typical course of business?
17  A. Yes.
18  Q. To invoice the approved attorney?
19  A. Well, to invoice who requested it,
20  yes.
21  Q. Right. And it was not typical to
22  invoice the insured or prospective insured?
23  MR. JONES: Object to the form.
24  THE WITNESS: Unless they were the
25  ones who requested it.

### Page 104

1  MR. LISTON, CONTINUED:
2  Q. Okay. I'm talking about Exhibit 4 to
3  Ms. Freeman's deposition now. These are invoices
4  that all apply to the Bank of Forest.
5  A. Okay.
6  Q. And can you confirm for me that the
7  first two pages apply to the 2008 White Oaks loan
8  and the last page of this exhibit applies to the
9  2009 White Oaks loan?
10  A. Yeah, appears to.
11  Q. Okay. Now, this is -- these are
12  bills from Valley to Charles Evans, correct?
13  A. Correct.
14  Q. Not bills from Valley to Bank of
15  Forest?
16  MR. JONES: Object to the form.
17  THE WITNESS: Correct.
18  MR. LISTON, CONTINUED:
19  Q. Okay. And down here on these bills
20  is a customer number of 2410?
21  A. Yes.
22  Q. Correct?
23  A. Correct.
24  Q. That number was assigned by Valley to
25  Charles Evans?

## Deposition of Parrish Fortenberry

27 (Pages 105 to 108)

### Page 105

1  A.  Yes.
2  Q.  And hence, Valley considered Charles
3  Evans to be its customer in these transactions; is
4  that right?
5  A.  I don't know that we ever have any
6  policy about who we consider a customer. He was
7  assigned that number since he was the one that
8  requested it.
9  Q.  Was there any customer number or
10  other number on these documents that was assigned
11  to the Bank of Forest, to your knowledge?
12  A.  Not to my knowledge.
13  Q.  I'm looking at Exhibit 5 to
14  Ms. Freeman's deposition. These are -- I think
15  you've got a three-paged exhibit over there. Is
16  that correct?
17  A.  That's correct.
18  Q.  Okay. These are apparently cover
19  letters of different dates which Valley addressed
20  to Charles Evans, and all of them involve the Bank
21  of Forest, right?
22  A.  Yes, appears to be.
23  Q.  And you know, we -- they speak for
24  themselves, to the extent I've ever heard a
25  document say anything. But they talk about

### Page 106

1  commitments and/or policies being delivered or
2  transmitted from Valley to Charles Evans?
3  A.  Right.
4  Q.  Right?
5  A.  Uh-huh (affirmative response).
6  Q.  Which is the typical course of
7  business, correct?
8  A.  Yeah.
9  Q.  Now, these letters also reflect that
10  Valley is waiting to receive a check from Charles
11  Evans before it issues the title insurance
12  policies, correct?
13      MR. JONES:  Object to the form.
14      THE WITNESS:  Yeah, it says "your
15  check."
16  MR. LISTON, CONTINUED:
17  Q.  Right. And they are addressed to
18  Charles Evans?
19  A.  Right.
20  Q.  All right.
21  A.  I mean, I don't think we would turn
22  it down if it's made from someone else.
23  Q.  Sure. But Valley didn't send any
24  letters to the Bank of Forest requesting payment?
25  A.  Right.

### Page 107

1      MR. JONES:  Object to the form.
2  MR. LISTON, CONTINUED:
3  Q.  Okay. I'm talk- -- I'm looking at
4  Exhibit 6 to Ms. Freeman's deposition, which says
5  it's the "Application and Attorney's First
6  Certificate."
7  A.  Okay.
8  Q.  Can you confirm that this document
9  applies to the 2009 White Oaks loan involving Bank
10  of Forest?
11  A.  It appears to.
12  Q.  Okay. Did Charles Evans fill out
13  these -- this document?
14  A.  It appears he did.
15  Q.  Okay. And he's certified title down
16  to a certain date of August 26, 2009?
17  A.  Yeah, that was the certification
18  date.
19  Q.  And then he attached at least two
20  exhibits to it, correct?
21  A.  Correct.
22  Q.  Okay. And those are property
23  descriptions and exceptions, it looks like?
24  A.  Yes.
25      MR. JONES:  Object to the form on

### Page 108

1  that. Exactly two exhibits. It's not at least
2  two.
3      MR. LISTON:  Oh, yeah.
4  MR. LISTON, CONTINUED:
5  Q.  Two exhibits, A and B, right?
6  A.  Right.
7  Q.  Okay. To your knowledge, speaking on
8  behalf of Valley, is this a complete copy of the
9  application and attorney's first certificate
10  applying to the 2009 White Oaks loan?
11  A.  As far as I know.
12  Q.  Okay. Let's look at Exhibit 7 to
13  Ms. Freeman's deposition.
14  A.  Okay.
15  Q.  Is this a -- look through it now,
16  from the front to back. Is this a true and
17  correct copy of the commitment for title insurance
18  issued by Valley pertinent to the 2009 White Oaks
19  loan involving the Bank of Forest?
20  A.  Appears to be.
21  Q.  Okay. Now, this document has two
22  form pages after the title page that are
23  preprinted form pages that Valley uses on
24  commitments, as I understand it.
25  A.  Let me clarify your statement.

**Professional Court Reporting, LLC**
**601.919.8662**

Case 10-00040-NPO    Doc 342-2    Filed 01/04/11    Entered 01/04/11 21:11:36    Desc
Exhibit Parish Fortenberry depo excerpts    Page 14 of 18

Deposition of Parrish Fortenberry

28 (Pages 109 to 112)

Page 109

1  Q. Please do.
2  A. The page you're looking at is the
3  first page. The first page on there is actually
4  the back.
5  Q. This is like a folded thing?
6  A. Yes, it is.
7  Q. This is the jacket?
8  A. Right.
9  Q. On the front that says "Commitment
10 For Title Insurance"?
11 A. Right. And it's on the backside.
12 Q. Okay. That's fine. And then the
13 second page of the exhibit is the first page of
14 the commitment?
15 A. Right, yeah.
16 Q. Okay. And the first page of the
17 commitment and the second page are preprinted
18 forms that Valley uses for its commitments,
19 correct?
20 A. Yes.
21    MR. JONES: Object to the form.
22 MR. LISTON, CONTINUED:
23 Q. Are there any other forms that Valley
24 uses for commitments, or is this it?
25 A. I mean, that's the -- that's the

Page 110

1  version we've used since it was rewritten in 2006.
2  Q. Okay.
3     MR. JONES: I just object to the
4  form. The countersigned signature is not
5  preprinted, just for clarification.
6     MR. LISTON: Oh, I've got you.
7     THE WITNESS: Oh, sorry. Yeah.
8  MR. LISTON, CONTINUED:
9  Q. Ms. Freeman signed it?
10 A. Yeah, that would be an original
11 signature.
12 Q. Okay. Are the other signatures
13 proximate to hers presigned?
14 A. Yeah. They're part of the preprinted
15 form.
16 Q. Okay. Look at the Schedule A,
17 please, sir.
18 A. Okay.
19 Q. Okay. Schedule A is prepared by
20 Valley, as I understand it, right?
21 A. This one -- this Schedule A?
22 Q. Yes.
23 A. Yes.
24 Q. Okay. And it was prepared by Valley
25 for issuance to Charles Evans, correct?

Page 111

1  A. Yes.
2  Q. Valley knew, or at least thought,
3  that this commitment, including its schedule,
4  would be supplied to the Bank of Forest, right?
5  A. Yes.
6  Q. Okay. And it has an effective date
7  of August 26, 2009, on it, correct?
8  A. Right.
9  Q. All right. Up at the top, it
10 references Charles Evans, Jr. as an agent with
11 that six-digit number?
12 A. Right.
13 Q. Right?
14 A. Uh-huh (affirmative response).
15 Q. Now, you know this because you may
16 have been in the room, there's another commitment
17 involved in the Bank of Forest case?
18 A. Yes.
19 Q. Same looking form?
20 A. Right.
21 Q. But it doesn't say agent number
22 there?
23 A. Right.
24 Q. It says MVT number?
25 A. Right.

Page 112

1  Q. Can you explain to me why we have
2  "agent" on one form and "MVT" on another?
3  A. Yes.
4  Q. Why?
5  A. I went back and looked at the
6  software, and of that summer of 2009, there was an
7  update that overwrote that field, and it overwrote
8  it with agent number rather than MVT number. And
9  so it wasn't realized that it was -- it says
10 "agent."
11 Q. Who did that? Who changed the
12 software between the 2008 and 2009 commitment?
13 A. It's the version of the software that
14 went out. I mean, it was MVT software, if that's
15 what you mean.
16 Q. Was there an in-house IT guy at
17 Valley that did that to the software, or is it
18 just a new version that came from outside Valley?
19 A. It's a new version from an
20 independent company.
21 Q. Okay. From which company?
22 A. I can't remember what his name is. I
23 mean, the software is Valley, right. So, I mean,
24 I don't know if we technically own the source --
25 source code or not, but it's issued to agents so

**Deposition of Parrish Fortenberry**

29 (Pages 113 to 116)

Page 113

1  that they can issue commitments and policies.
2     Q.   Okay. Well, what I'm trying to find
3  out is who is the contractor that provides that
4  software to Valley?
5     A.   Oh. Brandon Manley.
6     Q.   Manning?
7     A.   Manley.
8     Q.   Where does Mr. Manley live?
9     A.   Madison. Gluckstadt.
10    Q.   Okay. You don't happen to know his
11 address and telephone number, do you?
12    A.   Sorry, no.
13    Q.   Does he have a business, or does he
14 just do business in his own name?
15    A.   He's -- I'm not sure if he does it in
16 his own name or not. He was our independent
17 contractor to write the software. And since it
18 primarily goes out to agents, it was -- just the
19 default field says "agent."
20    Q.   M-a-n-l-e-y?
21    A.   Yes.
22    Q.   You said you checked into that, and
23 you have determined there was a software upgrade?
24    A.   Yeah.
25    Q.   Or rewrite. What did you do to check

Page 114

1  into it?
2     A.   I asked Bonnie Woods when the update
3  went out and -- because I looked at those and
4  questioned why it did that. So...
5     Q.   Did you see any documentation
6  pertinent to that software change, or was this
7  just verbal information you obtained from
8  Ms. Woods?
9     A.   Just verbal. Just verbal.
10    Q.   Okay. When did you check on that?
11    A.   A couple of days ago.
12    Q.   Okay. Now, look down here, please,
13 sir, at paragraph No. 4.
14    A.   Okay.
15    Q.   On Schedule A of Exhibit No. 7. This
16 is a written statement, is it not, made by Valley
17 that fee simple estate or interest in the land is
18 at the effective date vested in G&B Investments?
19        MR. JONES: Object to the form.
20        THE WITNESS: Yes.
21 MR. LISTON, CONTINUED:
22    Q.   Okay. Now, you have come to learn
23 now that this statement -- I'll call it a
24 representation. I know you're not going to call
25 it that, are you?

Page 115

1     A.   I'm not going to call it a
2  representation.
3     Q.   But you'll agree it's a written
4  statement?
5     A.   I'll agree it's a written statement.
6     Q.   All right. I'll -- you know,
7  whatever you want to do. I'll say statement, if
8  that's okay.
9     A.   Okay.
10    Q.   You've come to learn now that this
11 statement is false?
12        MR. JONES: Object to the form.
13        THE WITNESS: Speaking as of the time
14 of the commitment?
15 MR. LISTON, CONTINUED:
16    Q.   No. The question was now.
17    A.   Oh, right now?
18    Q.   You know, as you sit here today
19 speaking on behalf of Valley, that the statement
20 on No. 4 is false?
21    A.   I'm sorry, you didn't understand my
22 question.
23    Q.   What?
24    A.   That the statement as of this was
25 incorrect, because I'm not sure exactly who has

Page 116

1  title with all of the bankruptcy proceedings and
2  all now.
3     Q.   I see what you mean.
4     A.   Yeah.
5     Q.   Okay. All right. Well, you came to
6  learn in September of 2009 that the statement made
7  in No. 4 is false?
8     A.   Right. Yes.
9     Q.   Okay. Now, based on what you've been
10 able to determine with Valley, did any employee of
11 Valley know this statement was false at the time
12 it was made?
13    A.   No.
14    Q.   Okay. Did any employee of Valley
15 know whether or not the statement was, in fact,
16 true at the time it was made?
17    A.   No. It's all based on his
18 certificate.
19    Q.   So this statement was put in this
20 document by Valley without knowledge of whether or
21 not the statement was true or false?
22        MR. JONES: Object to the form.
23 MR. LISTON, CONTINUED:
24    Q.   Is that correct?
25    A.   Correct.

# Deposition of Parrish Fortenberry

30 (Pages 117 to 120)

Page 117

1    Q.   Are the insureds, in particular the
2  Bank of Forest -- was the Bank of Forest ever
3  told, to your knowledge, what Valley's procedures
4  were with regard to simply adopting the statements
5  made in title certifications by an approved
6  attorney?
7    A.   I don't know that they were told
8  anything one way or the other.
9    Q.   Okay. In other words, is there any
10 information you can cite, whether it was
11 documented or given orally to the Bank of Forest,
12 whereby the Bank of Forest was informed that
13 Valley, including its employees, is not making an
14 independent determination as to the quality of
15 this title?
16         MR. JONES: Object to the form.
17         THE WITNESS: Nothing other than the
18 fact the commitment says it's not a status of
19 title.
20 MR. LISTON, CONTINUED:
21   Q.   Where does it say that?
22   A.   No. 4 on -- it's not Bates labelled.
23 "This commitment is a contract to issue one or
24 more title insurance policies and is not an
25 abstract of title or a report of the condition of

Page 118

1  title."
2    Q.   Okay. And then it goes on to say
3  what?
4    A.   Do you want me to read it?
5    Q.   Yes, sir.
6    A.   "Any action or actions or rights of
7  action that the proposed insured may have or may
8  bring against the company arising out of the
9  status of title to the estate or interest of the
10 status of the mortgage thereon covered by the
11 commitment must be based on and are subject to the
12 provisions of this commitment."
13   Q.   Okay. So any complaint the bank may
14 have must be based on this commitment, right?
15   A.   Right.
16   Q.   What's in the commitment? The fact
17 that G&B Investments owns the property, right?
18         MR. JONES: Object to the form.
19         THE WITNESS: Right.
20         MR. JONES: The commitment speaks for
21 itself.
22 MR. LISTON, CONTINUED:
23   Q.   Was the bank ever informed, to your
24 knowledge, about how Valley determined for
25 purposes of putting it in a commitment who the

Page 119

1  owner of the property is?
2          MR. JONES: Object to the form.
3          THE WITNESS: They weren't told
4  either way.
5          MR. JONES: Let's take a break.
6          (OFF THE RECORD.)
7  MR. LISTON, CONTINUED:
8    Q.   Look at Exhibit 8. I think the only
9  thing I want to ask you about this is whether this
10 is a true and correct and complete copy of the
11 application and attorney's first certificate
12 pertinent to the 2008 White Oaks loan involving
13 Bank of Forest?
14   A.   It appears to be.
15   Q.   Okay.
16         MR. JONES: Now, wasn't there --
17 isn't there two parcels on -- I thought that
18 was --
19         THE WITNESS: Oh, there are -- there
20 are two parcels on a revised commitment. There
21 are three versions of a commitment in there. I
22 don't think he ever changed --
23 MR. LISTON, CONTINUED:
24   Q.   On 2008?
25   A.   Yeah.

Page 120

1    Q.   I'm fixing to look at that
2  commitment.
3    A.   I don't think he ever submitted
4  another certificate that showed both of them.
5    Q.   Okay. Well, let's just look at --
6  look at Exhibit 9 to Ms. Freeman's.
7    A.   Okay.
8    Q.   Is this a true and correct copy of
9  the title commitment pertinent to the 2008 White
10 Oaks loan? If it's missing something, tell me
11 what it is.
12         MR. JONES: Back cover.
13         THE WITNESS: No, it's -- oh, yeah,
14 it is missing the back cover.
15         COURT REPORTER: I can't hear. With
16 the background distraction, I can't hear entirely
17 what you are saying.
18         MR. JONES: Hey, the court reporter
19 can't hear.
20         THE WITNESS: It appears a true and
21 correct copy, but it's missing the back cover.
22 MR. LISTON, CONTINUED:
23   Q.   Now, let's look at Exhibit No. 10 of
24 Ms. Freeman's.
25   A.   Okay.

Deposition of Parrish Fortenberry

35 (Pages 137 to 140)

Page 137

1  as just purely claims investigation, I helped with
2  investigating the title. So, I mean, does that
3  answer your question?
4       Q.   That answered my question.
5            Some of the information that he put
6  in here --
7       A.   Right.
8       Q.   -- may have been required due to your
9  efforts in claims investigation?
10      A.   Correct.
11      Q.   Okay. All right. You didn't -- did
12 you proofread this for him at any time before he
13 sent it to counsel? Were you aware he was sending
14 the affidavit to counsel? That's what I'm trying
15 to find out.
16           MR. JONES: Object to the form as to
17 whether he's aware if he was sending it to
18 counsel.
19           THE WITNESS: I was aware counsel was
20 retained and working on it.
21 MR. LISTON, CONTINUED:
22      Q.   Okay.
23      A.   So...
24      Q.   Well, have you reviewed this since he
25 signed it?

Page 138

1       A.   I don't recall specifically reading
2  through it, I mean, this specific document.
3       Q.   You're here today to talk on behalf
4  of Valley?
5       A.   Right.
6       Q.   I'm going to go through here and
7  substantively ask you some questions.
8       A.   Okay.
9       Q.   Okay. Look at Paragraph No. 3 in
10 Exhibit 2. This is Exhibit 2, right?
11      A.   Yes.
12      Q.   Okay. Paragraph No. 3 -- and if we
13 disagree about what it says, we can quote it, but
14 I'll try not to do that.
15           Paragraph No. 3 says, essentially,
16 that Valley has filed a lawsuit against Jon
17 Christopher Evans and Charles Evans alleging they
18 engaged in fraudulent or intentional negligent
19 conduct to the detriment of both Valley and its
20 lender -- and the lenders, right?
21      A.   Yes.
22      Q.   Okay. Does Valley agree that Charles
23 Evans' conduct, at least with regard to the Bank
24 of Forest, and some of the certifications -- or
25 the certification he gave on the 2009 White Oaks

Page 139

1  loan was fraudulent?
2            MR. JONES: Object to the form.
3            You can answer to the extent you
4  know.
5            THE WITNESS: It was wrong whether it
6  was fraud -- you know, I guess that goes to his
7  intent, and so. . .
8  MR. LISTON, CONTINUED:
9       Q.   It was -- it was a misrepresentation.
10 Is that a better word?
11      A.   Yeah.
12      Q.   Valley agrees that he made a
13 misrepresentation in those regards?
14           MR. JONES: Object. You said "it."
15 What are you referring to as "it"?
16 MR. LISTON, CONTINUED:
17      Q.   At least the 2009 White Oaks
18 certification, you would agree that was a
19 misrepresentation by Evans?
20           MR. JONES: The application and
21 certification from Charles Evans to --
22 MR. LISTON, CONTINUED:
23      Q.   The application.
24      A.   Yes. Well, I'm sorry, can you --
25      Q.   Sure. Let me --

Page 140

1       A.   It's getting confusing.
2       Q.   Yeah, we're going back and forth.
3  Let me state this the way I need to.
4            Does Valley agree that in the 2009
5  White Oaks loan application for the commitment,
6  that Evans provided to Valley, that it contained
7  misrepresentation about who the fee simple owner
8  of the property was?
9            MR. JONES: Object to the form to the
10 extent it calls for saying a commitment is a
11 representation.
12           THE WITNESS: Yes.
13 MR. LISTON, CONTINUED:
14      Q.   And Valley filed a suit against Evans
15 alleging that he had engaged in fraudulent conduct
16 as referenced by this paragraph, right?
17      A.   Yes.
18      Q.   So consequently, Valley must have had
19 a good faith belief of that fact before it filed
20 this, correct?
21      A.   Yes.
22      Q.   Paragraph No. 8 of this affidavit
23 reflects that Valley relied on title certificates
24 provided by Charles Evans to issue over a hundred
25 title insurance policies to various lenders,

Professional Court Reporting, LLC
601.919.8662

# Deposition of Parrish Fortenberry

36 (Pages 141 to 144)

## Page 141

1  right?
2  A.  Yes.
3  Q.  Okay. Do all of those contain
4  misrepresentations?
5  A.  No.
6  Q.  How many of them do? If you know.
7  A.  I think it was about 30 or 40.
8  Q.  In none of those instances, as I
9  understand your testimony, did Valley check behind
10 Charles Evans' certifications to see if, in fact,
11 they were accurate?
12 A.  At the time the commitments or
13 policies were issued?
14 Q.  Right.
15 A.  No.
16 Q.  No. 9 says, "Charles Evans
17 misrepresented the true ownership of and
18 encumbrances upon certain land and title
19 certificates provided to Valley for the benefit of
20 Jon Evans or entities who borrowed funds from
21 lenders," right?
22 A.  Yes.
23 Q.  Was that the typical modus operandi
24 that Valley discerned from what Charles Evans was
25 doing?

## Page 142

1       MR. JONES: Object to the form.
2       You can answer.
3       THE WITNESS: It appears to be, yes.
4  MR. LISTON, CONTINUED:
5  Q.  i.e., that he was either
6  misrepresenting ownership of property or
7  misrepresenting encumbrances on property?
8  A.  Yes.
9  Q.  No. 10 says, "Each of the business
10 entities obtaining loans based on these title
11 insurance policies and to whom loan proceeds were
12 disbursed was owned and/or controlled by Jon
13 Christopher Evans and/or Charles Evans and/or
14 participated in the common scheme and enterprise
15 of Jon Christopher Evans and Charles Evans."
16      Obviously, Valley believes that or it
17 wouldn't -- Mr. Brad Jones wouldn't have put it in
18 his affidavit, correct?
19 A.  Yeah. It was either believed or
20 suspected.
21 Q.  Okay.
22 A.  At this point, obviously.
23 Q.  Look at paragraph 13, please, sir.
24 It says, "Based on the false title certificates
25 provided by Charles H. Evans, Jr. and title

## Page 143

1  insurance commitments issued by Mississippi Valley
2  Title, lenders would advance funds to Jon
3  Christopher Evans, Charles H. Evans, Jr. and/or
4  others." Is that correct?
5  A.  Yes.
6  Q.  Okay. Now, you -- Mr. Brad Jones,
7  who works with Valley, cited two things that
8  lender would base an advancement of funds on
9  there, right?
10 A.  (Nods head affirmatively.)
11 Q.  One are title certificates provided
12 by Charles Evans, correct?
13 A.  Right.
14 Q.  And the other are title commitments
15 issued by Valley, correct?
16 A.  Right.
17 Q.  With regard to the 2009 White Oaks
18 loan, did Charles Evans ever give Bank of Forest,
19 to your knowledge, a title certificate?
20 A.  I don't know.
21 Q.  You don't know of him ever giving
22 one?
23 A.  I don't know either way. I mean, I
24 know nothing on that.
25 Q.  Do you know whether or not the only

## Page 144

1  indication of who owned the title to the Bank of
2  Forest with regard to the 2009 White Oaks
3  transaction was the title commitment that came
4  from Valley?
5       MR. JONES: Object to the form.
6       THE WITNESS: I don't know.
7  MR. LISTON, CONTINUED:
8  Q.  Do you agree or disagree with what
9  Mr. Jones said in paragraph 13 of this affidavit?
10 A.  I don't agree with the way it's
11 written.
12 Q.  Did you have an opportunity to review
13 this before this document was apparently filed in
14 connection with something, since it bears a filing
15 mark at the top?
16 A.  I don't believe so.
17 Q.  Okay. Look at the next page of the
18 affidavit, please, sir. I'm going to try to
19 summarize this. Now, if you want to read it
20 before you answer the question, that's fine.
21 Okay.
22 A.  Okay.
23 Q.  This part that starts on the next
24 page with Lot 1G has got subparagraphs C through N
25 under it.

Professional Court Reporting, LLC
601.919.8662