# Deposition of Carolyn Freeman

1 (Pages 1 to 4)

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

JON CHRISTOPHER EVANS         Case No. 09-03763-NPO
AND JOINTLY ADMINISTERED
RELATED CASES

DEBTORS.                      Chapter 7

**********************************************

G&B INVESTMENTS, INC.                PLAINTIFF

V.                 ADV. PROC. NO. 10-00040-NPO

DEREK A. HENDERSON, TRUSTEE
FOR THE BANKRUPTCY ESTATE OF
JON CHRISTOPHER EVANS, ET AL.        DEFENDANTS

**********
DEPOSITION OF CAROLYN WILLIAMS
Taken at the offices of
Adams and Reese,
111 Capitol Street, Suite 350,
Jackson, Mississippi,
on Thursday, November 18, 2010,
beginning at approximately 9:20 a.m.

**********

APPEARANCES NOTED HEREIN

CHRISTY R. SIEVERT, CSR, RPR
PROFESSIONAL COURT REPORTING, LLC
Registered Professional Reporter
Certified Shorthand Reporter
Mississippi CSR No. 1421
Post Office Box 320928
Jackson, Mississippi 39232-0928
www.procourtreporting.com

## Page 2

APPEARANCES

COUNSEL FOR MISSISSIPPI VALLEY TITLE
INSURANCE and OLD REPUBLIC NATIONAL
TITLE INSURANCE COMPANY:
    MR. POWELL G. OGLETREE, JR.
    MR. M. SCOTT JONES
    Adams and Reese, LLP
    111 East Capitol Street, Suite 350
    Jackson, Mississippi 39201
    MR. DAVID CLARK
    Bradley, Arant, Boult & Cummings
    Post Office Box 1789
    Jackson, Mississippi 39215

COUNSEL FOR BANK OF FOREST:
    MR. WILLIAM LISTON, III
    MR. LUKE PORTERA
    Liston & Lancaster
    2648 Ridgewood Road, Suite B
    Jackson, Mississippi 39216

COUNSEL FOR MERCHANTS & FARMERS BANK:

    MR. JEFF D. RAWLINGS
    Rawlings & MacInnis
    1296 Highway 51
    Madison, Mississippi 39110

COUNSEL FOR CHARLES EVANS:

    MR. TERRY R. LEVY
    Daniel, Coker, Horton & Bell
    4400 Old Canton Road, Suite 400
    Jackson, Mississippi 39211

## Page 3

(Continued:)
COUNSEL FOR G&B INVESTMENTS, INC.:
    MR. MICHAEL CORY
    MR. DALE DANKS, JR.
    Danks, Miller & Cory
    213 South Lamar Street
    Jackson, Mississippi 39201

ALSO PRESENT:

    DONALD JOSEPH BRATA
    W. PARRISH FORTENBERRY

## Page 4

TABLE OF CONTENTS
                                PAGE

Title Page................................ 1
Appearance Pages.......................... 2, 3
Table of Contents......................... 4
Exhibit Pages............................. 6
Stipulation Page.......................... 6

DEPOSITION OF CAROLYN FREEMAN:

    By Mr. Liston.......................... 7
    By Mr. Rawlings...................... 186
    By Mr. Cory.......................... 198
    By Mr. Jones......................... 241
Signature Page........................... 243
Certificate Page......................... 244

EXHIBIT 15

## Deposition of Carolyn Freeman

3 (Pages 9 to 12)

Page 9

1 "Valley" or "Mississippi Valley," or I may just
2 say "MVT." May we have the agreement that if I do
3 that, then you understand that I'm talking about
4 your employer?
5    A.   Yes.
6    Q.   Okay. Thank you.
7         Could you tell me what your current
8 employment position is with MVT?
9    A.   I'm vice president, senior
10 underwriter.
11   Q.   All right. How long have you held
12 that position?
13   A.   I'm not sure of the exact...
14   Q.   It wasn't last week, was it?
15   A.   No.
16   Q.   All right. Let's do this. Let me
17 start with your educational history. I want to
18 know where you grew up, where you went to school,
19 how far you went in school, and then I'll talk to
20 you about your employment background.
21   A.   Okay.
22   Q.   All right. Go ahead, tell me where
23 you grew up.
24   A.   I graduated from Union High School.
25   Q.   In Union, Mississippi?

Page 10

1    A.   Newton County.
2    Q.   Oh, okay. And then did you do any
3 education subsequent to high school?
4    A.   I went to East Central Junior
5 College.
6    Q.   What sort of studies did you focus on
7 there?
8    A.   I was taking secretarial.
9    Q.   Okay. And then following that, did
10 you go to any other higher education --
11   A.   No.
12   Q.   -- in colleges? What year did you
13 enter the workforce? Or what age? Let me ask you
14 that. What age did you enter the workforce?
15   A.   I don't know the exact age. I know
16 the year that I went to work -- started work, in
17 1963.
18   Q.   Okay. Who did you start work for in
19 1963?
20   A.   Interstate Life & Accident.
21   Q.   Okay. And what type of insurance
22 company was that?
23   A.   A life insurance company.
24   Q.   Okay. And where were they located?
25   A.   Out on North State Street.

Page 11

1    Q.   All right. How long did you work for
2 that company?
3    A.   About a year.
4    Q.   Okay.
5    A.   And then they had a cutback.
6    Q.   Okay. And can you -- when did you
7 begin work for Valley?
8    A.   In 1965.
9    Q.   Okay. So have you been with Valley
10 since 1965?
11   A.   Yes, sir.
12   Q.   Did you work for anybody else
13 between -- I'm going to call it Interstate and
14 Valley?
15   A.   USF&G.
16   Q.   Okay. When you started work for
17 Valley in 1965, what was your initial job
18 position?
19   A.   I worked in the escrow department.
20   Q.   Escrow?
21   A.   (Nods head affirmatively.)
22   Q.   Okay. And can you give me a list of
23 the different jobs you've had at Valley since
24 1965? The best that you can. I mean, I know you
25 may leave something out, but I just want to find

Page 12

1 out about you.
2    A.   I started out in the escrow
3 department doing document prep. Construction
4 loans. And then I went to underwriting.
5    Q.   Okay. How many years have you been
6 in underwriting? Or since when?
7    A.   Since in the '70s.
8    Q.   Okay. I don't imagine that when you
9 started in underwriting, you were the head of that
10 department.
11   A.   No.
12   Q.   You are now the head of that
13 department?
14   A.   Yes.
15   Q.   How many years have you been the head
16 of the underwriting department, roughly? More
17 than ten?
18   A.   Yes.
19   Q.   Can you explain to me, as someone who
20 has never worked for an insurance company, what
21 the function of Valley's underwriting department
22 is?
23   A.   We review the applications for title
24 insurance, and based on the attorney's
25 certification, we issue title.

**Professional Court Reporting, LLC**
**601.919.8662**

## Deposition of Carolyn Freeman

6 (Pages 21 to 24)

Page 21

1  A. That would be found in the
2  exceptions.
3  Q. Okay. Exceptions as well, right?
4  A. (Nods head affirmatively.)
5  Q. What happens if you get an
6  application for a title commitment -- and by the
7  way, those applications contain some certification
8  from the approved attorney about the status of the
9  title, do they not?
10 A. He's certifying the title.
11 Q. Correct. That's the cert- -- the
12 application is also a certification of title by
13 the approved attorney. Fair?
14 A. He's certifying.
15 Q. Is that right?
16 A. (Nods head affirmatively.)
17 Q. You need to say yes or no.
18 A. Yes.
19 Q. I'm sorry. If you get one from an
20 approved attorney that just simply says the
21 property is owned in fee simple by a certain
22 entity, is there any real underwriting you have to
23 do on an application like that?
24 A. You do the same underwriting on that
25 one as you would any other.

Page 22

1  Q. Okay. If it doesn't disclose any
2  issues about estates, if it doesn't disclose any
3  deceased persons, and it just says fee simple
4  titles in Company XYZ, what kind of underwriting
5  can you do on something like that? Just curious.
6  A. If the attorney has certified it,
7  then it is what it is.
8  Q. Okay. So if he certifies it, and
9  there's nothing on the application that gives you
10 a reason to want to review it, then there's
11 nothing to review, you're relying on his
12 certification?
13 A. Right.
14 Q. Okay. Are you employed in any way by
15 Old Republic?
16 A. It's a joint company.
17 Q. Okay. What do you mean by that when
18 you say "joint company"?
19 A. Mississippi Valley/Old Republic.
20 Q. Okay. Who -- when you get a
21 paycheck, what name is on the paycheck other than
22 yours? Who -- in other words, does it say
23 Mississippi Valley Title, at the top, is paying
24 you, or does it say Mississippi Valley and Old
25 Republic on your paycheck?

Page 23

1  A. I don't know.
2  Q. Okay. When you get -- do you get W-2
3  forms at the end of the year?
4  A. Yes.
5  Q. All right. Does it reflect that
6  Mississippi Valley is your employer or that Old
7  Republic is your employer or both? Or do you
8  know?
9  A. I don't know for sure.
10 Q. Have you ever been informed that --
11 anybody ever told you, you are an employee of Old
12 Republic, in addition to being an employee of
13 Mississippi Valley?
14 A. I don't recall.
15 Q. Are you an officer of Old Republic,
16 to your knowledge?
17 A. Not to my knowledge.
18 Q. Okay. Is there anyone superior to
19 you in the underwriting department?
20 A. Yeah.
21 Q. Okay. I thought you were the head of
22 the underwriting department.
23 A. I manage the underwriting department.
24 Q. Correct. Is there anyone that's
25 employed in the underwriting department to whom

Page 24

1  you report? In the underwriting department.
2  A. Not in the department.
3  Q. That's my question. To whom do you
4  report?
5  A. Mark Higdon.
6  Q. Okay. And he is what?
7  A. President.
8  Q. Okay. Of Valley?
9  A. No. He's the. . .
10 Q. He's something.
11 A. Yeah.
12 Q. I've seen his title.
13 A. Yeah.
14 Q. I don't remember, myself.
15 A. He's -- I'm not sure what his title
16 is.
17 Q. Okay. All right. Do you have the
18 obligation to make some sort of recurring report
19 to him about the operations of underwriting, or is
20 it just a situation where if he wants the answer
21 to a question, he comes and asks you, and you tell
22 him?
23 A. Right.
24 Q. Second? Not the first?
25 A. I mean, I don't make a monthly report

Professional Court Reporting, LLC
601.919.8662

## Deposition of Carolyn Freeman

32 (Pages 125 to 128)

Page 125

1  paragraph.
2  A.  (Reviews document.) Oh, you're
3  talking about up here?
4  Q.  Second paragraph, second line. It
5  talks about "for a valuable consideration." Do
6  you see that?
7  A.  Uh-huh (affirmative response). Yes,
8  I do.
9  Q.  To your knowledge, is that talking
10  about the fee for the commitment, the binder fee?
11  A.  I'm not sure.
12  Q.  Okay. Now, you signed this
13  commitment, as I understand it. Does that --
14  A.  Yes.
15  Q.  -- mean that you underwrote it before
16  you issued it?
17  A.  Certainly.
18  Q.  Okay. Tell me what underwriting you
19  did on this before issuing this commitment.
20  A.  I reviewed the commitment -- the
21  application and -- well, I may not have personally
22  entered this one. I don't know if I did or
23  didn't. Okay?
24  Q.  You mean drafted the schedules?
25  A.  Exactly.

Page 126

1  Q.  Okay.
2  A.  But I would have reviewed the
3  commitment against the title work.
4  Q.  I understand.
5  A.  Before I signed it.
6  Q.  Okay. All right.
7  A.  And then I would have delivered it.
8  Q.  Okay. And is it fair to say that
9  when you did that, you didn't find anything that
10  caused you any concern?
11  A.  I just took it from his certificate.
12  Q.  Okay. And as we've talked about
13  already, but now we're talking about this specific
14  document, neither you nor anyone with Valley,
15  to your knowledge, undertook to check behind
16  Charles Evans' certificate to see if his
17  certificate was, in fact, accurate?
18      MR. JONES: Object to form.
19      THE WITNESS: Not to my knowledge.
20  MR. LISTON, CONTINUED:
21  Q.  Okay. Let's look at the schedule,
22  please, ma'am, Schedule A. Do you -- do you know,
23  as you sit here today, whether you prepared this
24  schedule or whether somebody else prepared it?
25  A.  I'm not sure.

Page 127

1  Q.  But you would have reviewed it?
2  A.  Probably.
3  Q.  Okay. Well, I mean, do you
4  remember -- I thought a second ago you said, "I
5  would have checked the schedule against the
6  application."
7  A.  Before I signed it.
8  Q.  Before you signed it. But as you sit
9  here today, do you remember reviewing this
10  schedule?
11  A.  I don't remember, per se, this one.
12  I do a lot of them.
13  Q.  I know. Hard to remember a given
14  one, I'm sure.
15  A.  Right.
16  Q.  Okay. Now, at the top, it says --
17  well, let me just ask it this way. Charles Evans
18  didn't prepare this Schedule A, did he?
19  A.  No.
20  Q.  Okay. It had to be prepared in-house
21  at Valley, right?
22  A.  Yes.
23  Q.  Right here at the top, it says it's
24  issued for Charles Evans.
25  A.  Uh-huh (affirmative response).

Page 128

1  Q.  And when an approved -- approved
2  attorney submits an application, do they always
3  say they're issued for the approved attorney?
4  A.  I'm not sure if all of them say that
5  or not.
6  Q.  Do you see right next to his name, it
7  says the words "Agent No. 525241"?
8  A.  Yes.
9  Q.  Okay. You talked to me about he, to
10  your knowledge, was not an agent.
11  A.  Right.
12  Q.  How do we get the word "agent" on
13  here next to his name, with a number?
14  A.  It's in the software.
15  Q.  When did that software -- when did
16  Valley start using that software?
17  A.  I'm not sure of the exact date,
18  because it's updated versions.
19  Q.  Okay. Was it within the last -- was
20  it -- since 2005, has it been using it, or do you
21  know?
22  A.  I don't know.
23  Q.  Okay. So the word "agent" is, what,
24  a field on a computer screen that is always going
25  to print out "agent" when you create a schedule?

Case 10-00040-NPO    Doc 342-15    Filed 01/04/11    Entered 01/04/11 21:11:36    Desc
Exhibit Carolyn Freeman depo excerpts    Page 5 of 6

Deposition of Carolyn Freeman

33 (Pages 129 to 132)

Page 129

1    A.    When you -- when you pull it up to
2    the binder.
3    Q.    Okay. And what does this number
4    signify next to the word "agent," 525241?
5    A.    I would assume that's his approved
6    attorney number.
7    Q.    Do you know for a fact whether that's
8    the approved attorney number?
9    A.    Not exactly, no.
10   Q.    Okay. The commitment has a number.
11   Does every commitment have a number, a different
12   number?
13   A.    Yes.
14   Q.    Okay. And then Schedule A has an
15   effective date down here of August 26th, 2009,
16   right?
17   A.    Yes.
18   Q.    Okay. And that's the date and time
19   that the -- Charles Evans certified the property?
20   A.    Certified the title, yes.
21   Q.    Okay. And then it reflects that this
22   was being issued for a lender's policy to the Bank
23   of Forest, correct?
24   A.    Yes.
25   Q.    Okay. And then Paragraph No. 3 talks

Page 130

1    about the -- it says, "The estate or interest in
2    the land described or referred to in this
3    commitment is fee simple," right?
4    A.    Right.
5    Q.    And then what is your understanding
6    of fee simple?
7    A.    In fee.
8    Q.    Okay. Well, do you know what that
9    means, translated out of legal terms?
10   A.    No.
11   Q.    No. Look at No. 4, please. It says,
12   "Title to the fee simple estate or interest in the
13   land is, at the effective date, vested in G&B
14   Investments, Inc., by virtue of deed dated
15   October 1, 1999, recorded in Book 451 at page
16   291." Right? Is that what it says?
17   A.    Yes.
18   Q.    Now, that information, I understand,
19   was taken from the application submitted by
20   Charles Evans. Right?
21   A.    Certified, yes.
22   Q.    And so what Valley did was take his
23   information from that application that was
24   certified to Valley and turned around and put it
25   on its document that represents who the title was

Page 131

1    vested in?
2         MR. JONES: Object to form.
3    MR. LISTON, CONTINUED:
4    Q.    Correct?
5    A.    It was taken from his application,
6    yes.
7    Q.    Okay. And put on Valley's document,
8    right?
9    A.    Right. In the binder.
10   Q.    In the binder. And it's a
11   representation, isn't it, that G&B Investments is
12   the owner of the property?
13        MR. JONES: Object to form.
14        THE WITNESS: It's who the attorney
15   said the title was vested in.
16   MR. LISTON, CONTINUED:
17   Q.    Well, I understand where it came
18   from. That's not my question. My question is,
19   isn't it a representation on a Valley document as
20   to who the owner of the property is?
21        MR. JONES: Object to form. The
22   commitment itself is the best evidence.
23        THE WITNESS: I mean, the commitment
24   says it's vested in it.
25   MR. LISTON, CONTINUED:

Page 132

1    Q.    Okay. It says a statement, isn't it?
2         MR. JONES: Object to form.
3    MR. LISTON, CONTINUED:
4    Q.    It's a written statement on this form
5    that says the owner is G&B Investments, right?
6         MR. JONES: Object to form.
7         THE WITNESS: (Nods head
8    affirmatively.)
9    MR. LISTON, CONTINUED:
10   Q.    You need to say --
11   A.    Yes.
12   Q.    -- yes or no. Is that yes?
13   A.    Yes.
14   Q.    Okay. Now, did you know at the time
15   this statement was made, and the Schedule A of
16   this commitment, that this statement or
17   representation was false?
18        MR. JONES: Object to form.
19        THE WITNESS: I had no idea.
20   MR. LISTON, CONTINUED:
21   Q.    Okay. So does that mean you didn't
22   know, as of the time this schedule was prepared
23   and the time this commitment was issued, whether
24   G&B Investments, Inc., owned the property or
25   didn't own the property?

## Deposition of Carolyn Freeman

34 (Pages 133 to 136)

### Page 133

1  A. I had no way of knowing other than
2  what the attorney had certified to me.
3  Q. So from your personal knowledge, you
4  didn't know whether this statement was true or
5  false, did you?
6  A. No. I relied on him.
7  Q. Right. You're assuming he knows,
8  right?
9  A. He said he did.
10  Q. He said he did. But you don't know,
11  from your own knowledge and inquiry, do you?
12  A. No. I didn't check the title behind
13  it, no.
14  Q. To your knowledge, did anybody with
15  Valley, anybody employed by Valley, know whether
16  the statement was true or false that G&B
17  Investments owned the property?
18  A. Not that I'm aware of.
19     MR. JONES: Object to form.
20  MR. LISTON, CONTINUED:
21  Q. The only person you think might know
22  is Charles Evans, right?
23  A. That's who certified it. Yes.
24  Q. Okay. Now, are the banks to whom
25  policies are written, including Bank of Forest, to

### Page 134

1  your knowledge, ever informed as to what Valley's
2  procedures are when it issues title commitments?
3  A. I'm not aware of what procedures...
4  Q. Right. But in your knowledge, as
5  long as you've worked at Valley, have you ever
6  been familiar with Valley disclosing to insureds,
7  like insured banks, about how it determines who
8  owns property and who doesn't?
9     MR. JONES: Object to form.
10     THE WITNESS: I'm not sure.
11  MR. LISTON, CONTINUED:
12  Q. You don't know of anything, right?
13  A. I mean --
14     MR. JONES: Object to form.
15     THE WITNESS: I didn't.
16  MR. LISTON, CONTINUED:
17  Q. Okay. In other words, I'm asking you
18  this: How would a bank know, like the Bank of
19  Forest, that the only thing Valley has done in
20  determining who the owner is, is to take the word
21  of Charles Evans for it? Is there any way a bank
22  would know that?
23  A. I'm not sure.
24  Q. Okay.
25  A. I don't know what they require.

### Page 135

1  Q. To the best of your knowledge -- I'm
2  not talking about what the banks require, but what
3  Valley --
4  A. I mean, they require a copy of the
5  deed. I don't know.
6  Q. Okay. But do you know of any Valley
7  procedure to inform banks about how these
8  ownership of property is determined?
9     MR. JONES: Object to form.
10  MR. LISTON, CONTINUED:
11  Q. If you do, I want to know what it is.
12  A. I don't --
13  Q. If you don't --
14  A. I don't know.
15  Q. Okay.
16  (EXHIBIT NO. 8 WAS MARKED FOR THE RECORD.)
17  MR. LISTON, CONTINUED:
18  Q. I show you Exhibit 8, please. Now I
19  can tell you we're moving on to the 2008 White
20  Oaks loan. Okay? Remember how I defined those
21  terms?
22  A. Yes.
23  Q. All right. Is this a true and
24  correct copy of the application and attorney's
25  first certificate received by Valley from

### Page 136

1  Charles Evans for the 2008 White Oaks loan?
2  A. As far as I know, yes.
3  Q. Okay. Thank you, ma'am. I notice on
4  this first page, he's got some cross-outs in the
5  section that identifies the party to whom the
6  property will be sold. Right?
7  A. Yes.
8  Q. This looks like he wrote, "Town Park
9  Of Madison, LLC," and crossed it out, and then he
10  wrote "Park Place Commons, LLC," and crossed it
11  out, and then underneath a line, he came in and
12  wrote, "White Oaks Investment Company, LLC." Or
13  somebody did. Right?
14  A. Yeah. I don't know who did.
15  Q. Did you personally review this
16  application when it came in, if you remember?
17  A. I don't remember.
18  Q. Would the fact that several entities
19  are listed and crossed out in this part here be
20  any reason for a cause for concern or inquiry at
21  Valley, to the extent you know?
22  A. I don't know when he made the
23  changes, if it was before or...
24  Q. Okay. And on the second page, he's
25  got his certification he signed down to July 17,