UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

IN RE:

JON CHRISTOPHER EVANS                           CASE NO. 09-03763-NPO

DEBTOR                                          CHAPTER 7

*Jointly Administered with Related Cases*

---

G&B INVESTMENTS, INC.                           PLAINTIFF

versus                                          ADV. PROC. NO. 10-00040-NPO

DEREK A. HENDERSON, TRUSTEE FOR
THE BANKRUPTCY ESTATE OF JON
CHRISTOPHER EVANS, et al.                       DEFENDANTS

---

## BANK OF FOREST'S MEMORANDUM IN RESPONSE TO TITLE COMPANIES' MOTION FOR SUMMARY JUDGMENT

COMES NOW Bank of Forest, through counsel, and files its Memorandum in Response to the Title Companies' Motion for Summary Judgment, as follows:

### I. Introduction

The Cross Claim filed by the Bank of Forest in this matter involves two loans, the first made to White Oaks Investment Company, LLC ("White Oaks") in July 2008, and the second loan made to White Oaks in August 2009. The Bank's claim under the 2008 loan sounds in contract, and the claims made under the 2009 loan are based in tort.

In response to the Memorandum in support of Motion for Summary Judgment filed in this matter by Mississippi Valley Title Insurance Company ("MVT") and Old Republic National Title Insurance Company ("Old Republic"), collectively the "Title Companies", Bank of Forest asserts that there are genuine issues of material fact and that the Title Companies are not entitled to judgment as a matter of law with respect to the Bank's claims:

(1)     Under the 2008 loan, for breach of contract of the loan policy issued to the Bank by the Title Companies to insure against loss or damage arising from a defect in title

or unenforceability of the insured mortgage.  Bank of Forest submits that the Title

Companies have breached the insurance contract by failing to indemnify the Bank for losses

and damages it sustained, including a deficiency and attorney's fees; and

      (2)     Under the 2009 loan, for fraud and negligent misrepresentation arising out of

a misrepresentation of material fact contained within a 2009 title commitment issued by the

Title Companies, on which the Bank reasonably relied to its detriment, by making a

$451,450 loan to White Oaks which resulted in a total loss and related damages.  The Bank's

fraud claim is both direct and imputed, seeking to hold the Title Companies liable for their

own misrepresentation and for the misrepresentation of Charles Evans under principles of

actual and apparent authority.

Bank of Forest respectfully submits that the Title Companies are not entitled to dispositive

relief since the Bank demonstrates herein a *prima facie* case as to each of the above claims.[1]


## II.  Underlying Facts

### A.      Title Companies admit that Charles Evans' conduct was fraudulent.

The Title Companies do not contest that Charles Evans engaged in a scheme to defraud the

Bank of Forest and others, even though Mr. Evans refused to testify about it.[2]  *Ex. 2, Parish*

*Fortenberry, p. 140; Ex. 3, James Partin, p. 109.*

From 2003 until September of 2009, Charles Evans, acting as an approved attorney for the

Title Companies, submitted over 100 applications with title certifications on which the Title

---

[1]    The claims set forth in the "Introduction" are enumerated as Counts I, II and V of the
Bank's Amended Cross-Claim filed in this matter.  The Title Companies' summary judgment
motion did not raise issue or seek dismissal of Count IX and Count XII of the Amended Cross-
Claim.  Therefore, Bank of Forest reserves the right to seek all relief allowed by law under
Counts I, II, V, IX, and XII of its Amended Cross-Claim.

[2]    During his Rule 2004 Examination Under Oath, Charles Evans pled his Fifth
Amendment privilege in response to every substantive question asked concerning the Bank of
Forest.  *Ex.1, Charles Evans EUO, excerpts.*

Companies "relied" in issuing title insurance policies. *Ex. 4, Affidavit of Brad Jones*, ¶ *8; Ex. 5, Brad Jones, p. 111-12.* The Title Companies' investigation reveals that as many as 40 of these title certifications contained misrepresentations. *Ex. 2, parish Fortenberry, p. 140-41.* Mr. Evans' *modus operandi* was to misrepresent either the ownership of land or the encumbrances thereon when making application to the Title Companies for issuance of title insurance commitments or title insurance policies. *Ex. 2, parish Fortenberry, p. 141-42.*

Charles Evans employed the same fraudulent scheme to induce the Bank of Forest to loan $451,450.00 to White Oaks Investment Company, LLC ("White Oaks") in August of 2009. The Application and Attorney's First Certificate he submitted to the Title Companies misrepresented that the land was vested in G&B Investments, Inc. and requested the issuance of a title insurance commitment to the Bank of Forest. *Ex. 6, 9-26-09 Application and Attorney's First Certificate.* His application omitted the fact that the property was already encumbered by a $3 million mortgage in favor of Merchants & Farmers Bank. *Id.*

**B.    The Loans and Title Defects**

Bank of Forest made two loans to White Oaks, one in July 2008 and the other in August 2009. Chris Evans represented to the Bank that he had contracted to purchase various parcels of land from G&B Investments and gave the Bank purchase agreements to support each loan which identified G&B Investements as the seller. *Ex. 7, Purchase Agreements.*

The first loan, on July 21, 2008 in the amount of $1,296,500.00, was for the purchase of tracts T-4 and T-5. *Ex. 8, BoF Depo, p. 46; Ex. 9, 2008 Multipurpose Note & Security Agreement and Land Deed of Trust.* On August 27, 2009, Bank of Forest made a second loan to White Oaks for the purchase of tract T-3. *Ex. 8, BoF Depo, p. 46, 133; Ex. 10, 2009 Multipurpose Note & Security Agreement and Land Deed of Trust.* Both loans were closed by the Bank at its Rankin County branch without the participation of Charles Evans. *Ex. 8, BoF Depo, p. 133.* White Oaks and Chris Evans were responsible for all closing costs, including fees and premiums for title commitments and policies. *Ex. 8, BoF Depo, p. 48-49, 112.*

3

Bank of Forest insisted on the issuance of title commitments and title policies before agreeing to advance funds to White Oaks. *Ex. 11, BoF EUO, p. 57-58, 62; Ex. 8, BoF Depo, p. 42.* Clifton Fowler, President of the Rankin County branch of Bank of Forest, requested that Charles Evans provide commitments and policies for both loans through the Title Companies. *Ex. 11, BoF EUO, p. 62; Ex. 8, BoF Depo, p. 42, 48.* The Title Companies issued a commitment and a policy for the 2008 White Oaks loan. Even though the Title Companies issued a title commitment on the 2009 White Oaks loan, they subsequently discovered the fraudulent scheme of Charles Evans and then refused to issue a title policy on the 2009 loan. *Ex. 8, BoF Depo, p. 116.*

Title defects and undisclosed encumbrances impaired both loans made by Bank of Forest. In the 2008 loan, tracts T-4 and T-5 were owned by Hanover Investments, Inc., rather than White Oaks, at the time the title policy issued, and the Bank's deed of trust when filed was second in priority to one filed on behalf of G&B Investments. *Ex. 12, Affidavit of Clifton Fowler.* Bank of Forest's deed of trust on the 2009 White Oaks loan was invalid and unenforceable from its inception, since ownership of tract T-3 was vested in Hanover Investments at the time it was supposedly being sold by G&B Investments to White Oaks. *Ex. 12, Affidavit of Clifton Fowler.*

C.    **Title insurance commitments and policies**.

MVT and Old Republic jointly issued the title commitments and policy delivered to the Bank of Forest. *Ex. 13, Robert Chipinski, p. 20-21.* The commitments and policy issued for Bank of Forest were pre-printed forms, with the exception of Schedules attached thereto prepared by employees of MVT. *Ex. 2, parish Fortenberry, p. 102.*

Schedule "A" of the title commitment issued to Bank of Forest on the 2009 loan contains a representation of ownership in ¶4 which is pertinent to this Court's decision on summary judgment:

4

---

## MISSISSIPPI VALLEY TITLE

A MEMBER OF THE OLD REPUBLIC TITLE INSURANCE GROUP

---

Issued for: **Charles H. Evans, Jr., Agent #:525241**

Commitment No.: **V177829**

### SCHEDULE A

1. Effective Date: **August 26, 2009 at 8:00 A.M.**

2. Policy or Policies to be issued:

    a. Loan Policy: **Loan Policy (06-17-06)**   Amount: **$450,000.00**

    Proposed Insured: **Bank of Forest its successors and/or assigns...**

3. The estate or interest in the Land described or referred to in this Commitment is **Fee Simple**.

4. Title to the **Fee Simple** estate or interest in the land is at the Effective Date vested in:

    **G&B Investments, Inc., by virtue of deed dated October 1, 1999, recorded in Book 451 at Page 291**

5. Purchaser/Borrower: **White Oaks Investment Company, LLC**

---

*Ex. 14, Title Commitment No. V177829 ("2009 title commitment").*

When the Title Companies drafted Schedule A, and typed thereon that G&B Investments was the fee simple owner of the property, they did not know whether this representation of fact was true or false. *Ex. 13, Robert Chipinski, p. 95-97.* As MVT's corporate designee testified:

Q:   Well, you came to learn in September of 2009 that the statement made in No. 4 is false?

A:   Right.  Yes.

Q:   Now, based on what you've been able to determine with Valley, did any employee of Valley know this statement was false at the time it was made?

A:   No.

Q:   Did any employee of Valley know whether or not the statement was, in fact, true at the time it was made?

A:   No.  It's all based on his certificate.

5

Q:    So this statement was put in this document by Valley without knowledge of whether or not the statement was true or false?

Mr. Jones: Object to the form.

Q:    Is that correct?

A:    Correct.

*Ex. 2, parish Fortenberry, p. 116-17.*

### D.    The Title Companies did not underwrite Charles Evans certificate of title.

The Title Companies completely relied on the certificates of title submitted by Charles Evans, literally taking his word for it. Unbeknownst to Bank of Forest, no real underwriting of his applications and title certifications occurred. *Ex. 2, parish Fortenberry, p. 32-33.*

The senior "underwriter" at MVT explained that the Title Companies issue commitments and policies based only upon the attorney's certification. *Ex. 15, Carolyn Freeman, p. 12.* Underwriting only occurs when an application/certification discloses the involvement of Estates or decedents. *Ex. 15, Carolyn Freeman, p. 22.* Otherwise, the Title Companies engage in no underwriting at all and simply transfer the certification, including information as to fee simple ownership, to their own Schedules. Thus, when Charles Evans represented that G&B Investments was the fee simple owner in his application and certification, the Title Companies merely adopted his representation as their own by entering it onto Schedule A that became part of the title commitment. *Ex. 15, Carolyn Freeman, p. 126.*

The Title Companies did not "go behind" Charles Evans' certification of title, did not require him to produce copies of the vesting instruments upon which he relied, and did not undertake to form any independent conclusion as to the accuracy of his certifications. *Ex. 2, parish Fortenberry, p. 32-33.* With no checks in place, Charles Evans' fraudulent input became the Title Companies fraudulent output in the form of title commitments and policies.

### E.    Charles Evans' agency relationship with the Title Companies.

Charles Evans served as an approved attorney for the Title Companies from 1984 to September of 2009. *Ex. 2, parish Fortenberry, p. 19, 24.* From 2003 to 2009, he submitted over 100 title certifications to the Title Companies. *Ex. 5, Brad Jones, p. 111-12.*

From the Bank of Forest's perspective, Charles Evans was the sole representative of the Title Companies with whom the Bank was expected to deal in obtaining title commitments and policies for its loans. *Ex. 8, BoF Depo, p. 33.* Charles Evans related that he could obtain the title commitments and policies that the Bank required. *Ex. 8, BoF Depo, p. 190-91.* He obtained a title commitment and policy for the Bank's 2008 loan to White Oaks, and the Bank was not required to deal with anyone other than Charles Evans to obtain these documents. *Ex. 8, BoF Depo, p. 36.* He also obtained, at the Bank's request, the title commitment for the 2009 White Oaks loan. *Id.*

The fact that Charles Evans produced the end product, coupled with the Bank's lack of communication with other Title Company representatives, signaled to the Bank Charles Evans' authority to act on behalf of the Title Companies. The Title Companies knew, at least when they issued a commitment and policy to the Bank in 2008, that Charles Evans was transacting their business with the Bank of Forest. Yet, the Title Companies gave Bank of Forest no notice of any restriction or limitation on Charles Evans' authority. *Ex. 8, BoF Depo, p. 190-91.* When the 2009 title commitment issued with the word "Agent" next to Charles Evans' name, this was simply consistent with the type of acts he was already performing. *Ex. 8, BoF Depo, p. 37; Ex. 2, parish Fortenberry, p. 108-12.*

The following email string clearly demonstrates that Bank of Forest looked to Charles Evans as a representative of the Title Companies for the purpose of obtaining title commitments and policies:

| Date | Communication |
| --- | --- |
| July 15, 2008 | Bank to Evans - requesting title binder before closing on 2008 White Oaks loan |
| July 15, 2008 | Evans to Bank - promising to obtain requested binder and deliver it to Bank |
| July 20, 2008 | Bank to Evans - requesting that binder be reissued due to change in amount of loan |
| September 12, 2008 | Bank to Evans - requesting delivery of title policy after closing of 2008 White Oaks loan |
| September 15, 2008 | Evans to Bank - promising to check on status of title policy for 2008 White Oaks loan |
| September 22, 2008 | Bank to Evans - acknowledging receipt of title policy for 2008 White Oaks loan |
| September 1, 2009 | Bank to Evans - requesting delivery of title policy on 2009 White Oaks loan |

*Ex. 16, Emails between Bank and Charles Evans; Ex. 8, BoF Depo, p. 48.*

As it turns out, the Bank's reasonable belief about Charles Evans authority was correct – the Title Companies had authorized him to do the very acts the Bank had seen him do. As confirmed by the testimony of the Title Companies, Charles Evans was authorized in his capacity as an approved attorney to:

(1)    Research and examine titles on behalf of the Title Companies. *Ex. 2, parish Fortenberry, p. 65-66; Ex. 13, Robert Chipinski, p. 33-34.* (In fact, relieving the Title Companies from the burden of title examination is a principal reason for the use of approved attorneys. *Ex. 2, parish Fortenberry, p. 66-67.*)

(2)    Submit title certificates based on his title research to the Title Companies for issuance of title commitments and policies. *Ex. 13, Robert Chipinski, p. 43-44; Ex. 2, parish Fortenberry, p. 32-33, 67.*

(3)    Prepare and submit applications to the Title Companies for issuance of title commitments and title policies. *Ex. 13, Robert Chipinski, p. 43-44; Ex. 2, parish Fortenberry, p. 67.*

8

(4)     Receive title commitments and policies from the Title Companies and deliver them to insureds. *Ex. 13, Robert Chipinski, p. 43-44; Ex. 2, parish Fortenberry, p. 70.* (All of the title commitments and policies which the Title Companies issued to the Bank of Forest were transmitted to Charles Evans for delivery. *Ex. 2, parish Fortenberry, p. 105-06.*)

(5)     Collect fees and premiums for title commitments and policies and remit the same to the Title Companies. *Ex. 13, Robert Chipinski, p. 43-44; Ex. 2, parish Fortenberry, p. 67-70.* (The Title Companies did not bill Bank of Forest but looked to Charles Evans for payment. *Ex. 2, parish Fortenberry, p. 67-68, 104-06.*)

Further, the Title Companies viewed Charles Evans as their conduit for communication with their insured. Typically, the approved attorney is the only person with whom the insured will be in contact, as a conduit for information from the Title Companies. *Ex. 2, parish Fortenberry, p. 67, 70.* Why then would the Title Companies expect Bank of Forest to contact them to check if Charles Evans was their agent when the Title Companies intended for Charles Evans to be their main channel of communication with the insured? Doing so would have been a superfluous act, at best.

Obviously, the Title Companies' approved attorney network generates business for the Title Companies. The Title Companies allow approved attorneys to hold themselves out as "approved attorneys" to banks and other insureds, which directs commitment and policy business to the Title Companies. *Ex. 2, parish Fortenberry, p. 52-54.* It would be counterproductive to the goal of generation of business for the Title Companies to disseminate notices which limit the authority of the approved attorneys.

**F.     The Failure to Supervise and Monitor Charles Evans.**

The Title Companies did nothing to supervise, audit or monitor Charles Evans, and unchecked, he was able to exploit the approved attorney system for the purpose of defrauding Bank of Forest and others.

The Title Companies could have, but did not, require approved attorneys to attach copies of written instruments (*i.e.*, warranty deeds) to their applications/certifications. *Ex. 2, parish*

9

*Fortenberry, p. 83-84.* This easy step would have imposed no burden whatsoever on the Title Companies and would have deterred fraud by an approved attorney.

There is no constitutional right to be an approved attorney, and if an attorney desires to serve in such capacity he will agree to reasonable monitoring and supervision. Old Republic recognizes this since it authorizes each of its regions to promulgate rules and procedures for the supervision of approved attorneys. *Ex. 13, Robert Chipinski, p. 35-38.*

At the peril of their insureds, the Title Companies simply operated under the fallacious thought that all lawyers are honest[3]:

Q:     Let me talk to you about the company's procedures, if any, with regard to supervision of approved attorneys.

A:     Okay.

Q:     Is there any?

A:     No.

Q:     Certainly, the company doesn't check behind the work of the – title work of the approved attorney?

A:     Correct. Yes.

Q:     To determine whether or not each individual certification of title is accurate?

A:     Yes.

Q:     Or is free from fraud?

A:     Right.

Q:     The company, as I understand it, doesn't even do any random/spot checking of approved attorney's certification work?

A:     Right.

Q:     Is there a reason for that?

A:     Well, just relying on the attorney as a member in good standing of the Bar.

---

[3] "A lawyer with his briefcase can steal more than a hundred men with guns." Mario Puzo, *The Godfather*, 1969.

*Ex. 2, parish Fortenberry, p. 57.*

**G.    Bank of Forest's Reliance on the Title Companies' Representation**

The Title Companies' internal procedures and the Affidavit of their claims counsel establish

beyond peradventure that their statement of fact identifying G&B Investments as the fee simple

owner was a representation upon which Bank of Forest was entitled to rely.

The Mississippi Agents Manual, still in use by MVT, establishes that title commitments,

while promises to provide post-transaction insurance, also constitute assurances of the quality and

validity of title which enable property buyers and lenders to proceed with real property transactions:

1.2    Basic Title Insurance Process

The basic title insurance process was developed from the needs of persons dealing in real
estate. **The problem which arises in any real estate transaction is, first, the purchaser
desires to know before he pays his money that the title he is to purchase is a valid one.
When he receives his assurance, he is willing to pay his money**; but upon receipt of his
deed or mortgage, he then desires some security which will continue to protect him in the
future.

Therefore, **there is the necessity of providing the preliminary assurance** and later the
continuing protection. In the title insurance process, this is accomplished as follows:

(1)    The approved examining attorney makes a search of all the public records or a
       properly prepared abstract consistent with real estate practice in his locality and
       provides to the title insurance company or its agent an application for title insurance
       together with a preliminary report of title.

(2)    The title insurance company issues to the prospective purchaser or prospective
       mortgagee what is called a **"commitment to insure"**. **The Commitment to insure
       is a preliminary contract between the insured and the insurer which simply
       gives assurance to the prospective insured** that when the conditions of the
       commitment to insure have been met the insurer will issue to the insured a final title
       insurance policy.

(3)    If the terms under which the title insurance company will insure the title, which terms
       will be set out in detail in the commitment to insure, are satisfactory to the proposed
       insured, the proposed insured issues his check or does whatever else is necessary to
       complete the transaction.

(4)    Upon completion of the transaction, the matter is again referred to the approved
       examining attorney (in many instances the approved examining attorney is also the
       closing agent), who then submits to the title insurance company his final certificate
       showing compliance with all of the terms and requirements of the commitment to
       insure.

(5)   Upon receipt of the final certificate from the approved examining attorney, the title insurance company then issues its final title policy.

It will be noted from the above procedure that the proposed insured is protected every step of the way.  The basic problems of committing to insure the title **or committing to the validity of the title before the transaction takes place have been taken care of with the issuance of the commitment to insure.**  The continuing assurance of good title desired by purchasers and mortgagees of the real estate is provided when the final title policy is issued.

<u>The Application and Attorney's First Certificate</u>

2.1   This form is designed for use in those circumstances where it is contemplated that a commitment will be required.  The form is completed by an approved attorney of the Company, and **a commitment to insure is issued** with certain exceptions and under certain conditions.  **This enables the insured to proceed with disbursement of his funds with assurances as to the quality of title he is obtaining.**

*Ex. 17, Mississippi Agents Manual, §§ 1.2, 2.1.*

The Mississippi Agents Manual is remarkable in the context of this case, implicitly addressing fraud-based concepts such as *representation* ( pre-transaction assurance as to validity of title); *materiality* (real estate purchaser "desires to know" title valid, and "necessity of providing preliminary assurance"); *reliance* (purchaser willing to pay once assured of validity of title); the *right to rely* (insured protected every step of the way); and *intent party rely* (commitment to insure "enables the insured to proceed" with disbursement of funds with assurance as to quality of title).  Finally, the "commitment to insure" constitutes the assurance, and the commitment is given a dual purpose – providing both a commitment for insurance and a "commitment to the validity of title before the transaction".

Though MVT's claims counsel, Brad Jones, says it more directly, he says it just as well and makes it fact specific to Charles Evans and the Title Companies:

Based on the false title certificates provided by Charles H. Evans, Jr., **and the title insurance commitments issued by Mississippi Valley Title, lenders would advance funds** to Jon Christopher Evans, Charles H. Evans, Jr., and/or others.

*Ex. 4, Affidavit of Brad Jones, ¶ 13; Ex. 5, Brad Jones, p. 114-15.*  Bank of Forest did not receive a title certificate from Charles Evans for the 2009 White Oaks loan.  The Bank did receive, however,

a title insurance commitment from the Title Companies on which the Bank could obviously rely for the advancement of funds.

Clifton Fowler, carefully doing his job at the Bank of Forest, read the 2009 title commitment before disbursing the Bank's funds to White Oaks. In particular, he looked for and confirmed that the owner of the property was G&B Investments, the same party identified as the seller on the Purchase Agreement. *Ex. 8, BoF Depo, p. 97-98*.

If the Title Companies contend Bank of Forest did not rely on the representation of ownership in the title commitment, they have forgotten Mr. Fowler's clear testimony that, acting on behalf of the Bank, he relied on the title commitment representation that G&B Investments was the owner by advancing funds for the loan. *Ex. 8, BoF Depo, p. 40, 108-09, 114, 188-89*. Making this point abundantly clear, Mr. Fowler testified:

> Q:    So the reliance that you're talking about would be contained in the language in the title commitment?
>
> A:    It would be contained from the standpoint that I received a commitment on both loans from Mississippi Valley Title which stated that the property was vested in who we thought it was vested in. And the fact that it was going to be conveyed to our borrower, we relied – from that standpoint, we relied on that commitment to make our loan.
>
> *Ex. 8, BoF Depo, p. 114-15*.

Further, if the commitment had imparted the truth, that G&B Investments was not the owner, the Bank would not have parted with $451,450.00 that was unsecured. *Ex. 12, Affidavit of Clifton Fowler*.

**H.    Cure Actions and Conflicts**.

The Title Companies filed numerous lawsuits in an attempt to cure the title defects cause by Charles Evans' frauds. The wave of litigation gave rise to multiple conflicts and actions jeopardizing the Bank's liens where the Title Companies did not offer to provide a defense and the Bank was required to defend itself.

In one instance, the Title Companies hired attorney Gene Berry to file a cure action on behalf

of the Bank of Forest. However, the Title Companies also hired Gene Berry to file a lawsuit on behalf of Merchants & Farmers Bank which, if successful, would have divested Bank of Forest of its mortgage interest in tract T-3. *Ex. 3, James Partin, p. 90.* Bank of Forest pointed out Mr. Berry's obvious conflict but was required to provide its own defense in the tract T-3 cure action. *Ex. 5, Brad Jones, p. 87-89.*

Simultaneously, the Title Companies filed another state court action against the Evans brothers seeking injunctive relief – to force them to execute deeds for the purpose of curing title. The Title Companies, however, failed to join Bank of Forest and any other banks whose interests might be affected by the outcome of that action. *Ex. 5, Brad Jones, p. 92-93.* Consequently, the Bank of Forest hired its own counsel to protect its interest in that lawsuit.

In the meantime, G&B Investments filed suit to set aside its conveyance to Hanover Investments, and this action had the potential to vitiate the Bank of Forest's interests in T-4, T-5 and T-3. *Ex. 3, James Partin, p. 47.* The Title Companies did not offer to defend Bank of Forest in the G&B Investments action, and with its liens jeopardized, the Bank hired its own counsel to protect its liens.

Insult to injury came when the Title Companies filed a declaratory judgment action against the Bank of Forest on September 23, 2009, seeking a declaration that they were not required to issue the Bank a title policy for the 2009 White Oaks loan. *Ex. 5, Brad Jones, p. 93-94; Ex. 3, James Partin, p. 15.* The Title Companies recognized, of course, that by suing Bank of Forest they were causing it to incur additional attorney's fees and expenses. *Ex. 5, Brad Jones, p. 95.*

The confusion, the conflicts and the failures to defend, coupled with a reservation of rights by the Title Companies, entitled the Bank of Forest to separate and independent counsel in a number of these actions. Ultimately, the Title Companies conceded and authorized defense of the Bank of Forest by the firms of Watkins, Ludlam, Winter & Stennis and Corlew, Munford & Smith. *Ex. 18, Correspondence between Counsel.* Even though the Bank incurred and paid legal fees for the purposes specified above, the Title Companies have informed the Bank that they will pay no legal

14

fees pertinent to the 2009 White Oaks loan and that they are paying no further legal fees pertinent to the 2008 White Oaks loan, a considerable amount of which remains unpaid.

## I.     The Bank's damages.

With regard to the 2008 White Oaks loan and the 2008 title insurance policy, the Title Companies contend they cured the title defect by vesting title to T-4 and T-5 in White Oaks, the Bank's borrower. Therefore, the Title Companies conclude, they owe nothing else under the title policy.

Bank of Forest foreclosed on T-4 and T-5 on December 30, 2010, paying $1,164,379.70 to purchase the property. The total indebtedness on these properties is $1,395,732.08, consisting of loan principal, accrued interest on the loan, late fees, and the expenses of foreclosure. This leaves a deficiency balance in the amount of $231,352.38 which Bank of Forest submits is recoverable under the 2008 title policy. *Ex. 12, Affidavit of Clifton Fowler.* As of June 30, 2010, the Bank also incurred attorney's fees in the amount of $124,608.25 in connection with protecting its lien on the 2008 White Oaks loan. *Ex. 20, Affidavit of Kristina M. Johnson.*

With regard to the 2009 White Oaks loan, the Title Companies assert that they are not required to issue the Bank a title insurance policy. No matter, since the Bank's claims here are for fraud and negligent misrepresentation based upon the misrepresentation in the 2009 title commitment. Neither tort claim is affected by the lack of a title policy.

The Bank of Forest's damages arising out of the 2009 title commitment's misrepresentation of ownership are common law tort damages available for fraud and misrepresentation. The Bank's damages are not subject to the exclusions and limitations of a title policy, since no policy was issued to the Bank to provide coverage for losses arising from the 2009 White Oaks loan. Not counting attorney's fees incurred, the Bank's compensatory damages arising out of its reliance on the misrepresentation in the title commitment are $487,421.64. This amount includes lost loan principal, unpaid accrued interest on the principal, and late fees. Bank of Forest also has a claim for punitive damages against the Title Companies for the misrepresentation in the 2009 title commitment. *Ex.*

15

*12, Affidavit of Clifton Fowler.* As of June 30, 2010, the Bank incurred attorney's fees in the amount of $145,403.34 in connection with protecting its lien arising out of the 2009 White Oaks loan. *Ex. 20, Affidavit of Kristina M. Johnson.*

### III.  Argument and Authority

A.    **Liability Under The 2009 Title Commitment**

(1)    **Direct Fraud Claim against the Title Companies.**

The Title Companies, not Charles Evans, prepared Schedule A, attached it to the 2009 title commitment, and issued it to the Bank of Forest with knowledge that the Bank would rely thereon prior to closing the 2009 White Oaks loan.  As prepared by the Title Companies, Schedule A included the representation that tract T-3 was owned in fee simple by G&B Investments.  This representation was false when made, was made by the Title Companies in ignorance of its truth, and Bank of Forest reasonably relied thereon to its detriment.  These facts present a classic case of fraud under Mississippi law.

First, a few precepts of fraud:

(1) One who is held liable for fraud is not required to know that his statement is false.  "Scienter", or the knowledge requisite for  liability in fraud, may be found in either actual knowledge that a representation is false or in the making of a representation without knowledge of whether it is true or false. *Mayfield Motor Company v. Parker*, 222 Miss. 152, 75 So.2d 435, 437 (Miss. 1954).  A misrepresentation of material fact is a fraud in law even though one who is ignorant of the truth believes his statement to be true. *Touchstone v. Bond*, 78 So.2d 463, 466 (Miss. 1955).

(2) The doctrine of contributory negligence does not apply in an action for fraud.  One who makes a material misrepresentation cannot escape liability by charging the hearer with a duty to discover the truth through independent investigation. *Nash Mississippi Valley Motor Co. v. Childress*, 125 So. 708, 709 (Miss. 1930).  "Contributory negligence is not a

defense to an action based on fraud", because "if a false statement is made by one who may be fairly assumed to know what he is talking about, it may be accepted as true, without question and without inquiry, although the means of correct information are in reach." *Id.*

Fraud must be proved by clear and convincing evidence. *Moore v. Bailey*, 46 So.3d 375, 383 (Miss. App. 2010). However, in the context of a summary judgment motion, the focus should be upon whether there are genuine issues of material fact sufficient to defeat the motion, rather than whether a party can meet the clear and convincing evidence burden of proof. *Id.*

The nine elements of fraud under Mississippi law are well known. See, *Moore,* 46 So.3d at 383 (setting forth elements of fraud). The evidence in this matter creates genuine issues of material fact as to each element:

(1) A Representation. Schedule A of the 2009 title commitment contains a representation by the Title Companies that G&B Investments was the fee simple owner of tract T-3 as of August 26, 2009. *Ex. 14, 2009 title commitment.*

(2) Falsity of the Representation. The Title Companies have admitted that the representation in Schedule A was false when made. *Ex. 2, parish Fortenberry, p. 116-17.* At the time of the representation tract T-3 was owned by Hanover Investments. *Ex. 12, Affidavit of Clifton Fowler.*

(3) Materiality of the Representation. The representation was not only material, but essential, to Bank of Forest's decision to advance loan funds to White Oaks, all as shown by the testimony of Clifton Fowler. *Ex. 11, BoF EUO, p. 57-58, 62; Ex. 8, BoF Depo, p. 42, 116.* Schedule A of the title commitment was the Bank's method of confirming that T-3 "was owned by the people we thought it was owned by ...." for conveyance to White Oaks. *Ex. 8, BoF Depo, p. 108-09.* Under the Mississippi Agents Manual, representation/assurance of valid title is viewed as a "necessity". *Ex. 17, Mississippi Agents Manual.*

(4) Knowledge of Falsity or Ignorance of Truth. The Title Companies admit that they lacked knowledge of whether their representation of ownership in G&B Investments was true or false, and thus, scienter is established. *Ex. 13, Robert Chipinski, p. 95-97; Ex. 2, parish Fortenberry, p. 116-*

17

*17; Ex. 15, Carolyn Freeman, p. 132-33.*

(5) <u>Intent that Representation be acted upon in manner contemplated.</u> The import of the Mississippi Agents Manual and the Affidavit of Brad Jones cannot be more clear – title commitments allow mortgagees to advance funds with assurance as to the quality and validity of the title. *Ex. 17, Mississippi Agents Manual; Ex. 4, Affidavit of Brad Jones, ¶ 13.* The Title Companies intended, and even expected, that Bank of Forest would act on the representation in the title commitment by advancing loan funds.

(6) <u>Ignorance of Falsity by party receiving Representation.</u> Clifton Fowler, acting on behalf of the Bank of Forest when he received and read the title commitment to confirm ownership, did not know that the representation was false. *Ex. 12, Affidavit of Clifton Fowler.* The fact that Mr. Fowler believed the representation to be true is evidenced by his release of $451,450 to Chris Evans as a member in White Oaks.

(7) <u>Reliance on truth of Representation.</u> Mr. Fowler read the title commitment before closing the White Oaks loan to confirm that the owner of T-3 was G&B Investments. *Ex. 8, BoF Depo, p. 97-98.* Mr. Fowler's testimony that he relied on the representation is not disputed, and there is no evidence to the contrary. *Ex. 8, BoF Depo, p. 40, 108-09, 114-15, 188-89.*

(8) <u>Right to rely on Representation.</u> Bank of Forest's right to rely on the representation in the commitment is implicit from the passages of the Mississippi Agents Manual and the Affidavit of Brad Jones, both of which are cited in the "Underlying Facts" section of this brief. These documents reflect the Title Companies expectation that parties rely on commitments for validity of title before proceeding with a transaction. Further, and as discussed below, the commitment itself establishes the right of the Bank to rely thereon.

(9) <u>Proximate Injury as a consequence of Reliance on Representation.</u> As a result of the Bank's reliance on the false representation pertinent to ownership in the title commitment, Bank of Forest has sustained damages of at least $487,421.64, and more once the appropriate assessment of attorneys fees to the 2009 loan are determined. *Ex. 12, Affidavit of Clifton Fowler.*

The Title Companies argue that Bank of Forest had no right to rely on any representation in the title commitment. As demonstrated during the deposition of MVT, this argument is ill-founded and is based on a purely selective and partial reading of Condition No. 4 of the title commitment:

Q:  Are the insureds, in particular the Bank of Forest – was the Bank of Forest ever told, to your knowledge, what Valley's procedures were with regard to simply adopting the statements made in title certifications by an approved attorney?

A:  I don't know that they were told anything one way or the other.

Q:  In other words, is there any information you can cite, whether it was documented or given orally to the Bank of Forest, whereby the Bank of Forest was informed that Valley, including its employees, is not making an independent determination as to the quality of this title?

A:  Nothing other than the fact the commitment says it's not a status of title.

Q:  Where does it say that?

A:  No. 4 on – it's not Bates labeled.  *"This commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title."*

Q:  Okay.  And then it goes on to say what?

A:  Do you want me to read it?

Q:  Yes, sir.

A:  *"Any action or actions or rights of action that the proposed insured may have or may bring against the company arising out of the status of title to the estate or interest of the status of the mortgage thereon covered by the commitment must be based on and are subject to the provisions of this commitment."*

Q:  So any complaint the bank may have must be based on this commitment, right?

A:  Right.

Q:  What's in the commitment?  The fact that G&B Investments owns the property, right?

A:  Right.

*Ex. 2, parish Fortenberry, p. 117-19.*

Condition No. 4 does not preclude the Bank's action for misrepresentation. Bank of Forest's fraud claim against the Title Companies is in fact "based on the commitment" and arises out of the "status of title" or "status of the mortgage thereon".

19

Fraud is essentially a question of fact, and there are genuine issues of material fact with regard to the Bank of Forest's direct fraud claim against the Title Companies. *Nichols v. Tri-State Brick and tile*, 608 So.2d 324, 330 (Miss. 1992).

> **(2)    Imputed Fraud Claim Against the Title Companies based on doctrines of Apparent and Actual Authority**

Charles Evans engaged in a long-standing scheme to defraud banks, including Bank of Forest. Since the Bank of Forest required a title commitment and policy before extending the 2009 loan, procuring a title commitments and policy was part and parcel of his scheme to defraud, and without which it would not have occurred. By making a fraudulent certification of title to the Title Companies, which resulted in the issuance of a fraudulent title commitment, and by delivering the title commitment to the Bank when he knew it to be false, for the purpose of inducing the Bank to make a loan, Charles Evans defrauded the Bank of Forest, and his conduct satisfies each of the nine elements of fraud set forth in *Moore v. Bailey*, 46 So.3d 375 (Miss. App. 2010).

In addition, Charles Evans' fraudulent deeds were committed within the scope of the very activities which the Title Companies asuthorized him to do as an approved attorney. Consequently, liability for his fraud may be imputed to the Title Companies under the doctrines of apparent and actual authority.

The features of agency fit Charles Evans:

(1) The most characteristic feature of an agent is that he is employed primarily to bring about business relations between the principal and third persons. *Id.* The Title Companies did not restrict Charles Evans, or other approved attorneys, from holding themselves out as approved attorneys to banks, since banks desire to have their loans insured. *Ex. 2, parish Fortenberry, p. 52-53.* Charles Evans' dealings with Bank of Forest occurred in a business/commercial context with a bank that dealt with him for the purpose of obtaining the insurance products being offered by the Title Companies.

(2) An agent is one who acts on his principal's behalf and who is subject to the principal's control. *Norris v. Cox*, 860 So.2d 319, 323 (Miss. App. 2003). The Title

Companies had a right to control Charles Evans' activities as an approved attorney, and that right is implicit in their appointment of his to such position. In fact, the Title Companies actually demonstrated their power to control Charles Evans when they revoked closing protection letters[4] which they had previously disseminated concerning Charles Evans. *Ex. 2, parish Fortenberry, p. 35.* To the extent that Charles Evans may have resisted the Title Companies' assertion of control, his privilege to serve as an approved attorney could have been revoked just as easily as it had been granted.

(3) An agency relationship may exist regardless of whether the parties understood the exact nature of their relationship and irrespective of how the parties may have designated themselves. *Butler v. Bunge Corp.*, 329 F.Supp. 47, 57 (N.D. Miss. 1971). Thus, the fact that the Title Companies chose to call Charles Evans an approved attorney rather than an attorney agent is not determinative. It is also immaterial that Charles Evans was not formally licensed[5] agent.

(4) Further, the Title Companies may be subject to liability for Charles Evans' fraudulent scheme even though he was not an employee of either of their companies. The word "employee" is not synonymous with the word "agent", because an agent is one who stands in the shoes of his principal. *First Jackson Securities Corp. v. B.F. Goodrich Co.*, 176 So.2d 272, 278 (Miss. 1965).

---

[4]    Closing protection letters are essentially indemnity agreements whereby the Title Companies agree to indemnify a bank for any error made by an approved attorney in the course of closing a loan. The Title Companies, if they could write the law, would insulate themselves from liability to any bank to which they did not provide a closing protection letter. However, a voluntary agreement to indemnify is not the measure of their responsibility for the acts of an agent under the common law.

[5]    Charles Evans was not required to be licensed as an agent by the State of Mississippi. While *Miss. Code Ann.* §83-17-5 (2006) generally requires that agents for insurance companies obtain a certificate from the Commissioner of Insurance, *Miss. Code Ann.* §83-15-3 (1990) provides the exception that practicing attorneys at law may act as agents for Title Insurers without obtaining a license.

21

### **Apparent Authority**

A principal is bound by the actions of his agent within the scope of the agent's real or apparent authority. *Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1180 (Miss. 1990). If an agent had apparent authority to bind his or her principal, then the issue of actual authority need not be reached. *Id.* Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have. *Id.* The agent's authority as to those with whom he deals is what it reasonably appears to be; so far as third persons are concerned, the agent's apparent powers are his real powers. *Id.*

Much ado is made by the Title Companies over the fact that Charles Evans never told the Bank of Forest that he was an agent.[6] Apparent authority does not turn upon verbal statements alone. Apparent authority may be proved by facts and circumstances of the particular case, which may include words or conduct of the parties, or both. *Monticello Community Care Center, LLC v. Estate of Martin*, 17 So.3d 172, 178 (Miss. App. 2009).

The doctrine of apparent authority requires proof of three things, all of which exist here: (1) acts or conduct on the part of the principal indicating the agent's authority, (2) reasonable reliance on those acts, and (3) a detrimental change in position as a result of the reliance. *Andrew Jackson*, 566 So.2d at 1181. Whether the evidence satisfies the apparent authority test is a question of fact. *Id.*

Acts/Conduct on part of Principal indicating Agent's Authority.

The Title Companies have admitted their acts and conduct which indicated Charles Evans' authority. He was authorized to research and examine titles; to certify title to the Title Companies;

---

[6]    If Charles told the Bank of Forest that he was an agent every time he went into the bank, it would have been legally meaningless. Statements of one assuming to be an agent to establish the agency, made out of the presence of the supposed principal and not as a witness in court, are not competent to establish the agency. *Byrd v. Anderson-Tully Co.*, 6 So.2d 319, 320 (Miss. 1942).

to submit applications for commitments and policies to the Title Companies; to receive commitments and policies from the Title Companies; to deliver commitments and policies to insureds, such as the Bank of Forest; to collect fees and premiums to be remitted to the Title Companies; and to communicate with insureds of the Title Companies, since the Title Companies considered him to be their primary, if not sole, line of communication with the insured. *Ex. 13, Robert Chipinski, p. 43-44; Ex. 2, parish Fortenberry, p. 32-33, 65-70.*

> Reasonable Reliance on Acts/Conduct indicating Agent's Authority

Of note, the Title Companies never gave the Bank of Forest any notice of any restrictions placed on the authority Charles Evans as an approved attorneys, even though the Title Companies had actual knowledge that the Bank was seeking title commitments and/or policies from them through Charles Evans. *Ex. 2, parish Fortenberry, p. 62-64.* Those dealing with an agent without notice of any restrictions upon the agent's authority have a right to presume that the agent's authority is what it appears to be. *Andrew Jackson,* 566 So.2d at 1181-82.

What did Charles Evans' authority appear to be to the Bank of Forest? It appeared to the Bank that Charles Evans had power/authority to do whatever needed to be done to initiate, secure and deliver title commitments and title policies, particularly after he had in fact done so for the Bank's loan to White Oaks in 2008. Thus, the Bank could reasonably rely that Charles Evans had authority to perform all of the same acts in 2009 when it sought a title commitment and title policy.

Bank of Forest reasonably relied on the acts of the Title Companies which vested Charles Evans to act on their behalf for the issuance, delivery and sale of commitments and policies and demonstrated that reliance by dealing with Charles Evans for those very purposes. There is no authority for the proposition that, once vesting Charles Evans with authority to perform acts which he in fact performed and in the course of which he engaged the Bank, the Title Companies are not liable unless they verbally declare to the Bank that Charles Evans has the authority to perform acts which the Bank already knew he could perform.

23

Detrimental Change in position as a result of the Reliance

When the Bank of Forest received the 2009 title commitment, and verified that G&B Investments owned the property, the Bank was assured that it was safe to proceed with closing the loan and advanced $451,450.00 to White Oaks. Because Charles Evans' defrauded the Bank while performing acts within the authority of an approved attorney, the detriment suffered by the Bank resulted from its reliance on acts which the Title Companies gave him authority to perform. The Title Companies appointed him as an approved attorney and gave hm the authority to obtain commitments. The Bank relied on the authority given to him to obtain title commitments, and if there had not been any commitment, there would have been no fraud.

This will not be the first case where a title company is held liable for the fraud of an approved attorney. In *Meyerson v. Lawyers Title Insurance Corporation*, 333 N.Y.S.2d 33 (N.Y. 1972) the court held that an approved attorney who issued a false title report was acting within the scope of his authority with the title company. Just like the facts in this case, the attorney was authorized to examine titles for the company; the company knew about the transaction which caused damage to the third party; the attorney was authorized to collect fees for the company; the attorney was permitted to certify the correctness of title to the company, and upon receipt, the company issued a policy; the attorney had the right to hold himself out as an approved attorney for the company; and the company gave no notice of any restrictions on the approved attorney's authority. *Id.* at 34-35.

The Title Companies cite numerous cases from jurisdictions other than Mississippi, all of which are distinguishable for the reasons stated:

> *Southwest Title Insurance Company v. Northland Building Corporation*, 552 S.W.2d 425, 428 (Tex. 1977)
>
>> Attorney's misdeed arose out of obtaining "estoppel letters" from prior lienholders, an activity which the title company had not authorized.
>
> *Lawyers Title Insurance Corporation v. Edmar Construction Company, Inc.*, 294 A.2d 865, 870 (D.C. App. 1972)
>
>> Attorney stole closing funds, but court did not analyze the case on, or even mention, agency principles.

24

*Ticor Title Insurance Company v. Federal Trade Commission*, 998 F.2d 1129 (3rd Cir. 1993)

> This is an anti-trust case which does not concern whether an approved attorney has apparent authority.

*Bluehaven Funding, LLC v. First American Title Insurance Company*, 594 F.3d 1055, 1059 (8th Cir. 2010)

> Attorney's misdeed occurred in connection with his closing and escrow of a loan and did not arise out of any act which the title insurer had authorized him to perform.

*Proctor v. Metropolitan Money Store Corp.*, 579 F.Supp.2d 724, 737 (D. Maryland 2008)

> Attorney's misdeed occurred in connection with the closing of a loan, an activity which the title company had not authorized him to perform.

*Fidelity National Title Insurance Company v. Mussman*, 930 N.E.2d 1160, 1165 (Ind. 2010)

> Attorney's misdeed occurred in connection with his escrow and closing of a loan, an activity he was not authorized to perform on behalf of the title company.

*Haley v. Corcoran*, 659 F.Supp.2d 714, 725-26 (D. Maryland 2009)

> Attorney's misdeed occurred in connection with escrow and closing service which he was not authorized to perform on behalf of title company.

*First American Title Insurance Company v. First Alliance Title, Inc.*, 718 F.Supp.2d 669, 678-79 (E.D. Va. 2010)

> Attorney's misdeed arose out of his settlement and closing of a loan which court found was not authorized by title company.

The facts of the case at bar stand in stark contrast to those of the cases cited by the Title Companies. Charles Evans was authorized by the Title Companies to perform the very acts from which his fraudulent scheme took root and grew – examination of title, submission of applications, certification of title to the Title Companies causing the issuance of title commitments and policies, and the delivery of title commitments and policies to insureds.

Even if Charles Evans acted in his own interest when defrauding the Bank of Forest, the principal may still be liable where the agent's acts occurred within the apparent scope of his authority.[7] *First American Nat'l Bank of Iuka v. Mitchell*, 359 So.2d 1376, 1380 (Miss. 1978).

---

[7]    Bank of Forest's claim for imputed fraud is not based on *respondeat superior* liability, so the case of *Akins v. Golden Triangle Planning & Development District, Inc.*, 34

### Actual Authority

Given that Charles Evans' fraud was committed in the course and scope of certifying title to the Title Companies, making application for the issuance of a title commitment, and delivering that commitment to the Bank of Forest, all of which acts he was specifically authorized to perform by the Title Companies, his fraud may also be imputed to the Title Companies based on actual authority.

Actual authority may be either express or implied, and it is the power of the agent to effect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him. *Bunge Corp.,* 329 F.Supp. at 55. An express agency is created by an oral or written agreement of the parties; an implied agency (also an actual agency) may be proved by deductions or inferences from the facts and circumstances of the particular case, including the words and conduct of the parties. *Id.*

Whether the Court views Charles Evans' relationship with the Title Companies as deriving from an express or implied agency, the facts make out a case of actual authority. Why? Because the Title Companies have admitted all of the acts which Charles Evans was actually authorized to do – examining title, submitting applications and certifications to them, receiving and delivering commitments and policies, and being the main channel of communication with the insured. The fraud he committed against Bank of Forest was committed in the course of performing the acts which the Title Companies actually authorized. It is axiomatic that an express agency is created when the principal authorizes someone to act on their behalf. *Monticello Community Care Center, LLC v. Estate of Martin,* 17 So.3d 172, 177 (Miss. App. 2009).

The fact that the Title Companies did not authorize Charles Evans to commit fraud does not save them from imputed liability. This has long been settled under Mississippi law. In *Billups Petroleum Co. v. Hardin's Bakeries Corp.,* 63 So.2d 543, 546 (Miss. 1953) the Mississippi Supreme Court declared:

It is well settled that the principal is liable for the frauds and misrepresentations of his agent

---

So.3d 575 (Miss. 2010) does not apply, if the Title Companies choose to cite it.

within the scope of the authority or employment of the agent, **even though he had no knowledge thereof and has received no benefit therefrom** .... Acts of fraud by the agent, committed in the course or scope of his employment, are binding on the principal, even though the principal **did not know of or authorize the commission of the fraudulent acts**, and although he derives no benefit from the success of the fraud, and the agent committed it for his own benefit.

In *Napp v. Liberty National Life Insurance Company*, 159 So.2d 164, 166 (Miss. 1963), the company authorized an agent to deliver death benefits to a beneficiary. The court noted that rather than mail the check the company elected to entrust it to its agent. When the agent defrauded the beneficiary by embezzling some of the money, the court rejected the company's argument that the agent acted outside of his authority. "The company could not delegate to one certain duties and then deny agency because the written contract between them limited his activities to other matters." *Id.* The court also rejected the argument that the agent's fraud was not foreseeable to the company since "foreseeability of such an act is not a test in a case of this kind." *Id.*

In sum, liability for the fraud of Charles Evans against the Bank of Forest is imputed to the Title Companies. Under Mississippi law, a principal can be held vicariously liable for the misrepresentations of its agent. *Kubow v. Hartford Cas. Ins. Co.*, 475 F.3d 672, 676 (5th Cir. 2007). Where the agent is acting within his actual or apparent authority, his acts are those of the principal, and his frauds occurring within the scope of his authority may subject the principal to punitive damages. *First American*, 359 So.2d at 1381; *Miss. Ins. Law and Prac. § 5:10.*

**(3)    Claim for Negligent Misrepresentation**

To large degree, the same facts which support the Bank of Forest's claim for direct fraud against the Title Companies also make out a the elements of negligent misrepresentation. The elements of negligent misrepresentation are:

(1)    A misrepresentation or omission of fact;

(2)    Materiality or significance of the misrepresentation or omission;

(3)    The person/entity charged with negligence failed to exercise that degree of diligence and expertise which the public is entitled to expect;

27

(4)    Reasonable reliance upon the misrepresentation or omission; and

(5)    Damages as a direct and proximate result of such reasonable reliance.

*Hazlehurst Lumber Co., Inc. v. Miss. Forestry Comm'n*, 983 So.2d 309, 313 (Miss. 2008). A claim for negligent misrepresentation must be proved by a preponderance of the evidence. *Spragins v. Sunburst Bank*, 605 So.2d 777, 780 (Miss. 1992).

As to four of the elements, the misrepresentation of fact is the misrepresentation in Schedule A of the 2009 title commitment that the property was owned in fee simple by G&B Investments. This misrepresentation was material and significant to the Bank of Forest since Mr. Fowler read the commitment before advancing loan funds to confirm that the property was vested in G&B Investments. The Bank of Forest reasonably relied upon the misrepresentation by advancing the loan funds, and the Title Companies knew and expected that the Bank would rely in such manner. *Ex. 17, Mississippi Agents Manual.* Further, there is no dispute that the bank's reliance on the misrepresentation has proximately resulted in damages.

With regard to the third element of negligent misrepresentation, the Mississippi Agents Manual speaks to the issue. Since title commitments are viewed as necessary for the protection of members of the public engaging in real estate transactions who require assurance concerning the validity and quality of title, this gives rise to a legitimate public expectation that some level of care will be exercised by the title company so that commitments do not fail in their essential purpose. Section 1.3 of the Mississippi Agents Manual also addresses how essential it is that the work of approved attorneys be accurate:

> It should be kept in mind that the company is the insurer and the applicants will look to their policies and the company for protection. Consequently, it is imperative that the approved attorney prepare an opinion of title for the company which accurately reflects the title picture of the property covered.

*Ex. 17, Mississippi Agents Manual, § 1.3.*

Because the Title Companies recognize the importance of accuracy in the work of approved attorneys for protection of their insureds and the title company, the public can legitimately expect that some reasonable care will be exercised to ensure accuracy in the approved attorney system. For

28

the Bank of Forest's part, Mr. Fowler answers the question: Since the Title Companies knew they were issuing a title commitment for the protection of his bank in making a substantial loan, he legitimately expected that some reasonble care would be exercised to confirm that the statements made in the commitment were truthful. *Ex. 12, Affidavit of Clifton Fowler.*

### (4)    Rebutting Contention that Title Companies cannot be sued in Tort.

The Title Companies assert the proposition in their summary judgment brief that the contract of insurance (*i.e.,* title policy) establishes the extent of their liability, and therefore, they cannot be sued in tort.  In making this argument, they overlook one salient fact – there is no contract of insurance pertinent to the 2009 loan because they refused to issue a title policy to the Bank of Forest.

The 2009 title commitment contains a misrepresentation of material fact, but it is not a contract of insurance.  Hence, their citations of authority premises on the existence of a contract of insurance which governs all liability between the parties have no application to the tort claims asserted by the Bank of Forest in this matter.

### B.    Liability Under The 2008 Title Policy

Bank of Forest has one argument and one claim under the 2008 Title Polity issued to it by the Title Companies.  The argument: The policy is ambiguous and unclear, and therefore it must be interpreted in favor of the Bank.  The claim: The Title Companies have breached the insurance contract by refusing to pay the Bank's damages subsequent to cure of title.

### (1)    Ambiguity in the Policy

The 2008 title insurance policy insured the Bank's mortgage of $1,296,500.00 upon tracts T-4 and T-5.  The Bank thought, and reasonably so, that it purchased a contract of indemnity against loss or damage.  The Title Companies, however, believe that cure of a title defect brings their obligations to an end, regardless of the amount of covered damages sustained by the Bank.  Due to inherent ambiguity, the policy itself helps little in resolving this dispute. *Ex. 19, Loan Policy No. LP 107024 ("2008 title policy").*

The important terms "loss or damage" are not defined in the policy, which nevertheless asserts the following coverage:

### Covered Risks

Subject to the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions, Mississippi Valley Title Insurance Company, a Mississippi corporation, and Old Republic National Title Insurance Company, a Minnesota corporation, (collectively, the "Company") **insure as of Date of Policy** and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, **against loss or damage**, not exceeding the Amount of Insurance, **sustained or incurred by the insured by reason of:**

1.    Title being vested other than as stated in Schedule A.

9.    The invalidity or unenforceability of the lien of the insured Mortgage upon the Title.

10.    The lack of priority of the lien of the insured Mortgage upon the Title over any other lien or encumbrance.

14.    ..... **The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.**

There was a title defect and unenforceability of the mortgage from the inception of this policy. When the policy issued title to the land was in Hanover Investments, rather than in the Bank's borrower, White Oaks. Also, the Merchants & Farmers Bank Deed of Trust was a lien having priority over the Deed of Trust executed by White Oaks in favor of the Bank.

The Conditions section of the 2008 title policy contained definitions and a "Continuation of Insurance" provision that is essential to an understanding of the policy:

### Conditions

1.    Definition of Terms

(a)    "Amount of Insurance": The amount stated in Schedule A ....

(d)    **"Indebtedness"**: The obligation secured by the Insured Mortgage .... and if that obligation is the payment of a debt, the indebtedness is the sum of:

(i)    the amount of the **principal** disbursed as of Date of Policy;

(iv)    **interest on the loan**;

(v)    the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

(vi)    the **expenses of foreclosure** and any other costs of enforcement;

(vii)    the amounts advanced to assure compliance with laws or **to protect the lien or the priority of the lien of the Insured Mortgage** before the acquisition of the estate or interest in the Title;

(viii)    the amounts to pay taxes and insurance ....

2.    Continuation of Insurance

**The coverage of this policy shall continue in force** as of Date of Policy in favor of an Insured **after acquisition of the Title by an insured** or after conveyance by an insured, **but only so long as the insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage** given by a purchaser from the insured, or only so long as the insured shall have liability by reason of warranties in any transfer or conveyance of the Title.

The amount of the insurance provided by the 2008 title policy was $1,296,500, equal to the amount of the Bank of Forest's loan. The "Continuation of Insurance" provision clearly specifies that the Bank "shall" be covered by the policy from the time it acquires title and so long as it retains an interest in the land.

Paragraph 7 of the policy Conditions specifies payment options which the Title Companies have under the policy. Regardless of whether the Title Companies pay the Bank or pay a third party to resolve a lien, every payment option available to the Title Companies under this paragraph states that the Title Companies shall also pay "any costs, attorney's fees, and expenses incurred by the insured Claimant that were authorized by the Company."

The determination and extent of the Title Companies' liability under the policy is set forth in paragraph 8, which reinforces in clear terms that the policy is a contract of indemnity against actual monetary loss or damage. Paragraph 8 also incorporates "indebtedness" as a type of actual monetary loss, and promises that the extent of liability shall remain in force consistent with the "Continuation of Insurance" of paragraph 2:

8.    Determination and Extent of Liability

**This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.**

31

(a)     The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

           (i)      the Amount of Insurance,

           (ii)     the **Indebtedness,**

(c)     **In the event the insured has acquired the Title in the manner described in Section 2 of these Conditions** or has conveyed the Title, **then the extent of liability of the Company shall continue as set forth in Section 8(a) of** these Conditions.

The section which the Title Companies argue absolves them of further liability, even though the bank sustained loss and damage before the Title Companies effected a "cure" of the title defect in December 2010, provides:

9.      Limitation of Liability

(a)     If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, **or establishes the lien of the Insured Mortgage, all as insured**, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, **it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the insured**.

Finally, paragraph 14 is brief but important. It provides that"[I]n interpreting any provision of this policy, this policy shall be construed as a whole."

Under Mississippi law, the interpretation of an insurance policy presents a question of law. *Lewis v. Allstate Insurance Company*, 730 So.2d 65, 68 (Miss. 1999). When the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written. *Paul Revere Life Ins. Co. v. Prince*, 375 So.2d 417, 418 (Miss. 1979). However, ambiguous and unclear policy language must be resolved in favor of the insured. *Harrison v. Allstate Ins. Co.*, 662 So.2d 1092, 1094 (Miss. 1995). Provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer. *Nationwide Mutual Ins. Co. v. Garriga*, 636 So.2d 658, 662 (Miss. 1994).

The Bank of Forest submits that the above quoted provisions of the policy are ambiguous and

unclear.  On the one hand, the Title Companies rely solely on Condition No. 9 ("Limitation of Liability") for their position that once they have cured a defect they owe nothing more. On the other hand, the policy is a contract of indemnity against actual monetary loss or damage caused by a title defect or invalidity of the mortgage with the extent of the Title Companies' liability measured by the amount of insurance or the bank's indebtedness. See, "Covered Losses" and "Condition No. 8". The "indebtedness" includes, *inter alia*, the amount of principal loaned to White Oaks, the amount of interest accrued on the White Oaks loan, the expenses of foreclosure, and amounts advanced to protect the bank's lien. See, "Condition No. 1".  These provisions specify and define the coverage provided by the policy.  Condition No. 2 ("Continuation of Insurance") and Condition No. 8 (c) both provide that "coverage" and the "extent of liability" of the Company "shall continue in force" after acquisition of title by the bank and for so long as it retains an interest in the land.

Therefore, is the Bank entitled to payment of its actual monetary losses because coverage shall continue for so long as the Bank holds an interest in the land, or did the Title Companies' obligations under the policy terminate once they cured the title defect?  Bank of Forest submits that these conflicting policy conditions are not reconcilable and that the Court should find the policy to be ambiguous such that it is construed most strongly against the Title Companies and most favorably for the Bank.

Such a result would be consistent with the wide recognition that title insurance policies are contracts of indemnity against loss or damage. See, *Falmouth National Bank v. Ticor Title Insurance Company*, 920 F.2d 1058, 1062 (1st Cir. 1990) (title insurer does not guarantee state of title, but agrees to indemnify insured for any loss); 1 *Title Ins. Law § 1*:12 (Most analysts agree that a title insurance policy is an indemnity contract).

It appears that the Title Companies agree this policy is an indemnity contract as well.  Citing *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310 (Tex. 1994), the Title Companies quote as follows on page 24 of their summary judgment brief: "A title insurance policy is a contract of indemnity ... [T]he only duty imposed by a title insurance policy is the duty to indemnify the insured

33

against losses caused by defects in title ...."

If this Court finds that the policy is ambiguous, or that the Title Companies' interpretation of the Limitation of Liability Provision is not reasonable, then the Bank of Forest has sustained a sizeable deficiency which is due to be paid under the policy. That amount as of the present date is $231,352.38. *Ex. 12, Affidavit of Clifton Fowler.*

**(2)    Breach of Contract**

Even if this Court finds that the policy is not ambiguous in the above regards or finds that the Bank of Forest is not entitled to the recovery of its deficiency, there is a matter of attorney's fees owed by the Title Companies to the Bank.

The policy provides that the Title Companies shall be liable for payment of all attorney's fees which they "authorize" and they did in fact authorize the Bank to incur attorney's fees due to the conflicts which existed arising out of litigation in this matter.

The Title Companies have now breached the insurance contract by declaring that they have cured and owe nothing more, including attorney's fees which they authorized.

The Court should find that the Bank of Forest is entitled to recover all attorney's fees which were authorized by the Title Companies and which were reasonably incurred so that Bank of Forest may prove the same at the trial of this matter.

## IV.  Conclusion

Bank of Forest respectfully submits the Title Companies' Motion for Summary Judgment should be denied since there are genuine issues of material fact in this matter with regard to the Bank's claims and that the Title Companies are not entitled to judgment as a matter of law under *Fed.R.Civ.P. 56.*

Respectfully submitted this the 4th day of January, 2011.

s/William Liston, III
WILLIAM LISTON, III (MSB#8482)
LISTON/LANCASTER PLLC
P. O. Box 14127
Jackson, MS 39236
Tel. (601) 981-1636
Fax. (601) 982-0371
Email: wlist3@aol.com

ATTORNEY FOR CROSS-CLAIMANT,
BANK OF FOREST

Of Counsel:

W. LAWRENCE DEAS
DEAS & DEAS
P. O. Box 7282
Tupelo, MS 38802
Tel. (662) 842-4546
Fax. (662) 844-4551
Email: Ldeas@aol.com

### Certificate of Service

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the parties set forth in the Electonic Mail Notice List as of the date hereof, including the following:

R. Michael Bolen, Esq.
USTPRegion05.JA.ECF@usdoj.gov

Tylvestor O. Goss, Esq.
bankruptcy@dgwlaw.com

Derek A. Henderson, Trustee
d henderson@bellsouth.net

John G. Holaday, Esq.
john@msattys.com

M. Scott Jones, Esq.
scott.jones@arlaw.com

Lucy Elizabeth Johnson, Esq.
bankruptcy@msattys.com

David W. Clark, Esq.
dclark@babc.com

Michael S. MacInnis, Esq.
Mikems@bellsouth.net

Gene D. Berry, Esq.
genedberry@berryfirm.net

Richard A. Montague, Esq.
rmontague@wellsmoore.com

William C. Brabec, Esq.
bill.brabec@arlaw.com

Jeff D. Rawlings, Esq.
rrm_h@bellsouth.net

G. Todd Burwell, Esq.
tburwell@gtbpa.com

Kathy K. Smith, Esq.
ksmith@cmslawyers.com

John G. Corlew, Esq.
jcorlew@cmslawyers.com

R. Paul Randle, Jr., Esq.
prandall@randallsegrest.com

Michael V. Cory, Esq.
mc@dmc-law.net

Michael D. Simmons, Esq.
mike@cs-law.com

Kristina M. Johnson, Esq.
kjohnson@watkinsludlam.com

Additionally, I mailed by United States mail, postage prepaid, a true and correct copy of the foregoing document to:

Stephen Smith, Trustee
Shelton & Smith, PC
5 Old River Place, Suite 107
Jackson, MS 39202

Terry R. Levy, Esq.
P. O. Box 1084
Jackson, MS 39215-1084

Community Bank
Patrick F. McAllister, Esq.
Williford McAllister & Jacobus
303 Highland Park Cove, Suite A
Ridgeland, MS 39157-6059

Jeffrey K. Tyree, Esq.
P. O. Box 3380
Ridgeland, MS 39158-3380

Thomas R. Hudson, Esq.
BankPlus
1068 Highland Colony Parkway, Suite 200
Ridgeland, MS 39157-8807

So certified this the 4th day of January, 2011.

s/William Liston, III
William Liston, III