# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**JON CHRISTOPHER EVANS,**                    **CASE NO. 09-03763-NPO**

**DEBTOR.**                                    **CHAPTER 7**

**JOINTLY ADMINISTERED WITH RELATED CASES**


**G&B INVESTMENTS, INC.**                      **PLAINTIFF**

**V.**                              **ADV. PROC. NO.  10-00040-NPO**

**DEREK A. HENDERSON, TRUSTEE FOR THE
BANKRUPTCY ESTATE OF JON CHRISTOPHER
EVANS, STEPHEN SMITH, TRUSTEE FOR THE
BANKRUPTCY ESTATE OF CHARLES H.
EVANS, JON CHRISTOPHER EVANS, DEREK A.
HENDERSON, TRUSTEE FOR THE
BANKRUPTCY ESTATE OF HANOVER
INVESTMENTS, LLC, DEREK A. HENDERSON,
TRUSTEE FOR THE BANKRUPTCY ESTATE OF
LANDSDOWNE GROUP, LLC, DEREK A.
HENDERSON, TRUSTEE FOR THE
BANKRUPTCY ESTATE OF TOWN PARK OF
MADISON, LLC, DEREK A. HENDERSON,
TRUSTEE FOR THE BANKRUPTCY ESTATE OF
WHITE OAKS INVESTMENT COMPANY,
DEREK A. HENDERSON, TRUSTEE FOR THE
BANKRUPTCY ESTATE OF TWINBROOK RUN
DEVELOPMENT COMPANY, LLC,  BANKFIRST
FINANCIAL SERVICES, MERCHANTS &
FARMERS BANK, BANK OF FOREST,
HERITAGE BANKING GROUP, MISSISSIPPI
VALLEY TITLE INSURANCE COMPANY, AND
OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY**                                      **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER ON CROSS-CLAIMS OF
## MISSISSIPPI VALLEY TITLE INSURANCE COMPANY,
## OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY,
## BANK OF FOREST, AND HERITAGE BANKING GROUP RELATED TO TRACT IV
## PHASE ONE: LIABILITY AND UNCONTESTED DAMAGES

Page 1 of  83

This matter came before the Court from February 28 through March 4, 2011, for the liability and uncontested damages phase ("Phase One")[1] of the trial (the "Adversary Trial") on the cross-claims of (1) Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies"), (2) Bank of Forest ("BOF"), and (3) Heritage Banking Group ("Heritage").[2] At the Adversary Trial,[3] William C. Brabec and Michael Scott Jones represented the Title Companies; William Liston, III and W. Lawrence Deas represented BOF; and Michael D. Simmons represented Heritage.

The relevant pleadings in the above-styled adversary proceeding (the "Adversary") are: First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief *(Adv. Dkt. No. 21)*[4]; Trustee's Answer to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Counterclaim, Crossclaims and Third Party Complaint *(Adv. Dkt. No. 31)***;** Answer and Defenses of BankFirst Financial Services to Amended Complaint of G&B Investments, Inc. with Counterclaim *(Adv. Dkt. No. 61)*; Merchants & Farmers Bank's Answer to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Counterclaim, Crossclaims and Third Party Complaint *(Adv. Dkt. No. 62)*; Answer

---

[1] The Court entered an Order (Adv. Dkt. No. 413) granting the Joint Motion to Bifurcate Issues of Liability and Damages at Trial (Adv. Dkt. No. 402) on February 25, 2011.

[2] After the Adversary Trial, Heritage was placed into receivership on April 15, 2011. The Federal Deposit Insurance Corporation ("FDIC") accepted an appointment of Receiver on that date. As the Receiver, the FDIC succeeded to all rights, titles, powers, and privileges of Heritage under 12 U.S.C. § 1821(c)(2)(A)(ii). Under Fed. R. Civ. P. 25(c), as made applicable by Fed. R. Bankr. P. 7025, this action proceeds in Heritage's name.

[3] The cross-claim of BOF against M&F is addressed in a separate opinion.

[4] In this paragraph only, citations to the docket entries are italicized to distinguish them from the docket entries included in the captions of some of the pleadings.

and Defenses of BankFirst Financial Services to Cross-Claim of Trustee with Cross-Claim *(Adv. Dkt. No. 63)*; G&B Investments, Inc.'s Reply to Defendant Derek A. Henderson's Counterclaim *(Adv. Dkt. No. 67)*; Amended Answer, Defenses, Counterclaim and Cross Claims of Bank of Forest *(Adv. Dkt. No. 70)*; Amended Answer, Defenses, Counterclaim and Cross Claims of Bank of Forest *(Adv. Dkt. No. 71)*; Answer of Merchants & Farmers Bank to Trustee's Crossclaim Included in Trustee's Answer to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Counterclaim, Crossclaims and Third Party Complaint (Adversary Proceeding Dkt No. 31) and Counterclaim of Merchants & Farmers Bank Against Trustee Incorporating by Reference Crossclaim Against Trustee (Adversary Proceeding Dkt No. 62) *(Adv. Dkt. No. 73)*; Amended Cross-Claim for Declaratory Judgment And Damages and Third Party Complaint *(Adv. Dkt. No. 74)* filed by the Title Companies; Bank of Forest's Answer and Affirmative Defenses to Amended Cross-Claim for Declaratory Judgment and Damages and Third Party Complaint of Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company [Dkt. #74] *(Adv. Dkt. No. 75)*; Trustee Henderson's Answer to Merchants & Farmer Bank's Crossclaim (AP Docket No. 62) *(Adv. Dkt. No. 78)*; Trustee Henderson's Answer [to] Crossclaim by BankFirst Financial Services for Declaratory Relief and to Remove a Cloud on Title (AP Docket No. 63) *(Adv. Dkt. No. 79)*; Trustee Henderson's Answer to Bank of Forest's Crossclaim (AP Docket No. 70) *(Adv. Dkt. No. 80)*; Trustee Henderson's Answer to Bank of Forest's Crossclaim (AP Docket No. 71) *(Adv. Dkt. No. 81)*; Trustee Henderson's Answer to Merchants & Farmers Bank's Counterclaim (AP Docket No. 73) *(Adv. Dkt. No. 82)***;** Title Companies' Answer and Affirmative Defenses to Cross-Claim Filed by Bank of Forest *(Adv. Dkt. No. 85)*; Title Companies' Answer and Affirmative Defenses to Cross-Claim filed by Bank of Forest *(Adv. Dkt. No. 86)*; Bank of Forest's Answer and Defenses to the Crossclaim of Merchants & Farmers Bank *(Adv. Dkt. No. 87)*; Second

Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief *(Adv. Dkt. No. 88)*; Response of G&B Investments to Counterclaim of BankFirst Financial Services *(Adv. Dkt. No. 96)*; Response of G&B Investments, Inc. to Counterclaim of Merchants & Farmers Bank *(Adv. Dkt. No. 97)*; G&B Investments, Inc.'s Response to Bank of Forest's Counterclaim *(Adv. Dkt. No. 98)*; Bank of Forest's Amended Crossclaims against Defendants Mississippi Valley Title Insurance Company, and Old Republic National Title Insurance Company *(Adv. Dkt. No. 101)*; Bank of Forest's Amended Answer and Affirmative Defenses to Amended Cross-Claim for Declaratory Judgment and Damages and Third Party Complaint of Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company [Dkt. #74] *(Adv. Dkt. No. 102)*; Answer and Defenses of BankFirst Financial Services to the Provisional Cross-Claim of Merchants & Farmers Bank *(Adv. Dkt. No. 105)*; Title Companies' Answer and Affirmative Defenses to Second Amended Complaint filed by G&B Investments, Inc. *(Adv. Dkt. No. 111);* Answer of Bank of Forest to Second Amended Complaint [#88] by G & B Investments, Inc., to Determine Validity, Priority and Extent of Liens and for Other Relief *(Adv. Dkt. No. 112)*; Answer of Merchants & Farmers Bank to Bank of Forest's Cross Claims *(Adv. Dkt. No. 113)*; Answer to Third Party Complaint by Dodd Enterprises, LLC *(Adv. Dkt. No. 118)*; Title Companies' Answer and Affirmative Defenses to Cross-Claim filed by Bank of Forest *(Adv. Dkt. No. 119)*; Answer of Merchants & Farmers Bank to Second Amended Complaint (Adversary Proceeding Dkt. No. 88) by G & B Investments, Inc., to Determine Validity, Priority and Extent of Liens and for Other Relief *(Adv. Dkt. No. 120)*; Heritage Banking Group's Answer and Defenses to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Answer and Defenses to Trustee's Cross-Claim *(Adv. Dkt. No. 129)*; Answer of Charles Evans to Third Party Complaint of Merchants & Farmers Bank *(Adv.*

*Dkt. No. 134)*; Answer and Defenses of Charles Evans to Third Party Complaint of Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company *(Adv. Dkt. No. 161)*; Answer of Charles Evans to Second Amended Complaint of G&B Investments, Inc. *(Adv. Dkt. No. 183)*; Stephen Smith, Trustee for the Bankruptcy Estate of Charles H. Evans' Answer and Defenses to Second Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief *(Adv. Dkt. No. 187)*; Stephen Smith, Trustee for the Bankruptcy Estate of Charles H. Evans' Answer and Defenses to Bank of Forest's Crossclaim *(Adv. Dkt. No. 188)*; Heritage Banking Group's Cross-Claim Against Mississippi Valley Title Insurance Company, Old Republic National Title Insurance Company and Derek A. Henderson, Trustee for the Bankruptcy Estate of Twinbrook Run Development Company, LLC *(Adv. Dkt. No. 195)*; Title Companies' Answer and Affirmative Defenses and Cross-Claim filed by Heritage Banking Group *(Adv. Dkt. No. 223)*.

Having considered the pleadings as well as the testimony, exhibits, and the arguments of counsel presented at the Adversary Trial, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## TABLE OF CONTENTS

Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.      Bankruptcy Filings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      2.      Adversary (Adv. Proc. No. 10-00040). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Summary of Claims, Counterclaims, Cross-claims, and Third-Party Complaints. . . . . . . . . . . . 18

Settlements Reached Before the Adversary Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Adversary Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.     BOF's Tort Claims under the 2009 BOF Title Commitment. . . . . . . . . . . . . . . . . . . . . 38

       A.     Doctrines of Election of Remedies and/or Waiver. . . . . . . . . . . . . . . . . . . . . . . . 42

       B.     Whether Mississippi Law Imposes a Duty on the Title Companies to Search
              the Record for and Disclose Title Defects Before Issuing a Title Commitment. . 44

       C.     Whether the Title Companies Voluntarily Undertook the Duty to Perform a
              Title Search Before Issuing the 2009 BOF Title Commitment. . . . . . . . . . . . . . 46

       D.     Fraudulent Misrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

              1.     False Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

              2.     Intent to Deceive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

              3.     Reasonable Reliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       E.     Imputed Fraudulent Misrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

              1.     Whether an Agency Relationship Existed Between Charles Evans and
                     the Title Companies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

              2.     Agency Principles and *Respondeat Superior*. . . . . . . . . . . . . . . . . . . . . 56

              3.     Adverse-Interest Exception. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

              4.     Dual Agency and Imputed Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

       F.     Negligent Misrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

II.    BOF's Breach of Contract Claims under the 2008 BOF Policy. . . . . . . . . . . . . . . . . . 62

       A.     Pertinent 2008 BOF Policy Provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

              1.     "Covered Risks" Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2.    "Determination and Extent of Liability" Provision. . . . . . . . . . . . . . . . . 63

3.    "Limitation of Liability" Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.    Mississippi Rules for Construing Insurance Policies.. . . . . . . . . . . . . . . . . . . . . . . 64

C.    Whether the 2008 BOF Policy Obligated the Title Companies to Pay Additional Damages Where They Have Cured the Title Defect. . . . . . . . . . . . . 65

D.    Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

III.    Heritage's Claims for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Bad Faith.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

A.    Breach of Contract.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

1.    Whether the Maximum Payment Provision Is Ambiguous. . . . . . . . . . . . 69

2.    Whether the Heritage Policy Should Be Construed Against the Title Companies and in Favor of Heritage.. . . . . . . . . . . . . . . . . . . . . . . . 71

3.    Reasonableness of Heritage's Expectations Under and Interpretation of the Heritage Policy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

4.    Title Companies' Alleged Attempt to Cure the Title Defect.. . . . . . . . . . 77

B.    Breach of Covenant of Good Faith and Fair Dealing. . . . . . . . . . . . . . . . . . . . . . . 78

C.    Bad Faith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

## <u>Jurisdiction</u>

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant

to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O).[5]
Notice of the Adversary Trial was proper under the circumstances.

### Introduction

After bilking numerous banks in Mississippi and elsewhere for untold millions, Charles H.
Evans, Jr. ("Charles Evans") and Jon Christopher Evans ("Chris Evans") (together, the "Evans
Brothers") pled guilty on January 18, 2011, to conspiracy to commit money laundering and bank
fraud. This introduction provides a broad summary of their fraudulent scheme, which is necessary
to understand the posture of the cross-claims against the Title Companies that are the subject of this
Opinion. A detailed discussion of the basis for the Court's Opinion is found later in the findings of
fact and conclusions of law sections.

On July 23, 2008, Charles Evans, purportedly acting on behalf of Hanover Investments, LLC
("Hanover"), entered into an agreement with G&B Investments, Inc. ("G&B") to purchase 105 acres
of prime commercial real estate alongside Highway 463 in Madison County, Mississippi. The 105
acres are referred to herein as "Tract IV." All claims, counterclaims, and cross-claims asserted in
this Adversary arose from events that began in 2008 and relate only to Tract IV, although the Evans
Brothers did not similarly limit their fraudulent scheme. There have been other contested matters
and adversary proceedings that involve transactions that relate to other real estate located in

---

[5] This finding of core jurisdiction is undisputed. *See* Pretrial Order at 2 (Adv. Dkt. No.
408). The Court notes, however, that after the Adversary Trial, the United States Supreme Court
issued its watershed opinion in <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011), which nullified as
unconstitutional 28 U.S.C. § 157(b)(2)(C), on the ground that it vested jurisdiction in the
bankruptcy court (a non-Article III court) to adjudicate a compulsory counterclaim that arose
solely under state law and was filed in response to a proof of claim. The implications of the
<u>Stern</u> decision remain to be determined.

Mississippi and elsewhere.[6]

Both of the Evans Brothers were licensed to practice law in Mississippi during the relevant time period.[7]  Because Charles Evans was on the list of attorneys "approved" by the Title Companies, he was able to procure title commitments and title insurance policies based on false applications he submitted to the Title Companies showing that corporations owned certain real property when most of them did not.[8]  He also performed most of the closings on the real estate transactions himself.

Before Hanover purchased Tract IV, the Evans Brothers borrowed $5,078,840.00 from three Mississippi commercial lenders: Merchants & Farmers Bank ("M&F") ($3,000,028.00), BOF ($1,296,500.00), and Heritage ($781,980.00). The Evans Brothers, acting through different corporate entities, granted deeds of trust to these three commercial lenders on smaller parcels of Tract IV as collateral when Tract IV was still owned by G&B, that is, *before* Hanover had purchased Tract IV from G&B.

On July 23, 2008, Hanover paid G&B, the owner of Tract IV, $5 million–which the Evans Brothers had borrowed from M&F, BOF, and Heritage–the cash portion of the $16 million total

---

[6] *See, e.g.*, Henderson v. Community Bank (In re Evans), Adv. Proc. No. 10-00005-NPO (Bankr. S.D. Miss. 2010).

[7] Since then, The Mississippi Bar has suspended their licenses.

[8] From 2000 until 2009, the Title Companies issued over 100 title insurance policies based upon applications submitted by Charles Evans.  (Tr. at 122-23, 160).  The transcript of the Adversary Trial is cited as "Tr. at _____".

purchase price.[9]  G&B financed the remaining $11 million by a note secured by a deed of trust executed by Charles Evans on behalf of Hanover.

Because G&B had agreed to release a prorated portion of Tract IV from the deed of trust upon payment of any portion of the purchase price, the deed of trust signed by Charles Evans on behalf of Hanover did not include approximately 28 acres of Tract IV.  These 28 acres are referred to herein as the "Released Parcels."  Carved out of the Released Parcels are even smaller tracts of land, which are identified herein as Parcels T-1 through T-6, as shown in the Appendix at the end of this Opinion.

The Evans Brothers' fraudulent scheme did not end after Hanover's purchase of Tract IV.  Instead, they engaged in the same scam over and over again using smaller parcels of Tract IV and sometimes, when no other property was available, using the same parcels as collateral.  In exchange for large sums of money, they executed promissory notes in the name of corporations that they controlled, purportedly secured by deeds of trust on Tract IV, which the newly-formed corporate entities almost never actually acquired.  For each such conveyance, Charles Evans obtained a title commitment and/or title insurance policy from the Title Companies.

Over the course of the next 18 months, the Evans Brothers formed almost 40 companies for

---

[9] By paying G&B with money borrowed from other banks, the Evans Brothers orchestrated a fraud that resembles a Ponzi scheme.  A Ponzi scheme takes its name from the notable financial career of Charles Ponzi, who between 1919 and 1921, convinced 40,000 Bostonians to put money into a fictitious investment by promising them 50% returns in 45 days.  Ponzi paid investors from new investment money rather than from actual profits.  Ponzi made millions of dollars before his fraud was uncovered.  *See* Cunningham v. Brown, 265 U.S. 1 (1924).  Because there were no investors, the Evans Brothers' fraudulent conduct does not fit precisely within the definition of a Ponzi scheme.

fraudulent purposes and wreaked financial havoc on the Title Companies[10] as well as on numerous commercial lenders. Their scheme was not complicated if one keeps in mind (1) that the corporations that were controlled by the Evans Brothers almost never actually acquired any of the real estate pledged as collateral for the purchase-money loans they obtained from the lenders and (2) that Charles Evans duped lenders into believing otherwise by obtaining inaccurate title commitments and/or title insurance policies from the Title Companies. They did not stray far from this formula. The scheme ended, and the Evans Brothers' march to justice[11] began, in early September 2009, when the Title Companies discovered the fraud[12] and removed Charles Evans from their list of approved attorneys.

### Tract IV

Titles to the various parcels in Tract IV, identified as Parcels T-1 through T-6, were affected by the conveyances resulting from the Evans Brothers' fraud in the manner summarized below:

_____

[10] A proof of claim filed by the Title Companies in Charles Evans's bankruptcy case shows that the Title Companies paid almost $16 million to resolve title insurance claims involving Charles Evans. (Case No. 10-0117, POC-1).

[11] As of the date of this Opinion, the Evans Brothers have not yet been sentenced for their crimes.

[12] On September 8, 2009, Carolyn Freeman, the senior underwriter at Mississippi Valley Title Insurance Company, called Brad Jones ("Jones"), claims counsel for Mississippi Valley Title Insurance Company, asking him for his assistance in locating Charles Evans. (Tr. at 186). Freeman told Jones that an auditor from the FDIC could not locate two deeds of trust granted Holmes County Bank in separate loan closings handled by Charles Evans. An examination of the land records at the local courthouses revealed that the deeds of trust had never been filed. Jones's efforts to locate Charles Evans, including a trip to his law office, were unsuccessful. Jones's suspicion that something was amiss was verified when a criminal defense attorney contacted him on Charles Evans's behalf. (Tr. at 188).

1.     **Parcel T-1 (77 acres)**

Parcel T-1, which consists of 77 acres outside the Released Parcels, was foreclosed upon by G&B on October 23, 2009, after Hanover defaulted on the note.  G&B bought Parcel T-1, for $7 million.  On November 25, 2009, G&B granted BankPlus a deed of trust which was recorded on December 21, 2009.

2.     **Parcel T-1A (3.21 acres)**

Parcel T-1A, which is a tract carved out of Parcel T-1, was sold by G&B to Dodd Enterprises, LLC ("Dodd") after G&B's foreclosure sale.   On April 9, 2010, Dodd granted Community Bank a deed of trust in the amount of $650,000.00, and the deed was recorded on April 14, 2010.

3.     **Parcel T-2 (15.912 acres)**

Parcel T-2 is a tract carved out of the Released Parcels.  On July 18, 2008, Chris Evans, on behalf of Town Park of Madison, LLC ("Town Park"), executed a note and deed of trust to M&F. The amount of the note was $3,000,028.00 and, as mentioned previously, was used as part of the down payment paid G&B by Hanover on July 23, 2008. At the time of the conveyance, Hanover did not yet own Parcel T-2.  The Title Companies issued a title insurance policy to M&F on Parcel T-2. The deed of trust that purportedly gave M&F a lien was recorded on January 6, 2009. Hanover conveyed Parcel T-2 to Town Park by a warranty deed that was recorded on September 11, 2009.

4.     **Parcel T-3 (5.541 acres)**

The same note and deed of trust from Town Park to M&F that covered Parcel T-2 also included 5.541 acres carved out of the Released Parcels.  On August 27, 2009, Chris Evans, through White Oaks Investment Company, LLC ("White Oaks"), granted BOF a deed of trust on Parcel T-3,

that secured a note in the amount of $451,450.00 (the "2009 White Oaks Loan"). This deed of trust was recorded on September 18, 2009. At the time of the conveyance, Hanover was the record owner of Parcel T-3. No deed from Hanover to White Oaks was ever recorded. The Title Companies issued a title insurance policy to M&F and a title commitment to BOF on Parcel T-3.

     **5.**      **Parcel T-4 (2.2505 acres)**

Parcel T-4, known as the North 2.2505 acres, is part of the Released Parcels. On July 21, 2008, Chris Evans, through White Oaks, executed a note and deed of trust to BOF in the amount of $1,296,500.00, that was used as part of the down payment paid to G&B by Hanover (the "White Oaks Loan"). The deed of trust was recorded on September 17, 2008. The Title Companies issued a title insurance policy to BOF on Parcel T-4.

     **6.**      **Parcel T-5 (2.2505 acres)**

Parcel T-5, known as the South 2.2505 acres, is part of the Released Parcels. On July 21, 2008, Chris Evans, through White Oaks, executed a note and deed of trust to BOF in the amount of $1,296,500.00, which is the same note and deed of trust referred to above under Parcel T-4 as the 2008 White Oaks Loan. The deed of trust was recorded on September 17, 2008. The Title Companies issued a title insurance policy to BOF on Parcel T-5.

     **7.**      **Parcel T-6 (3 acres)**

Parcel T-6, a three-acre tract, was carved out of the Released Parcels. Chris Evans, through Twinbrook Run Development Company, LLC ("Twinbrook"), executed a note on July 18, 2008, and a deed of trust on July 21, 2008, to Heritage in the amount of $781,980.00. The deed of trust from Twinbrook was recorded on October 29, 2008. No deed from Hanover to Twinbrook was ever

recorded.  On April 27, 2009, Chris Evans executed a deed from Hanover to Landsdowne Group, LLC ("Landsdowne"), and Landsdowne executed a note and deed of trust to BankFirst Financial Services ("BankFirst") in the amount of $828,750.00.  The deed of trust to BankFirst was recorded on May 6, 2009. The deed from Hanover to Landsdowne was recorded on September 10, 2009.  The Title Companies issued title insurance policies to both Heritage and BankFirst.

## Overview

Given the length of this Opinion–due to the multitude of legal disputes that arose in the aftermath of the fraud perpetrated by the Evans Brothers–the Court pauses here to provide an overview.  First, the Court discusses the relevant procedural history of (1) the bankruptcy filings in the various bankruptcy cases, including the consolidation of the bankruptcy case of Chris Evans with the bankruptcy cases of the corporate entities formed by the Evans Brothers and (2) the Adversary, including the consolidation of all claims related to Tract IV.  Then, the Court identifies the parties and the claims they each assert in the Adversary.  Next, the Court discusses the resolution of some of those claims by agreement of the parties.  A discussion of what happened at the Adversary Trial itself follows, beginning with a list of stipulated facts.  Finally, the Court addresses the merits of the issues raised at the Adversary Trial, discussing first BOF's claims of liability against the Title Companies, Heritage's claims of liability against the Title Companies, and uncontested damages.

## Procedural History

### 1.    Bankruptcy Filings

On October 26, 2009, Chris Evans filed a voluntary petition under chapter 7 of the United States Bankruptcy Code in Case No. 09-03763-NPO.   Derek A. Henderson was appointed the

Page 14 of  83

chapter 7 trustee ("Trustee Henderson").

During the next few months, from November 12, 2009, until January 14, 2010, the companies formed by the Evans Brothers, referred to herein as the "Related Entities," filed voluntary petitions under chapter 7. Trustee Henderson was also appointed the chapter 7 trustee for these Related Entities. In a series of orders, the Court consolidated these bankruptcy cases for joint administration with the main bankruptcy case of Chris Evans (Case No. 09-3763-NPO, Dkt. Nos. 161, 298 & 513). These cases, which are referred to as the "Related Cases," are listed below in the order in which each of the Related Entities filed its petition for relief:

Colony Developers, Inc. (Case No. 09-04016-NPO)
Highland of Ridgeland, Inc. (Case No. 09-04017-NPO)
Twin City Commons Development Company, LLC (Case No. 09-04091-NPO)
Old Agency Business Park, Inc. (Case No. 09-04101-NPO)
Cedar Lake Investors LLC (Case No. 09-04102-NPO)
Colony Construction Ltd. (Case No. 09-04104-NPO)
Town Park of Madison, LLC (Case No. 09-04105-NPO)
Madison Avenue Development Co., LLC (Case No. 09-04109-NPO)
White Oak Investment Company (Case No. 09-04118-NPO)
Woodgreen Development Corporation (Case No. 09-04120-NPO)
Nottaway Pointe LLC (Case No. 09-04124-NPO)
Ridgeland Recreational, Corp. (Case No. 09-04125-NPO)
Hanover Investments, LLC (Case No. 09-04126-NPO)
Highland of Madison Development, Inc. (Case No. 09-04214-NPO)
Highland Colony Group LLC (Case No. 09-04215-NPO)
Paloma Ridge, LLC (Case No. 09-04216-NPO)
Riverbend Group, LLC (Case No. 09-04217-NPO)
Sawbridge Development, LLC (Case No. 09-04218-NPO)
Westfield Way LLC (Case No. 09-04219-NPO)
JCE Construction (Case No. 09-04369-NPO)
CE Development, Inc. (Case No. 09-04396-NPO)
Oakmont Mill LLC (Case No. 09-04398-NPO)
Snowden Lane Investments LLC (Case No. 09-04488-NPO)
C & L, INC. (Case No. 09-04489-NPO)
Canton Oaks Investment & Redevelopment Company, LLC (Case No. 09-04490-NPO)
Westwoods Investment, LLC (Case No. 09-04491-NPO)

Twinbrook Run Development Company, LLC (Case No. 09-04492-NPO)
Brashear Heath LLC (Case No. 09-04494-NPO)
463 Development Company LLC (Case No. 09-04505-NPO)
Park Place Commons LLC (Case No. 09-04508-NPO)
Parkway Crossing LLC (Case No. 09-04510-NPO)
Marner Park LLC (Case No. 09-04511-NPO)
Greenwood Place LLC (Case No. 10-00117-NPO)
Lake Harbor Development Company LLC (Case No. 10-00118-NPO)
Windsor Pass LLC (Case No. 10-00120-NPO)
Clear Creek Development (Case No. 10-00121-NPO)
Brisbane Centre LLC (Case No. 10-00122-NPO)
Landsdowne Group LLC (Case No. 10-00123-NPO)
Snowden Grove Investors LLC (Case No. 10-00124-NPO)

On March 23, 2010, an involuntary petition for relief under chapter 7 was filed against Charles Evans.  (Case No. 10-01117-NPO,  Dkt. No. 1).  On July 12, 2010, this Court entered an Order for Relief in an Involuntary Case (Case No.10-01117-NPO,  Dkt. No. 28) against Charles Evans, who did not file any pleading or defense to the involuntary petition.  Stephen Smith was appointed the chapter 7 trustee ("Trustee Smith").

### 2.     Adversary (Adv. Proc. No. 10-00040)

The discovery of the Evans Brothers' fraudulent scheme, and the bankruptcy filings that ensued shortly thereafter, resulted in a plethora of claims, counterclaims, cross-claims, and third-party complaints filed in the bankruptcy cases of the Evans Brothers, in state court, and in federal district court in multiple civil actions.  This Adversary (Adv. Proc. No. 10-00040) was initiated on May 10, 2010, with the filing by G&B of the Complaint to Determine Validity, Priority and Extent of Liens (Adv. Dkt. No. 1).  On June 29, 2010, this Court entered an Order of Consolidation (Adv. Dkt. No. 10), which consolidated into this Adversary (Adv. Proc. No. 10-00040), all actions, claims, counterclaims, and cross-claims related to Tract IV asserted by any of the parties in the bankruptcy

cases of Chris Evans and the jointly administered Related Cases. Those actions, claims, counterclaims and cross-claims include those asserted in the following matters:

(a) Adversary Proceedings Filed in the United States Bankruptcy Court for the Southern District of Mississippi:

(1) *Derek A. Henderson, Trustee for the Bankruptcy Estate of Jon Christopher Evans and Jointly Administered Related Cases*
*v.*
*Community Bank of Mississippi, BancorpSouth Bank, First Bank, State Bank & Trust Company, Bank of Yazoo City, Bank of the South, Citizens National Bank of Meridian, Holmes County Bank & Trust Company, BankFirst Financial Services, Renasant Bank, Metropolitan Bank, First Commercial Bank, National Bank of Commerce, Guaranty Bank & Trust Company, Cadence Bank, Britton & Koontz National Bank, Wachovia Bank, South Trust Bank, Omni Bank, Merchants & Planters Bank, First Bank of McComb, Heritage Banking Group, The Carthage Bank, BankPlus, Union Planters Bank, Peoples Bank & Trust Company, First Trust Bank for Savings, First Alliance Bank, First State Bank, First Security Bank, Patriot Bank, Trust One Bank, First Tennessee Bank, Bank of Bartlett, Bank of America, Merchants & Farmers Bank, Bank of Forest, Copiah Bank, Consumer National Bank, Regions Bank, Mississippi Valley Insurance Company and Old Republic National Title Insurance Company*
(Adv. Proc. No. 10-00005); and

(2) *Bank of Forest*
*v.*
*White Oaks Investment Company and Derek A. Henderson as Chapter 7 Trustee for White Oaks Investment Company*
(Adv. Proc. No. 09-00158).

(b) Civil Actions Removed to the United States District Court for the Southern District of Mississippi:

(1) *Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company*
*v.*
*Bank of Forest, Charles H. Evans, Jr. and The Evans Firm*
(Civil Action No. 3:09cv746-HTW-LRA) (Adv. Proc. No. 10-00062-NPO);

(2)     *Merchants & Farmers Bank*
        *v.*
        *Hanover Investments, LLC and Town Park of Madison, LLC*
        (Civil Action No. 3:10cv108-TSL-FKB) (Adv. Proc. No. 10-00059-NPO);

(3)     *Bank of Forest*
        *v.*
        *Hanover Investments, LLC and White Oaks Investment Company, LLC*
        (Civil Action No. 3:10cv111-TSL-FKB) (Adv. Proc. No. 10-00060-NPO);
        and

(4)     *G&B Investments, Inc.*
        *v.*
        *Hanover Investments, LLC*
        (Civil Action No. 3:10cv116-TSL-FKB) (Adv. Proc. No. 10-00061-NPO).

In this Adversary, G&B, the original owner of Tract IV, sued the Evans Brothers, the Title

Companies, and the following financial institutions: (1) BankFirst, (2) M&F, (3) BOF, and (4)

Heritage.  G&B also sued Trustee Smith, as trustee for the bankruptcy estate of Charles Evans, and

Trustee Henderson, as trustee for the bankruptcy estates of Chris Evans and five Related Entities,

which include: (a) Hanover, (b) Landsdowne, (c) Town Park, (d) White Oaks, and (e) Twinbrook.

Trustee Henderson added BankPlus, Dodd, and Community Bank as parties to this Adversary by way

of a third-party complaint.  The claims, counterclaims, cross-claims, and third-party complaints

alleged by the parties regarding Tract IV are summarized below:

**<u>Summary of Claims, Counterclaims, Cross-Claims, and Third-Party Complaints</u>**

**1.      G&B: Tract IV**

G&B claims in its Second Amended Complaint to Determine Validity, Priority and Extent

of Liens and for other Relief (Adv. Dkt. No. 88) filed on September 10, 2010, that as a result of the

actions of the Evans Brothers, it sustained a loss in the amount of $4,556,717.40, which is the

Page 18 of  83

difference between the amount owed by Hanover pursuant to the promissory note signed by Charles Evans and the amount G&B recovered in the foreclosure sale of the 77 acres of Tract IV, including Parcels T-1 and T-1A.  G&B also claims that it has the only valid and enforceable lien on Parcels T-1 and T-1A. G&B alleges fraud, vicarious liability, negligence, misrepresentation, breach of contract, and breach of the duty of good faith and fair dealing.

### 2.    Trustee Henderson: Tract IV

Trustee Henderson filed Trustee's Answer to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Counterclaim, Crossclaims and Third Party Complaint (Adv. Dkt. No. 31).  In a counterclaim against G&B, and in cross-claims against BankFirst, M&F, BOF, Heritage, and the Title Companies, Trustee Henderson contends that the deed of trust from Hanover to G&B, which was recorded on July 25, 2008, is invalid, and that G&B's foreclosure of that deed of trust is void.  He also asserts claims for voidable preference transfers and fraudulent transfers. In a third-party complaint against BankPlus, Dodd, and Community Bank, Trustee Henderson asserts that G&B's deed to Dodd is void, and Dodd's deed to Community Bank is likewise void.

### 3.    M&F: Parcels T-2 and T-3

M&F filed (1) Merchants & Farmers Bank's Answer to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Counterclaim, Crossclaims and Third Party Complaint (Adv. Dkt. No. 62); and (2) Answer of Merchants & Farmers Bank to Trustee's Crossclaim Included in Trustee's Answer to First Amended Complaint to Determine Validity, Priority and Extent of Liens and for Other Relief and Counterclaim, Crossclaims and Third

Party Complaint (Adversary Proceeding Dkt No. 31) and Counterclaim of Merchants & Farmers Bank Against Trustee Incorporating by Reference Crossclaim Against Trustee (Adversary Proceeding Dkt No. 62) (Adv. Dkt. No. 73). M&F asserts counterclaims against G&B and Trustee Henderson and cross-claims against: BOF; the Title Companies; Trustee Smith, as trustee for the bankruptcy estate of Charles Evans; Trustee Henderson, as trustee for the bankruptcy estates of Chris Evans, Hanover, and Town Park; Chris Evans; BankFirst; and Heritage. M&F also filed a third-party complaint against Charles Evans. M&F claims that it has a first, perfected security interest in Parcels T-2 and T-3 by virtue of a deed of trust granted by Town Park on July 21, 2008, and recorded on September 17, 2008. M&F asserts claims against the Evans Brothers for fraud, negligent misrepresentation, and breach of contract.

4.      **Title Companies: Parcel T-3**

The Title Companies filed an Amended Cross-Claims for Declaratory Judgment and Damages and Third Party Complaint (Adv. Dkt. No. 74) against BOF, Charles Evans, and the Evans Firm. The Title Companies seek a declaratory judgment that they are not obligated to issue a title insurance policy to BOF. The Title Companies seek damages against Charles Evans and the Evans Firm for professional negligence.

5.      **BOF: Parcels T-3, T-4, and T-5**

BOF filed an Amended Answer, Defenses, Counterclaim and Cross Claims of Bank of Forest (Adv. Dkt. Nos. 70 & 71) and Bank of Forest's Amended Crossclaims Against Defendants Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (Adv. Dkt. No. 101). BOF filed cross-claims against: the Title Companies; Trustee Henderson as trustee for the bankruptcy estates of Chris Evans and White Oaks; and Trustee Smith, as trustee for

the bankruptcy estate of Charles Evans.  In its cross-claims against the Title Companies, BOF seeks damages in the amount of the loan proceeds it disbursed to White Oaks for negligent misrepresentation, intentional misrepresentation and fraud, negligent hiring and retention of agent, breach of contract, promissory estoppel, breach of obligation of good faith and fair dealing in claims handling, extent and validity of lien against property, bad faith, and civil conspiracy.  In its cross-claims against Trustee Smith, as trustee for the bankruptcy estate of Charles Evans, and Trustee Henderson as the trustee for the bankruptcy estate of White Oaks, and Chris Evans, BOF seeks damages for negligent misrepresentation, intentional misrepresentation and fraud, breach of professional obligation/professional negligence, and civil conspiracy.  BOF also asserts cross-claims for declaratory relief, reformation, and equitable liens against M&F and Trustee Henderson, as trustee for the bankruptcy estates of Hanover, White Oaks, and Town Park.

### 6.        BankFirst: Parcel T-6

BankFirst filed an Answer and Defenses of BankFirst Financial Services to Amended Complaint of G&B Investments, Inc. with Counterclaim (Adv. Dkt. No. 61), an Answer and Defenses of BankFirst Financial Services to Cross-Claim of Trustee with Cross-Claim (Adv. Dkt. No. 63), and an Answer and Defenses of BankFirst Financial Services to the Provisional Cross-Claim of Merchants & Farmers Bank (Adv. Dkt. No. 105).  In its counterclaim against G&B and in its cross-claims against Trustee Henderson, BankFirst seeks a declaratory judgment that its rights are superior to Heritage's rights to Parcel T-6 by virtue of the deed of trust granted BankFirst by Landsdowne on April 27, 2009, and recorded on May 6, 2009.  BankFirst also asserts, in the alternative only, equitable subrogation, equitable lien, constructive trust, and restitution.

7.      **Heritage: Parcel T-6**

Heritage filed Heritage Banking Group's Cross-Claim Against Mississippi Valley Title Insurance Company, Old Republic National Title Insurance Company and Derek A. Henderson, Trustee for the Bankruptcy Estate of Twinbrook Run Development Company, LLC (Adv. Dkt. No. 195). Heritage asserts claims against the Title Companies and the Trustee Henderson, as trustee for the bankruptcy estate of Twinbrook, for vicarious liability/*respondeat superior*, breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, intentional misrepresentation/fraud, negligent hiring, training, and supervision, and bad faith.

## Settlements Reached Before the Adversary Trial [13]

Before the Adversary Trial, the parties settled numerous claims. On October 21, 2010, the Court entered an Order Granting Motion to Approve Compromise and Settlement Between G&B Investments, Inc., and Derek A. Henderson, Trustee (Adv. Dkt. No. 176). Also before the Adversary Trial, Charles Evans consented to the entry of a Final Judgment (Adv. Dkt. No. 381), awarding the Title Companies the sum of $681,300.00, together with interest. On January 4, 2011, M&F entered into a Stipulation of Dismissal (Adv. Dkt. No. 333) pursuant to Federal Rule of Bankruptcy Procedure 7041. Next, the Court entered an Order Approving Compromise and Settlement Regarding Parcel T-6 and Parcels T-2 and T-3. (Adv. Dkt. No. 432). These settlements greatly

---

[13] On May 21, 2010, this Court entered an Order Granting Motion to Approve Title Resolution Agreement, Including (I) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation, and (V) Other Relief in the main bankruptcy case (the "Title Resolution Agreement") (Case No. 09-03763-NPO, Dkt. No. 683). The Title Resolution Agreement did not resolve any claims regarding Tract IV. (MVT Ex. 11). "[T]he Court reserves its ruling on all issues related to [Tract IV] because of the pending adversary proceeding filed by G&B Investments, Inc." Id. at 21.

reduced the number of issues and claims remaining for the Adversary Trial and are summarized as follows:

### 1.    G&B v. Hanover

Hanover agreed to convey Parcel T-1 to G&B and Parcel T-1A to Dodds.  G&B and Hanover agreed that G&B holds title to Parcel T-1 subject only to the first priority deed of trust of BankPlus. They also agreed that Dodds holds title to Parcel T-1A, subject only to the deed of trust of Community Bank.  Hanover agreed to allow the proof of claim filed by G&B in the amount of $4,556,717.40 as an unsecured claim, and G&B reserved all rights with regard to that claim. Hanover dismissed its third-party complaint with prejudice.  All claims between G&B and Hanover were also dismissed with prejudice.

### 2.    G&B v. Charles Evans and the Evans Firm

G&B dismissed without prejudice its claim against Charles Evans and the Evans Firm.  (Adv. Dkt. No. 338).

### 3.    Trustee Henderson v. M&F & Title Companies

Trustee Henderson agreed to dismiss with prejudice his claims against M&F and the Title Companies concerning Parcels T-2 and T-3.  The parties agreed that title to Parcel T-2 remains in the name of Town Park, and the deed of trust granted to M&F, recorded on January 6, 2009, and the deed from Hanover to Town Park, recorded on September 11, 2009, are valid.  BOF reserved all of its rights against M&F as to Parcel T-3. (Adv. Dkt. No. 432).

### 4.    M&F v. Hanover

M&F agreed to dismiss its claims against Hanover as to Parcels T-2 and T-3 with prejudice. Trustee Henderson agreed to convey Parcel T-2 to M&F free and clear of all claims, liens, and

encumbrances by execution and delivery of a deed in lieu of foreclosure.  (Adv. Dkt. No. 432).

**5.     M&F v. Title Companies, the Bankruptcy Estates of Charles Evans & Chris Evans, & Charles Evans, Individually**

M&F dismissed without prejudice (1) the crossclaims M&F had asserted against the Title Companies, the bankruptcy estates of Charles Evans and Chris Evans, and (2) the third-party complaint M&F had filed against Charles Evans, individually. (Adv. Dkt. No. 333).

**6.     Trustee Henderson v. Heritage, BankFirst & Title Companies**

Trustee Henderson agreed to dismiss with prejudice its claims against Heritage, BankFirst, and the Title Companies concerning Parcel T-6.  The parties agreed that Parcel T-6 remains in the name of Landsdowne and that the lien of BankFirst, deed of trust recorded May 6, 2009, and the deed from Hanover to Landsdowne, recorded on September 10, 2009, are valid and enforceable.

**7.     Heritage v. Hanover**

Heritage agreed to dismiss its claims against Hanover with prejudice.

**8.     BankFirst v. Hanover**

BankFirst agreed to dismiss its claims against Hanover with prejudice.

**9.     Heritage v. Trustee Henderson**

Heritage agreed to dismiss its claims against Trustee Henderson with prejudice.

<u>**Adversary Trial**</u>

The parties entered into a Pretrial Order ("Pretrial Order") (Adv. Dkt. No. 408), which was approved by the Court on February 24, 2011.  Pursuant to the Pretrial Order, and consistent with the representations made by counsel at the Adversary Trial, the parties resolved certain claims by agreement. Those settlements are summarized below:

1.      **Title Companies v. BOF**

BOF conceded in the Pretrial Order and at the Adversary Trial (Tr. at 39-40) that the Title Companies are entitled to the entry of a declaratory judgment that the Title Companies have no obligation to issue a title insurance policy on Parcel T-3 to BOF.  (BOF Ex. 11).  Additionally, BOF agreed that the Title Companies are entitled to a declaratory judgment that they have not acted in bad faith by seeking declaratory relief in this Adversary.  The Court finds that BOF did not satisfy the conditions and requirements for the issuance of a title insurance policy on Parcel T-3 and concludes that a declaratory judgment should be granted in favor of the Title Companies.

2.      **BOF v. Title Companies**

BOF agreed to abandon the following cross-claims against the Title Companies: negligent hiring and retention of agent, breach of contract, promissory estoppel, bad faith, and civil conspiracy.

3.      **BOF v. White Oaks, Town Park, Charles Evans & Chris Evans**

Trustee Henderson and Trustee Smith agreed that BOF is entitled to a judgment holding the bankruptcy estates of White Oaks, Town Park, and the Evans Brothers liable for civil conspiracy. The Court finds that White Oaks, Town Park, and the Evans Brothers, working in concert, diverted funds, executed fraudulent instruments, and engaged in other deceptions to defraud BOF and convert funds advanced by BOF for the 2008 White Oaks Loan and the 2009 White Oaks Loan.  A conspiracy is an agreement between two or more persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully.  Gallagher Bassett Servs., Inc. v. Jeffcoat, 887 So. 2d 777, 786 (Miss. 2004).  This Court finds that these individuals and entities are jointly and severally liable to BOF for damages suffered as a result of their conspiracy.  *See* Roussel v. Hutton, 638 So. 2d 1305, 1315 (Miss. 1994).  Trustee Henderson and Trustee Smith conceded liability of the

named bankruptcy estates for the claim of civil conspiracy.

The parties agreed that BOF sustained actual damages in the amount of $226,102.50, the loan deficiency on the 2008 White Oaks Loan, and $488,559.02, the loan deficiency on the 2009 White Oaks Loan. Because these damages are uncontested, the Court finds that BOF is entitled to a judgment in these amounts in Phase One of the Adversary Trial. This Court further finds that the amount of attorneys' fees that BOF is entitled to receive as damages should be determined in Phase Two of the Adversary Trial.

### 4.     BOF v. Hanover

This Court finds that BOF is entitled to a judgment holding the bankruptcy estate of Hanover liable for civil conspiracy. As mentioned previously, White Oaks, Town Park, Hanover, Charles Evans, and Chris Evans, working in concert, diverted funds, executed fraudulent instruments, and engaged in other deceptions to defraud BOF and convert funds advanced by BOF for the 2009 White Oaks Loan. This Court finds that Hanover is jointly and severally liable to BOF, with these individuals and entities, for damages suffered as a result of their conspiracy. *See* Roussel, 638 So. 2d at 1315.

The parties agreed that BOF sustained actual damages in the amount of $488,559.02, the loan deficiency on the 2009 White Oaks Loan. Because these damages are uncontested, the Court finds that BOF is entitled to this amount in Phase One of the Adversary Trial. This Court further finds that the amount of attorneys' fees BOF is entitled to receive should be determined in Phase Two.

### 5.     BOF v. Chris Evans

Trustee Smith conceded liability on part of the bankruptcy estate of Chris Evans based on the continuing guaranties Chris Evans executed on July 21, 2008, and August 27, 2009, in

conjunction with the 2008 White Oaks Loan and the 2009 White Oaks Loan. The parties agreed that BOF incurred damages in the amount of $131,920.30, the unpaid principal balance on the 2008 White Oaks Loan, and $452,680.00, the unpaid principal balance of the 2009 White Oaks Loan. The Court concludes that BOF is entitled to these uncontested amounts in Phase One of the Adversary Trial.

### 6.   BOF v. Charles Evans

Trustee Smith conceded liability on the part of the bankruptcy estate of Charles Evans for fraud. Charles Evans defrauded BOF by submitting a fraudulent certification of title to the Title Companies, which he knew would result in the issuance of a title commitment to BOF, and by delivering the title commitment to BOF for the purpose of inducing BOF to make the 2009 White Oaks Loan. The Court finds that the conduct of Charles Evans satisfies all the elements of common-law fraud under Mississippi law. *See* Moore v. Bailey, 46 So. 3d 375, 383-84 (Miss. Ct. App. 2010).

The parties agreed that BOF sustained actual damages in the amount of $226,102.50, the loan deficiency on the 2008 White Oaks Loan, and $488,559.02, the loan deficiency on the 2009 White Oaks Loan. Because these damages are uncontested, the Court finds that BOF is entitled to a judgment in these amounts in Phase One of the Adversary Trial. This Court further finds that the amount of attorneys' fees BOF is entitled to receive should be determined in Phase Two.

### 7.   BOF v. White Oaks

Trustee Henderson conceded liability to BOF on the part of the bankruptcy estate of White Oaks for breach of contract. Chris Evans, on behalf of White Oaks, signed a promissory note on July 21, 2008, which obligated White Oaks to repay BOF the 2008 White Oaks Loan. On August 27, 2009, Chris Evans, on behalf of White Oaks, signed a promissory note which obligated White Oaks

to repay BOF the 2009 White Oaks Loan.  Neither loan has been repaid by White Oaks, and White Oaks has breached the provisions of both promissory notes.

The parties agreed that BOF sustained actual damages in the amount of $131,920.30, the unpaid principal balance on the 2008 White Oaks Loan and $452,680.00, the unpaid principal balance on the 2009 White Oaks Loan.  Because these damages are uncontested, the Court finds that BOF is entitled to a judgment in these amounts in Phase One of the Adversary Trial.  This Court further finds that the amount of attorneys' fees that BOF is entitled to receive as damages should be determined in Phase Two of the Adversary Trial.

**Remaining Cross-Claims**

As a result of the multiple settlements and concessions among the parties, only the cross-claims asserted by BOF and Heritage against the Title Companies, and the cross-claim asserted by BOF against M&F, remain in dispute.  For the convenience of counsel and the parties, not all of these remaining cross-claims were tried at the same time.  Those cross-claims that are addressed in this Opinion are summarized below:

1.      **BOF v. Title Companies**

BOF asserts tort claims against the Title Companies arising from the failure of the title commitment, number V177829, issued on August 26, 2009 (the "2009 Title Commitment") to disclose the deed of trust on Parcel T-3 to M&F. These tort claims are fraudulent misrepresentation and negligent misrepresentation.  BOF also alleges breach of contract claims against the Title Companies based on the lender's title insurance policy, number LP-107024, they issued to BOF on September 17, 2008, on Parcels T-4 and T-5 (the "2008 BOF Policy").

2.     **Heritage v. Title Companies**

Heritage asserts a breach of contract claim against the Title Companies based on their alleged failure to pay the full measure of their actual losses under the lender's title insurance policy, number LP-107059, they issued to Heritage on October 28, 2008, on Parcel T-6 (the "Heritage Policy"). Heritage also asserts claims for breach of the covenant of good faith and fair dealing, and bad faith.

As mentioned previously, Phase One of the Adversary Trial on the cross-claims addressed in this Opinion took place from February 28 through March 4, 2011. In Phase One, the Court considered only issues of liability and uncontested damages. At the conclusion of the Adversary Trial, the parties submitted the following post-trial briefs: Bank of Forest's Memorandum on the Trial Liability Issues ("BOF Brief") (Adv. Dkt. No. 443); Heritage Banking Group's Post-Trial Brief (Adv. Dkt. No. 444); and the Post-Trial Memorandum of Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company ("Title Cos. Brief")(Adv. Dkt. No. 445).

## <u>Findings of Fact</u>

The Court adopts and incorporates into this Opinion the facts as set forth in the stipulation of facts in the Pretrial Order with primarily stylistic changes:

1.     Charles Evans and Chris Evans are natural brothers.

2.     Chris Evans represented that he owned or controlled certain limited liability companies or corporate entities, including but not limited to, 463 Development Company, LLC ("463 Development"); Hanover; Town Park; and White Oaks.

3.     Charles Evans first was placed on the approved attorney list for the Title Companies in 1984. The Title Companies removed Charles Evans from their approved attorney list in September 2009.

4.     The Title Companies issued certain title insurance policies and provided certain title commitments in response to applications submitted by Charles Evans.

5.   During Charles Evans's tenure on the approved attorney list, the Title Companies did not audit his files.

**Tract IV**

6.   On December 17, 2007, G&B, as seller, and 463 Development, as buyer, entered into a Real Estate Agreement for the sale of Tract IV in its entirety, for a total purchase price of $16 million.  The Real Estate Agreement was signed by Charles Evans in the stated capacity of "authorized agent" for 463 Development.

7.   Record title to all of Tract IV was vested in G&B as of July 22, 2008.

**M&F and Town Park**

8.   On July 18, 2008, Town Park executed a note and deed of trust to M&F in the amount of $3,000,028.00, which was secured by Parcels T-2 and T-3.  The note and deed of trust were signed by "Jon C. Evans, Managing Member" of Town Park.

9.   The Town Park deed of trust executed in favor of M&F on Parcels T-2 and T-3 was recorded on January 6, 2009, in the Madison County Chancery Court records at book 2382 and page 30.

10.  Record title to Parcel T-2 and T-3 was vested in Hanover on January 6, 2009.

11.  M&F check number 872415654 in the amount of $3,000,017.00 was deposited into the Charles H. Evans Trust Account at BankPlus.

12.  In response to an Application and Attorney's Final Certificate submitted for M&F by Charles Evans, the Title Companies issued a lender's title insurance policy to M&F on January 6, 2009.

13.  Hanover conveyed Parcels T-2 and T-3 to Town Park by warranty deed filed in the Madison County Chancery Court records on September 11, 2009, at book 2467 and page 905.

**BOF and White Oaks (2008 White Oaks Loan)**

14.  Clifton Fowler ("Fowler"), president of the Rankin County branch of BOF, requested that Charles Evans procure a title commitment and policy from the Title Companies for the 2008 White Oaks Loan that would be secured by Parcels T-4 and T-5.

15.  In response to an Application and Attorney's First Certificate submitted by Charles Evans, the Title Companies issued a title commitment to BOF, number V135289 (the "2008 BOF Title Commitment"), on July 17, 2008, for the 2008 White Oaks Loan

on Parcels T-4 and T-5.

16.     On July 21, 2008, to fund the purchase of Parcels T-4 and T-5, White Oaks entered into the 2008 White Oaks Loan in the amount of $1,296,500.00. The note and deed of trust granted to BOF were signed by "Jon C. Evans, Member" of White Oaks.

17.     BOF closed the 2008 White Oaks Loan for the purchase of Parcels T-4 and T-5 on July 21, 2008, at its office in Rankin County, Mississippi. Charles Evans did not act as closing attorney for the transaction.

18.     Charles Evans did not represent to BOF that he was an agent for the Title Companies prior to making the 2008 White Oaks Loan.

19.     On July 22, 2008, BOF's check number 005597 in the amount of $1,296,500.00 was given directly to Chris Evans and after endorsement later deposited into the Charles H. Evans Trust Account at BankPlus.

20.     The White Oaks deed of trust in favor of BOF regarding Parcels T-4 and T-5 was filed in the Madison County Chancery Court records on September 17, 2008 at book 2354 and page 391.

21.     The Title Companies issued the 2008 BOF Policy, insuring that BOF had a valid lien on Parcels T-4 and T-5.

22.     At the time of issuance of the 2008 BOF Policy on September 17, 2008, record title to Parcels T-4 and T-5 was in Hanover.

23.     The Title Companies paid $251,300.00 on behalf of BOF to Trustee Henderson for the jointly administered bankruptcy estates to cure all title defects on Parcels T-4 and T-5.

24.     On September 22, 2009, Gene Berry, an attorney retained by the Title Companies on behalf of BOF, contacted BOF regarding possible problems with the 2008 White Oaks Loan.

25.     Hanover conveyed Parcels T-4 and T-5 to White Oaks by special warranty deed filed in the Madison County Chancery Court records on November 22, 2010, at book 2611 and page 277.

26.     The Title Companies authorized BOF to hire Corlew, Munford & Smith as separate counsel and incur attorneys' fees in defense of its lien or insured mortgage on Parcels T-4 and T-5.

**Heritage and Twinbrook**

27.     On July 1, 2008, Charles Evans issued a certificate of title to Heritage regarding Parcel T-6.

28.     Twinbrook applied with and was approved for a loan by Heritage.

29.     On July 18, 2008, Twinbrook executed a promissory note and deed of trust to Heritage on Parcel T-6, in return for a $781,980.00 loan. Both the note and the deed were signed by "Jon C. Evans, Member-Manager."

30.     The Twinbrook deed of trust in favor of Heritage regarding Parcel T-6 was filed in the Madison County Chancery Court records on October 28, 2008, at book 2365 and page 1.

31.     Heritage did not request or receive a title commitment from the Title Companies pertaining to Parcel T-6.

32.     Based upon an Application and Attorney's Final Certificate submitted for Heritage by Charles Evans, the Title Companies issued the Heritage Policy, insuring that Heritage had a valid lien on Parcel T-6.

33.     Record title to Parcel T-6 was vested in Hanover as of July 18, 2008 and October 28, 2008.

34.     The Title Companies prepared Schedule "A" of the Heritage Poolicy, using a form drafted by the American Land Title Association  ("ALTA").

35.     Heritage's check number 007035 in the amount of $780,000.00 was given directly to Twinbrook and after endorsement was deposited into the Charles H. Evans Trust Account at BankPlus.

36.     Heritage did not communicate with the Title Companies prior to making the loan with Twinbrook on July 18, 2008.

37.     Heritage never communicated with the Title Companies regarding Charles Evans.

38.     The only communication between Heritage and Charles Evans of which Heritage is aware is contained in the November 4, 2008, letter from Charles Evans.

39.     Twinbrook never obtained record title to Parcel T-6.

40.     Heritage submitted a notice of claim under the Heritage Policy regarding Parcel T-6 on November 20, 2009.

41.     Heritage submitted to an examination under oath under the Heritage Policy for its title insurance claim on February 23, 2010.

42.     The Title Companies tendered $430,000.00 to Heritage on July 21, 2010, for the title claim under policy number LP-107059.

43.     Prior to sending payment to Heritage, Rob Dodson, counsel for the Title Companies, contacted Michael Simmons, counsel for Heritage, and informed him that the $430,000.00 payment was forthcoming and was based on an appraisal pertaining to Parcel T-6 obtained from an independent appraiser by the Title Companies.

44.     Heritage did not request a copy of the appraisal on Parcel T-6 obtained by the Title Companies.

45.     The only appraisal on Parcel T-6 obtained after Heritage made its title insurance claim was performed by Duncan & Associates, who valued the property at $430,000.00.

**G&B and Hanover**

46.     The Title Companies issued an owner's title insurance policy to G&B, policy number OP-109631, with an effective date of July 22, 2008, insuring that G&B had good title to all of Tract IV for purposes of conveying the property to Hanover.

47.     At the time the owners policy from the Title Companies to G&B was issued, title was vested in G&B in fee simple.

48.     On July 23, 2008, Hanover was formed with the Mississippi Secretary of State.

49.     On July 23, 2008, 463 Development assigned its purchase agreement with G&B to Hanover. The assignment was executed by "Charles H. Evans, Member" for 463 Development Company and by "Charles H. Evans, Member" for Hanover.

50.     On July 23, 2008, Charles Evans and Chris Evans executed a "Consent and Resolution of the Members of the Hanover Investments, LLC" ratifying and confirming the execution of the Real Estate Sales Agreement with G&B, as assigned to the company by 463 Development. Charles Evans and Chris Evans both signed the Consent and Resolution in the stated capacities of "MEMBERS."

51.     On July 23, 2008, G&B sold Tract IV to Hanover for a total purchase price of $16 million. At closing, G&B released approximately 28 acres to Hanover, and Hanover paid $5 million to G&B at closing and executed a promissory note and deed of trust,

signed by "Charles H. Evans, Member," to G&B in the amount of $11 million.

52.    $5,000,000.00 was wired from the Charles H. Evans, Jr. Trust Account into the Watkins & Eager Trust Account on July 22, 2008, and was used as the down payment by Hanover for the G&B transaction.

53.    On July 22, 2008, $2,900,000.00 was deposited into the Trust Account of Watkins & Eager law firm by wire transfer from the Charles H. Evans Trust Account.

54.    On July 23, 2008, $2,100,000.00 was deposited into the Trust Account of Watkins & Eager law firm by wire transfer from the Charles H. Evans Trust Account.

55.    At the closing G&B received $5 million from Hanover.

56.    Hanover and 463 Development complied with all of the requirements of the contract between G&B and 463 Development up to and through closing.

57.    Record title to all of Tract IV was conveyed to Hanover by warranty deed filed in the Madison County Chancery Court records on July 25, 2008.

58.    At the time G&B closed the sale to Hanover, G&B had good marketable title to the property without any defects.

59.    At the time G&B released the 28 acres to Hanover, G&B had good clear title to that property.

60.    A deed of trust from Hanover to G&B was recorded in the Madison County Chancery Court records at book 2338 and page 374.

61.    Hanover's first annual interest payment became due to G&B around the first of September, 2009.  Hanover failed to make a single payment.

**BankFirst and Landsdowne**

62.    On April 27, 2009, BankFirst made a $828,750.00 loan to Landsdowne.  In return, Chris Evans signed a promissory note and deed of trust from Landsdowne as "managing member." At the time of closing, record title to Parcel T-6 was in Hanover.

63.    The Landsdowne deed of trust in favor of BankFirst regarding Parcel T-6 was filed in the Madison County Chancery Court records on May 6, 2009 at book 2424 and page 715.

64.     Hanover conveyed Parcel T-6 to Landsdowne by warranty deed filed in the Madison County Chancery Court records on September 10, 2009 at book 2467 and page 494.

**BOF and White Oaks (2009 White Oaks Loan)**

65.     Fowler, president of the Rankin County branch of BOF, requested that Charles Evans procure the 2009 BOF Title Commitment and loan policy for the bank from the Title Companies for the loan to purchase Parcel T-3.

66.     On August 26, 2009, Charles Evans submitted an Application & Attorney's First Certificate to the Title Companies for issuance of the 2009 BOF Title Commitment on Parcel T-3.

67.     In the August 26, 2009, Application and Attorney's First Certificate submitted by Charles Evans to the Title Companies, Charles Evans stated that record title to Parcel T-3 was vested in G&B and that Parcel T-3 was to be sold to White Oaks.

68.     On August 26, 2009, the Title Companies issued the 2009 BOF Title Commitment pertaining to Parcel T-3.

69.     The Title Companies prepared Schedule "A" of the 2009 BOF Title Commitment issued to the BOF, using a form drafted by ALTA.

70.     BOF closed the 2009 White Oaks Loan on August 27, 2009 and disbursed loan proceeds directly to White Oaks in the amount of $451,450.00.

71.     In connection with the 2009 White Oaks Loan and to fund the purported purchase of Parcel T-3, White Oaks executed a note and deed of trust dated August 27, 2009, to BOF in the amount of $451,450.00.  The note and deed of trust were signed by "Jon C. Evans, Member" of White Oaks.

72.     The 2009 White Oaks Loan for the purported purchase of Parcel T-3 was closed by BOF at its office in Rankin County, Mississippi on August 27, 2009.

73.     Charles Evans did not represent to BOF that he was an agent for the Title Companies prior to making the loan with White Oaks on August 27, 2009.

74.     The deed of trust signed by Chris Evans on behalf of White Oaks, which granted a purported lien to BOF on Parcel T-3 was recorded on September 18, 2009 in book 2489 and page 497 of the Madison County Chancery Court records.

75.     On August 27, 2009, and September 18, 2009, record title to Parcel T-3 was in Hanover.

76.     White Oaks never obtained record title to Parcel T-3.

77.     On August 31, 2009, BOF's check number 009319 in the amount of $450,000.00, previously given directly to White Oaks, was endorsed and deposited into the Charles H. Evans Trust Account at BankPlus.

78.     Charles Evans did not close either the 2008 White Oaks Loan or the 2009 White Oaks Loan.

79.     BOF closed both the 2008 White Oaks Loan and the 2009 White Oaks Loan in-house.

80.     BOF delivered the deeds of trust for both the 2008 White Oaks Loan and the 2009 White Oaks Loan to Charles Evans at his office.

81.     On September 8, 2009, the Title Companies contacted BOF to determine whether the loan proceeds for the 2009 White Oaks Loan had been disbursed.

82.     On September 22, 2009, the Title Companies filed an action for declaratory judgment against BOF in cause number 2009-0270 in the Circuit Court of Madison County, Mississippi, requesting the court to determine whether the Title Companies were obligated to issue a loan policy to the BOF on Parcel T-3, and if so, in what form the policy should be issued.

83.     To date, the Title Companies have not issued a title insurance policy to BOF on Parcel T-3, relating to the 2009 White Oaks Loan.

**The Title Companies**

84.     The title commitments and loan policies pertaining to Tract IV and issued to BOF, M&F, and Heritage were jointly issued by the Title Companies.

85.     Old Republic National Title Insurance Company owns 100% of the outstanding stock of Mississippi Valley Title Insurance Company.

86.     The title commitments and the loan policies which the Title Companies issued pertaining to Tract IV to BOF, M&F, Heritage, and BankFirst were transmitted to the lenders through Charles Evans.

## Conclusions of Law

Throughout the Adversary Trial and other proceedings, the testimony and evidence showed

Page 36 of  83

that BOF, as well as other banks who were victims of the Evans Brothers' fraudulent scheme, made two incorrect assumptions about (1) the type of protection title insurance provided them and (2) the significance of Charles Evans's status as an attorney on the Title Companies' list of approved attorneys. Because of these two incorrect assumptions, the banks loaned money in a way that made them less vigilant against, and more vulnerable to, the misconduct of the Evans Brothers.

Specifically, the testimony and evidence at the Adversary Trial showed that the banks assumed that a title commitment was equivalent to a guarantee of good title, so that the Title Companies would be liable for all damages caused by any uncovered title defect. A title commitment, however, is not such a guarantee. A title company's business is to insure title, not to report on the condition of title or to guarantee good title, unless the title company voluntarily undertakes that additional duty. Allowing a bank to recover extra-contractual damages waylays the relationship between the amount of liability a title company assumes and the amount of premiums the bank pays.[14] *See* Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 429 (5th Cir. 2007) (*citing* State Auto. Mutual Ins. Co. v. Glover, 176 So. 2d 256, 258 (Miss. 1965) ("No rule of construction requires or permits [Mississippi courts] to make a contract differing from that made by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear.")).

The testimony and evidence also clearly demonstrated that BOF and the other banks assumed the "approved" attorney status meant more than it did. The fact that Charles Evans was on the approved-attorney list did not in itself render him an agent of the Title Companies. Nor did it

---

[14] *See* James Bruce Davis, More Than They Bargained for: Are Title Insurance Companies Liable in Tort for Undisclosed Title Defects? 45 Catholic Univ. L. Rev. 71 (1995).

guarantee that Charles Evans was of good moral character.  The "approved attorney" status meant merely that the Title Companies had satisfied themselves that Charles Evans understood their application process for title insurance.[15]  Those two incorrect assumptions led the banks to engage in business practices that were incompatible with the title commitments and insurance policies they purchased from the Title Companies to protect them from the fraud committed by the Evans Brothers.

## I.      BOF's Tort Claims under the 2009 BOF Title Commitment

BOF's tort claims against the Title Companies for fraudulent (or intentional) misrepresentation and negligent misrepresentation are based on Schedule A of the 2009 BOF Title Commitment.  Schedule A  includes the following sentence, which BOF views as a report on the condition of the title to Parcel T-3:

> 4.      Title to the Fee Simple estate or interest in the land is at the Effective Date [August 26, 2009] vested in:
> G&B Investments, Inc.,
> by virtue of deed dated October 1, 1999, recorded in Book 451 at Page 291

(BOF Ex. 11 at 4 of 6).[16]  This information was taken directly from the Application and Attorney's First Certificate that Charles Evans submitted to the Title Companies (BOF Ex. 10).  Schedule A mentions nothing about the deed of trust on Parcel T-3 that Chris Evans, acting on behalf of Town

---

[15] The fact that Charles Evans was granted a license to practice law in the State of Mississippi meant only that in 1980 Charles Evans met the qualifications for admission to The Mississippi Bar for good moral character and legal knowledge.  From that point forward, Charles Evans maintained his license by satisfying The Mississippi Bar's continuing legal education requirements, paying his bar dues, and avoiding disbarment.  However, one need only read a newspaper or watch the evening news to understand that a law license in any state is not a forever guarantee of good moral character.

[16] Exhibits from the Adversary Trial are cited as "BOF Ex. ____", "MVT Ex. ____", or "Heritage Ex. ____".

Park, previously granted M&F on July 18, 2008, to secure a $3 million loan.[17]  BOF insists that it

relied on this sentence to its detriment on August 27, 2009, when it disbursed to Chris Evans the

proceeds from the 2009 White Oaks Loan in the amount of $451,450.00, and received, in return, a

deed of trust on Parcel T-3[18] to secure the debt.

BOF claims that the 2009 BOF Title Commitment issued by the Title Companies

fraudulently or negligently misrepresented that G&B was the fee simple owner of Parcel T-3 when,

in fact, Hanover was the owner and M&F held a lien on the property.  BOF further argues that: (1)

this language is a representation of a material fact which was made by the Title Companies without

knowledge of its veracity; (2) the Title Companies intended or expected BOF to rely on the

representation; and (3) BOF, ignorant of the falsity of the representation, relied on the representation

to its detriment by advancing a $451,450.00 loan to fund the purchase by White Oaks of Parcel T-3

from G&B.  BOF asserts that these facts establish all of the elements of common-law fraud under

_____

[17] On July 18, 2008, when M&F loaned $3 million to Chris Evans, G&B was the record
title owner of Parcel T-3.  Hanover later acquired the property and on September 11, 2009,
conveyed it to Town Park.

[18] It is worth noting that the relationship between BOF and the Title Companies is very
different with respect to the 2009 White Oaks Loan than it is with respect to the 2008 White
Oaks Loan.  Whereas the Title Companies did issue a title insurance policy to BOF regarding the
2008 White Oaks Loan, they did not issue a title insurance policy as to the 2009 White Oaks
Loan.  Moreover, BOF agreed at the Adversary Trial that the 2009 BOF Title Commitment does
not impose an obligation on the Title Companies to do so now.

A commitment for title insurance differs considerably from a title insurance policy.
Briefly stated, a title insurance commitment, also called a title insurance binder, sets forth the
conditions under which a title insurance company will issue a title insurance policy based upon
the title commitment.  Joyce Palomar, TITLE INSURANCE LAW § 5:29 (West 2010).  Generally, a
title insurance policy is a contract of indemnity under which a title insurance company agrees to
defend the insured against any legal challenges to the title and if the title proves to be defective,
to indemnify the insured against any loss, up to the face amount of the policy, from defects in the
title that are not explicitly excluded in the policy.  Id. § 1:8.

Mississippi law.  *See* <u>Moore</u>, 46 So. 3d at 383-84 (outlining the elements of common-law fraud).

In addition to the language in Schedule A relied upon by BOF, other provisions of the 2009 BOF Title Commitment are important to the inquiry at hand.  The paragraph referred to as the "Commitment Provision" states:

> [The Title Companies], for a valuable consideration, commit[] to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment.

(BOF Ex. 11 at 2 of 6).  The Title Companies' commitment to issue a title insurance policy was subject to numerous conditions, including the following two, which are referred to herein as "Condition 3" and "Condition 4," respectively:

> 3.     Liability of the [Title Companies] under this Commitment shall be .  .  . only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment.  In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions and Conditions and the Exclusions from Coverage of the form of the policy or policies committed for in favor of the proposed insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

> 4.     This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title.  Any action or actions or rights of action that the proposed insured may have or may bring against the [Title Companies] arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

(BOF Ex. 11 at 3 of 6).  Pertinent excerpts from Schedule A, referred to in the Commitment Provision and in Condition 3 above, are:

SCHEDULE A

1.     Effective Date: August 26, 2009 at 8:00 A.M.

2.     Policy or Policies to be issued:

     a.     Loan Policy: Loan Policy (06-17-06)     Amount: $450,000.00

     Proposed Insured: Bank of Forest its successors and/or assigns, as their interest may appear

     b.     Owner's Policy: N/A     Amount: N/A

     Proposed Insured: N/A

3.     The estate or interest in the Land described or referred to in this Commitment is Fee Simple.

4.     Title to the Fee Simple estate or interest in the land is at the Effective Date vested in:

G & B Investments, Inc.,
by virtue of deed dated October 1, 1999, recorded in Book 451 at Page 291

5.     Purchaser/Borrower: White Oaks Investment Company, LLC

(BOF Ex. 11 at 4 of 6).  Also, the 2009 BOF Title Commitment sets forth numerous requirements

in Schedule B, Section 1, including:

SCHEDULE B - SECTION 1
Requirements

Showing defects and objections to be removed or eliminated; liens and encumbrances to be satisfied and discharged of record and requirements to be complied with before policy of title insurance can be issued without exception thereto.

Item 1.  Proper instrument creating the interest or estate to be insured must be executed and duly filed for record, to wit:

Execution and recordation without intervening rights of a Warranty Deed by G & B Investments Inc., conveying the property described in Schedule "A" above to White Oaks Investment Company, LLC.

Execution and recordation without intervening rights of a First deed of trust by White Oaks Investment Company, LLC to _____, Trustee for Bank of Forest, Beneficiary, securing an indebtedness in ths sum of $450,000.00.

(BOF Ex. 11 at 5 of 6) (blank in original).

## A.      Doctrines of Election of Remedies and/or Waiver

Under the doctrines of election of remedies and waiver, BOF had the option either to rescind the 2009 BOF Title Commitment and sue the Title Companies for fraud, or affirm the 2009 BOF Title Commitment and sue the Title Companies for contractual damages. Here, BOF has abandoned its contract claims against the Title Companies in pursuit of its claim for fraudulent and/or negligent misrepresentation.  (Adv. Dkt. No. 101).

The doctrine of election of remedies "serves to prevent a litigant from presenting inconsistent causes of action and/or testimony before the court." Beyer v. Easterling, 738 So. 2d 221, 224 (Miss. 1999).  The doctrine states that where one claims to have been fraudulently induced to enter a contract, the defrauded party must elect either to rescind the contract and pursue its claim for fraud, or affirm the contract and sue for contractual damages. *See* Bogy v. Ford Motor Co., 538 F.3d 352, 354-55 (5th Cir. 2008) (citing Turner v. Wakefield, 481 So. 2d 846,  848-49 (Miss. 1985)); *see also* Tel. Man,  Inc. v. Hinds County, 791 So. 2d 208, 210-11 (Miss. 2001).  This election must be made because an allegation of fraud makes a contract voidable, not void, under Mississippi law.  Allen v. Mac Tools, Inc., 671 So. 2d 636, 641 (Miss. 1996) (citing Turner, 481 So. 2d at 848-49).  The Mississippi Supreme Court has held that this "election must be made promptly, and when once made, is final." Turner, 481 So. 2d at 848.

In order to void the 2009 BOF Title Commitment, BOF was obligated to "act promptly and finally to repudiate the agreement; however, a continuance to ratify the contract terms constitutes

Page 42 of  83

waiver." Id. at 849. The Court finds, however, that BOF affirmed the 2009 BOF Title Commitment. BOF alleged ratification, complete performance, and anticipatory breach of contract in Bank of Forest's Answer and Affirmative Defenses to Amended Cross-Claim for Declaratory Judgment and Damages and Third Party Complaint of Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (Adv. Dkt. No. 75). In its Amended Answer, Defenses, Counterclaim and Cross Claims of Bank of Forest (Adv. Dkt. No. 70) and in Bank of Forest's Amended Crossclaims Against Defendants Mississippi Valley Title Insurance Company, and Old Republic National Title Insurance Company (Adv. Dkt. No. 101), BOF asserted that the Title Companies breached the 2009 BOF Title Commitment and as a remedy sought specific performance of the 2009 BOF Title Commitment. To support its specific performance claim, BOF tendered payment of the premium to the Title Companies, as required by the 2009 BOF Title Commitment. (Tr. at 551:9-15). By these actions, BOF affirmed the 2009 BOF Title Commitment. There is no evidence in the record that BOF took any action to rescind or repudiate the 2009 BOF Title Commitment.

By its own actions in seeking specific performance of the 2009 BOF Title Commitment, BOF waived its right to recover under fraud. In other words, BOF elected its remedy in contract, rather than in tort. Additionally, as this Court noted in its Memorandum Opinion Denying Motion for Summary Judgment Against Bank of Forest (Adv. Dkt. No. 371), BOF has abandoned its claim for breach of the 2009 BOF Title Commitment in Bank of Forest's Response to Title Companies' Motion for Summary Judgment (Adv. Dkt. No. 342). Accordingly, BOF has no legal remedy against the Title Companies related to the 2009 BOF Title Commitment. Nevertheless, the Court will address the merits of BOF's tort claim.

**B.      Whether Mississippi Law Imposes a Duty on Title Insurance Companies to Search the Record for and Disclose Title Defects Before Issuing a Title Commitment**

None of the parties has cited, and the Court has not itself found, any Mississippi statute[19] or case that imposes a duty on a title insurance company to search for and report defects in title–for the benefit of the insured–before issuing a title commitment.  In the absence of any Mississippi authority, it is the task of this Court in its <u>Erie</u> role to predict how the Mississippi Supreme Court would rule.  <u>Erie RR Co. v. Tompkins</u>, 304 U.S. 64 (1938); *see* <u>Lawrence v. Va. Ins. Reciprocal</u>, 979 F.2d 1053, 1055 (5th Cir. 1992).  "[A]bsent evidence to the contrary, we presume that the Mississippi courts would adopt the prevailing rule if called upon to do so." <u>Jackson v. Johns-Manville Sales Corp.</u>, 781 F.2d 394, 398 (5th Cir. 1986) (overruled in part, on other grounds).

The Title Companies contend that the prevailing rule in a majority of other jurisdictions is that no common-law duty exists.  (Title Cos. Brief at 7). *See* James L. Gosdin, <u>Title Insurance A Comprehensive Overview</u> (3d ed. 2007).  The Court finds, however, that other jurisdictions are almost evenly divided, when those governed by state statutes barring tort claims are omitted from the tally.  For that reason, the Court declines the invitation of the Title Companies to rest its <u>Erie</u> decision on a count of cases.  Apparently, however, a slight majority of jurisdictions have refused to impose tort liability on a title insurance company for an undisclosed title defect.  *See, e.g., Colorado*: <u>Arapahoe Land Title, Inc. v. Contract Fin., Ltd.</u>, 472 P.2d 754 (Colo. App. 1970); *Delaware*: <u>Ruger v. Funk</u>, C.A. No. 93C-04-210, 1996 Del. Super. LEXIS 34 (Del. Super. Ct., Jan.

─────────────

[19] Mississippi law establishes certain financial requirements for companies engaged in the business of title insurance for the purpose of assuring that they will have sufficient financial resources to pay claims. Miss. Code Ann. § 83-15-1 to § 83-15-11.   It does not attempt to define the duties of title insurance companies.

22, 1996); *Idaho*: Brown's Tie & Lumber Co. v. Chicago Title Co., 764 P.2d 423 (Idaho 1988);

*Illinois*: First Midwest Bank, N.A. v. Stewart Title Guar. Co., 843 N.E.2d 327, 341 (Ill. 2006);

*Maine*: NE Props., Inc. v. Chicago Title Ins. Co., 660 A.2d 926, 928 (Me. 1995); *Massachusetts*:

Private Lending & Purchasing, Inc. v. First Am. Title Ins. Co., 766 N.E.2d 532, 537 (Mass. App. Ct.

2002); *Michigan*: Mickam v. Joseph Louis Palace Trust, 849 F. Supp. 516, 522 (E.D. Mich. 1993);

*New Jersey*: Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 562 A.2d 208, 218 (N.J. 1989); *New

York*: Sabbagh v. Pizzuro, 2004 WL 2295824 (N.Y. Sup. Ct. July 13, 2004); *Oregon*: Womer v.

Melody Woods Homes Corp., 997 P.2d 873, 875 (Or. 2000); *Utah*: Culp Constr. Co. v. Buildmart

Mall, 795 P.2d 650, 654 (Utah 1990); *Washington*: Barstad v. Stewart Title Guar. Co., 39 P.3d 984,

988 (Wash. 2002); *Wisconsin*: Greenberg v. Stewart Title Guar. Co., 492 N.W.2d 147 (Wis. 1992).

On the other hand, a significant number of courts have concluded that a title insurance

company has an implied duty to search public records for title defects and should be held liable in

tort for negligently performing that duty.  *See, e.g., Alaska*: Bank of Cal., N.A. v. First Am. Title Ins.

Co., 826 P.2d 1126 (Alaska 1992); *Arizona*: Title Ins. Co. v. Costain Ariz., Inc., 791 P.2d 1086,

1090 (Ariz. Ct. App. 1990); *Arkansas*: Bourland v. Title Ins. Co., 627 S.W.2d 567 (Ark. Ct. App.

1982); *Florida*: Shada v. Title & Trust Co., 457 So. 2d 553, 557 (Fla. Dist. Ct. App. 1984); *Georgia*:

Razete v. Preferred Research, Inc., 415 S.E.2d 25 (Ga. Ct. App. 1992); *Indiana*: U.S. Bank, N.A. v.

Integrity Land Title Corp., 929 N.E.2d 742, 745 (Ind. 2010);  *Kansas*: Bender v. Kan. Secured Title

& Abstract Co., 119 P.3d 670, 678 (Kan. Ct. App. 2005); *Montana*: Malinak v. Safeco Title Ins. Co.

of Idaho, 661 P.2d 12, 16 (Mont. 1983); *Nebraska*: Heyd v. Chicago Title Ins. Co., 354 N.W.2d 154

(Neb. 1984).

Recognizing an implied duty would result in a new tort cause of action in Mississippi that

would arise independent from the contractual obligations in the title commitment and in this way would disrupt the agreement reached between the parties.  Under these circumstances, where there is no case authority in Mississippi and there is no clear majority among the jurisdictions imposing the duty to search on title insurance companies, this Court will not burden a title insurance company with a duty that the Mississippi legislature has not seen fit to impose.  Therefore, this Court concludes that a title insurance company in Mississippi does not have a legal duty to conduct a title examination and disclose that search information to the insured.  As the Greenberg court aptly explained:

> [T]he issuance of a title commitment does not . . . constitute an independent undertaking by the insurer to search the title for the benefit of the insured.  Rather, the title commitment "generally constitutes no more than a statement of the terms and conditions upon which the insurer is willing to issue its title policy."

Greenberg, 492 N.W.2d at 151 (quoting Lawrence v. Chicago Title Ins. Co., 237 Cal. Rptr. 264, 268 (Cal. Ct. App. 1987)).

### C.   Whether the Title Companies Voluntarily Undertook the Duty to Perform a Title Search Before Issuing the 2009 BOF Title Commitment

BOF asserts that the Title Companies, by voluntarily undertaking to represent the status of title, "incurred the concomitant risk of liability for doing so fraudulently and/or negligently."  (BOF Brief at 19).  There is no evidence, however, that the Title Companies voluntarily undertook the duty to perform a title search for BOF's benefit before issuing the 2009 BOF Title Commitment.

William Parrish Fortenberry ("Fortenberry"), senior counsel for Mississippi Valley Title Insurance Company, testified that the Title Companies typically charge from $500.00 to $1,000.00 for a title report, whereas the Title Companies charged BOF only $150.00 for the 2009 BOF Title Commitment. (Tr. at 547:17 - 548:5).  Consistent with the $150.00 fee, the Title Companies' invoice

to BOF for the 2009 BOF Title Commitment and the proposed title policy show that the Title Companies did not charge BOF for any title search. (BOF Ex. 18). Additionally, the Title Companies sent a letter accompanying the 2009 BOF Title Commitment that stated "[t]his amount is for the title insurance premium only and does not include any attorney's fees, abstracting or title search fees." (BOF Ex. 19 at 3 of 3). Because the Title Companies did not assume any duties to BOF outside the 2009 BOF Title Commitment, it is unnecessary for the Court to determine whether Mississippi law would hold them liable for failing to disclose the deed of trust to M&F if they had voluntarily undertaken the duty to perform such a title search.

     **D.   Fraudulent Misrepresentation**

Even assuming that Mississippi law did impose upon the Title Companies the duty to search for, and disclose, title defects for BOF's benefit, BOF failed to satisfy the elements of fraudulent misrepresentation. In order to recover for fraudulent misrepresentation, BOF had to prove by clear and convincing evidence: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury. Trim v. Trim, 33 So. 3d 471, 478 (Miss. 2010) (citing McCord v. Healthcare Recoveries, Inc., 960 So. 2d 399, 406 (Miss. 2007)).

     **1.   False Representation**

As to the first and second elements, BOF claimed at the Adversary Trial that the sentence in Schedule A of the 2009 BOF Title Commitment that G&B held "[t]itle to the [f]ee [s]imple estate or interest in" Parcel T-3 was a false representation about the status of the title because (1) G&B was

not the title record owner and (2) it omitted the fact that M&F had a prior lien on Parcel T-3.   The

Title Companies, on the other hand, asserted that this sentence should be construed in the context

of the entire 2009 BOF Title Commitment, including Condition 4.   The 2009 BOF Title

Commitment is based on a form contract that ALTA approved in 2006 to replace the prior 1982

ALTA form.   Among the changes made to the form in 2006 was Condition 4, which states in

pertinent part: "This Commitment is a contract to issue one or more title insurance policies and is

not an abstract of title or a report of the condition of title."

According to the Title Companies, when considered in that context, the information in

Schedule A was not a representation about the condition of the title but, rather, about the subject

matter of the policy.   The Title Companies further contend that the representation in the 2009 BOF

Title Commitment regarding the Title Companies' promise to issue BOF a title insurance policy

subject to certain requirements was true.

 The Court agrees with the Title Companies.   Well-established Mississippi law states that,

"[w]hen construing a contract, [the court should] read the contract as a whole, so as to give effect

to all of its clauses."   Brown v. Hartford Ins. Co., 606 So. 2d 122, 126 (Miss. 1992).   Therefore,

Condition 4 cannot be ignored but must be read as part of Schedule A of the 2009 BOF Title

Commitment.   The disclaimer found in Condition 4 of the 2009 BOF Title Commitment prevents

BOF from establishing the first and second elements of a fraudulent misrepresentation claim.

### 2.        Intent to Deceive

Additionally, BOF failed to present clear and convincing proof of  "an intention to deceive

or defraud," Berkline Corp. v. Bank of Miss., 453 So. 2d 699, 702-03 (Miss. 1984), or a reckless act

on the part of the speaker which is the "equivalent[] of [a] conscious misrepresentation[]," Vincent

v. Corbitt, 47 So. 641, 642 (Miss. 1908).  The evidence at the Adversary Trial did not show any intent by the Title Companies to deceive BOF.  Nor did the evidence at the Adversary Trial show that the Title Companies acted recklessly in relying on the Application and Attorney's First Certificate submitted by Charles Evans, a licensed attorney, in preparing the 2009 BOF Title Commitment. *See* Marsh v. Wallace, 666 F. Supp. 2d 651, 660 (S.D. Miss. 2009) (Mississippi law holds a party liable for his ignorance only where he was "reckless" or where he "ought to have known" the falsity of the disputed representations).

### 3.      Reasonable Reliance

As discussed previously, Condition 4 provides that the 2009 BOF Title Commitment was "not an abstract or report on the condition of title."   In short, Condition 4 is a disclaimer.  The Mississippi Supreme Court considered the effect of disclaimers in contracts in Hazlehurst Lumber Co. v. Mississippi Forestry Commission, 983 So. 2d 309, 312-13 (Miss. 2008).  There, the Supreme Court held that disclaimers in an invitation to bid to remove trees, and in the subsequent contract, protected the Mississippi Forestry Commission ("Forestry Commission") from any liability to the successful bidder on the tree-removal project.  The invitation to bid, and the contract prepared by the Forest Commission, included detailed data sheets estimating the volumes of timber on the property.  That estimate proved to be incorrect when the actual number of trees cut by the lumber company turned out to be a lot less.   The invitation to bid and the contract contained language that the estimated volume figures were inexact and not intended to represent any guarantee.  According to the Mississippi Supreme Court,  "The disclaimer provisions in the invitation and contract protect the [Forestry] Commission from any liability resulting from an inaccurate timber estimate."  Id. at 312-13.  As to the lumber company's negligent misrepresentation claim, the court found that "[i]n light

of the disclaimer provision in the contract, the [lumber company] could not reasonably rely on the [Forestry] Commission's estimates." Id. at 313.  Accordingly, the court affirmed the trial court's dismissal of the lumber company's claims.

Similar to the disclaimers in Hazlehurst, Condition 4 of the 2009 BOF Title Commitment specifically states that the 2009 BOF Title Commitment "is not an abstract of title or a report of the condition of title." (Tr. at 137-39).  BOF, therefore, was not entitled to rely on the sentence in Schedule A that G&B held fee simple title to Parcel T-3 as its source of title information in deciding whether to loan money to White Oaks. Consistent with the holding in Hazlehurst, Condition 4 protects the Title Companies from liability for incorrectly identifying the status of the title in the 2009 BOF Title Commitment.

This outcome is unchanged by the testimony of Fowler, an officer of BOF, who said that he never read Condition 4.  (Tr. at 377:11 - 379:1).  The Mississippi Supreme Court has held that parties to a contract are charged with the knowledge of the contents of that contract whether they have read it or not.  See Mladineo v. Schmidt, 52 So. 3d 1154, 1161-62 (Miss. 2010) (citing Atlas Roofing Mfg. Co. Inc. v. Robinson & Julienne, Inc., 279 So. 2d 625, 629 (Miss. 1973); Oaks v. Sellers, 953 So. 2d 1077, 1083-84 (Miss. 2007); Stephens v. Equitable Life Assurance Soc'y of U.S., 850 So. 2d 78, 83 (Miss. 2003); Cherry v. Anthony, Gibbs, Sage, 501 So. 2d 416, 419 (Miss. 1987); Zepponi v. Home Ins. Co., 161 So. 2d 524 (Miss. 1964)). "The 'duty-to-read' and the 'imputed-knowledge' doctrines are firmly rooted in Mississippi precedent." Mladineo, 52 So. 3d at 1162.

Pursuant to long-standing case law in Mississippi, BOF is charged with the knowledge that the 2009 BOF Title Commitment was not a title opinion and, therefore, BOF had no right to rely on

Schedule A as to the status of the title to Parcel T-3.  Notably, Fowler testified that if he had read Condition 4, he would have understood that the 2009 BOF Title Commitment was not a title opinion. (Tr. at 377-378).

In summary, the Court finds that BOF did not carry its burden to show by clear and convincing evidence that the Title Companies are liable for fraudulent misrepresentation.  The disclaimer in Condition 4 of the 2009 BOF Title Commitment prevented BOF from proving that the Title Companies made a false representation.  BOF also failed to prove intent to deceive or recklessness on the part of the Title Companies.  Finally, BOF failed to show that it had a right to rely on the inaccurate sentence in Schedule A in the 2009 BOF Title Commitment.  For these reasons, even if Mississippi law imposed extra-contractual duties on the Title Companies, BOF's fraudulent misrepresentation claim fails.

### E.      Imputed Fraudulent Misrepresentation

As noted previously, Schedule A of the 2009 BOF Title Commitment between BOF and the Title Companies contained a statement from Charles Evans concerning the ownership of the subject property which Charles Evans knew to be false.  BOF claims that the Title Companies are liable for the frauds committed by Charles Evans under principles of agency law and imputed liability. (BOF Brief at 8).  Specifically, BOF contends that Charles Evans "was most likely an *implied* agent of the Title Companies" at the time he made the statement and, therefore, that his actions impute liability to the Title Companies because of his *actual* authority. (BOF Brief at 9) (emphasis added). In the alternative, BOF lays out an argument that Charles Evans was an *apparent* agent, and, therefore, that his actions impute liability to the Title Companies because of his *apparent* authority.  (BOF Brief at 12-13) (emphasis added).   The Title Companies counter that Charles Evans had no actual or

apparent authority to act on their behalf and was neither an implied nor apparent agent of the Title

Companies. (Tr. at 550:1-3, 75:3-8). In the event the Court finds that an agency relationship existed,

the Title Companies articulate three defenses: (1) Charles Evans acted outside the scope of his

authority; (2) Charles Evans's interests were adverse to their own; and (3) Charles Evans was a dual

agent whose actions may not be imputed either to them or BOF since his actions were adverse to

both. (Title Cos. Brief at 28-30).

> **1.      Whether an Agency Relationship Existed Between Charles Evans and the Title Companies**

In Mississippi, the principal-agent relationship is defined as "the fiduciary relation which

results from the manifestation of consent by one person to another that the other shall act on his

behalf and subject to his control, and consent by the other so to act." O.W.O. Invs., Inc. v. Stone Inv.

Co., 32 So. 3d 439, 447 (Miss. 2010) (internal quotation marks omitted).   An agent may bind his

principal through actual or apparent authority.  Barnes, Broom, Dallas & McLeod, PLLC v. Estate

of Cappaert, 991 So. 2d 1209, 1211 (Miss. 2008).   Actual authority exists when the principal

expressly authorizes the agent in either written or oral specific terms to act on its behalf.  Migerobe,

Inc. v. Certina USA, Inc., 924 F.2d 1330, 1336 (5th Cir. 1991) (applying Mississippi law).  Apparent

authority exists when a reasonably prudent person having knowledge of the business involved, would

be justified in supposing, based on the character of the duties that the principal entrusted to the agent,

that the agent has the power he is assumed to have.  Barnes, 991 So. 2d at 1211.  "The burden of

proving an agency relationship rests squarely upon the party asserting it."  Highlands Ins. Co. v.

McLaughlin, 387 So. 2d 118, 120 (Miss. 1980).  Whether an agency relationship exists depends upon

whether the parties intended to create an agency relationship, a factual issue that may be proved by

either direct or circumstantial evidence. <u>Engle Acoustic & Tile, Inc. v. Grenfell</u>, 223 So. 2d 613, 617 (Miss. 1969). Once established, an agency relationship generally imputes knowledge and information of an agent received in conducting the principal's business to the principal, regardless of whether the agent communicated that knowledge or information to the principal. <u>Lane v. Oustalet</u>, 873 So. 2d 92, 95-96 (Miss. 2004).

It is worth noting that an agency relationship may subject the principal to liability, even though the agent's conduct was not actuated by a purpose to serve the principal. *See* <u>Billups Petroleum Co. v. Hardin's Bakeries Corp.</u>, 63 So. 2d 543, 546 (Miss. 1953); <u>Napp v. Liberty Nat'l Life Ins. Co.</u>, 159 So. 2d 164, 166 (Miss. 1963). An express agent is actually authorized to act on the principal's behalf. <u>Monticello Cmty. Care Ctr., LLC v. Martin ex rel. Peyton</u>, 17 So. 3d 172, 177 (Miss. Ct. App. 2009). An implied agent, on the other hand, is authorized by the principal to perform certain acts that reasonably lead third parties to believe that an agency relationship exists. <u>Forest Hill Nursing Ctr., Inc. v. McFarlan</u>, 995 So. 2d 775, 781 (Miss. Ct. App. 2008). Apparent agency emanates from apparent authority and is established when the principal intentionally or negligently induces third parties to believe in, and detrimentally rely upon, the agency. <u>Cooley v. Brawner</u>, 881 So. 2d 300, 302 (Miss. Ct. App. 2004).

BOF bases its contention that Charles Evans was an implied agent of the Title Companies primarily upon the long period of time, almost twenty years, that he served as an "approved attorney" for the Title Companies. BOF also relies upon their knowledge that the work he performed was essential to their business and their realization of profits from his sale of their insurance products. (BOF Brief at 11). Moreover, according to BOF, Charles Evans's fraud arose from the very actions the Title Companies authorized him to perform: submitting applications for title commitments and

title insurance, delivering title commitments and title insurance policies, and collecting premiums. Finally, BOF contends that the Title Companies intended and permitted Charles Evans to act as the "sole conduit" for the flow of communication between themselves and BOF. (BOF Brief at 12).

The Court finds that the record does not support BOF's assertion that Charles Evans possessed either actual or apparent authority. There is no evidence that Charles Evans and the Title Companies entered into any written or verbal agreement that granted Charles Evans authority to act on their behalf. To the contrary, Fortenberry testified that Charles Evans was never registered as an agent for the Title Companies under Mississippi law.[20] (Tr. at 549:20-22). More important, Freeman testified that Charles Evans submitted the insurance policy application at the request of BOF. (Tr. at 75:3-9). He also performed other work for BOF, such as filing deeds of trust, providing BOF with copies of all pertinent documents, and participating in the loan closing.

BOF relies upon Meyerson v. Lawyers Title Insurance Corp., 333 N.Y.S.2d 33 (N.Y. App. Div. 1972), where the court held that an "approved attorney" who prepared a fraudulent title insurance report was an authorized agent of the title insurance company. The Meyerson decision, however, is distinguishable because in that case the "approved" attorney testified extensively at trial about the close relationship he enjoyed with the title insurance company. Such testimony is missing from this Adversary. Regardless, Meyerson is not binding precedent.

The Court also finds that the record does not support BOF's assertion that Charles Evans possessed apparent authority. Mississippi employs a three-prong test to determine the existence of

---

[20] Under Mississippi law, every agent of any insurance company must obtain a certificate of authority from the Mississippi Commissioner of Insurance. Miss. Code Ann. § 83-17-5. BOF alleges that practicing attorneys are exempt from licensure. That exemption, however, applies only to title insurance companies. Miss. Code Ann. § 83-15-3. Moreover, the fact that Charles Evans was not licensed as a title insurance agent is not dispositive of the agency issue.

apparent authority.  Under that test, BOF must establish: (1) acts or conduct on the part of the principal indicating the agent's authority; (2) reasonable reliance on those acts; and (3) a detrimental change in position as a result of such reliance.  Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1180-81 (Miss. 1990) (citing Ford v. Lamar Life Ins. Co., 513 So. 2d 880, 888 (Miss. 1987)).  The only representations from the Title Companies to BOF during the relevant time period were contained in three written contracts: (1) the 2008 BOF Title Commitment, (2) the 2008 BOF Policy, and (3) the 2009 BOF Title Commitment.  In none of these contracts did the Title Companies hold Charles Evans out as their agent.  Yet, the existence of apparent authority hinges upon the acts and representations made by the principal to the third party.  Lamar Life Ins. Co., 513 So. 2d at 888.

Moreover, BOF unreasonably relies on Charles Evans's status as an "approved attorney" as indicative of his agency status.  BOF  presented no Mississippi authority that has embraced the view they urge this Court to adopt.  Moreover, Fowler himself testified that he was unsure of the exact nature of the relationship between the Title Companies and Charles Evans (Tr. at 364:1-8; Tr. at 384:7-14).  "We had no idea what [Charles Evans's] designation was."  (Tr. at 384:11).  It is therefore unclear that BOF relied on Charles Evans's status as an approved attorney.  Even so, the Court finds that such reliance, in the absence of any other representations by the Title Companies, was unreasonable.

From the record, it is clear that BOF has not met its burden of proving Charles Evans committed his fraud under actual or apparent authority from the Title Companies.[21] Even if Charles Evans did act under an agency relationship, the Title Companies submitted a valid defense to imputed fraud, namely that Charles Evans acted adversely to the Title Companies' interests.  The

_____

[21] This conclusion, obviously, does not shield Charles Evans from liability for fraud.

Court next addresses all three defenses raised by the Title Companies, including the aforementioned adverse-interest defense.

### 2.    Agency Principles and *Respondeat Superior*

In defense of BOF's vicarious liability claim, the Title Companies argue that some conduct is so clearly beyond the scope of a servant's authority that it cannot form the basis for a claim of imputed liability as a matter of law.  Children's Medical Group v. Phillips, 940 So. 2d 931, 935 (Miss. 2006) (alleged consensual affair with a co-worker was not within the course and scope of a physician's employment).  According to the Title Companies, Charles Evans's fraudulent scheme fits within this category of conduct and, thus, exceeded the scope of his authority.

The Title Companies' argument invokes the doctrine of *respondeat superior*, which imputes liability to a principal for the tortious acts of its agent when committed "within the scope of his employment." *See* Commercial Bank v. Hearn, 923 So. 2d 202, 204 (Miss. 2006).  In order to be considered acting within the scope of employment, an agent's conduct must be actuated, in part, by a purpose to serve the principal.  This doctrine recognizes the rights and correlative obligations of an employer to direct its employee's work and prevent its employee from committing a tort within the scope of employment. Gulledge v. Shaw, 880 So. 2d 288, 295 (Miss. 2004).  It is undisputed in this Adversary that Charles Evans was not motivated by his desire to serve the Title Companies.

Mississippi case law[22] acknowledges that the theories of apparent authority and *respondeat superior* have distinct, although overlapping, elements and that these distinctions are central to

---

[22] Mississippi courts have routinely consulted the RESTATEMENT (SECOND) OF AGENCY and the RESTATEMENT (THIRD) OF AGENCY, which was adopted in 2005 and published in 2006, for guidance.  *See, e.g.*, Northrop Grumman Ship Systems, Inc. v. Scruggs Law Firm, P.A., 575 F.3d 491, 500 (5th Cir. 2009); Entente Mineral Co. v. Parker, 956 F.2d 524, 526-27 (5th Cir. 1992) (applying Mississippi law).

discerning the appropriate claims and defenses for imputed liability.  The Title Companies cite <u>Akins</u> <u>v. Golden Triangle Planning & Dev. Dist., Inc.</u>, 34 So. 3d 575, 581 (Miss. 2010) (5-4 decision), in which the Mississippi Supreme Court upheld the trial court's award of summary judgment in favor of the employer on the ground that the employer was not liable under the doctrine of *respondeat superior* for fraudulent acts perpetrated by its employee when the fraud was committed for the employee's own personal gain and conferred no benefit to the employer.  In his dissenting opinion, Justice Michael K. Randolph[23] agreed with the majority that the employee's fraudulent conduct was outside the scope of her employment and that the *respondeat superior* standard was not met for that reason.  Justice Randolph recognized, however, that the "scope of employment" inquiry does not provide the sole basis for vicarious liability.  <u>Akins</u>, 34 So. 3d at 582 (Randolph, J., dissenting). In cases of employee negligence, an analysis under *respondeat superior*, as set forth in § 228[24] of the

---

[23] In <u>Akins</u>, the plaintiff failed to plead vicarious liability on the basis of apparent authority, relying solely on the claim of *respondeat superior*. *See* <u>Akins</u>, 34 So. 3d at 579 n.3; <u>Id.</u> at 583 (Randolph, J., dissenting). Thus, the majority narrowly tailored its ruling to limit vicarious liability only under *respondeat superior*.  <u>Akins</u>, therefore, is not binding on  the present issue, but its reasoning is instructive.

[24] Section 228 of the RESTATEMENT (SECOND) OF AGENCY states:
   (1)   Conduct of a servant is within the scope of employment if, but only if:
      (a)   it is of the kind he is employed to perform;
      (b)   it occurs substantially within the authorized time and space limits;
      (c)   it is actuated, at least in part, by a purpose to serve the master, and
      (d)   if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
   (2)   Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

RESTATEMENT (SECOND) OF AGENCY § 228 (1958).

RESTATEMENT (SECOND) OF AGENCY, is appropriate. Akins, 34 So. 3d at 582 (Randolph, J.,

dissenting). Because no employee is expressly or impliedly authorized to steal, cases involving

employee theft, dishonesty, or fraud are more appropriately analyzed under the standards outlined

in § 219(2)(d)[25] and § 261[26] of the RESTATEMENT (SECOND) OF AGENCY. Akins, 34 So. 3d at 582-

83 (Randolph, J., dissenting).

These distinctions are important in determining which actions of an agent are imputable to

the principal. Because respondeat superior requires analysis of whether an agent's tort was

committed "within the scope of employment," liability is assessed based upon the type of

employment, the employee's authority, and the employee's purpose. See RESTATEMENT (SECOND)

OF AGENCY § 228 (1958). Thus, a principal's liability may be limited, notwithstanding the

appearance of authority as perceived by third parties. Because § 228 outlines the factual analysis for

conduct that is "within the scope of employment," it is central to assessing liability under respondeat

superior. See, e.g., Akins, 34 So. 3d at 580; Commercial Bank, 923 So. 2d at 209.

In contrast, claims of imputed fraud brought under principles of apparent agency depend upon

---

[25] Section 219(2)(d) of the RESTATEMENT (SECOND) OF AGENCY states:
    (2)    A master is not subject to liability for the torts of his servants acting
        outside the scope of their employment, unless:
                * * *
    (d)    the servant purported to act or to speak on behalf of the
        principal and there was reliance upon apparent authority, or
        he was aided in accomplishing the tort by the existence of the
        agency relation.

RESTATEMENT (SECOND) OF AGENCY § 219(2)(d) (1958).

[26] Section 261 of the RESTATEMENT (SECOND) OF AGENCY states:
    A principal who puts a servant or other agent in a position which enables the
    agent, while apparently acting within his authority, to commit a fraud upon
    third persons is subject to liability to such third persons for the fraud.

RESTATEMENT (SECOND) OF AGENCY § 261 (1958).

the reasonable understanding of an agent's authorization given the conduct of its principal. Forest Hill Nursing Ctr., Inc., 995 So. 2d at 781. "The proper inquiry for determining vicarious liability of a principal whose agent defrauds [an innocent third party] is the relationship between the principal and the [innocent third party]." Entente Mineral Co., 956 F.2d at 529. Sections 219(2)(d) and 261 set out the ways a principal may still be liable to injured third parties for the torts of its agent, even though the agent acted outside the "scope of employment."

BOF does not allege imputed liability for the Title Companies under *respondeat superior*. Indeed, at no point has BOF pleaded for relief under this doctrine. Rather, BOF advances two arguments for imputed fraud based upon broader principles of agency: actual authority and apparent authority. As explained previously, Entente Mineral Co. and the dissent in Akins distinguished claims of imputed fraud based on *respondeat superior* from claims based on general agency principles. Since BOF alleges vicarious liability based on actual and apparent authority, and not on *respondeat superior*, Akins's holding that the employer was not liable for its employee's fraud is inapposite to the issue presented. Thus, the Title Companies' reliance on Akins to limit imputed liability is not well-founded. Simply put, the "scope of employment" analysis is not dispositive of the present issue.[27]

### 3.   Adverse-Interest Exception

Although the knowledge of an agent is generally imputed to his principal, the Mississippi Supreme Court has long recognized an exception to the general rule when an agent acts adversely to his principal's interests. According to the Title Companies, this exception, known as the

---

[27] Scope of employment and scope of apparent authority are not identical concepts. For example, unlike "scope of employment," scope of apparent authority is limited by the third party's reasonable belief that the agent is authorized to perform an act.

"adverse-interest" exception, is what precludes them from being held vicariously liable for Charles Evans's false representation. In Scott County Milling Co. v. Powers, 73 So. 792, 793 (Miss. 1916), the court considered whether a milling company had constructive knowledge of the insolvency of a wholesaler grocery when it received payments for goods only a few months before the wholesaler filed bankruptcy. If so, then the bankruptcy trustee could recover the payments made to the milling company as voidable preferences. The local agent of the milling company, who was also the manager of the wholesaler, had agreed to turn over those goods, without charge, to the wholesaler for payment of his shares of stock. Instead, the agent arranged for the wholesaler to pay the milling company for the goods. The milling company was unaware of the payment arrangements that its agent had made with the wholesaler.

The Mississippi Supreme Court reasoned that the knowledge of the agent concerning the insolvency of the wholesaler could not be imputed to the milling company because the agent's interest in the transaction with the wholesaler was part of a scheme to defraud one or both of the businesses. Id. Specifically, the court ruled that "where the agent is engaged in a transaction in which he is interested adversely to his principal, or is engaged in a scheme to defraud the latter, the principal will not be charged with knowledge of the agent acquired therein." Id. (internal quotations marks omitted).

Likewise, the record here shows that even assuming that Charles Evans was an implied or apparent agent of the Title Companies, his conduct was part of a scheme to defraud the Title Companies as his alleged principal. Just as the milling company in Scott County Milling Co. was unaware of its agent's scheme to defraud it and the grocery, so also the Title Companies were not aware of Charles Evans's scheme to defraud them and BOF. As the Title Companies rightly suggest,

Page 60 of 83

they were the sole insurers of title that Charles Evans knew was defective, and they have been left "holding the bag" for millions of dollars of claims. Thus, Charles Evans's actions constituted fraud against the Title Companies, and his interest in providing false representations in Schedule A was clearly adverse to that of the Title Companies. Rather than confer any benefit upon the Title Companies, Charles Evans's actions caused great detriment to them. Therefore, the Title Companies are not vicariously liable for Charles Evans's fraud.[28]

### 4.      Dual Agency and Imputed Liability

The Title Companies assert that even assuming Charles Evans was their agent, he was also BOF's agent. For that reason, Charles Evans's knowledge may not be imputed to either party. The Title Companies rely on Lane, where the Mississippi Supreme Court considered whether knowledge of a mutually agreed upon dual agent should be imputed to both principals. Lane, 873 So. 2d at 96. In Lane, the agent represented both the buyer and seller in a real estate transaction. Although acknowledging that agency law generally imputes knowledge of an agent in conducting business of a principal to that principal, the court declined to establish a bright-line rule for all cases involving dual agency and imputed knowledge. Id. at 97. Rather, in a dual agency, two distinct agencies are vested in the agent with separate duties owed to each principal. Id.

The factual context in which the Lane court considered the agency issue is distinguishable from the facts *sub judice* in that Charles Evans was not a mutually agreed upon disclosed dual agent serving a buyer and a seller in a real estate transaction. Thus, an analysis under the principles set forth in Lane would not resolve the present issue. Because the Title Companies have not submitted

---

[28] Needless to say, Charles Evans's interests were also adverse to BOF. Thus, his actual knowledge of the falsity of the statement in Schedule A may not be imputed to BOF for the purpose of defeating BOF's fraud claim.

any Mississippi precedent that precludes imputed knowledge under a dual agency, and because the Mississippi Supreme Court has declined to impose a general bright-line rule on this issue, the Title Companies' defense is without merit.

### F.    Negligent Misrepresentation

Even if Mississippi law did impose extra-contractual duties on the Title Companies, BOF failed to satisfy the elements of negligent misrepresentation.  In order to recover for negligent misrepresentation, BOF had the burden of proving "(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that plaintiff suffered damages as a direct and proximate result of such reasonable reliance." Hazlehurst, 983 So. 2d at 313.

The third element is the only element that is substantively different from its counterpart element for fraudulent misrepresentation.  BOF, however, did not satisfy this element.  For the reasons previously stated, the Title Companies were under no legal obligation to search and report on the status of title before issuing the 2009 BOF Title Commitment.  Moreover, there is no evidence in the record that it is the standard of care for title companies to confirm independently the title work of "approved attorneys" who submit title insurance applications.  Accordingly, BOF did not meet its burden to prove negligent misrepresentation.

## II.    BOF's Breach of Contract Claims under the 2008 BOF Policy

The Title Companies issued the 2008 BOF Policy, insuring that BOF had a valid lien on Parcels T-4 and T-5 (BOF Ex. 8).  BOF alleges that the Title Companies breached the 2008 BOF

Policy in two ways, as follows: first, the Title Companies failed to compensate BOF for its full measure of losses and damages resulting from the title defect in Parcels T-4 and T-5. (BOF Brief at 22-24); and second, they failed to reimburse BOF for the attorneys' fees and expenses it incurred in litigation affecting its interests in Parcels T-4 and T-5.

### A.    Pertinent 2008 BOF Policy Provisions

The following provisions are pertinent to the issues:

### 1.    "Covered Risks" Provision

#### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, MISSISSIPPI VALLEY TITLE INSURANCE COMPANY, a Mississippi corporation, and OLD REPUBLIC NATIONAL TITLE INSURANCE, a Minnesota corporation, (collectively, the "Company") insure as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by reason of:

1.    Title being vested other than as stated in Schedule A.

2.    Any defect in or lien or encumbrance on the Title. . . .

                              *   *   *

9.    The invalidity or unenforceability of the lien of the Insured Mortgage
       upon the Title. . . .

(BOF Ex. 8, at 1-2 of 10).

### 2.    "Determination and Extent of Liability" Provision

#### CONDITIONS

8.    DETERMINATION AND EXTENT OF LIABILITY
       This policy is a contract of indemnity against actual monetary loss or damage
       sustained or incurred by the Insured Claimant who has suffered loss or
       damage by reason of matters insured against by this policy.
       (a)    The extent of liability of the Company for loss or damage under this

policy shall not exceed the least of
(i)      the Amount of Insurance,
(ii)    the Indebtedness,
(iii)   the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy . . . .

(BOF Ex. 8, at 5 of 10, ¶ 8(a)).

### 3.    "Limitation of Liability" Provision

CONDITIONS

9.    LIMITATION OF LIABILITY
(a)    If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, . . . or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(BOF Ex. 8 at 5 of 10, ¶ 9(a)).

### B.    Mississippi's Rules for Construing Insurance Policies

In <u>Centennial Insurance Co. v. Ryder Truck Rental, Inc.</u>, 149 F.3d 378 (5th Cir. 1998), the United States Court of Appeals for the Fifth Circuit set forth general rules governing the construction of insurance policies under Mississippi law. These rules include, in pertinent part, the following: (1) where an insurance policy is plain and unambiguous, a court must construe the policy exactly as written, (2) it must read the policy as a whole, (3) it must read the policy more strongly against the party drafting the policy and most favorably to the policyholder, (4) where the terms of a policy are ambiguous, a court must interpret them most favorably to the insured and against the insurer, (5) when a policy is subject to two equally reasonable interpretations, a court must adopt the one that gives greater indemnity to the insured. <u>Id.</u> at 382-83.

Page 64 of 83

C.   **Whether the 2008 BOF Policy Obligated the Title Companies to Pay Additional Damages Where They Have Cured the Title Defect**

It is undisputed that the 2008 BOF Policy provided coverage to BOF because BOF did not, in fact, have a valid lien on Parcels T-4 and T-5 on the effective date of the policy when the transaction occurred.  Record title in Parcels T-4 and T-5 was in Hanover, not in White Oaks, and, therefore, White Oaks' deeds of trust to BOF were invalid.  It is also undisputed that the Title Companies cured the title defects by paying Trustee Henderson, as trustee of the bankruptcy estate of Hanover, approximately $250,000.00, to convey Parcels T-4 and T-5 to White Oaks, which Hanover later did by a Special Warranty Deed recorded on November 22, 2010.  (BOF Ex. 14). Fowler testified that when BOF foreclosed on Parcels T-4 and T-5 on December 30, 2010, BOF incurred a loan deficiency in the amount of $131,920.30.  (Tr. at 332-35).  Fowler also testified that prior to the date of the cure by the Title Companies, BOF lost interest payable under the 2008 White Oaks Loan in the amount of $93,582.90.  (BOF Ex. 25).  BOF insists that these damages are payable under ¶8 of the 2008 BOF Policy, which states, "This policy is a contract of indemnity against actual monetary loss or damage . . . ."

The Title Companies contend that because they have cured the title defects, they have fully performed their obligations and have no additional liability to BOF under the express terms of the 2008 BOF Policy.  They rely on ¶ 9(a) of the 2008 BOF Policy, known as the "Limitation of Liability" provision, which states:

9.   LIMITATION OF LIABILITY
(a)   If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, . . . or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter

Page 65 of 83

and shall not be liable for any loss or damage caused to the Insured.

(BOF Ex. 8 at 5 of 10, ¶ 9(a)).

BOF counters that where monetary losses have been sustained *prior* to curative action, ¶ 9(a) creates an "irreconcilable conflict within the policy which turns the policy's declared intent to indemnify against monetary loss or damage on its head." (BOF Brief at 23). According to BOF, this conflict in the coverage provisions renders the whole policy ambiguous.

BOF does not cite any cases that directly support its position that ¶ 9(a) creates an ambiguity as to the losses covered under the 2008 BOF Policy. To the contrary, numerous jurisdictions that have considered the cure provision at issue here have found it clear and unambiguous. *See, e.g.*, Belle v. First Franklin, No. 08-11465, 2010 U.S. Dist. LEXIS 91691, at *27 (E.D. Mich. Sept. 3, 2010) (finding that the insured could not overcome the provision in the title policy "that absolves the company of liability once it establishes the title"); Miller v. Ticor Title Ins. Co., 93 P.3d 88, 92 (Or. Ct. App. 2004) (finding that the same "Limitation of Liability" paragraph was clear within the context of the policy); Holmes Dev., LLC v. Cook, 48 P.3d 895, 903 (Utah 2002) (finding that "plain language" of the policy meant that title insurance company had fully performed its obligations by defending insured in litigation and successfully establishing title).

In JP Morgan Chase Bank v. First American Title Insurance Co., 725 F. Supp. 2d 619, 623 (E.D. Mich. 2010), for example, the district court found that the title insurance company had fully performed its obligations under a title insurance policy by tendering title to the subject property to the insured. In doing so, the district court rejected the insured's demand for monetary damages. Likewise, this Court finds that ¶ 9(a) of the 2008 BOF Policy is clear and unambiguous. By tendering cured title to BOF, the Title Companies fully performed their obligations and do not owe

BOF for any monetary losses or damages they may have sustained.

### D.   Attorneys' Fees

Paragraph 5(a) of the 2008 BOF Policy requires the Title Companies to furnish BOF representation "in litigation in which any third party asserts a claim covered by this policy adverse to the Insured." (BOF Ex. 7 at 4). In March, 2010, the Title Companies retained the law firm of McGlinchey Stafford PLLC to defend BOF under ¶ 5(a), pursuant to a reservation of rights. BOF objected and retained the law firm of Corlew, Munford & Smith as separate counsel. *See* Moeller v. American Guar. & Liab. Ins. Co., 707 So. 2d 1062 (Miss. 1998) (insured is entitled to retain its own independent attorney to represent the insured's interest when a conflict of interest arises). In a letter dated July 7, 2010, the Title Companies agreed to pay the fees and expenses of Corlew, Munford & Smith to represent BOF. (MVT Ex. 21). Later, BOF retained the law firm of Watkins Ludlam Winter & Stennis.

BOF claims the Title Companies breached ¶ 5(a) of the 2008 BOF Policy (1) by waiting until March, 2010, to provide it representation when Chris Evans filed his petition for relief much earlier on October 26, 2009 and (2) by failing to pay BOF's legal expenses for work performed by the law firms of both Corlew, Munford & Smith and Watkins Ludlam Winter & Stennis. The Title Companies contend that it was unreasonable for BOF to retain multiple law firms and deny that they are responsible for payment of any of the fees and expenses charged by Watkins Ludlam Winter & Stennis. They also challenge some of the fees and expenses charged by Corlew, Munford & Smith. The parties agree that whether the work performed by these law firms falls within the scope of ¶ 5(a) of the 2008 BOF Policy, and whether their fees were reasonable, are issues that should be resolved in Phase II of the Adversary Trial.

### III.   Heritage's Claims for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Bad Faith

As noted previously, the Title Companies issued the Heritage Policy with an effective date of October 28, 2008, insuring that Heritage had a valid lien on Parcel T-6.  On November 20, 2009, Heritage submitted a claim to the Title Companies, which paid Heritage $430,000.00 based on the appraised value of the property as of January 2, 2010.  (MVT Exs. 34 & 35).   The Title Companies based this amount on the actual loss they believed Heritage sustained from the title defect.  Heritage contends that the Title Companies should have paid the amount of the loan, approximately $780,000.00, and that, therefore, the Title Companies owe Heritage at least an additional $350,000.00.  Heritage asserts three causes of action against the Title Companies: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) bad faith.

An insurance policy, such as the Heritage Policy issued by the Title Companies, is a contract. Mink v. Andrew Jackson Cas. Ins. Co., 537 So. 2d 431, 434 (Miss. 1988).  "Mississippi law acknowledges that the standard insurance policy is a contract, and its terms are a matter of usual contract interpretation unless some statutory imperative controls."  Lynch v. Miss. Farm Bureau Cas. Ins. Co., 880 So. 2d 1065, 1070 (Miss. Ct. App. 2004).

### A.   Breach of Contract

According to the Title Companies, they paid Heritage $430,000.00 under the provisions of ¶ 8(a)(iii) and/or ¶ 8(b) of the Heritage Policy.  Heritage contends that the Title Companies breached ¶ 8(a)(iii) by underpaying its claim.  Paragraph 8(a) of the Heritage Policy, referred to as the "Maximum Payment Provision," provides:

> 8.   DETERMINATION AND EXTENT OF LIABILITY
> This policy is a contract of indemnity against actual monetary loss or damage

sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

      (a)     The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

            (i)      the Amount of Insurance,

            (ii)     the Indebtedness,

            (iii)    the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or . . . .

(Heritage Ex. 4, at 5, ¶ 8(a)).  To prevail on its breach of contract claim, Heritage carried the burden of proof at the Adversary Trial on the following elements: (1) the existence of a valid and binding contract; (2) that the defendant has broken or breached it; and (3) that he has been thereby damaged monetarily.  <u>Warwick v. Matheney</u>, 603 So. 2d 330, 336 (Miss. 1992).

## 1.      Whether the Maximum Payment Provision Is Ambiguous

Heritage contends that the Maximum Payment Provision is capable of more than one reasonable interpretation as to when and how claims are valued under the Heritage Policy and because of these ambiguities, the Maximum Payment Provision must be construed as indemnifying Heritage for the actual loss it sustained as a result of the covered title defect.  The Title Companies, on the other hand, insist that the Maximum Payment Provision is not ambiguous and is not rendered ambiguous by the absence of the definition of "value."  They further insist that the primary issue before this Court is the value of Heritage's lien, without the title defect, at the time Heritage could have enforced its lien.

Under Mississippi law, a contract is ambiguous if it contains conflicting clauses when the contract is read as a whole.  Once a contract is found to be ambiguous, resolution of any uncertainties will be against the drafter of the contract.  <u>Pursue Energy Corp. v. Perkins</u>, 558 So. 2d 349, 352 (Miss. 1990).  An ambiguity in an insurance policy exists when the policy can be interpreted to have

two or more reasonable meanings.  Ins. Co. of  N. Am. v. Dep. Guar. Nat'l Bank, 258 So. 2d 798,

800 (Miss. 1972).  The Mississippi Supreme Court has held, however, that silence alone does not

mandate a finding of ambiguity.  Facilities, Inc. v. Rogers-Usry Chevrolet, Inc., 908 So. 2d 107, 115

(Miss. 2005).

Heritage contends that the Maximum Payment Provision is ambiguous because it fails to

specify the value of the insured title, the date for valuing the insured title, and the means by which

the insured title is valued.  Indeed, the parties do not dispute that the term "value" is not defined

anywhere in the Heritage Policy.

The Title Companies contend that "value" means "fair market value," as determined by an

appraiser.  They interpret the Maximum Payment Provision as requiring a comparison between the

value of the title as described in Schedule A of the Heritage Policy, and the value of the title subject

to the undisclosed liens.  According to the Title Companies, this comparison provides an accurate

determination of the impact of the title defect on the value of the title.[29]  For that reason, they hired

an appraiser to prepare a summary appraisal report to value the insured title.  (Tr. at 258-59).

Heritage points out that the method for valuing the insured title used by the Title

Companies–an appraiser and an appraisal–is not mentioned in the Heritage Policy, but is based on

the Title Companies' own interpretation of the Maximum Payment Provision, an interpretation that

provides them wide latitude in determining value.  Indeed, during closing arguments, counsel for the

Title Companies admitted that there are multiple methods used by appraisers to value property other

than the one chosen by them, "fair market value."

_____

[29] Notwithstanding the contention of the Title Companies, no actual comparison of values takes place in this factual scenario where the value of the defective title is $0.

Heritage also points out that the date for valuing the insured title is unspecified in the Heritage Policy. Although the Title Companies contend that the date for valuing the insured title is the date of a hypothetical foreclosure, James Partin ("Partin"), an employee of Old Republic National Title Insurance Company, admitted that there is no language in the Maximum Payment Provision that refers to a hypothetical foreclosure date. (Tr. at 445).

The Court agrees with Heritage and finds that the Maximum Payment Provision is ambiguous. There are multiple, reasonable interpretations of value of the insured title, including the date of valuation and the method for valuation. "The language of an insurance policy will be deemed ambiguous if it is reasonably subject to more than one interpretation." Universal Underwriters Ins. Co. v. Ford, 734 So. 2d 173, 176 (Miss. 1999). Unlike ¶ 9(a) of the 2008 BOF Policy, which clearly limits the liability of Title Companies once they have cured the title defect, ¶ 8(a)(iii) is rendered ambiguous by the absence of a definition of "value."

### 2.    Whether the Heritage Policy Should Be Construed Against the Title Companies and in Favor of Heritage

Having concluded that the Maximum Payment Provision is ambiguous, the Court next turns to whether it should be construed against the Title Companies and in favor of Heritage. In the case of ambiguity, Mississippi applies the interpretation that favors the insured, and determines the intent of the parties to the insurance contract with reference to what a reasonable person in the insured's position would have understood the terms to mean. Progressive Gulf Ins. Co. v. We Care Day Care Ctr., Inc., 953 So. 2d 250, 253 (Miss. Ct. App. 2006). In the insurance context, when the language of a policy is subject to more than one reasonable interpretation, courts apply a construction permitting recovery. State Farm Mut. Aut. Ins. Co. v. Scitzs, 394 So. 2d 1371, 1372 (Miss. 1981);

State Farm Mut Auto. Ins. Co. v. Taylor, 233 So. 2d 805, 811 (Miss. 1970).  If there is an ambiguity within a policy of insurance, then the intention of the parties to the insurance contract should be determined based upon what a reasonable person placed in the insured's position would have understood the terms to mean.  *See* Key Life Ins. Co. of S.C. v. Tharp, 179 So. 2d 555, 558 (Miss. 1965).  Where a clause of an insurance policy subject to dispute involves exceptions or limitations on the insurer's liability under the policy, courts construe the policy even more stringently.  Gov't Employees Ins. Co. v. Brown, 446 So. 2d 1002, 1006 (Miss. 1984) (adopting theory that, without clear and unambiguous language of limitation by insurer, insurer cannot limit recovery for benefits for which a insured paid a premium); Hartford Acc. & Indem. Co. v. Bridges, 350 So. 2d 1379, 1381-82 (Miss. 1977) (holding that because language seeking to limit liability of insurer was ambiguous and difficult to understand, aggregating of coverages was warranted).  The Heritage Policy was presented to Heritage on a take-it-or-leave-it basis, and the terms of the Heritage Policy were non-negotiable.

The Title Companies rely on First American Title Insurance Co. v. First Trust National Association (In re Biloxi Casino Belle, Inc.), 368 F.3d 491 (5th Cir. 2004), in support of their position that they are not the drafters of the Heritage Policy and that, therefore, the usual rule in Mississippi requiring courts to construe ambiguities against the insurer should not apply.  (Title Cos. Brief at 34-35).  In Biloxi Casino, however, the Fifth Circuit held:

> It is sometimes said that the usual rule of construing ambiguities against the insurer should have less force in the context of title insurance loan policies, since those policies were originally created by the lenders, not the title insurers. . . . Mississippi law does not appear to have recognized such an exception to the usual rule.

Id. at n.5.  In light of this holding, the Court finds that the Title Companies, collectively, are the

drafters of the Heritage Policy.

### 3.   Reasonableness of Heritage's Expectations Under and Interpretation of the Heritage Policy

The Title Companies contend that title insurance indemnifies the insured for the loss caused by a title defect, and is not intended to insure the lender against a loss from a downward fluctuation in the real estate market.  According to the Title Companies, the earliest date for valuing insured title under the Maximum Payment Provision is the date the title defect is actually discovered. The Title Companies are quick to point out, however, that the discovery of a title defect does not necessarily mean that the lender will incur an actual loss at that time if, for example, the borrower continues to make timely payments to the lender for the loan or if the foreclosure price satisfies any undisclosed liens as well as the lender's lien.  "Since a lender suffers loss only if the note is not repaid, the discovery of an insured–against lien does not trigger recognition of that loss.  Only the completion of foreclosure signifies that a lender will not collect on its note."  Marble Bank v. Commonwealth Land Title Ins. Co., 914 F. Supp. 1252, 1254 (E.D.N.C. 1996). In November, 2009, the Title Companies ordered an appraisal of the fair market value of the property.  The property appraised at $430,000.00 as of January 2, 2010, which is the amount they paid Heritage.  (MVT Ex. 35).

The Title Companies cite numerous cases, none of which constitutes binding precedent, where valuation under a lender's policy was held to be the date of foreclosure, the date of an attempted foreclosure, or the date the lender received a deed in lieu of foreclosure.  See Karl v. Commonwealth Land Title Ins. Co., 24 Cal. Rptr. 2d 912, 919-20 (Cal. Ct. App. 1993); Cale v. Transamerica Title Ins., 225 Cal. App. 3d 422, 426-27 (Cal. Ct. App. 1990); Blackhawk Prod. Credit Ass'n v. Chicago Title Ins. Co., 423 N.W.2d 521, 525 (Wis. 1988); CMEI, Inc. v. Am. Title Ins. Co.,

447 So. 2d 427, 428 (Fla. Dist. Ct. App. 1984); <u>Falmouth Nat'l Bank v. Ticor Title Ins. Co.</u>, 920 F.2d 1058, 1063 (1st Cir. 1990); <u>Green v. Evesham Corp.</u>, 430 A.2d 944, 949 (N.J. Super. Ct. App. Div. 1981); <u>Trico Mortg. Co. v. Penn Title Ins. Co.</u>, 657 A.2d 890, 896 (N.J. Super. Ct. App. Div. 1995); <u>Atlanta Title & Trust Co. v. Allied Mortg. Co.</u>, 12 S.E.2d 147, 149 (Ga. Ct. App. 1940). From these cases, the Title Companies surmise that three events must occur before a lender incurs an actual loss within the meaning of a title policy: (1) there must be a title defect; (2) the borrower must be in default on the loan; and (3) the value received at foreclosure must be inadequate to fulfill the obligation owed to the lender.

Heritage counters that there is no consensus in the case law about when the value of the insured title should be determined. Moreover, Heritage maintains that the cases relied upon by the Title Companies are distinguishable because Heritage had no enforceable lien and would not have made the loan if it had known that there was no collateral. As an example, Heritage cites <u>Citicorp Sav. v. Stewart Title Guaranty Co.</u>, 840 F.2d 526 (7th Cir. 1988), where the grantor of a deed of trust insured by the title company was found to have been incompetent to execute the deed. The <u>Citicorp</u> court held:

> As a practical matter, Citicorp would not have extended $27,000 credit to Robinson on the basis of a voidable mortgage. No lender would do so. Citicorp gave Robinson $27,000 on Stewart Title's promise that the mortgage lien was enforceable by Citicorp. In actuality, at that time Citicorp could not enforce the lien. . . . In May 1979, Citicorp's lien was unenforceable, regardless of whether the guardian *later* ratified it. Stewart Title breached the policy's guarantee of the mortgage's enforceability, and Citicorp is therefore entitled to $27,000 in damages, the amount they gave Robinson in reliance upon Stewart Title's guarantee . . . .

<u>Id.</u> at 530. Thus, the court in <u>Citicorp</u> measured the lender's damages for the defective title as of the date the lender loaned money in reliance on good, insured title.

The court in <u>Securities Service, Inc. v. Transamerica Title Insurance Co.</u>, 583 P.2d 1217 (Wash. App. 1978), aptly explained the reason for determining the value of the insured title as of the date money was loaned:

> The contract is one of indemnity against defects in or unmarketability of title, or liens, or encumbrances. The risks of title insurance, although they may be referable to the contingency of future loss, are only designed to save the insured harmless from loss through defects in or unmarketability of title, or liens, or encumbrances, that may affect or burden his title when he takes it.
>
> Since the contract is one of indemnity only, the insured must show actual loss sustained before recovery can be had. The conditions of a policy of title insurance and the covenants of title contained in a deed are analogous in many respects, and in the absence of express words in the policy the same rules of damages would apply. The measure of damages in an action for the breach of a covenant of seizin is ordinarily the consideration paid by the grantee for the property . . . . This measure of damages is applied upon the theory, that since the grantor had no title he had none to convey, and the grantee, therefore, may recover the money paid without consideration. The covenant against encumbrance ordinarily contained in deeds is essentially more nearly like the agreement of a title policy. That covenant is one of indemnity and the measure of damages for its breach is such sum as will indemnify the grantee for the loss actually sustained.

<u>Id.</u> at 1221; *see also* <u>Beaullieu v. Atlanta Title & Trust Co.</u>, 4 S.E.2d 78, 80-81 (Ga. Ct. App. 1939) (measure of damages under title policy is difference between defective title and good title at time of purchase).

Charles Courtney ("Courtney"), chief executive officer of Heritage, testified at the Adversary Trial that Heritage expected the Title Companies to pay the insured amount, which represented the clear title value of that policy when the loan was made. Courtney explained that Heritage expected that the property would be valued when Heritage sustained the loss–when it was unable to have clear title to its property. He was asked, "When did you not have that lien position?" He answered, "Well, in fact, we didn't have it when the loan was made, when the policy was issued and the deed of trust

was recorded."  (Tr. at 482).

A leading treatise agrees with Heritage that "the lender with a loan policy expects the value of the lien will repay the debt."  Barlow Burke, LAW OF TITLE INSURANCE (3d ed. Aspen Publishers 2004).  Allowing the insurer to wait to value the claim in a falling real estate market works to the insurer's benefit, a result that does not construe an ambiguity in the policy in favor of the insured.  "The choice of a date for measuring damages should not provide the insurer with an opportunity to shield its eyes from the insured's actual, economic, and consequential losses."  Id.

The Court finds that Heritage's expectations are reasonable and consistent with the purpose of the Heritage Policy, which is to indemnify the insured for "actual loss" sustained or incurred as a result of a covered title defect.  Heritage lent $781,980.00 that was not repaid, yet the borrower, Twinbrook, had no right, title, or interest in the collateral that should have supported the loan.  The Title Companies resorted to an appraisal (not provided for in the Heritage Policy) based on fair market value (not provided for in the Heritage Policy) to determine what Heritage's actual loss would be as of the date of an hypothetical foreclosure sale (not provided for in the Heritage Policy) which they claimed was January 2, 2010, almost18 months after Heritage had loaned the money and well after the real estate market had sustained an unprecedented decline.  Whether Heritage discovered the title defect on the day after it made the loan in 2008 or later in 2009, it was in the same position and suffered the same actual loss regardless, given that no payments were ever made by Twinbrook on the loan and the value of the defective title is $0.00.  The Title Companies' failure to acknowledge these facts is why they confuse the date of Heritage's actual loss with the date of Heritage's *discovery* of its actual loss.  Also, as a practical matter, Heritage never could have foreclosed on the deed of trust because there was no collateral, and in this scenario, the Title

Companies' hypothetical foreclosure date is meaningless.

### 4.   Title Companies' Alleged Attempt to Cure the Title Defect

At the Adversary Trial, the Title Companies maintained that they had attempted to cure the title defect but were unsuccessful and, therefore, they contend that ¶ 8(b) of the Heritage Policy, referred to as the "Unsuccessful Cure Provision," applies.  Notably, application of the Unsuccessful Cure Provision would resolve the ambiguity in ¶ 8(a) by providing a date certain for valuing the insured title.  That provision states:

> (b)      if the Company pursues its rights under Section 5 of these Conditions [right to cure title] and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,
>> (i)      the Amount of Insurance shall be increased by 10%, and
>> (ii)     the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(Heritage Ex. 4 at 5 of 9).  Unlike  ¶ 8(a), the Unsuccessful Cure Provision in ¶ 8(b) grants the insured two options for the date for having its actual loss determined.  Neither of the two dates is prior to the discovery of the title defect.

In support of its position that the Unsuccessful Cure Provision applies, the Title Companies rely upon the testimony of Jones, who stated that he attempted to obtain deeds to cure title defects from Chris Evans before the filing of the bankruptcy petitions.  The Title Companies also rely on a preliminary injunction they obtained on October 27, 2009, in the Chancery Court of Madison County, Mississippi, that required the Evans Brothers to "execute deeds and/or modification agreements, as directed by Mississippi Valley Title, to correct and/or cure title problems." (MVT Ex. 40).

The Court finds that Jones's testimony at the Adversary Trial regarding Heritage and Parcel

T-6 is not credible. The alleged curative deed from Landsdowne to Twinbrook[30] was never produced as an exhibit, and Jones's supervisor, Partin, testified he had never seen it. (Tr. at 421). In the absence of credible proof of a curative deed, the state court action alone does not constitute an effort to cure this particular title defect. Although Partin testified that the Title Companies did attempt to cure the title defect, he contradicted his earlier deposition testimony that they did not.

Even if this Court found sufficient evidence of curative actions, it is clear that the Title Companies never invoked the Unsuccessful Cure Provision because they never gave Heritage the option of selecting which date to apply for purposes of valuing its claim. The evidence at the Adversary Trial established that Heritage was unaware of the alleged curative actions of the Title Companies, as indeed was the Title Companies' own corporate representative, Partin. Partin testified that he was unaware of an instance where the Title Companies attempted to cure a title defect but failed to notify their insured of those efforts. (Tr. at 428).

### B.    Breach of Covenant of Good Faith and Fair Dealing

Heritage contends that the Title Companies' breach of ¶ 8(a)(iii) constituted a breach of the duty of good faith and fair dealing. Mississippi law recognizes that all contracts carry an implied duty of good faith and fair dealing. Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992). "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." Id. The covenant holds that "neither party will do anything which injures the right of the other to receive the benefits of the

---

[30] As may be recalled, Hanover conveyed Parcel T-6 to Landsdowne on April 27, 2009, and the deed was recorded on September 10, 2009.

agreement." <u>Ferrara v. Walters</u>, 919 So. 2d 876, 883 (Miss. 2005); *see also* <u>Lippincott v. Miss.</u> <u>Bureau of Narcotics</u>, 856 So. 2d 465, 467 (Miss. Ct. App. 2003) (citing <u>Hartford Accident & Indem.</u> <u>Co. v. Foster</u>, 528 So. 2d 255, 281 (Miss. 1988)).  To establish "bad faith" there must be evidence of some conscious wrongdoing caused by "dishonest purpose or moral obliquity."  <u>Univ. of So.</u> <u>Miss. v. Williams</u>, 891 So. 2d 160, 170-71 (Miss. 2004).

This Court has previously found that the Title Companies underpaid Heritage's claim under ¶ 8(a)(iii) of the Heritage Policy.  The evidence at the Adversary Trial, however, did not show that their valuation of Heritage's actual loss was so unfounded as to violate standards of decency, fairness, or reasonableness.  *See* <u>Cenac</u>, 609 So. 2d at 1272.

### C.  Bad Faith

Heritage alleges that the Title Companies acted in bad faith in delaying full payment of their claim under ¶ 8(a)(iii).  To prevail on its claim for bad faith, Heritage must establish three elements by clear and convincing evidence.  First, Heritage must "demonstrate that the claim or obligation was in fact owed."  <u>Essinger v. Liberty Mut. Fire Ins. Co.</u>, 529 F.3d 264, 271 (5th Cir. 2008).  Second, "the insured must demonstrate that the insurer has no arguable reason to refuse to pay the claim or to perform its contractual obligation."  Third, "the insured must demonstrate that the insurer's breach of the insurance contract 'results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an intentional tort.'"  <u>Id.</u>  Heritage has established that the Title Companies breached ¶ 8(a)(iii) by failing to pay Heritage the full amount of its claim in a timely manner.  Accordingly, only the second and third elements of its bad faith claim are in dispute.

Paragraph 11 of the Heritage Policy states, "When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within

30 days." (Heritage Ex. 4 at 5). Heritage submitted its claim for payment on November 20, 2009. The Title Companies received their appraiser's report on June 3, 2010. The Title Companies paid Heritage $430,000.00 on July 23, 2010.

The Title Companies contend that they had an "arguable reason" for their decision to pay Heritage the appraised value of the property, namely, because it was consistent with a majority of jurisdictions throughout the nation. However, as discussed in the previous section, those cases are factually distinguishable and none of them constitutes binding precedent. It is clear to the Court that the Title Companies valued the insured title using a procedure they concocted without much contractual basis. The date used by the Title Companies for valuing the insured title was not the date the Heritage Policy was issued, not the date that Heritage discovered the title defect, not the date Heritage filed its claim, and not the date Heritage could have actually foreclosed on the property. Rather, the date chosen by the Title Companies was January 2, 2010, the date of a hypothetical foreclosure. It is also clear to the Court that the Title Companies' efforts to cure the title defect were no more than an afterthought, in light of the testimony of Partin and the absence of any curative deed.

The Court, nevertheless, concludes that the dispute concerning payment of Heritage's claim was a "pocketbook dispute." According to the Mississippi Supreme Court, "'a pocketbook dispute' exists when parties are in agreement as to the extent of damage but disagree on the value to be assigned to the damage." Fonte v. Audubon Ins. Co., 8 So. 3d 161, 168 (Miss. 2009). A pocketbook dispute does "not rise to the level of wanton, gross or intentional conduct in the nature of an independent tort."[31] State Farm Mut. Auto Ins. Co. v. Roberts, 379 So. 2d 321, 322 (Miss. 1980).

_____

[31] In that regard, it is worth noting that the Title Companies' $430,000.00 payment to Heritage was made unconditionally without the release or waiver of any claim and was not considered by the Title Companies to constitute final payment, which is inconsistent with bad

"Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed 'with caution and within narrow limits'." Life & Cas. Ins. Co. v. Bristow, 529 So. 2d 620, 622 (Miss. 1988). There were numerous extenuating circumstances, such as the complexities of the claims, the large number of claimants, and the intervening bankruptcy filings, that confronted the Title Companies which remove this case from those where punitive damages have been awarded, even with the delay in payment between the date they valued the property and the date they paid Heritage.

### Conclusion

In conclusion, the Court finds that:

1.      The Title Companies are entitled to a judgment declaring that they have no obligation to issue a title insurance policy to BOF under the August 26, 2009, title commitment and, in addition, declaring that they have not acted in bad faith by seeking such declaratory relief.

2.      The Title Companies are not liable to BOF for negligent hiring and retention of agent, breach of contract (title commitment), promissory estoppel, bad faith, or civil conspiracy.

3.      The bankruptcy estates of White Oaks, Town Park, Charles Evans, and Chris Evans are jointly and severally liable to BOF for civil conspiracy regarding the 2008 White Oaks Loan and the 2009 White Oaks Loan.  BOF is entitled to damages in the uncontested amount of $714,661.52, representing the loan deficiencies.

4.      The bankruptcy estate of Hanover is jointly and severally liable to BOF, along with the bankruptcy estates of White Oaks, Town Park, Charles Evans, and Chris Evans, for civil conspiracy regarding the 2009 White Oaks Loan.  BOF is entitled to damages in the uncontested

faith.  (Tr. at 522-23).

Page 81 of 83

amount of $488,559.02, representing the loan deficiency.

5.      The bankruptcy estate of Chris Evans is liable to BOF under the continuing guaranties he executed on July 21, 2008, and August 27, 2009, in conjunction with the 2008 White Oaks Loan and the 2009 White Oaks Loan, in the uncontested amount of $584,600.30, representing the total unpaid loan balance.

6.      The bankruptcy estate of Charles Evans is liable to BOF for his fraudulent acts. BOF is entitled to damages in the uncontested amount of $714,661.52, representing the loan deficiencies on the 2008 White Oaks Loan and the 2009 White Oaks Loan.

7.      The bankruptcy estate of White Oaks is liable to BOF for breach of contract for its failure to pay the 2008 White Oaks Loan and the 2009 White Oaks Loan. BOF is entitled to damages in the uncontested amount of $584,600.30, representing the total unpaid loan balance.

8.      The Title Companies are not liable to BOF for direct common-law fraud, imputed common-law fraud, or negligent misrepresentation.

9.      Because the Title Companies cured the title defects, they are not liable to BOF for any additional monetary losses under the 2008 BOF Policy.

10.     The Title Companies are liable to Heritage for breach of contract.

11.     The Title Companies are not liable to Heritage for breach of the covenant of good faith and fair dealing or for bad faith.

The Court will set a status conference to schedule Phase Two of the Adversary Trial for an adjudication of contested damages, including: (1) BOF's claims of attorneys' fees against the bankruptcy estates of White Oaks, Town Park, Charles Evans, Chris Evans, and Hanover; (2) BOF's claims of attorneys' fees and expenses against the Title Companies under the 2008 BOF Policy; and

Page 82 of 83

(3) Heritage's breach of contract damages against the Title Companies.  A final judgment will not be entered until the final disposition of all matters asserted in the Adversary.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated:  October 7, 2011

**APPENDIX**

